IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 12 CR 872 |
| ) | Judge Michael J. Reagan |
| CHERRON MARIE PHILLIPS ) | |
| ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**I. Section 3553(a) Factors Support a Downward Departure**
   **A. History and Characteristics of the Defendant**

Section 3553(a) provides that the sentence imposed should be sufficient but not greater than necessary to meet the purposes of sentencing. According to the Presentence Report, the advisory guideline range in this case is 46-57 months. Such a range provides a long period of incarceration. This is particularly true for a crime for which Ms. Phillips obtained no benefits and from which no one suffered a loss of any kind. Moreover, Ms. Phillips' family circumstances, long history of employment, and general background provide mitigating factors that support a below guideline sentence.

Ms. Cherron Phillips, a single mother of two children – one a young adult in his early twenties, the other a six-year old child – awaits sentencing in this Court. Ms. Phillips is the oldest child of Wayne and Betty Phillips and the older sister to Devon, Wayne Jr., and Eva. Cherron grew up with her intact family on the South side of Chicago. The family was known in their community to be kind, generous and regularly welcomed others into their home. Wayne Sr. served as a soldier in Vietnam. Betty was a teacher and went to graduate school as an adult to get a

Master's Degree in Education. Wayne Sr. was a career long employee of AT&T where he worked as an outside lineman.

According to Ms. Phillips' Aunt, Shirley Hiner, Ms. Phillips was a "delightful child and an awesome adult." *See* Letter from Shirley Hiner, submitted to the Court under separate cover. "She was always a "respectful, well-behaved intelligent, funny, fun loving, obedient child, teenager, young adult and adult." She watched after and took care of her younger siblings when she was growing up. She was sweet, kind and nurturing.

After graduating from Lindblum High School, Cherron went to Chicago State University where she participated in the ROTC and the Army Reserves. She went on to study Statistics at DePaul University but did not finish her degree due to childrearing responsibilities. For most of her adult life, she was a single mother, raising two children born many years apart. Ms. Phillips has been an active and supportive mother to both of her sons. Her older son participated in numerous sports. She transported him to and watched him at his various sporting events, including practices and games and supported him in all of his activities. This is an exhausting process for two parents let alone for a single working mom. Yet, she was completely dedicated to her son.

Ms. Phillips' high school sweetheart, Nick Anderson, played basketball at Simeon High School in Chicago and went on to play at University of Illinois and professionally as a shooting guard for the Orlando Magic. Shortly after signing on with the Magic, Cherron gave birth to their son, Josh. Although they had not decided whether to marry, Anderson remained emotionally attached to Cherron. Cooper,

2

Barry. "Faces of Nick Anderson's Defense Is A Scowl That Now Hides A Smile." *Orlando Sentinel* 08 Apr. 1990, Sunday Special ed., viewed on 6/22/14, at http://articles-orlandosentinel.com/1990-04-08/sports/9004083669_1_anderson-scowl-young-nick Moreover, he had this to say about her when interviewed by the Orlando Sentinel after signing with the Magic:

> "My girl back home, I know why she wants me," he said. "She wants me because I am Nick Anderson, a person, not because I am a professional basketball player. I can remember when I would show up at school without any lunch money, and she would give me half of her lunch. That's what I am talking about. She was with me when I didn't have a dime."

*Id.,* at 2.

Although they never married, they stayed in touch over the years. Nick has remained involved in his son's life. Josh too is a basketball player and like his dad, he played basketball for Simeon High School on the same team as Derrick Rose. Johnson, K.C., *Fellow Simeon grad Nick Anderson thinks highly of Derrick Rose, Chicago Tribune* Nov. 4, 2008, Sports, viewed on 7/13/14 at http://articles.chicagotribune.com/keyword nick-anderson. Josh grew up to reflect the values of a good upbringing that he received mostly from his single mom, the basketball talent he received from his dad and the dedication that he learned from them both. When he went on to play basketball at University of Illinois-Chicago, after graduating from Simeon High School, the head basketball coach said: "We are extremely happy to have Josh join the program…He comes into our program with outstanding athletic and academic credentials, and will represent our university well as a student athlete." *Former Simeon star joins UIC*, Chicago Defender, August

27, 2008, viewed on 7/13/14, at http://chicagodefender.com/2008/08/27/former-simeon-star-joins-uic/ At that time, Josh "led the entire Public League in free throw percentage, hitting 98 percent from the charity stripe." *Id*. Without the caring, nurturing support of his dedicated mother and father, Josh could not have achieved the heights that he reached in high school and college.

Both Cherron and Nick have taken pride in their son's accomplishments on the basketball court as a high school star at Simeon High School and later at University of Illinois at Chicago and at Robert Morris University where he is still a student. Josh currently is a father of his own, helping to raise his own young son and, now that Ms. Phillips is in custody, his young half-brother. He works in construction and hopes to finish his college degree. He misses his mother as does his younger brother and son. While only twenty-four years old, he has the responsibility of not only bearing the responsibility for his own son but also for that of his younger half-brother.

According to Ms. Phillips' aunt, since Ms. Phillips' younger boy was born, mother and son have been almost inseparable. Ms. Phillips would take him to day care in the morning and pick him up after work. When not at day care, the two were almost inseparable. (Photos of their home shows toys next to a desk.) The young boy evidently played at his mother's feet when she worked at home. He misses his mom and does not understand why she is away from him. He is a sweet, quiet boy, who looks up to his older brother and uncle.

Although she had sole responsibility for her children, she nonetheless obtained her real estate license and insurance license. She was highly regarded and

respected by those with whom she worked. Her extended family members obtained their insurance through her. Ms. Phillips was successful in her career, bought a home, which she had remodeled, drove a nice car, wore nice clothes and took good care of herself and her family. She is a vegetarian and raised her young son as one too. When taken into custody, following her conviction in the instant case, she voiced her concern that her young son and grandson would not eat properly if she was not there to prepare their meals. "Would they eat enough vegetables?" she wondered.

Earlier in her work life, Ms. Phillips taught math in the school that her mother opened on the Southwest side of Chicago. It was a private school whose goals were to provide an affordable quality education to young African American children so as to empower them to succeed in college and beyond. Ms. Phillips' older son attended his grandmother's school and had his mother for a teacher. Ms. Phillips comes from a close-knit extended family of successful, hardworking individuals. Like Wayne, Sr., Wayne, Jr. also worked at AT & T until his untimely death in his thirties. Her extended family members include a member of the Illinois state legislator, a retired investigator for AT&T, and a member of law enforcement. Those who have been contacted have warm and wonderful things to say about Ms. Phillips – they highlight her generosity and kindness, her closeness to them growing up, her ambition, her intelligence, her successes as a family member and in the business world. They, like her Aunt Shirley, are dumbfounded at the strange course of events that have led her to federal custody, facing a long prison term.

5

While the extended family is close-knit and successful, the nuclear family consisting of Wayne and Betty, Cherron, and Eva, has shattered into pieces. Most of the collapse has occurred in recent years but its roots reach back into family history. Wayne, Sr. served his country in Vietnam but came back home a changed man. Moreover, the Phillips' family was always a little removed from the others and very private about their affairs. They also seemed to be looking for something – what, is hard to say – but searching nonetheless.

At one point, according to Ms. Phillips' Aunt, Wayne and Betty joined the Church of Judah that was led by a charismatic leader – a cult of sort. They remained in the church for about a year, even after others recognized that the leader was a charlatan. While they were successful in the eyes of the community, they lost their oldest son at a young age. Cherron was close to her older brother as was her mother and father.

Perhaps the arrest of the remaining brother, Devon, and the prospect of losing him as well was too much for the family to accept. He faced a lengthy period of federal incarceration – another devastating loss for a family that, until then, had not had any negative contact with the law. While most families cope with the prospect of conviction and incarceration of a loved one with the hiring of a lawyer and participation in a system that can seem unfair and heavily stacked against them. Nonetheless, they learn to resign themselves to the anger, frustration and helplessness that accompanied an indictment on federal criminal charges. This was not the path chosen by the Phillips. Perhaps, their need to be attached to a black power based community drew them to the Moorish Science Temple as earlier they

had been attracted to the Church of Judah, and to the opening of the private school for young African American children.

Wayne Phillips, Cherron Phillips' father, revealed that he saw the Moorish Science Temple as a religion, much like Christianity, Judaism and Islam. As with all religions, belief for him was based on faith in its tenets. Like a true follower of religion, even in the face of its implausibility, he remained a believer. Like Cherron, he and his wife Betty turned to the Moorish Science Temple as a way to deal with the helplessness that he felt in the face of the federal prosecution. Perhaps, their desperate need to help and to change the course of events was so great that it drove them to blindly follow the Moorish Science even when it led to their own self-destruction.

What other explanation for the self-destruction of an otherwise successful, hardworking, law-abiding family? Certainly, the extended family members have no answers. Nor does Ms. Phillips' older son, who was away at University during the events that underlay this indictment. All he knows is that he came home during the pendency of his uncle's case and his mother was a changed person. She was distracted and obsessed –in a way that he had never seen before and it stemmed from his uncle's case. Another possibility for the unraveling of Ms. Phillips' life is mental illness. Ms. Hiner saw Ms. Phillips become "out of touch with reality" and as if she and her family were "brainwashed." It is hard to reconcile the woman who "loves her children and everything she did up to her mental break reflected her desire to love, protect, support and raise her children," with the image held in the

7

court's mind's eye of the federal defendant – "paper terrorist" who deserves a lengthy term of punishment.

Ms. Phillips was examined pursuant to a court-ordered psychological evaluation. While she was found to be competent to stand trial and sane, she was not free of psychological impairments. The psychological evaluation in this case revealed that Ms. Phillips has many traits associated with schizotypal personality disorder. Competency Evaluation, at 25. According to the DSM-V, the essential feature of such a personality disorder is a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior." *Id.* The diagnosis is made when five or more of the following criteria are present:

1) Ideas of reference (excluding delusions of reference)
2) Odd beliefs or magical thinking that influences behavior and inconsistent with subcultural norms (e.g., superstitiousness, belief in clairvoyance, telepathy, or "sixth sense");
3) Unusual perceptual experiences, including bodily illusions
4) Odd thinking and speech (e.g., vague, circumstantial, metaphorical, overelaborate, or stereotyped)
5) Suspiciousness or paranoid ideation
6) Inappropriate or constricted affect
7) Behavior or appearance that is odd, eccentric, or peculiar
8) Lack of close friends or confidants other than first-degree relatives
9) Excessive social anxiety that does not diminish with familiarity and tends to be associated with paranoid fears rather than negative judgments about self.

Individuals who suffer from this disorder experience "ideas of reference" which are "incorrect interpretations of casual incidents and external events as having a particular and unusual meaning for the person." *Id.* Ms. Phillips clearly suffers from odd thinking, suspiciousness or paranoid ideation, constricted affect, odd, eccentric

8

behavior and appears to lack close confidants other than first-degree relatives. The diagnosis was provisional as Dr. Goldstein did not have the opportunity to speak with any relatives during the evaluation process. Ms. Phillips Aunt, through her letter to this Court, confirms the existence of some of these criteria and Ms. Phillips' need for therapy. Her rigid thinking and tunnel vision make her particularly vulnerable to the ideology of the Moors and particularly unresponsive to the calls of her extended family to turn away from the faulty ideology, stop her participation in self-destructive behavior and to participate in the process. Her suspiciousness and paranoia has made her distrust the judicial process, her attorney, the probation officer and the court system.

      Now frustration, helplessness, feelings of unfairness and distrust in the criminal justice system are not unusual. Nor are these feelings arising whole cloth without relationship to reality. Such feelings clearly have come to the fore in the wake of the recent shooting death of an unarmed young African American man in Ferguson, Missouri. Nor are the devastating effects of incarceration on love ones something new. Endless statistics and studies chronicle the heavy toll that incarceration takes on the relatives of the one imprisoned. However, it is rare, in the absence of economic necessity that arises out of the loss of income from a loved one's incarceration (and rare even then in the federal system) that other family members face federal charges arising from the initial offense. It is rarer still that the impetus for the new federal charges arise from a failed ideology that has never succeeded at any time in any court for any defendant. As one of Ms. Phillips' relatives noted after attending a meeting of the Moors, why would he want to join a

9

movement where everyone in it was penniless and had lost everything that they owned?

Ms. Phillips, her brother Devon and her parents did not ask that question. Yet, when they return to the community (Devon already has done so and is doing well, receiving job training and living with relatives), Wayne and Betty and then Ms. Phillips will find themselves penniless and homeless – and to what gain?  For Wayne and Betty, perhaps it was a fraudulent attempt to receive tax benefits to make up for the money that they spent on attorney's fees for their son Devon.  For Ms. Phillips, however, there was no gain whatsoever and only significant and painful loss for her, her two sons, her grandson, her sister and her children and for her extended family. Moreover, while there is significant loss to Ms. Phillips and her family, there was no actual harm to any of the victims.

Accordingly, while Ms. Phillips made a nuisance of herself during the course of her brother's proceedings, she caused no harm other than slowing down the process.  Following, her brother's trial, she filed false liens that caused no monetary damage nor harm to any of the named victims. Perhaps, the most alarming aspect of this case is that the Cook County Recorders Office allows billion dollar "maritime liens" to slip so easily into its official records without so much as an upturned eyebrow.

The advisory sentencing guidelines in this case is 48 to 57 months in prison. This is only slightly less than a sentence imposed for a young suburban woman who ran over and killed a five year old girl after huffing compressed dusting spray containing difluoroethane, while driving.  It also is only slightly less than the

mandatory five year sentence that many individuals receive in federal court for dealing drugs and far more than the probationary sentence that the billionaire owner of Beanie Babies received for hiding millions of dollars in offshore tax shelters in the Caribbean or for those on Wall Street who remain unpunished for the economic meltdown of 2008. This advisory guideline simply is too much for the filing of false liens in this case. In light of these kind of disparities, it is not surprising that people grab onto a failed ideology when interacting with the American judicial system.

While Ms. Phillips' actions are puzzling, and why this failed ideology from which she gained nothing is puzzling, it is her dogged, self-destructive adherence to it that is most puzzling of all. Her willingness to follow this ideology on a path that takes her away from her children and grandchild is the aspect of this case that is the most incomprehensible. This is particularly true, where as here, she previously was a good and attentive mother. Her young child is sad and misses his mother, yet she continues in her adherence to the Moors ideology.

Prior to Ms. Phillips' actions related to her younger brother, Devon's criminal case, she was a law-abiding productive member of society without any encounters with the criminal justice system.[1] Her conviction for a FOID card violation stemmed from the search in this case. Other arrests occurred in 2012.

---

[1] The probation office includes an arrest for criminal damage to vehicle and harassment in January 2004. PSR at 15. Ms. Phillips was released without being charged in that case. Further, it is counsel's understanding that the arrest stemmed from a dispute with a contractor who had done unsatisfactory work on Ms. Philips' home. When he was fired and not paid for his shoddy workmanship, he broke windows in Ms. Phillips' house and slashed her tires. Ms. Phillips was frightened that of the contractor and did what she could to protect herself and her home.

11

Prior to this time, Ms. Phillips was a successful licensed real estate and insurance broker. She is the loving mother of two sons, the doting grandmother of a grandson, and the caretaker for a disabled sister and her sister's young child. She grew up as the oldest of four children in an intact nuclear family that was highly respected in the community. Her mother has a Master's Degree in Education and opened a private school where Ms. Phillips taught mathematics and where Ms. Phillips older son attended school. Her father was a long time employee of AT&T, where her brother, Wayne, Jr., also worked before he died when he was in his thirties. She was convicted by a jury of ten counts of filing false claims against federal officials in retaliation for their official actions in relation to the prosecution of her younger brother, Devon Phillips' criminal case.

 Ms. Phillips has been particularly vulnerable to the influence of those people in the community who espouse the ideology of the Moorish Science Temple. The question, therefore, is what is the best method for breaking that influence and that tie? Will a lengthy prison term isolate her from that ideology and loosen its hold on her or will it make her more entrenched in its ideology? Believing in its ideology is not illegal. Filing documents espousing its beliefs is also legal. It is only where, as here, Ms. Phillips used her beliefs to file false liens that the confluence of belief and action became illegal. It is possible for the Court to fashion strict conditions of probation that will restrict Ms. Phillips to again stray into breaking the law. Clearly, when on probation, any violation of law can serve as the basis for a violation report and potential revocation and prison term. These restrictions should be sufficient for deterrence.

### B. The Nature of the Offense

As discussed above, Ms. Phillips was convicted of ten counts of filing false liens against various federal officials and local law enforcement officers acting in conjunction with federal law enforcement officers. These officials were named in liens that with one exception were filed against property unrelated to them. No monetary harm was caused. Indeed, prior to the sale of a parking space, none of the named victims were even aware of the liens' existence. The liens on their face were ludicrous as they gave notice of maritime liens in the amount of $1 billion. More importantly, Ms. Phillips obtained no gain from the criminal conduct.

### C. The Need for Punishment

In imposing sentence, the court must consider the need for punishment. In involving herself in her brother's case, Ms. Phillips has lost everything that she has built over the years – her business, her professional licenses, and her reputation in the community. As a convicted felon, she will never again be able to work in the fields of insurance or real estate. She has tax liens against her house and will undoubtedly lose it and will be homeless when she is released. She has been removed from her child and her family responsibilities. Additional incarceration will only serve to punish her family and her young son. As evidenced by her apology letters to the judges, she was influenced by outsiders who follow the Moorish Science ideology. She has been severely punished for her adherence to it. As her Aunt states in her letter to the court, she needs therapy more than she needs excessive time in a prison cell.

13

**D. The Need for Deterrence**

Both specific and general deterrence is raised when an individual faces incarceration. Obviously, if Ms. Phillips is incarcerated she will be unable to file additional liens against government officials. However, except for the liens involved in this case, Ms. Phillips had never prior nor since filed additional liens. In addition, a judge considers the need for general deterrence when imposing sentence. In this case, Ms. Phillips saw her brother, her mother and father, her friend from whom she found out about the liens and his wife all go to prison and yet, she nonetheless, filed the liens. It does not appear that any amount of prison will deter other likeminded individuals from pursuing this ideology. Indeed, it may have the opposite affect. The ideology of the Moors and Sovereign Citizens spreads primarily through the prison system. Incarcerating individuals helps to keep the ideology alive.

**E. The Kinds of Sentences Available**

According to the Presentence Report, under the advisory sentencing guidelines, Ms. Phillips is facing a sentence of 46-57 months in prison. Under the government's view, she is facing an advisory guideline range of 57-71 months in prison. In either case, the period of incarceration is excessive. It is noteworthy that Devon Phillips received 78 months in prison for three kilos of cocaine. The government's guideline calculations are near that same sentence. The Court's calculations could exceed that sentence. Under the statute of conviction, Ms. Phillips is eligible for probation, with imposition of a fine, restitution or community service. While restitution is not at issue here, nor is she able to pay a fine, she can do community service as a condition of probation. Moreover, a halfway house or home

confinement with strict requirements and mental health counseling could also be imposed as a condition of probation.

### IV. Defendant Seeks Waiver of A Fine Due to Inability to Pay

Ms. Phillips currently is in custody. She has lost her business and is unemployed. She has liens against her house for unpaid taxes and civil judgments for additional debts for a total of about $350, 000 in debt. In light of her diminished earning potential when she is released and her current debts, she currently has no ability to pay a fine and is not likely to have the ability to do so when released from custody.

### CONCLUSION

Ms. Phillips respectfully requests that this Court exercise its discretion and sentence her below the advisory guideline range of 46-57 months set forth in the Presentence Report. Specifically, this Court should sentence her to Probation with the condition that she spend a period of time in a halfway house, under house arrest or home confinement, participate in community service and receive mental health treatment. In the alternative, she requests that this Court impose a sentence at the low end or within the advisory guideline range of 46-57 months. Finally, Ms. Phillips requests that this Court waive the imposition of fine and costs of incarceration.

    Respectfully submitted,

    /s/Lauren Weil Solomon
    Attorney for Cherron Phillips

Lauren Weil Solomon
P.O. Box. 2013
Highland Park, IL 60035
847-756-0489