```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,  )  No. 12 CR 872
 4                             )
              vs.              )  Chicago, Illinois
 5                             )
    CHERRON MARIE PHILLIPS,    )
 6                             )  June 16, 2014
                    Defendant. )  9:00 a.m.
 7

 8                          VOLUME 1A
                     TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE MICHAEL J. REAGAN AND A JURY

10
    APPEARANCES:
11
    For the Government:     MR. NATHAN D. STUMP
12                          (United States Attorney's Office,
                             9 Executive Drive,
13                           Fairview Heights, Illinois  62208)

14
    For the Defendant:     MS. LAUREN WEIL SOLOMON
15                          (Lauren Weil Solomon,
                             P.O. Box 2013,
16                           Highland Park, Illinois  60035)

17

18

19

20

21

22

23                          PATRICK J. MULLEN
                          Official Court Reporter
24              219 South Dearborn Street, Room 1412,
                       Chicago, Illinois  60604
25                          (312) 435-5565
```

1    (Proceedings in open court.  Venire out.)

2          THE CLERK:  12 CR 872, U.S.A. versus Phillips.

3          THE COURT:  This case is set for trial this morning.

4  The United States is represented by Mr. Stump.  Good morning.

5          MR. STUMP:  Good morning, Your Honor.

6          THE COURT:  Ms. Solomon is here for the defendant.

7  Good morning.

8          MS. SOLOMON:  Good morning, Judge.

9          THE COURT:  And Ms. Phillips is here.  The first

10  order of business is something that was just handed to me by

11  Ms. Phillips, not through counsel.

12          Have you had a chance to look at it, Mr. Stump?  I

13  believe it could be characterized as a notice of appeal, but

14  I'm not certain.

15          MR. STUMP:  Your Honor, I did flip through it.

16          THE COURT:  Your position?

17          MR. STUMP:  Your Honor, I believe this has already

18  been addressed by the Court.  This is merely repetitive of what

19  was previously filed.  I'd reference my own motion to deny her

20  request for a stay pending appeal as well as the order that was

21  docketed by the Court coming to the same conclusion, which is

22  that the issue is frivolous.  The issue of jurisdiction is

23  preserved for appeal, but it's not a proper subject of an

24  interlocutory appeal at this time.

25          THE COURT:  Ms. Solomon?

1          MS. SOLOMON:  Your Honor, I have not been given a

2     copy of it.  I have not reviewed it.

3          THE DEFENDANT:  Judge, may I?

4          THE COURT:  No, you may not.  You're represented by

5     counsel.

6          Apparently the defendant has requested a writ of

7     mandamus, appealing the Court's decision that it enjoys subject

8     matter jurisdiction and personal jurisdiction over the

9     defendant.  There was a previous notice of appeal filed.  I

10    entered a memorandum order regarding that, docket 139, I

11    believe.  Subsequent to that, the Seventh Circuit Court of

12    Appeals denied a stay in this case, allowing the case to

13    proceed to trial.

14         I reiterate my analysis from that order.  It is my

15    conclusion that this case should proceed forward and that the

16    defendant's interlocutory appeal or the attempt to appeal is

17    frivolous in nature, an attempt to continue this case or to

18    judge-shop.  As a result, I'm going to proceed forward with the

19    trial unless and until the Court of Appeals concludes that

20    there ought to be a stay granted.

21         So having said that, I think the next order of

22    business before I bring the jury up here is the defendant's

23    motion in limine.  Rather than discuss this --

24         THE DEFENDANT:  Your Honor, may I just --

25         THE COURT:  Ma'am, you may not speak.  I don't want

1  to have to tell you again that you may not speak.  This is not

2  your turn.  I'm talking now.  There will be an opportunity for

3  you to speak through counsel.

4          With respect to the defense motion in limine, what I

5  suggest is that unless you intend to get into this during voir

6  dire that we take it up in the future.

7          MR. STUMP:  That's fine, Your Honor.

8          THE COURT:  Is there anything else we need to take up

9  before I bring the jury up?

10          MS. SOLOMON:  Just for the record, Your Honor, I

11  would like it to be known that I have not had any contact with

12  Ms. Phillips since the pretrial conference and that she has not

13  assisted in the defense.

14          THE COURT:  Okay.  Have you attempted to talk to her

15  and discuss the matter with her?

16          MS. SOLOMON:  On many occasions.

17          THE COURT:  All right.  Please be seated.

18          THE DEFENDANT:  Just for the record, I do not consent

19  to these proceedings.

20      (Discussion off the record.)

21          THE COURT:  All right.  We'll bring the jury up.  As

22  I have indicated in further orders, Ms. Phillips, you have an

23  absolute right to be present for these proceedings.  You are

24  speaking through counsel, and I understand that's over your

25  objection.

1          If, however, you act out and are disruptive in this

2   case, your right to be present could be revoked.  So you should

3   consider this a warning.  Any acting out on your part and

4   speaking at any time inappropriately will be a consideration by

5   me of your indication that you agree that you can removed from

6   the proceedings.

7          THE DEFENDANT:  Judge, can I ask, would that mean you

8   will be accepting liability for this matter if I take issue

9   with this case?

10          THE COURT:  Ma'am, I don't answer questions by pro se

11   defendants.  You must speak through counsel.  So please be

12   seated, and we'll get the jury up here.

13      (Discussion off the record.)

14          THE COURT:  Counsel, when we present the chart to

15   you, the numbers are a little different than I had told you.

16   Juror number 1 is going to be in the bottom left, and then it

17   goes to the right.

18          MR. STUMP:  Yes, sir.

19          THE COURT:  Then we're going to put the balance of

20   the jurors back on the right-hand side.

21          Sir, in the back, would you mind moving over to where

22   you were originally?  We're going to put all the jurors on that

23   side.

24      (Brief pause.  Venire in.)

25          THE COURT:  Good morning.  We'll be with you in just

1  a moment.

2      (Discussion off the record.)

3          THE COURT:  Good morning, folks.  I'm Judge Michael

4  Reagan.  As we get started with our proceedings today, we've

5  got a seating chart.  So if you would come forward in the order

6  I address you, we've got a specific seat here for everybody so

7  that we know who you are.  Okay?  So looking at the numbers on

8  your badge, could I have juror number 7, then 6 and 5 -- oh, we

9  have two 6s?  Oh, could you be 9?

10         PROSPECTIVE JUROR 9:  Yes.

11         THE COURT:  Okay.  Stay here.  We're getting off to a

12 good start.  So 5, 4, 3, 2, 1, and then 14, 13, 12, 11.  14 is

13 in the back right.  Then 10, 9, and 8.  Actually, I'm sorry.  9

14 is there, and 10 is there (indicating).  Okay.  Folks, if

15 you'll all just stand up and move over a little bit, thank you.

16         Then in the front row over in the right-hand corner,

17 20, 19, 18, 17, 16, 15.  So you're over on the far right, and

18 then 16, 15.  Okay?

19         Back in this next row then, it's 26, 25, 24, 23, 22,

20 21.  This is all going to make sense eventually.

21         The next row is 32, 31, 30, 29, 28, 27, and then the

22 very last row is 36, 35, 34, 33.

23     (Discussion off the record.)

24         THE COURT:  Welcome, folks.  I'm Judge Michael

25 Reagan.  I'm a United States District Judge on assignment here

1  from the Southern District of Illinois.  I actually sit in East

2  St. Louis, Illinois.  It's not uncommon for the Chief Justice

3  of the Seventh Circuit Court of Appeals to assign me to

4  different courts.  Those of us in the federal system under

5  Article III have jurisdiction all over the country, so I've

6  been called to assist with this particular case.

7         Although you're in Judge Feinerman's courtroom, I'm

8  not Judge Feinerman.  But you might remember this name so that

9  when you have to come back, if you have to come back, this is

10  his courtroom.  It's 2125.  You've been summoned for jury duty

11  in this case which should conclude this week.

12         First of all, let me set your mind at ease a little

13  bit.  It's not a death penalty case, so you don't worry about

14  that.  We don't sequester people, so you're not going to have

15  to spend the night.  In fact, in about 40 years in the law

16  business, I've never seen a jury sequestered.

17         So one thing we're going to do this morning is engage

18  in a procedure called a voir dire.  This is a criminal case,

19  and I'll be telling you a lot more about it as we go through

20  the proceedings.  There are basically eight parts to a trial.

21  The first is this section.  It's called voir dire.  That's

22  French for to speak the truth.

23         I'm going to be asking you some questions that touch

24  on your qualifications to sit as a juror in this case.  Then

25  the Government will be permitted to ask questions, and defense

Jury Selection

 1  counsel will be able to ask questions, also.  It's not our

 2  intention to pry into your personal lives, but the parties have

 3  a right to know a little bit about you to see if you can be

 4  fair and impartial jurors in this particular case.

 5          If at any time I or any of the attorneys touch on

 6  anything that you just think is too personal to discuss in

 7  front of the other jurors, that's fine.  Just don't answer.  At

 8  the conclusion of the proceedings this morning, I'll ask you to

 9  stay behind.  Then we'll bring you out, and we'll discuss that

10  issue confidentially.  It will be here in open court and on the

11  record, but the other jurors will not be present.

12          At this time, I'll ask if you'll please stand and

13  take an oath to either swear or affirm that you'll answer our

14  questions truthfully.

15          THE CLERK:  Please raise your right hand.

16      (Venire duly sworn.)

17          THE COURT:  Okay.  Please be seated.

18          So this "voir dire" comes from a French word and,

19  interestingly enough, the English system actually was held in

20  French for many hundreds of years before we took it over.  So

21  that's why we have this French proceeding called the voir dire

22  in our court here today.

23          People serve their country in many ways, in the

24  military, public service, civil service, and volunteerism.

25  Jury selection and service is one way you serve your country.

1   I recognize it's involuntary.  We're going to pay you 40 bucks

2   a day and mileage.  I recognize that's certainly not enough for

3   the important function you're going to serve.

4           The jury system in criminal cases goes back to the

5   original Constitution.  Defendants in criminal cases have a

6   right to a trial by jury.  In fact, when the original

7   Constitution was proposed, it didn't have enough detail about

8   jury service.  So the Sixth Amendment was added to include such

9   things as speedy trial and the right to counsel.

10          You might wonder why you're here and why I'm here.

11  Well, I was appointed by President Clinton under Article III of

12  the Constitution.  As you know, the first three articles of the

13  Constitution include Article I, which set up Congress, Article

14  II set up the Executive Branch, and Article III set up the

15  judiciary.

16          There is a statute that the Congress passed called

17  the Jury Act.  In it, I'm not permitted to excuse any of you

18  from jury service unless it amounts to undue hardship or

19  extreme inconvenience.  I've interpreted that to mean that if

20  you're a sole caregiver for a person who can't be left alone,

21  if you have prepaid non-refundable travel plans or medical

22  procedures that can't be rescheduled, that in my view would be

23  undue hardship and extreme inconvenience.  Otherwise, we're

24  going to have to keep you here if you are chosen as a juror.

25          My goal is to obtain fair and impartial jurors so

1  that both sides in this case have a level playing field.  The

2  jury will decide whether or not the defendant is guilty or

3  innocent.  I'll decide all of the issues of law.

4          In terms of your service, I have to tell you that I

5  sat on a jury myself back when I was a lawyer.  I was called

6  into the federal court.  In fact, it's the courtroom that I now

7  sit in, which is kind of interesting.  I remember the judge at

8  that time was Judge Riley, who I ultimately succeeded.  As I

9  came into the courtroom, he said:  I'm sure he'd be a great

10  juror.

11          I didn't think either side would take me in that

12  criminal case because I was a former police officer, so I

13  didn't think the defendants would want me, and I've done

14  prosecution work, so I didn't think that the Government would

15  want me.  Well, lo and behold, I sat on the jury.  We got to

16  the fourth day of deliberations, it was late in the day, and we

17  decided the particular case.

18          Then one of my co-jurors said:  Can we wait and

19  announce our verdict tomorrow rather than today?

20          Then I said:  Well, why?

21          He said:  I'm a truck driver, and I make more money

22  at 40 bucks a day -- and at that time 35 cents a mile -- than I

23  do driving my truck.  So if we come back tomorrow, I'll make

24  more money by sitting here.

25          So I said:  Well, I'm a lawyer.  I make more money by

1  working.  So how about if I give you 40 bucks a day and we go

2  home?

3              Of course, I was just kidding.

4              Then as recently as last year, I was summoned to

5  state court for jury duty.  Frankly, I could have gotten out by

6  making a phone call to the chief judge and saying:  Look, I've

7  got my own docket here.

8              I didn't do that because I wanted to be able to look

9  at all of you and say that I did my part.  So for three days I

10  went to court and never got called.  They sent me home the

11  fourth day.  When I got back to the courthouse, they called me

12  back and said:  We need you.

13              So I came back.  It turned out it was a criminal

14  case, and both the prosecutor and the defense lawyer had been

15  former law clerks of mine.  Neither of them wanted me as a

16  juror, and so I was sent home.  So the bottom line is it's a

17  duty.  I understand it's a hardship, but we certainly can't do

18  our work without you.

19              So let me tell you a little bit about this case.

20  First of all, everything I tell you is not evidence.  It's just

21  to give you some general background information.  The evidence

22  you'll hear will come from the witness stand in the form of

23  under-oath testimony, direct examination, cross-examination,

24  any exhibits I admit, and any agreements that the parties make

25  that I tell you that you can consider as evidence.

Jury Selection

1          This is a criminal case brought by the United States
2   against the defendant, Cherron Marie Phillips, also known as
3   Cherron Phillips El, River Tali El Bey, River Tali Bey, River
4   Tali, and River.
5          The United States alleges on specific dates in March
6   and April of 2011 Ms. Phillips, with some assistance from other
7   people, knowingly filed or attempted to file false liens
8   against the property of 12 people, all of whom are alleged to
9   have been officers and employees of the United States.
10         The liens were allegedly filed with the Cook County
11  Recorder of Deeds in retaliation for the federal investigation
12  and prosecution of the defendant's brother, Devon Phillips,
13  here in Chicago.  Each lien claimed that the named official
14  owed the defendant's brother $100 billion.
15         The United States alleges that the defendant targeted
16  the named officials because of their association with her
17  brother's criminal case and that the filing of the liens
18  violated federal criminal law.  The defendant denies these
19  charges against her.
20         So that's just a little bit of information about the
21  case.  In this case, the United States is represented by
22  Assistant United States Attorney Nathan Stump.  The case agent
23  in this case, that is, the individual in charge of marshalling
24  the evidence in the case, is FBI Agent Josh Rongitsch.
25         I'm going to refer to the jury box and the gallery.

Jury Selection

1  Okay?  In the jury box, do any of you know either Mr. Stump or

2  Mr. Rongitsch?

3       (No response.)

4            THE COURT:  How about anybody back in the gallery?

5       (No response.)

6            THE COURT:  The defendant in this case is, as I

7  indicated, Ms. Phillips, and she's represented in this case by

8  attorney Lauren Solomon.  Do any of you know either Ms. Solomon

9  or Ms. Phillips in the jury box?

10      (No response.)

11           THE COURT:  How about back in the gallery?

12      (No response.)

13           THE COURT:  We've asked you to fill out

14 questionnaires, and you've been assigned numbers.  All of these

15 proceedings in federal are open to the public and are actually

16 eventually uploaded for the world to see.  Because of that, in

17 order to protect your identities, I've assigned you these

18 numbers.

19           Nobody is going to refer to your name here in open

20 court.  We have a cross-reference so that we know who you are,

21 but that will be sealed so that only court personnel can get

22 it.  The forms that you filled out are the property of the

23 court.  No one is allowed to take any notes from them, put down

24 any personal information about you in their private notes.

25           Once we've completed the jury selection process

Jury Selection

1  today, I will collect those documents, and they will be

2  destroyed.  So all of that information is confidential.  We

3  have you fill that out, though, because it does tend to speed

4  up the procedure.  So that's the information, and that's why we

5  have the numbers that have been assigned to you.

6          So let me start out by asking those of you in the

7  gallery, do any of you have any close friends or relatives who

8  work for any federal law enforcement agency?  There I'm talking

9  about the FBI, the Drug Enforcement Administration, the Postal

10 Inspection Service, the Internal Revenue Service Criminal

11 Division, anyone like that.  Anybody in the jury box?

12         PROSPECTIVE JUROR 11:  Yes.

13         THE COURT:  Okay, Juror 11.  Could you tell us who

14 that is, please?  Now, you're our first juror, so you have to

15 be the role model.  You have to speak loud because everything

16 is being taken by the court reporter.  If he can't hear you,

17 he's going to give me a nasty look, and then I'm going to have

18 to ask you to speak up.  Then if you don't speak up loud

19 enough, I'll ask you to stand up.  If that doesn't work, I'll

20 get a microphone.  So the pressure is on.

21         PROSPECTIVE JUROR 11:  My brother-in-law works, and

22 he's associated with Homeland Security.

23         THE COURT:  Okay.  Is there anything about that

24 relationship or anything about his job that you think would

25 affect your ability to be fair and impartial in this case?

Jury Selection

```
 1           PROSPECTIVE JUROR 11:  No.

 2           THE COURT:  Okay.  Anybody else in the juror box?

 3           PROSPECTIVE JUROR 6:  Yes.

 4           THE COURT:  Okay, Juror 2 -- I'm sorry -- 6.

 5           By the way, in my courtroom, the numbers are

 6   backwards, so I can tell you right now I'm going to call you by

 7   the wrong numbers.  Juror 1 is actually 7 where I come from.

 8   So Juror 6?

 9           PROSPECTIVE JUROR 6:  My brother-in-law is assistant

10   police chief in Rockford, and he'S on the SWAT team out there.

11           THE COURT:  Okay.  Is there anything about that

12   relationship or his job or any discussions with him that you

13   think would affect your ability to be fair and impartial here?

14           PROSPECTIVE JUROR 6:  No.

15           THE COURT:  Anybody else in the jury box?

16      (No response.)

17           THE COURT:  How about back there in the gallery?

18           PROSPECTIVE JUROR 16:  Yes.

19           THE COURT:  All right, Juror 16.  Tell us about it.

20           PROSPECTIVE JUROR 16:  I work for --

21           THE REPORTER:  I'm sorry.

22           THE COURT:  Okay.  You'll have to speak louder.

23           PROSPECTIVE JUROR 16:  I'm with the Department of

24   Homeland Security.  I work for them.

25           THE COURT:  Okay.  What do you do for Homeland
```

Jury Selection

 1  Security?

 2          PROSPECTIVE JUROR 16:  I work for TSA.

 3          THE COURT:  Okay.

 4          PROSPECTIVE JUROR 16:  I'm at the airport, but not in

 5  the public.  I'm underneath.  You don't see me.

 6          THE COURT:  Oh, okay.  So you're behind the scenes.

 7          PROSPECTIVE JUROR 16:  Correct.

 8          THE COURT:  Got you.  Okay.  Is there anything about

 9  your work or the --

10          PROSPECTIVE JUROR 16:  Depends on the situation.

11          THE COURT:  Okay.  How about this particular case?

12  The allegation is the defendant filed a false lien.

13          PROSPECTIVE JUROR 16:  Oh, it's making me a little

14  bitter if she is a --

15          THE REPORTER:  I'm sorry.  I can't hear you.

16          PROSPECTIVE JUROR 16:  It's making me a little bitter

17  on that, to accuse somebody, to place liens on them for no

18  reason, because she's jealous or whatever it is, something with

19  her family.

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR 16:  It pisses me off, actually.

22          THE COURT:  Okay.  Well, that's just an allegation.

23          PROSPECTIVE JUROR 16:  Well, it's the allegation, but

24  it's kind of, you know, like pointing fingers at somebody.

25          THE COURT:  Okay.  You're Juror 16?

Jury Selection

```
 1              PROSPECTIVE JUROR 16:  Yeah.
 2              THE COURT:  Okay.  How about anybody else in the
 3  back?
 4              PROSPECTIVE JUROR 15:  Yes.
 5              THE COURT:  Okay.  Juror 15?
 6              PROSPECTIVE JUROR 15:  My first cousin is a federal
 7  prosecutor.
 8              THE COURT:  I can't hear you.
 9              PROSPECTIVE JUROR 15:  My first cousin is a federal
10  prosecutor.
11              THE COURT:  Okay.  Where at?
12              PROSPECTIVE JUROR 15:  In D.C., outside of D.C.  He's
13  in anti-terrorism.
14              THE COURT:  I didn't get the city.
15              PROSPECTIVE JUROR 15:  Outside of D.C.
16              THE COURT:  Oh, D.C., all right.  Anything about that
17  relationship that would affect your ability to be fair and
18  impartial here?
19              PROSPECTIVE JUROR 15:  No.
20              THE COURT:  Do you ever discuss your cousin's work
21  with him?
22              PROSPECTIVE JUROR 15:  Not really, no.
23              THE COURT:  Interesting cases, anything like that?
24              PROSPECTIVE JUROR 15:  Not really, no.
25              THE COURT:  Okay.  Anybody else in the gallery?
```

Jury Selection

```
 1              PROSPECTIVE JUROR 21:  Yes.

 2              THE COURT:  Okay.  Are you Juror 21?

 3              PROSPECTIVE JUROR 21:  Yes.

 4              THE COURT:  Okay.  Could you tell us about it?

 5              PROSPECTIVE JUROR 21:  My sister is a prosecutor for

 6   Department of Homeland Security in Washington, D.C.

 7              THE COURT:  Okay.

 8              PROSPECTIVE JUROR 21:  I don't know if counsel is

 9   part of that branch as well.

10              THE COURT:  Okay.  Do you ever discuss the cases with

11   her?

12              PROSPECTIVE JUROR 21:  No.

13              THE COURT:  Okay.  Can you be fair and impartial in

14   this case?

15              PROSPECTIVE JUROR 21:  Yes.

16              THE COURT:  Okay.  Anybody else back in the gallery?

17        (No response.)

18              THE COURT:  Okay.  You might wonder why you got

19   called.  I'm often asked that.  At the conclusion, sometimes

20   the jurors -- at least in my courthouse, I give them a tour of

21   the chambers and that, and they want to know why they were

22   chosen.  The fact is that we use a very complicated algorithm

23   out of Washington, D.C., and it's a combination of the driving

24   license records of the Secretary of State and the voting

25   record.
```

1    So to get here you either voted, registered to vote,

2  and you drive or have a driver's license.  You're over 18.  You

3  have United States citizenship.  You've resided in this

4  district for at least a year.  You're proficient enough in

5  English to fill out our forms.  You have no disqualifying

6  mental or physical condition.  You are not currently subject to

7  any felony charges, and you don't have a felony on your record,

8  unless it's been legally restored.  So that's how you got here.

9  It's completely random.  Then once you got to this courthouse,

10  again, there was a random draw that sent you to this courtroom

11  as opposed to any others.

12    There are three groups exempt, members of the armed

13  forces on active duty, members of professional fire and police

14  departments if they request to get off, and public officials of

15  federal, state, or local governments.  So, for example, I

16  cannot be a juror in a federal court.

17    So some questions now about this, related kind of to

18  this case.  Do any of you in the jury box have any specialized

19  knowledge regarding commitments for title insurance, title

20  insurance policies, liens, encumbrances, or mortgages on real

21  estate?  I know that's pretty broad.

22    PROSPECTIVE JUROR 12:  Yes.

23    THE COURT:  Okay.  Are you Juror 12?

24    PROSPECTIVE JUROR 12:  Yes.

25    THE COURT:  Tell us what your background is.

Jury Selection

1          PROSPECTIVE JUROR 12:  I spent 15 years as the

2    funding director for Universal Mortgage Corporation.

3          THE COURT:  So you know a lot about mortgages.

4          PROSPECTIVE JUROR 12:  They closed down a couple

5    years ago.

6          THE COURT:  Okay.  So did you have occasion to review

7    title insurance policies and title commitments?

8          PROSPECTIVE JUROR 12:  Yes.

9          THE COURT:  And you're familiar with liens and

10   encumbrances?

11         PROSPECTIVE JUROR 12:  Yes.

12         THE COURT:  Okay.  Is there anything about your

13   background that you think would cause you to become or would

14   lead you to conclude that you cannot be fair and impartial in

15   this case?

16         PROSPECTIVE JUROR 12:  The company I worked for all

17   those years closed down because the accounting department

18   embezzled $8 million.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR 12:  So I have a problem with

21   people placing liens that should be banned.

22         THE COURT:  Okay.  Anybody else in the jury box with

23   specialized knowledge regarding liens, encumbrances, mortgages,

24   that type of thing?

25      (No response.)

Jury Selection

1          THE COURT:  How about back in the gallery?

2          PROSPECTIVE JUROR 26:  Yes.

3          THE COURT:  Okay.  Are you Juror 26?

4          PROSPECTIVE JUROR 26:  Yes.

5          THE COURT:  Okay.  Tell us.

6          PROSPECTIVE JUROR 26:  I was a loan closer for

7  Chicago Title & Trust and Continental Bank six years ago.

8          THE COURT:  Okay.  So Chicago Title is one of the big

9  title companies, right?

10          PROSPECTIVE JUROR 26:  Right.

11          THE COURT:  And they were around a long time.  What

12  did you do for them?

13          PROSPECTIVE JUROR 26:  I was a loan closer.

14          THE COURT:  Okay.  So as part of that, you would take

15  a look at the commitment for title insurance.  I guess you'd

16  create it, right?

17          PROSPECTIVE JUROR 26:  Yes.

18          THE COURT:  Okay.  If there was a lien on it, you

19  would note that, correct?

20          PROSPECTIVE JUROR 26:  Correct.

21          THE COURT:  Okay.  All right.  How long did you do

22  that?

23          PROSPECTIVE JUROR 26:  About 14 years.

24          THE COURT:  Okay.  Is there anything about that

25  experience that you think would affect your ability to be fair

Jury Selection

1 and impartial here?

2          PROSPECTIVE JUROR 26:  Not at all.

3          THE COURT:  Okay.  Anybody else back in the gallery?

4     (No response.)

5          THE COURT:  Okay.  I'm going to read a witness list

6 to you.  Not everyone that I read to you will necessarily

7 testify, but they may.  So I'm going to see if you know any of

8 these individuals.  If you do, raise your hand.  I'm going to

9 go three at a time.  Michael Dobbins, Wendy Holderman, Thomas

10 Bruton, does anybody recognize those names?

11     (No response.)

12          THE COURT:  Thomas Shakeshaft, James F. Holderman,

13 Karl Barnes, does anybody recognize those names?

14     (No response.)

15          THE COURT:  Okay.  Joan Humphrey Lefkow, Patrick

16 Fitzgerald, Arlander Keys, does anybody recognize those names

17 or any of them?

18     (No response.)

19          THE COURT:  Geraldine Soat Brown, Justin Williams,

20 Noel Sanchez, anybody recognize those names?

21     (No response.)

22          THE COURT:  Eric Cato, C-a-t-o, Andre Thompson, Kevin

23 Powers, anybody recognize those names?

24     (No response.)

25          THE COURT:  Robert Simmons, Monte Swank, Michael

1  Rees, R-e-e-s, anybody recognize those names?

2      (No response.)

3          THE COURT:  Okay.  In this case, there will be some

4  individuals testifying who are federal judges.  There will be a

5  former United States Attorney testifying.  There will be law

6  enforcement personnel testifying as well as others.  A person's

7  occupation does not mean that they are entitled to any more

8  believability or credibility than the baker, the butcher, or

9  the candlestick maker.

10          So just because somebody comes in and testifies that

11  they are the former chief judge of the Northern District of

12  Illinois or the former United States Attorney does not mean

13  that you are required to believe them or to consider them to be

14  credible.  In other words, before people take that witness

15  stand, they're all considered equal.  The jurors decide which

16  testimony to accept and reject in whole or in part.

17          Do any of you in the jury box have any problem with

18  that idea?

19      (No response.)

20          THE COURT:  How about back in the gallery?

21      (No response.)

22          THE COURT:  Okay.  In this case, a criminal case in

23  federal court, the Government has the burden of proving certain

24  things.  In other words, it's up to them to prove things to you

25  beyond a reasonable doubt.  If they fail in proving everything

1 required of them, you must find the defendant not guilty.  Do

2 any of you in the jury box have a problem with the Government

3 being required to prove someone guilty beyond a reasonable

4 doubt?

5    (No response.)

6       THE COURT:  How about back in the gallery?

7    (No response.)

8       THE COURT:  Okay.  Another basic premise of our

9 criminal law is that the defendant is presumed innocent.  The

10 defendant is here because a grand jury issued a document called

11 an indictment.  That is a proceeding that is held in secret.

12 The defendant didn't have a right to be there.  The defendant

13 didn't have a lawyer there.  It was a one-sided proceeding

14 whereby the grand jury determined that there was enough

15 evidence for the case to proceed to this point.  The grand jury

16 indictment is not evidence.  It is not any indication of guilt

17 whatsoever.  It is merely the document that brings someone

18 officially into court.

19       Do any you have any problem with the presumption of

20 innocence?  That is, as she sits here today, Ms. Phillips is

21 presumed innocent of the allegations against her, and unless

22 and until the Government meets its burden of proof beyond a

23 reasonable doubt, she is presumed innocent of the charges.  Do

24 any of you have a problem with that concept in the jury box?

25    (No response.)

1          THE COURT:  Anybody back In the gallery?

2      (No response.)

3          THE COURT:  Okay.  So if we were all to vote right

4   now on is she guilty or is she innocent, we would find her

5   innocent because she is presumed innocent of the charges

6   against her.

7          Additionally, there's another premise that's very

8   important, and that is that a defendant in criminal court has a

9   right to testify if they want to or a right not to testify.

10  They have a right to call witnesses and offer exhibits or to do

11  nothing.  Because the Government has the burden of proving

12  their guilt, the defendant doesn't have to prove or disprove

13  anything.

14         Do any of you have any problem with the fact that the

15  defendant has an absolute right not to testify, and if she

16  chooses not to testify you can't consider that at all in

17  arriving at your verdict?  In fact, I would instruct you that

18  you can't even discuss the fact that she chose not to testify

19  if that's the course she chose.  Do any of you have a problem

20  with that?  Sometimes it's called the Fifth Amendment

21  privilege, the privilege against self-incrimination.  Do any of

22  you have a problem with that basic criminal premise?  Anybody

23  in the jury box?

24      (No response.)

25         THE COURT:  How about back in the gallery?

Jury Selection

 1      (No response.)

 2           THE COURT:  Okay.  The term "sovereign citizen,"

 3  s-o-v-e-r-e-i-g-n, is sometimes used to describe a broad range

 4  of people who for one reason or another claim that they are a

 5  sovereign nation, separate and apart from the land where they

 6  live.  Sovereign citizens typically claim that they are not

 7  subject to the laws of their government.  Instead, they claim

 8  to be covered by something they call, quote, common law, closed

 9  quote.  Is there anyone in the jury box who considers yourself

10  to be a sovereign citizen as I have described it?

11      (No response.)

12           THE COURT:  How about anybody back in the gallery?

13      (No response.)

14           THE COURT:  All right.  Is there anybody in the jury

15  box who believes in the sovereign citizen ideology, that is,

16  that people should be able to live in a country without being

17  subject to that country's laws?  Anybody in the jury box?

18      (No response.)

19           THE COURT:  How about anybody back in the gallery?

20      (No response.)

21           THE COURT:  Okay.  Have any of you in the jury box

22  heard or read anything about sovereign citizens?

23      (No response.)

24           THE COURT:  How about back in the gallery?

25           PROSPECTIVE JUROR 16:  Me.

Jury Selection


1          THE COURT:  Juror 16?  Okay.

2          In the jury box, do any of you know any judges, state

3   court, city judges, or federal judges?

4          PROSPECTIVE JUROR 12:  I do.

5          THE COURT:  Okay.  Juror 12?

6          PROSPECTIVE JUROR 12:  Yes.

7          THE COURT:  Tell us who you know.

8          PROSPECTIVE JUROR 12:  My girlfriend's brother is a

9   lawyer, and his wife is a judge.  Her first name is Diane.

10         THE COURT:  Okay.  Which court is she a judge in?

11         PROSPECTIVE JUROR 12:  Cook County.

12         THE COURT:  In Cook County?  Okay.  In the city

13  court?

14         PROSPECTIVE JUROR 12:  State.

15         THE COURT:  State court, okay.  Do you know what

16  division she works in?

17         PROSPECTIVE JUROR 12:  No, I don't.

18         THE COURT:  Okay.  Do you ever have occasion to talk

19  to her about her cases or her work?

20         PROSPECTIVE JUROR 12:  No.

21         THE COURT:  Okay.  Does anybody else in the jury box

22  know any judges?

23     (No response.)

24         THE COURT:  How about back in the gallery?

25         PROSPECTIVE JUROR 28:  Yes.

```
 1          THE COURT:  Okay.  Juror 22 is it?
 2          PROSPECTIVE JUROR 28:  28.
 3          THE COURT:  Oh, sorry.  28, okay.  Tell us about it.
 4          PROSPECTIVE JUROR 28:  His name is Steven Brodie in
 5  Cook County, I believe.
 6          THE COURT:  Okay.  How do you know Mr. Brodie?
 7          PROSPECTIVE JUROR 28:  A college friend of mine.
 8          THE COURT:  Okay.  Do you ever discuss cases with
 9  him?
10          PROSPECTIVE JUROR 28:  No.
11          THE COURT:  Okay.  Anybody else?
12      (No response.)
13          THE COURT:  Those of you in the jury box, do you know
14  any Federal Government employees?  Let's take the first row.
15  Federal Government employees?
16          PROSPECTIVE JUROR 1:  Yes.
17          THE COURT:  Juror 1.
18          PROSPECTIVE JUROR 1:  He's a prosecutor, and I
19  volunteer at PADS with him.
20          THE COURT:  Okay.  Tell me what PADS is?
21          PROSPECTIVE JUROR 1:  Pardon me?
22          THE COURT:  What is PADS?
23          PROSPECTIVE JUROR 1:  PADS is Public Action to
24  Deliver Shelter.  It's a homeless shelter.
25          THE COURT:  Okay.  So this is a federal prosecutor.
```

1  You do this volunteer work, and he happens to be a federal

2  prosecutor.

3          PROSPECTIVE JUROR 1:  He's on the same team that I'm

4  on.

5          THE COURT:  Okay.  What's his name?

6          PROSPECTIVE JUROR 1:  Matt Schneider.

7          THE COURT:  Okay.  Do you ever discuss any cases with

8  him?

9          PROSPECTIVE JUROR 1:  No.

10         THE COURT:  Okay.  You just know that happens to be

11  his occupation.

12         PROSPECTIVE JUROR 1:  Yes.

13         THE COURT:  Okay.  How about the second row in the

14  jury box?  Do you know any Federal Government employees?

15         PROSPECTIVE JUROR 11:  Yes.

16         THE COURT:  Okay.  Juror 11?

17         PROSPECTIVE JUROR 11:  Yes.  I know the regional

18  inspector general for the Department of Health and Human

19  Services.

20         THE COURT:  All right.  How do you know that person?

21         PROSPECTIVE JUROR 11:  She's a good friend.

22         THE COURT:  Okay.  Anybody else in the jury box?

23      (No response.)

24         THE COURT:  How about the front row of the gallery?

25  Number 16, I know you know a lot of federal employees.  You

1  work with a lot of them.

2          PROSPECTIVE JUROR 16:  A real lot.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR 16:  I'll just give you Kathy

5  Piotrowski.  She's in charge of O'Hare.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR 16:  And Robert Cahill, he's from

8  D.C.  He's in Homeland Security.

9          THE COURT:  Okay.  I just went through O'Hare Friday.

10  It's a big airport.

11          PROSPECTIVE JUROR 16:  You should have come down by

12  the airplanes.

13          THE COURT:  Well, I went through the international

14  wing.  Now they have the automatic passport, but then you still

15  have to see two more people.  I don't know.  I had nothing to

16  declare, though.

17          Anybody else in the front row know any federal

18  employees?

19     (No response.)

20          THE COURT:  How about the second row?

21          PROSPECTIVE JUROR 21:  Yes.

22          THE COURT:  Juror 22?  I'm sorry.  21.

23          PROSPECTIVE JUROR 21:  An attorney,

24  a sibling.

25          THE REPORTER:  I'm sorry?

Jury Selection

1        THE COURT:  It's an attorney who's a sibling.

2        Okay.  Anybody else in the second row?

3    (No response.)

4        THE COURT:  How about the third row?

5    (No response.)

6        THE COURT:  Does the fourth row know any federal

7    employees?

8    (No response.)

9        THE COURT:  Okay.  I'm going to now ask you what your

10   main source of news is.  Okay?  What I'm going to do is give

11   you four choices:  print, television, Internet, or radio.  I

12   just want your main source of news.  If you just hold your hand

13   up until I tell you to stop, we're going to kind of take notes

14   as to who raised their hand.  So who gets their main source of

15   news from the print, such as newspapers?

16   (Prospective Jurors 2, 14, and 28 raise their hands.)

17       THE COURT:  Okay.  So who gets your main source of

18   news from television?  Just raise your right hand.  Oh, do you

19   know what?  We can't see.  Those of you in the back, could you

20   stand up, and could you one at a time tell us what your numbers

21   are?

22       PROSPECTIVE JUROR 31:  31.

23       PROSPECTIVE JUROR 30:  30.

24       PROSPECTIVE JUROR 29:  29.

25       PROSPECTIVE JUROR 35:  35.

Jury Selection

 1          PROSPECTIVE JUROR 36:  36.

 2          THE COURT:  Okay.  Thank you.  And you are juror

 3  number?

 4          PROSPECTIVE JUROR 27:  27.

 5          THE COURT:  27, okay.  Then we had Juror 19?

 6          PROSPECTIVE JUROR 18:  18.

 7          THE COURT:  18, okay.  Sorry.  18, 19, and 20?

 8          PROSPECTIVE JUROR 19:  Yes.

 9          PROSPECTIVE JUROR 20:  Correct.

10          THE COURT:  Okay.  And I think Juror 1.  Did you have

11  your hand up, too?

12          PROSPECTIVE JUROR 1:  Yes.

13          THE COURT:  All right.  Then the third choice is who

14  gets your main source of news from the Internet?  Okay.  That's

15  a lot of people.  Just let me read the numbers:  7, 6, 5, 4,

16  13, 12, 11, 9, 8, 16, 15.  I can't tell your numbers.  We have

17  Juror 21, and is it 23?

18          PROSPECTIVE JUROR 22:  22.

19          THE COURT:  22, 23, 24.  Then way in the back are you

20  34?

21          PROSPECTIVE JUROR 34:  34.

22          THE COURT:  Thank you.  Then the last choice is who

23  gets their main source of news from the radio.

24      (No response.)

25          THE COURT:  Nobody?  Okay.  Radio is dying, I guess.

1   The Internet looks like it's alive and well, which brings me to

2   this point.  As jurors and as potential jurors, you must not do

3   any independent research regarding this case.  You can't get on

4   Google and put my name in or the prosecutor or Ms. Phillips or

5   "sovereign citizen" or anything like that, because we want you

6   to get information that is tested by cross-examination and

7   under oath.  That's why it must come from the witness stand.

8           So there will be a special instruction that I'll give

9   those of you who sit as jurors.  We'll be taking a break before

10  you actually are chosen, and so I would caution you to please

11  don't use the Internet to do any research, to discuss this

12  matter with anybody, texting, Facebooking, anything like that.

13          Those of you who indicated you use the Internet for

14  your main source of news, let's take the front row.  Could you

15  tell me which websites you regularly use to do that?  Let's

16  take the front row, if you could raise your hands, those of you

17  who -- okay.  Juror 6 we'll start with -- or 7.  What websites?

18          PROSPECTIVE JUROR 7:  Just whatever shows up on

19  Yahoo.

20          THE COURT:  Okay.  Yahoo's main page, and then you go

21  to whatever feed they suggest?

22          PROSPECTIVE JUROR 7:  Yes.

23          MS. SOLOMON:  I'm sorry, sir.  Could you speak up?

24          THE COURT:  He said whatever shows up on Yahoo.

25          Okay.  Juror 6?

```
 1          PROSPECTIVE JUROR 6:  The NPR and CNN app.
 2          THE COURT:  Okay, NPR and CNN.  5?
 3          PROSPECTIVE JUROR 5:  Whatever shows up on Reddit.
 4          THE COURT:  Okay.  I've heard of Rennit, but I don't
 5  get on it.  Is that R-e-n-n-i-t?
 6          PROSPECTIVE JUROR 5:  R-e-d-d-i-t.
 7          THE COURT:  Oh, Reddit, okay.
 8          Okay.  Who else, Juror 4?
 9          PROSPECTIVE JUROR 4:  I go with Fox News and BBC.
10          THE COURT:  BBC?  Okay.  Anybody else in the front
11  row?
12          PROSPECTIVE JUROR 9:  WGN.
13          THE COURT:  Okay.  Juror 9, WGN's website.
14          Juror 8?
15          PROSPECTIVE JUROR 8:  MSN.
16          THE COURT:  MSN, Microsoft, okay.  Back row, juror
17  11?
18          PROSPECTIVE JUROR 11:  NPR and CNN.
19          THE COURT:  Okay.  Anybody else?
20          PROSPECTIVE JUROR 10:  AOL.
21          THE COURT:  Okay, AOL for Juror 10.  Juror 13?
22          PROSPECTIVE JUROR 13:  Google.
23          THE COURT:  Google, all right.
24          Let's take the front row then of the gallery.  If
25  you've raised your hand that you get your main source of news
```

Jury Selection

1  from the Internet, please raise it again.  Okay.  We'll start

2  with Juror 15.  What websites?

3          PROSPECTIVE JUROR 15:  Yahoo, Google, Huffington

4  Post.

5          THE COURT:  Okay, Yahoo, Google, Huffington Post.

6          Juror 16?

7          PROSPECTIVE JUROR 16:  Yahoo, CNN, and then there's a

8  TSA one, but you guys can't get it.

9          THE COURT:  We can't get it.  It's a private website.

10          PROSPECTIVE JUROR 21:  Yeah.

11          THE COURT:  Okay.  Anybody else in the front row?

12      (No response.)

13          THE COURT:  Okay.  How about the second row, and

14  we'll start with juror number 21.

15          PROSPECTIVE JUROR 21:  AOL, CNN, ABC, NBC.

16          THE COURT:  Okay.  Who else do we have, Juror 22?

17          PROSPECTIVE JUROR 22:  Whatever Sprint picks up, CNN,

18  or ABC 7.

19          THE COURT:  Okay.  23?

20          PROSPECTIVE JUROR 23:  ABC and Wall Street Journal.

21          THE COURT:  Okay.  24?

22          PROSPECTIVE JUROR 24:  Yahoo.

23          THE COURT:  Yahoo?  All right.

24          How about the third row, your source of Internet

25  news?

Jury Selection

1    (No response.)

2        THE COURT:  Nobody?  Okay.  Then the fourth row?

3  Okay.  I can't see your number.

4        PROSPECTIVE JUROR 34:  34.

5        THE COURT:  Okay.  What sites?

6        PROSPECTIVE JUROR 34:  Yahoo, Google, and NBC.

7        THE COURT:  Okay.  All right.  Those of you in the

8  jury box that happen to watch YouTube with any regularity, if

9  there's any particular videos you look for, could you raise

10  your hand?

11    (No response.)

12        THE COURT:  Nobody in the jury box?  Okay.  How about

13  in the back, in the gallery?

14        PROSPECTIVE JUROR 22: Yes.

15        THE COURT:  Okay.  Juror 22, is it?

16        PROSPECTIVE JUROR 22:  Yes, just faith-based.

17        THE COURT:  I can't hear you.

18        PROSPECTIVE JUROR 22:  Faith-based.

19        THE COURT:  Faith based?  Okay.  I use YouTube when I

20  have to fix something.  Once the dryer went out, and I couldn't

21  get anybody to fix it.  It happened on a weekend, and it needed

22  a belt.  I don't know if you've ever tried to put a belt on a

23  dryer, I mean, it serpentines back and forth.  Sure enough,

24  there was a video on YouTube on how to put a dryer belt on this

25  particular dryer.  It's quite a source of information.

Jury Selection

```
 1          There has been some publicity about this particular
 2   case in the media, nothing recent that I've seen but in the
 3   past.  Have any of you read anything in the newspaper about
 4   Ms. Cherron Phillips, the defendant in this case?  Anybody in
 5   the jury box?
 6       (No response.)
 7          THE COURT:  It's either on the Internet or print.
 8   How about anybody back in the gallery?
 9       (No response.)
10          THE COURT:  Okay.  Have any of you in the jury box
11   had any experience with someone placing a lien on your
12   property?  I'm not talking about a mortgage.  I mean, that's a
13   kind of lien.  If you buy a house, unless you've got a lot of
14   money, you have a mortgage, which is a lien.  But have you had
15   any other kind of lien placed on your real estate or even your
16   personal property, anybody in the jury box?
17       (No response.)
18          THE COURT:  Have you placed a lien on anybody's
19   property, anybody in the jury box?
20       (No response.)
21          THE COURT:  How about back in the gallery?  Have you
22   had any liens placed on your property other than normal
23   mortgages?
24          PROSPECTIVE JUROR 27:  Yes.
25          THE COURT:  Okay.  Juror 27, is it?
```

Jury Selection

1          PROSPECTIVE JUROR 27:  Yes.  When we were building

2    our house, we went through a lawsuit with our original builder.

3    So they put a lien on it until that got resolved.

4          THE COURT:  Okay.  So you build a house, and you have

5    a general contractor, usually, and that general contractor

6    hires a plumber and that.

7          PROSPECTIVE JUROR 27:  Yes.

8          THE COURT:  Those are subs.

9          PROSPECTIVE JUROR 27:  Yes.

10          THE COURT:  They all have what we call mechanics

11    liens rights.

12          PROSPECTIVE JUROR 27:  Yes.

13          THE COURT:  So in your situation, is that what

14    happened?

15          PROSPECTIVE JUROR 27:  Yes.

16          THE COURT:  Okay.  I'm told that there's an article

17    about this case in today's Chicago Tribune.  Have any of you

18    read it?  Anybody in the jury box?

19       (No response.)

20          THE COURT:  Good.  Don't.  That's an order from the

21    Court.

22          How about back in the gallery?

23       (No response.)

24          THE COURT:  Okay.  The problem with the newspaper

25    article is this.  My experience has been that the reporters are

1 very good about reporting what they see, but they only see a
2 small bit of it.  The jurors who sit on the case see the whole
3 thing, beginning to end, under-oath testimony.  So that's why
4 we don't want you influenced by something you read.  It's not
5 fair to the attorneys if you get information from out here
6 that's not subject to cross-examination or other information.
7         With respect to that lien in your case, Juror 27, was
8 that resolved to your satisfaction?
9         PROSPECTIVE JUROR 27:  Yes.
10        THE COURT:  Okay.  So sometimes what happens is you
11 pay the general in full, but the general doesn't pay the subs.
12 Then they put a lien on your property.
13        PROSPECTIVE JUROR 27:  Well, not only that, we sued
14 the general contractor, and he was indicted for wrongful
15 doings, not just with us, but for scheming 15 other people.
16        THE COURT:  Okay.  But eventually it was resolved to
17 your satisfaction?
18        PROSPECTIVE JUROR 27:  Uh-huh.
19        THE COURT:  Is there anything about that experience
20 that would cause you to question your fairness and impartiality
21 in this case?
22        PROSPECTIVE JUROR 27:  I kind of feel towards the
23 little guy, so I don't know.
24        THE COURT:  So who's the little guy, all these
25 judges?

Jury Selection

1          PROSPECTIVE JUROR 27:  Usually, the home owner and

2    not the big corporations.

3          THE COURT:  Okay.  Can you keep that experience out

4    of your mind and treat the parties equally here and decide the

5    case based on the evidence that you hear?

6          PROSPECTIVE JUROR 27:  That would be difficult to say

7    until I hear all the evidence.

8          THE COURT:  Okay.  That's what I want you to do, hear

9    all the evidence and not prejudge this.  Can you do that?

10          PROSPECTIVE JUROR 27:  Yes.

11          THE COURT:  Okay.  Did I miss anybody else regarding

12    the lien question, anybody in the back?

13       (No response.)

14          THE COURT:  Okay.  Do any of you in the jury box have

15    any special expertise in debt collection and the placing of

16    liens?  Debt collection, anybody?

17       (No response.)

18          THE COURT:  How about back in the gallery?

19       (No response.)

20          THE COURT:  Okay.  Do any of you in the jury box have

21    any religious beliefs that would preclude you from sitting in

22    judgment in this case?

23       (No response.)

24          THE COURT:  Nobody?  How about anybody in the back,

25    in the gallery?

Jury Selection

1     (No response.)

2          THE COURT:  Okay.  One thing we're going to ask you

3     to do in this case is to follow the law, even if you disagree

4     with it.  Now, I took an oath back in 2000 when I first took

5     the bench that I would follow law even if I disagreed with

6     it, and I have to tell you that on a weekly basis I see laws

7     that make me just scratch my head.  How did they pass this?

8     Congress doesn't call me up and say:  Hey, Reagan, what do you

9     think?

10          It doesn't work that way.  I get a book that's got

11     the laws in it, and I have to interpret it.  So I follow that

12     oath that I took.

13          You're going to be asked to follow the law, even if

14     you disagree with it in this case.  It's tough for me to commit

15     you to that because you don't know what the law is, but you're

16     going to have to follow the law here, even if you disagree with

17     it.

18          One way to explain it is this.  In Illinois, you have

19     to wear a helmet if you ride a motorcycle.  In Missouri, you

20     don't.  If you happen to be someone who believes you have a

21     right to wear a helmet or not wear a helmet.  You've got plenty

22     of insurance so it's your own business.  Could you still find

23     somebody guilty of not wearing a helmet if that was the law?

24     If you answer that question yes, then you can follow the law

25     even if you disagree with it.

1           Another thing might be the seat belt law.  Some
2  people don't think they should have to wear a seat belt.  The
3  law is that you have to wear a seat belt.  Can you follow the
4  law, even if you disagree with it?
5           You can't text and drive in Illinois.  You can't use
6  a cell phone without a Bluetooth connection.
7           If you can follow the law, even though you disagree
8  with it, that's what I'm looking for.  Is there anyone in the
9  jury box who cannot follow the law if you happen to disagree
10  with it?
11      (No response.)
12           THE COURT:  How about back in the gallery?
13      (No response.)
14           THE COURT:  Okay.  Let's go to the front row.  Do any
15  of you have any prior jury service?
16           PROSPECTIVE JUROR 6:  Yes.
17           THE COURT:  Okay.  Juror 6, would you tell us about
18  it.
19           PROSPECTIVE JUROR 6:  I was a grand juror for three
20  months in Kane County.
21           THE COURT:  Okay.  So you know it's a secret
22  proceeding, right?
23           PROSPECTIVE JUROR 6:  Uh-huh.
24           THE COURT:  Okay.  Was that interesting?
25           PROSPECTIVE JUROR 6:  It was all right.

Jury Selection

1      THE COURT:  Three months.

2      PROSPECTIVE JUROR 6:  Three months, yeah.

3      THE COURT:  A long time.

4      PROSPECTIVE JUROR 6:  Every Friday.

5      THE COURT:  A long time.

6      PROSPECTIVE JUROR 6:  Yeah.

7      THE COURT:  You know, it's so secret that I don't

8 even know how long they meet, not even in my district.  It's

9 handled by some other judge.  I'm not the chief judge.  I will

10 be shortly.  So I don't even know.  It's that secret.

11      Anybody else in the front row?

12      PROSPECTIVE JUROR 2:  Yes.

13      THE COURT:  Okay, Juror 2.  Tell us about it.

14      PROSPECTIVE JUROR 2:  It was a civil case in Cook

15 County.

16      THE COURT:  Okay.  Is there anything about that

17 experience that you think would affect your ability to be fair

18 and impartial here?

19      PROSPECTIVE JUROR 2:  No.

20      THE COURT:  Juror 1?

21      PROSPECTIVE JUROR 1:  I was an alternate on a

22 coroner's jury in DuPage County.

23      THE COURT:  Oh, a coroner's jury, okay.

24      How about the back row of the jury box, prior jury

25 service?

Jury Selection

1              PROSPECTIVE JUROR 8:  Yes.

2              THE COURT:  Okay.  Juror 8?

3              PROSPECTIVE JUROR 8:  I had two.  One was a traffic

4    court case, and one was gender discrimination.

5              THE COURT:  Okay.  Was the gender discrimination in

6    federal court?

7              PROSPECTIVE JUROR 8:  No.

8              THE COURT:  Okay, state court.

9              PROSPECTIVE JUROR 8:  Uh-huh.

10             THE COURT:  Okay.  Those of you in the jury box who

11   indicated you've been on juries in the past, or an alternate,

12   is there anything about that experience that you think would

13   affect your ability to be fair and impartial here?

14      (No response.)

15             THE COURT:  Okay.  Let's go back to the gallery.

16   Front row, anybody have prior jury service?

17             PROSPECTIVE JUROR 19:  Uh-huh.

18             THE COURT:  Juror 19, can you tell us about it?

19             PROSPECTIVE JUROR 8:  It was civil in Cook County

20   about 10, 15 years ago.

21             THE COURT:  Okay.  20?

22             PROSPECTIVE JUROR 20:  It was in DuPage County about

23   four or five years ago.  It was civil court.

24             THE COURT:  Okay.  How about the second row, prior

25   jury service?

Jury Selection

```
 1          PROSPECTIVE JUROR 24:  Yes.

 2          THE COURT:  Okay.  Is it Juror 24?

 3          PROSPECTIVE JUROR 24:  Yes.

 4          THE COURT:  Okay.  Tell us about it, please.

 5          PROSPECTIVE JUROR 24:  November of 2013, it was a

 6  medical malpractice.  It was at the Daley Center.

 7          THE COURT:  Okay, Downtown Chicago.

 8          Who else do we have?  Juror 26, is it?

 9          PROSPECTIVE JUROR 26:  I served twice in DuPage

10  County, malpractice, attorneys.

11          THE COURT:  Okay.  The third row, prior jury service,

12  Juror 28, is it?

13          PROSPECTIVE JUROR 28:  Yeah.  Lake County, it was

14  over ten years ago.

15          THE COURT:  Okay.  What kind of case was it, civil or

16  criminal?

17          PROSPECTIVE JUROR 28:  Civil.

18          THE COURT:  All right.  Juror 32?

19          PROSPECTIVE JUROR 32:  I don't know if it's

20  considered, but I was in a pre-jury selection, and after two

21  days I was dismissed.

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR 32:  It was a DUI case in DuPage

24  County about 22 years ago.

25          THE COURT:  Okay.  Very good.
```

1        Then the back row, prior jury service?

2        PROSPECTIVE JUROR 36:  Yes.

3        THE COURT:  Okay.  Juror 36?

4        PROSPECTIVE JUROR 36:  It was a criminal case down at

5   26th and California.  It was a multiple murder case.

6        THE COURT:  Okay, a criminal case.  So those of you

7   in the gallery who have had jury service, is there anything

8   about your experience with the system that would lead you to

9   believe you cannot be fair and impartial here?  If so, please

10  raise your hand.

11      (No response.)

12       THE COURT:  Okay, folks.  Give me a minute.  I want

13  to talk to the attorneys at sidebar.  That means we're going to

14  tell secrets.  Okay?  I'm going to keep you informed all along

15  the way, but sometimes we have to tell secrets.  So I'm going

16  to tell a few secrets, and we'll get back to you.  If you want

17  to stand and stretch, feel free to do so.

18      (Discussion at sidebar on the record.)

19       THE COURT:  Okay.  Mike tells me that he can hear us

20  through this microphone, but they can't hear us.

21       My inclination is to exclude juror 16 for cause and

22  juror 12 for cause, but I wanted to hear from you first.

23       MS. SOLOMON:  I agree with you.

24       THE COURT:  Let's not ask them any more questions

25  because that might poison the water.

Jury Selection

1          MR. STUMP:  That's fine.

2          THE COURT:  Are there any other questions you want me

3    to ask before I turn it over to you?

4          MR. STUMP:  No, sir.

5          MS. SOLOMON:  No.

6          THE COURT:  Okay.  Whenever we do sidebars, you're

7    welcome to come up here.  We won't tell you not to without your

8    attorney being here.

9          THE DEFENDANT:  Again, for the record, I don't

10   consent to these proceedings.

11         THE COURT:  Okay.

12     (Discussion at sidebar concluded.)

13         THE COURT:  Isn't that horrible noise?  It's that or

14   Barry Manilow.

15         Okay.  I've completed my questions.  At this time,

16   I'm going to ask you to respond to the attorneys' questions.

17   Again, it's not their intention to pry.  If they ask any

18   questions that you don't want to answer now, we'll get back to

19   you confidentially later.

20         Mr. Stump?

21         MR. STUMP:  Thank you, Your Honor.

22         Good morning.  I have a few questions, not very many.

23   One, the Judge listed out a list of folks that we expect to

24   testify.  In addition to them, there may be some other names

25   that just come up throughout the trial, and I wanted to run

1   some of them by you and see if you know them.  If you could,

2   I'm just going to read through them.  Just keep it in mind if

3   there's a name that you recognize or a person that you know

4   personally.  Keep it in the back of your mind, and I'll ask you

5   at the very end if there was anybody.  Here we go.

6           Paul Banos, Michael Biegalski, David Bird, Carrie

7   Byrne, Gilberto Calderon, Anthony Catenacci, Andrew Cramlet,

8   Felicia Dangerfield, Victor Demtschenko, Nancy DePodesta, Duane

9   Devries, Scott Eichstaedt, Tim Engel, Gabriel Fakhouri, Sheila

10  Finnegan, Daniel Glavach, Antonio Gonzalez, Albert Guarnieri,

11  Sharon Jamieson, Jesse King, Janice Martin, Mary Martin, Andrew

12  McArtor, Ginger Miller, Raquel Paredes, Wayne Phillips, Betty

13  Phillips, Eva Phillips, Kenneth Pitts, Alex Reina, Timothy

14  Robertson, Edgar Rossbach, Jr., Joe Ruiz, Patrick Sherlock,

15  Daniel Simmons, Kevin Stoll, Marilou Thomas, Gary Turlington,

16  Richard Walenda, Kenneth Wheeler, Yvette Williams, David

17  Willshaw, Michael Woods-Hawkins, Chad Yarbrough, Marny Zimmer,

18  is any of those names someone who you know personally?

19      (No response.)

20          MR. STUMP:  Okay, no response.  I'm going to run

21  through very quickly a few institutions that may be named.  I

22  want to ask you if you have any specific feelings, really

23  strong feelings one way or the other, really positive or any

24  negative about any of these institutions.

25          This courthouse, the U.S. District Court for the

1  Northern District of Illinois, the Federal Bureau of

2  Investigation, the U.S. Marshal's Service, the Cook County

3  Recorder of Deeds, the Chicago Police Department, the Drug

4  Enforcement Administration, U.S. Department of Justice, any of

5  those, does anybody have a really strong feeling, positive or

6  negative?

7       (No response.)

8          MR. STUMP:  No response.  Do any of you have any

9  specialized training in either the law or law enforcement?

10      (No response.)

11         MR. STUMP:  Any at all in paralegal school, night

12  school for law, or it could be auditing classes?  Anything?

13      (No response.)

14         MR. STUMP:  Okay, no response.

15         I want to talk a little bit about circumstantial

16  evidence and direct evidence.  Circumstantial evidence is proof

17  of a chain of circumstances or facts that indirectly proves a

18  fact.  You hear the terms on TV "circumstantial" versus

19  "direct."  The law makes no distinction between the two.

20         I want to give you an example.  I was trying to

21  convert this to a soccer example because of the World Cup, but

22  I'll probably lose myself.  So I'm going to stick with what I

23  usually like to do it with, football, which is my sport.

24         Imagine you're watching a football game and you have

25  it on TV, wherever the TV is, and it's kind of boring.  The

1  score is knotted zero to zero, and so you decide it's a safe

2  point in the game.  You're going to go ahead and go to the

3  kitchen and fix yourself something to eat.

4        You have the TV volume turned up loud enough that you

5  can hear the sounds of the game.  While you're in the kitchen,

6  all of a sudden you hear the roar of the crowd coming from the

7  TV.  You hear the commentators' and announcers' jubilant and

8  excited voices.  You hear the unmistakable sound of the home

9  team's fight song being played by a marching band.

10        You drop what you're doing and race back into the

11  room and look at the TV, and what you see is that the score now

12  says zero to six.  Well, right then, you know beyond a

13  reasonable doubt based entirely on circumstantial evidence that

14  the home team just scored a touchdown.

15        Then you can stay and watch it.  That's what I would

16  do, stay and watch the TV, and they'll do the replay.  Then you

17  can see the wide receiver in the corner of the end zone.  The

18  ball is on his finger tips, and it's a beautiful thing.  Then

19  you've actually watched it happen, and that's direct evidence.

20        But you didn't need to see that replay.  You knew

21  before you saw the replay what happened just based on your

22  common sense and the circumstantial evidence.  In this case, as

23  in all cases, the law does not distinguish between those two

24  kinds of evidence.  They are both given equal weight, or they

25  can be given equal weight by the jury.

Jury Selection

1          Is there anybody here who feels like they could not
2    reach a verdict in a case like this based solely on
3    circumstantial evidence and that you have to have direct
4    evidence?
5         (No response.)
6         MR. STUMP:  Okay, no response.  The Judge touched on
7    this briefly.  The Government's burden in this case is to prove
8    the defendant's guilt beyond a reasonable doubt.  You hear
9    about it on the TV all the time, too.  Everybody knows that
10   standard, beyond a reasonable doubt.
11         My question to you is this.  Is there anybody here
12   who feels uncomfortable with that standard and feels that it
13   should be that the Government has to prove it to you beyond all
14   doubt, reasonable or unreasonable?  Does anybody feel that way?
15        (No response.)
16        MR. STUMP:  No response.  If the United States proves
17   the case to you beyond a reasonable doubt, if we prove to you
18   all the elements of the offenses that are required to find the
19   defendant guilty beyond a reasonable doubt, would you hesitate
20   to return a guilty verdict for any reason?
21         Let me give you a few things to think about.  Would
22   it matter to your verdict that the defendant is a woman?
23        (No response.)
24        MR. STUMP:  Would it matter to your verdict if a
25   victim of the crime did not suffer any kind of financial loss?

1      (No response.)

2          MR. STUMP:  Would it matter to your verdict if you

3   don't like the Government's team or if you don't like our

4   witnesses, that they just rubbed you the wrong way?

5      (No response.)

6          MR. STUMP:  All right.  Is there anyone here who

7   cannot decide this case based solely on the evidence that's

8   properly admitted from the witness stand, the exhibits that are

9   properly admitted, and the law as directed to you by the Court,

10  for any reason whatsoever?

11     (No response.)

12         MR. STUMP:  That's it for me.  Thanks, Judge.

13         THE COURT:  Thank you.

14         Ms. Solomon?

15         MS. SOLOMON:  Thank you, Judge.

16         Good morning, everyone.  My name is Lauren Solomon,

17  and I represent Ms. Phillips, who's in the courtroom today.  I

18  just have a few questions to ask you so that I get a sense of

19  who you are and what kinds of things you bring to this

20  courtroom today and what you would bring to each other when you

21  go into the jury room to deliberate.

22         PROSPECTIVE JUROR 36:  Can you speak up, please?

23         MS. SOLOMON:  Sorry.  Is that better?

24         PROSPECTIVE JUROR 36:  Yes.

25         THE COURT:  Much better.

Jury Selection

 1          MS. SOLOMON:  Okay.  I'm going to ask some questions

 2    just so I get an understanding of who you are and what you

 3    bring to this courtroom and what you would bring to one another

 4    if you are chosen to be jurors in this case.

 5          So the first question I have is I want to know if

 6    anyone has had any kind of bad experience with the Government,

 7    whether it be trying to sign up for health care in the new open

 8    enrollment period of time or whether you have needed to get

 9    some information on some kind of benefit from the Government

10    and you haven't been able to and that's left you frustrated.

11    Has anybody had that experience?

12      (No response.)

13          MS. SOLOMON:  Well, you're all very lucky.  Okay.  So

14    recently there's been two instances of kind of protest

15    movements or anti-government movements.  One has been the Tea

16    Party, and other one has been the Occupy Wall Street movement.

17    Does anybody think that one or the other was a better approach

18    to getting their objective achieved?  So who thinks that the

19    Occupy Wall Street movement was a better approach, anyone?

20      (No response.)

21          MS. SOLOMON:  No response.  How about the Tea Party?

22    Do you think going through the political process is the better

23    way to achieve change in this country, or you don't think that?

24    Does anybody think that was the better way to go?

25      (No response.)

Jury Selection

1          MS. SOLOMON:  Okay, no response.  If neither of those
2    kinds of movements were the appropriate way to participate,
3    does anybody have any ideas on what would have been a better
4    way to achieve change, anyone?
5          (No response.)
6          MS. SOLOMON:  No response.  Now, most organizations,
7    whether sports, schools, work, government, have rules, and we
8    all know that we're supposed to follow the rules.  Has anybody
9    had an experience where they believe something was unfair,
10   whether at your office or at school, where somebody didn't
11   follow the rules and got some kind of advantage over you or
12   someone else?
13         (No response.)
14         MS. SOLOMON:  No response.  Has anybody ever
15   benefited from the kind of fudging of a rule?  So a rule didn't
16   really apply to you, and you got a benefit, whether it was on
17   the sports field or in your office, any kind of fudging of
18   rules that was to your benefit?
19         (No response.)
20         MS. SOLOMON:  No response.  Was there ever a time
21   that you caught someone cheating, whether at work, at school,
22   or in sports?
23         (No response.)
24         MS. SOLOMON:  No response.  The Internet has made
25   plagiarism rampant, and a study showed that a majority of

1  students will cheat if they think they'll get an advantage.

2  What's even more interesting is that their parents would

3  support their cheating if it helped them.  Does anybody agree

4  that that's a good policy or a good direction for us to be

5  going?

6      (No response.)

7          MS. SOLOMON:  No response.  I see some smiles and

8  some negative shakes of the head.  I assume that that's a bad

9  way for us as a country to be going.  Who wishes they were more

10  patient?  So we have a response from Juror 7, Juror 14, Juror

11  5, Juror 11, Juror 4.  I'm sorry.

12          PROSPECTIVE JUROR 18:  18.

13          MS. SOLOMON:  And Juror 20, Juror 34.

14          PROSPECTIVE JUROR 32:  32.

15          MS. SOLOMON:  Oh, I'm sorry.

16          PROSPECTIVE JUROR 32:  Did you say "patient"?

17          MS. SOLOMON:  "Patient," yes.

18          PROSPECTIVE JUROR 32:  Yes, I do.

19          MS. SOLOMON:  Okay.  Then kind of a parallel question

20  to that is:  Who wishes they were more tolerant?

21          Juror 4, Juror 7, Juror 14, Juror 20, Juror -- I'm

22  sorry, but I can't see your number.

23          PROSPECTIVE JUROR 24:  24.

24          MS. SOLOMON:  And next to you?

25          PROSPECTIVE JUROR 23:  23.

1          MS. SOLOMON:  Juror 23 and 24.  Then which juror?

2          PROSPECTIVE JUROR 30:  30.

3          MS. SOLOMON:  And Juror?

4          PROSPECTIVE JUROR 32:  32.

5          MS. SOLOMON:  32, great.

6          Who thinks they don't have enough backbone in tough

7     situations?

8          PROSPECTIVE JUROR 5:  Me.

9          MS. SOLOMON:  Oh, Juror 5.  Thank you.

10         Who thinks they're really good at standing their

11    ground?

12         PROSPECTIVE JUROR 6:  I do.

13         MS. SOLOMON:  Juror 6, Juror 2.

14         PROSPECTIVE JUROR 36:  36.

15         MS. SOLOMON:  Juror 36.

16         PROSPECTIVE JUROR 33:  33.

17         PROSPECTIVE JUROR 27:  27.

18         MS. SOLOMON:  Juror 33 and Juror 27.

19         Who thinks it's possible to change the views of those

20    around you?

21         PROSPECTIVE JUROR 20:  Me.

22         MS. SOLOMON:  Juror 20, Juror 2, and who?

23         PROSPECTIVE JUROR 36:  36.

24         MS. SOLOMON:  Juror 36 and --

25         PROSPECTIVE JUROR 15:  15.

Jury Selection

```
 1          MS. SOLOMON:  15, Juror 15.

 2          Who seeks out new experiences?

 3          Juror 7, Juror 6, Juror 5, Juror 2, Juror 1, Juror 8,

 4  Juror 11, Juror 18, Juror 23, Juror 24.  I'm sorry.  In the

 5  pink?

 6          PROSPECTIVE JUROR 30:  30.

 7          MS. SOLOMON:  Juror 30 and Juror 36.

 8          PROSPECTIVE JUROR 36:  36.

 9          MS. SOLOMON:  Who prefers the tried and true?

10          Juror 4?

11          PROSPECTIVE JUROR 4:  I'm sorry.  I didn't hear the

12  question.

13          MS. SOLOMON:  Who prefers the tried and true?

14          Juror 20 and Juror 19 and Juror number?

15          PROSPECTIVE JUROR 32:  32.

16          MS. SOLOMON:  Juror 32 and Juror 34?

17          PROSPECTIVE JUROR 34:  Yes.

18          MS. SOLOMON:  If I could just go around to the jurors

19  in the jury box and ask this generally.  Where did you go on

20  your last vacation, Juror 1?

21          PROSPECTIVE JUROR 1:  Wisconsin.

22          MS. SOLOMON:  2?

23          PROSPECTIVE JUROR 2:  Maine.

24          MS. SOLOMON:  3?

25          PROSPECTIVE JUROR 3:  Stayed at home.
```

Jury Selection

```
 1          MS. SOLOMON:  Stayed at home, okay, a staycation.
 2          PROSPECTIVE JUROR 3:  Right.
 3          MS. SOLOMON:  4?
 4          PROSPECTIVE JUROR 4:  I didn't go anywhere.
 5          MS. SOLOMON:  You didn't go anywhere.
 6          PROSPECTIVE JUROR 5:  Shelbyville, Illinois.
 7          MS. SOLOMON:  Shelbyville.
 8          PROSPECTIVE JUROR 6:  Florida.
 9          PROSPECTIVE JUROR 7:  Wisconsin Dells.
10          MS. SOLOMON:  Wisconsin Dells.
11          PROSPECTIVE JUROR 8:  Vegas.
12          MS. SOLOMON:  Vegas.
13          THE COURT:  Did you get their names or numbers?
14          MS. SOLOMON:  Oh, I'm sorry.  So juror 7 -- well,
15  I'll start with number 1.  Number 1 was Wisconsin.  Number 2
16  was Maine.  Number 3 was a staycation.  Number 4 didn't go
17  anywhere.  Number 5 was Shelbyville, Illinois.  Number 6 was
18  Florida.  Number 7 was Wisconsin Dells.  Number 8 was Vegas.
19  We're at number 9.
20          PROSPECTIVE JUROR 9:  Kentucky.
21          MS. SOLOMON:  Kentucky.
22          PROSPECTIVE JUROR 10:  Stay at home.
23          MS. SOLOMON:  Stay at home, number 10.
24          PROSPECTIVE JUROR 11:  Colorado.
25          MS. SOLOMON:  Number 11 is Colorado.
```

Jury Selection

1           PROSPECTIVE JUROR 12:  Home.

2           MS. SOLOMON:  Number 12 is home.

3           PROSPECTIVE JUROR 13:  Puerto Rico.

4           MS. SOLOMON:  13 is Puerto Rico.  14?

5           PROSPECTIVE JUROR 14:  Vegas.

6           MS. SOLOMON:  Vegas, okay.  Thank you.

7           Who thinks that the NSA should not have been able to

8  track all of our telephone calls?

9           Juror 5, Juror 4, Juror 8, Juror 11, Juror 14.

10          Who doesn't mind that the NSA tracks our calls?

11          Juror 6, Juror 7, Juror 27, and Juror 36.

12          PROSPECTIVE JUROR 33:  33.

13          MS. SOLOMON:  Oh, 33.

14          Who thinks Edward Snowden should be punished for

15  disclosing what he did?

16          Juror 16, Juror 11, Juror 13, Juror 14, Juror 15.

17          PROSPECTIVE JUROR 28:  28.

18          MS. SOLOMON:  28.

19          PROSPECTIVE JUROR 33:  33.

20          MS. SOLOMON:  33.

21          PROSPECTIVE JUROR 34:  34.

22          MS. SOLOMON:  34.

23          Who thinks Edward Snowden should be admired?

24      (No response.)

25          MS. SOLOMON:  No response.  Thank you very much.

```
 1           THE COURT:  Okay, folks.  Could I have a show of
 2   hands for those of you in the jury box who have some issues to
 3   discuss with us that you didn't want to do in the presence of
 4   the other jurors?  Anybody at all?
 5           PROSPECTIVE JUROR 9:  Yes.
 6           THE COURT:  Juror 9?
 7           PROSPECTIVE JUROR 9.  Yes.
 8           THE COURT:  Okay.  How about back in the gallery?
 9           PROSPECTIVE JUROR 34:  Me.
10           THE COURT:  And your number, please?
11           PROSPECTIVE JUROR 34:  34.
12           THE COURT:  Okay, 34.  Then is it Juror 20?
13           PROSPECTIVE JUROR 20:  Yes.
14           THE COURT:  And 22?
15           PROSPECTIVE JUROR 23:  23.
16           THE COURT:  I'm sorry?
17           PROSPECTIVE JUROR 23:  23.
18           THE COURT:  23, okay.  Did I miss anybody?
19       (No response.)
20           THE COURT:  Okay.  So, folks, here's what I'm going
21   to do.  I'm going to ask those four jurors to remain here, and
22   we're going to talk to them about their issues.  Then here's
23   how the procedure works, just so you know.  The attorneys will
24   get together with their respective clients and select the jury.
25           Now, there's a lot of articles about how you select a
```

1  jury or how we select a jury, but here's the bottom line.

2  They're allowed to excuse you for any reason they want except

3  for race, gender, national origin, ethnicity, religion, or

4  physical handicap.  So if they don't like people who wear

5  yellow shirts, they can kick you off the jury, but they can't

6  kick you off the jury if they don't like the color of your

7  skin.

8         The defense gets to remove ten of you, and the

9  Government gets to remove six, as long as it's within those

10  bona fide reasons, and then I end up eventually with a total of

11  14 of you.  Only 12 will deliberate, but I need two extras in

12  case something happens to the original 12.

13         So what we're going to do now is take a break.  I

14  would ask if you would come back here at 1:00 so that you can

15  have lunch.  That will give us time to talk to those four

16  jurors.  It will give the attorneys time to caucus with their

17  clients.  It will give me time to pick the jury, and then those

18  of you who will not be chosen will be able to leave for the

19  afternoon.  Okay?

20         So I would ask you to all --

21         Should we have them come up here, Mike, outside the

22  courtroom?

23         THE MARSHAL:  Sure.

24         THE COURT:  Okay.  So if you could all be right

25  outside the courtroom right at 1:00 o'clock, we'll let you know

1  who's going to be on the jury and who is not.  Okay?  Again,

2  please don't discuss the case with anyone, including any other

3  jurors, and don't do any kind of research, texting, et cetera.

4         Then staying, we have Jurors 9, 34, 20, and 23.

5     (Venire excused.)

6         THE COURT:  We're going to start with Juror 9.  The

7  other three of you, if you'll follow me, I'm going to put you

8  back in the jury room just until it's time for us to call you

9  out.  So the three of you should come back with me, please.

10    (Said prospective jurors depart.)

11        THE COURT:  Okay.  We're in open court out of

12 presence of the balance of the jurors, and we have Juror 9

13 here.

14        Juror 9, could you tell us what the issue was you

15 wanted to discuss with us confidentially?

16        PROSPECTIVE JUROR 9:  I have a felony conviction.

17        THE COURT:  Okay.  How old is it?

18        PROSPECTIVE JUROR 9:  1985.

19        THE COURT:  Okay.  Have your civil rights ever been

20 restored?

21        PROSPECTIVE JUROR 9:  Yes.

22        THE COURT:  They have.  Okay.  How was that done, do

23 you know?  If your civil rights have been restored, then you

24 can sit as a juror.

25        PROSPECTIVE JUROR 9:  Okay.

Jury Selection

1          THE COURT:  So do you know if they have been
2    formally?
3          PROSPECTIVE JUROR 9:  No, no, actually, no.  I don't
4    know if they have or haven't.
5          THE COURT:  Okay.  Did you engage in any procedure to
6    get them restored?  Did you file anything?
7          PROSPECTIVE JUROR 9:  No.
8          THE COURT:  Okay.  Mr. Stump, any questions?
9          MR. STUMP:  Do you feel comfortable saying what it
10   was for?
11         PROSPECTIVE JUROR 9:  Oh, yeah.  I just had some
12   trouble in my youth.  It was a burglary charge.
13         MR. STUMP:  Okay.  Was it something that you pled
14   guilty to, or were you found guilty?
15         PROSPECTIVE JUROR 9:  I pled guilty.
16         MR. STUMP:  Your experience going through that, has
17   it affected your view of the legal system?
18         PROSPECTIVE JUROR 9:  Well, maybe back then, but now,
19   no.
20         MR. STUMP:  Okay.  That's all I have.  Thanks, Judge.
21         THE COURT:  Questions, Ms. Solomon?
22         MS. SOLOMON:  Was the case in Cook County, or was it
23   somewhere else?
24         PROSPECTIVE JUROR 9:  Yeah, it was Cook County.
25         MS. SOLOMON:  Cook County?

Jury Selection

1          PROSPECTIVE JUROR 9:  Uh-huh.

2          MS. SOLOMON:  And approximately how old were you?

3          PROSPECTIVE JUROR 9:  I was 19.

4          MS. SOLOMON:  Okay.  So you were tried as an adult?

5          PROSPECTIVE JUROR 9:  Yeah.

6          MS. SOLOMON:  So it was an adult felony conviction.

7          PROSPECTIVE JUROR 9:  Yes.

8          MS. SOLOMON:  And you haven't had any other crimes of

9  conviction since that time?

10          PROSPECTIVE JUROR 9:  Well, I had a DUI.  I had a few

11  scrapes with the law, yes.

12          MS. SOLOMON:  And what is your employment?  I'm

13  sorry.

14          PROSPECTIVE JUROR 9:  What's that?

15          MS. SOLOMON:  Currently, what is your employment?

16          PROSPECTIVE JUROR 9:  I'm a pipefitter.

17          MS. SOLOMON:  Pipefitter, okay.  I have nothing

18  further.

19          THE COURT:  Okay.  Thanks.  If you'll be back here at

20  1:00 o'clock, we'll get back to you.  We appreciate it.

21      (Prospective Juror 9 departs.)

22          THE COURT:  Okay.  So we'll get Juror 20.

23      (Brief pause.)

24          THE COURT:  Okay.  Juror 20, I told you we could go

25  to sidebar on this, but the only people here are the ones who

1  are entitled to be at sidebar.  So could you just tell us

2  confidentially?  This goes nowhere in the record.  I can

3  certainly seal it.  There's nothing you can say that's going to

4  surprise me.

5          PROSPECTIVE JUROR 20:  I don't even know how to get

6  the words out.  I would rather just tell you.

7          THE COURT:  Counsel, do you have any objection to her

8  telling me, and then me screening it.

9          MR. STUMP:  No.

10          MS. SOLOMON:  No, sir.

11          THE COURT:  Okay.  Let's go to sidebar then, just you

12  and I.

13      (Discussion at sidebar off the record.)

14          THE COURT:  Counsel, back on the record, she's been

15  very candid in telling me that she thinks she's prejudged the

16  case and can't be fair to the defendant in this case, not for

17  anything personal with the defendant, but she was a victim of a

18  crime in the past.

19          MR. STUMP:  Okay.

20          THE COURT:  Does anyone want me to go any further

21  than what's already on the record?

22          MS. SOLOMON:  No, Your Honor.

23          MR. STUMP:  No, Judge.

24          THE COURT:  All right.  We'll excuse you for cause.

25      (Discussion off the record.)

Jury Selection

1          THE COURT:  You don't need to come back.  You can go
2     out this way.  Juror 20 will be excused for cause.
3          (Prospective Juror 20 excused.)
4          THE COURT:  Okay.  Mike, could we have Juror 23?
5          (Brief pause.)
6          THE COURT:  Okay.  Have a seat over there in the jury
7     box, Juror 23.  Could you tell us what issue you wanted to
8     discuss with us confidentially?
9          PROSPECTIVE JUROR 23:  So it was your question which
10    was basically about if the rules were fudged for you at all.
11    So final exams are like a policy at college.  You have to take
12    them, but I had four out of five teachers who didn't make me
13    take them because I had a self-infliction with my dad.  So I
14    didn't know if you wanted to know about that.
15         MS. SOLOMON:  I'm sorry.  You had what?
16         PROSPECTIVE JUROR 23:  My dad self-inflicted himself.
17         MS. SOLOMON:  Oh, I'm sorry.
18         PROSPECTIVE JUROR 23:  So the rules were a little
19    fudged.
20         MS. SOLOMON:  Okay.
21         THE COURT:  Sure.  Is there anything about that
22    experience that you think would affect your impartiality here?
23         PROSPECTIVE JUROR 23:  No.
24         THE COURT:  Okay.  Follow-up questions by the
25    Government?

1        MR. STUMP:  No, sir.

2        THE COURT:  Ms. Solomon?

3        MS. SOLOMON:  No.

4        THE COURT:  Thanks for your candor.  We'll see you at

5   1:00 o'clock.

6        PROSPECTIVE JUROR 23:  Thank you.

7   (Prospective Juror 23 departs.)

8        THE COURT:  Then lastly, Juror 34.

9   (Brief pause.)

10       THE COURT:  Okay.  Juror 34, have a seat and tell us

11  what issue you wanted to discuss with us confidentially.

12       PROSPECTIVE JUROR 34:  I am the primary caretaker of

13  my two small children.  I was able to find care for them while

14  I was coming today, but I didn't know.  Depending on when the

15  trial was and how long it was, I probably would not be able to

16  provide child care for that long.

17       THE COURT:  Okay.  Let me tell you what I think we're

18  going to do.  We'll start roughly at 9:00 o'clock every morning

19  and finish around 5:00, 5:30 at the latest.  The case will go,

20  we think, until Thursday.  It could go over into Friday.  I

21  hope not, but it kind of depends on how long it takes the jury

22  to deliberate.

23       PROSPECTIVE JUROR 34:  Okay.

24       THE COURT:  See, I can't control that.  Once it gets

25  in the jury's hands, I don't know how long it takes.  With that

Jury Selection

1  understanding, would you have child care issues?

2        PROSPECTIVE JUROR 34:  If I can make sure I'm home in

3  the evening just this week?

4        THE COURT:  Right, just this week.

5        PROSPECTIVE JUROR 34:  Okay.

6        THE COURT:  I turn into a pumpkin at 5:00 Friday

7  night.

8    (Laughter.)

9        PROSPECTIVE JUROR 34:  Okay.  As long as it's this

10  week, yeah.

11        THE COURT:  You could do that?

12        PROSPECTIVE JUROR 34:  Yeah.

13        THE COURT:  What time do you need to be home for

14  child care?

15        PROSPECTIVE JUROR 34:  At around dinnertime, but

16  after 5:00.

17        THE COURT:  Okay.  I'm not familiar with this area at

18  all.  How far is it that you live from the courthouse here?

19        PROSPECTIVE JUROR 34:  About an hour.

20        THE COURT:  Okay.  So if we wouldn't finish till 5:30

21  on a night, you wouldn't get home till 6:30.  Could you do

22  that?

23        PROSPECTIVE JUROR 34:  Yeah, that would be okay.

24        THE COURT:  Okay.  Follow-up questions by the

25  Government?

Jury Selection

 1          MR. STUMP:  No.  Thank you.

 2          THE COURT:  Ms. Solomon?

 3          MS. SOLOMON:  I have just one question.  Would your

 4  thinking about your children and their welfare interfere with

 5  your ability to pay attention to the case?

 6          PROSPECTIVE JUROR 34:  I've been thinking about them

 7  today.

 8          MS. SOLOMON:  Okay.  But you've been able to follow?

 9  They're sort in the back of your mind?

10          PROSPECTIVE JUROR 34:  Yeah, in the back of my mind.

11          MS. SOLOMON:  Okay.  Do you work outside the home?

12          PROSPECTIVE JUROR 34:  I'm a teacher, so I am not

13  right now.

14          MS. SOLOMON:  But during the school year, you work

15  outside the home?

16          PROSPECTIVE JUROR 34:  Yes.

17          MS. SOLOMON:  So you don't think about them all day,

18  or when you do, they're in the back of your mind?

19          PROSPECTIVE JUROR 34:  I get to see them during the

20  day because they're in the nursery where I work.

21          MS. SOLOMON:  Oh, okay.

22          PROSPECTIVE JUROR 34:  I did have one other question.

23  You asked about the faith base.  Because I believe in the Bible

24  and what it says, do you think it would cause any problems or

25  anything in religion that may be brought up during the --

THE COURT: Here's what I was getting at. There are some religions -- and I think it might be the Mormons -- who aren't allowed to sit in judgment to people. Therefore, they have a religious belief such that they cannot sit as jurors.

PROSPECTIVE JUROR 34: Okay.

THE COURT: I'm not sure if it's the Mormons or not. Do you hold any of those beliefs?

PROSPECTIVE JUROR 34: No.

THE COURT: Okay. That's what I was interested in.

PROSPECTIVE JUROR 34: Okay.

MS. SOLOMON: Could I just ask a follow-up on that?

THE COURT: Sure.

MS. SOLOMON: Because there may be some references to religious beliefs of some sort in this case, if they were not the same that you shared, would that make it difficult for you to just keep in mind what those doctrines are for the purposes of this case, you know, without thinking about: Well, I don't believe that so, therefore, I can't accept this document? Would that be a problem for you?

PROSPECTIVE JUROR 34: I think I would be okay with it, as long as it did not go against what I believe from the Bible.

MS. SOLOMON: Okay. So you would approach the documents from your perspective.

PROSPECTIVE JUROR 34: I believe so.

1        MS. SOLOMON:  Okay.

2        MR. STUMP:  Can I ask a follow-up?

3        THE COURT:  Sure.

4        MR. STUMP:  If we didn't prove the case to you but

5   you decided that you just didn't like what the defendant had

6   done for your own religious reasons, would you be more inclined

7   to vote guilty because of that, or would you able to follow the

8   law and the evidence and vote not guilty if we failed to prove

9   the case to you?

10        PROSPECTIVE JUROR 34:  I would want to follow the

11   case and the evidence that was given.

12        MR. STUMP:  Thank you.

13        THE COURT:  Okay.  Thanks.  We'll see you at 1:00

14   o'clock.

15        PROSPECTIVE JUROR 34:  Thank you.

16        THE COURT:  How old are your kids, by the way?

17        PROSPECTIVE JUROR 34:  Two and the other one just

18   turned one.

19        THE COURT:  Wow.  Well, maybe we'll let you forget

20   about them for a day and give you a break.

21        MS. SOLOMON:  Give you a vacation.

22     (Laughter.)

23        THE COURT:  Thank you.

24     (Prospective Juror 34 departs.)

25        THE COURT:  Okay.  We're in open court and out of the

Jury Selection

1  presence of everyone now.  Are there any additional challenges

2  for cause based upon what these two jurors indicated?  Although

3  I am excusing Juror 20 by agreement for cause, how about

4  Juror 9?

5         MR. STUMP:  Your Honor, I'd strike him for cause

6  because it seems like he -- he has a felony conviction, and

7  he's not sure his rights have been restored.  I don't think

8  that's fair to either party.

9         THE COURT:  Ms. Solomon?

10         MS. SOLOMON:  I would concur.

11         THE COURT:  Yes, I just don't think I can keep him

12  without knowing whether his rights have been restored or not.

13  That is a disability that is disqualifying.  So Juror 9 will be

14  excused for cause, also.  So far for cause, we have 9, 12, 16,

15  and 20.  Does the Government have any other challenges for

16  cause?

17         MR. STUMP:  No, Your Honor.

18         THE COURT:  The defense?

19         MS. SOLOMON:  I thought that -- well, I guess I was

20  concerned about the jurors with Homeland Security connections.

21  That was Juror 15 and Juror 21, whose sister is a prosecutor

22  for Homeland Security.  I think both of those should be

23  stricken for cause.

24         THE COURT:  Mr. Stump?

25         MR. STUMP:  Your Honor, they may be related to people

1  that work in law enforcement, but so were some other

2  prospective jurors.  Both of those prospective jurors indicated

3  on the record that they could be fair and impartial.  I saw no

4  reason to disbelieve their statements in that regard, so we'd

5  oppose that motion.

6        THE COURT:  Okay.  I agree with Government on this

7  one.  I think they indicated they could be fair and impartial.

8  There is a law enforcement connection there, but I don't think

9  it's disqualifying.

10        For judicial notice purposes, the Court notes that

11  Juror 22 is an African-American.  I did not see any other

12  African-Americans on the panel.  You can correct me if I'm

13  wrong, but she was the only one who I could tell was obviously

14  African-American.  The defendant in this case is

15  African-American.

16        Okay.  So how about if we join back up about 12:30,

17  and we'll do peremptory challenges and pick the jury.  Then

18  I'll give some jury instructions, and we'll go into opening

19  statements.  Anything else we need to do right now?  We have

20  that motion in limine yet.

21        MR. STUMP:  There is that, Judge, and then also I had

22  talked to Ms. Solomon.  I want to make sure it's clear with the

23  Court.  There are two exhibits that I was going to just show to

24  the jury during my opening statement.  Ms. Solomon indicated to

25  me that she didn't have any problem with that, but I wanted to

Jury Selection

1 make sure that I wasn't offending the Court's rules.

2        THE COURT:  No, no.  As long as the defense counsel

3 has no objection, I have no objection.  That's fine.

4        MS. SOLOMON:  No objection.

5        THE DEFENDANT:  Judge, for the record, I'm not an

6 African-American.

7        THE COURT:  I'm sorry?

8        THE DEFENDANT:  For the record, I'm not an

9 African-American.

10        THE COURT:  Okay.  I'm sorry.  You appear to be, just

11 from the naked eye.  I just want to make certain that the

12 record was clear, so that there's no pervasive discrimination

13 by excluding jurors who might be of the same color as you.

14 That's the only reason I said that.  What is your race, if

15 you're not African-American?

16        THE DEFENDANT:  I am Asiatic.

17        THE COURT:  Okay.  Anything else?

18        MR. STUMP:  No, sir.

19        THE COURT:  All right.  We'll see you back at 12:30

20 then.

21     (Luncheon recess.)

22

23

24

25

```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,  )  No. 12 CR 872
 4                              )
              vs.               )  Chicago, Illinois
 5                              )
     CHERRON MARIE PHILLIPS,    )
 6                              )  June 16, 2014
                    Defendant.  )  12:30 p.m.
 7

 8                         VOLUME 1B
                      TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE MICHAEL J. REAGAN AND A JURY

10
     APPEARANCES:
11
     For the Government:     MR. NATHAN D. STUMP
12                           (United States Attorney's Office,
                              9 Executive Drive,
13                            Fairview Heights, Illinois  62208)

14
     For the DEFENDANT:      MS. LAUREN WEIL SOLOMON
15                           (Lauren Weil Solomon,
                              P.O. Box 2013,
16                            Highland Park, Illinois  60035)

17

18

19

20

21

22

23                         PATRICK J. MULLEN
                          Official Court Reporter
24            219 South Dearborn Street, Room 1412,
                        Chicago, Illinois  60604
25                           (312) 435-5565
```

1      (Proceedings in open court.  Jury out.)

2              THE COURT:  Okay.  Counsel, are you ready to proceed?

3              MR. STUMP:  Yes, Your Honor.

4              MS. SOLOMON:  Yes, Judge.

5              THE COURT:  All right.  We're in open court out of

6      the presence of the jury for the jury selection to proceed.

7      We'll start, consistent with what I told you at the final

8      pretrial, with Juror 1 to the Government.  Juror 1, accept or

9      reject?

10             MR. STUMP:  Accept, Your Honor.

11             THE COURT:  To the defendant?

12             MS. SOLOMON:  Accept.

13             THE COURT:  Okay.  Juror 1 will be our first juror.

14             Juror 2, to the defendant?

15             MS. SOLOMON:  The defense will strike.

16             THE COURT:  Juror 2 is stricken, defendant.

17             Juror 3, to the Government?

18             MR. STUMP:  Strike, Your Honor.

19             THE COURT:  Juror 3 is stricken, United States.

20             Juror 4, to the defendant?

21             MS. SOLOMON:  Strike.

22             THE COURT:  Juror 4 is stricken, defendant.

23             Juror 5, to the United States?

24             MR. STUMP:  Accept, Your Honor.

25             THE COURT:  To the defendant?

1        MS. SOLOMON:  Strike.

2        THE COURT:  Juror 5 is stricken, defendant.

3        Juror 6, to the defendant?

4        MS. SOLOMON:  Strike.

5        THE COURT:  Juror 6 is stricken, defendant.

6        Juror 7, to the United States?

7        MR. STUMP:  Accept.

8        THE COURT:  To the defendant?

9        MS. SOLOMON:  Accept.

10       THE COURT:  Juror 7 will be our second juror.

11       Juror 8, to the defendant?

12       MS. SOLOMON:  Accept.

13       THE COURT:  To the United States?

14       MR. STUMP:  Accept.

15       THE COURT:  8 will be our third juror.

16       Juror 10, to the United States?

17       MR. STUMP:  Strike.

18       THE COURT:  10 is stricken, United States.

19       Juror 11, to the defendant?

20       MS. SOLOMON:  Accept.

21       THE COURT:  To the United States?

22       MR. STUMP:  Accept.

23       THE COURT:  Juror 11 will be our fourth juror.

24       Juror 13, to the United States?

25       MR. STUMP:  Accept.

1          THE COURT:  To the defendant?

2          MS. SOLOMON:  Strike.

3          THE COURT:  Juror 13 is stricken, defendant.

4          Juror 14, to the defendant?

5          MS. SOLOMON:  Accept.

6          THE COURT:  To the United States?

7          MR. STUMP:  Accept.

8          THE COURT:  14 will be our fifth juror.

9          Juror 15, to the United States?

10         MR. STUMP:  Accept.

11         THE COURT:  To the defendant, 15, Ms. Solomon?

12         MS. SOLOMON:  Strike.

13         THE COURT:  Okay.  15 is stricken, defendant.

14         Juror 17, to the defendant?

15         MS. SOLOMON:  Accept.

16         THE COURT:  To the United States?

17         MR. STUMP:  Strike.

18         THE COURT:  17 is stricken, United States.

19         Juror 18, United States?

20         MR. STUMP:  Accept.

21         THE COURT:  To the defendant?

22         MS. SOLOMON:  Accept.

23         THE COURT:  18 will be our sixth juror.

24         Juror 19, to the defendant?

25         MS. SOLOMON:  Can I have a moment?  Oh, accept.

1            THE COURT:  To the United States?

2            MR. STUMP:  Accept.

3            THE COURT:  That will be our seventh juror.  19 will

4  be our seventh juror.

5            Juror 21, to the United States?

6            MR. STUMP:  Accept.

7            THE COURT:  To the defendant?

8            MS. SOLOMON:  Accept.

9            THE COURT:  21 will be our eighth juror.

10            Juror 22, to the defendant?

11            MS. SOLOMON:  Accept.

12            THE COURT:  To the United States?

13            MR. STUMP:  Strike.

14            THE COURT:  22 is stricken, United States.

15            Juror 21 -- I'm sorry.  Juror 23, to the United

16  States?

17            MR. STUMP:  Accept.

18            THE COURT:  To the defendant?

19            MS. SOLOMON:  Accept.

20            THE COURT:  23 will be our ninth juror.

21            24, to the defendant?

22            MS. SOLOMON:  Strike.

23            THE COURT:  24 is stricken, defendant.

24            25, to the United States?

25            MR. STUMP:  Accept.

1           THE COURT:  To the defendant?

2           MS. SOLOMON:  Accept.

3           THE COURT:  25 will be our tenth juror.

4           Juror 26, to the defendant?

5           MS. SOLOMON:  Accept.

6           THE COURT:  To the United States?

7           MR. STUMP:  Accept.

8           THE COURT:  26 will be our eleventh juror.

9           Juror 27, to the United States?

10          MR. STUMP:  Accept.

11          THE COURT:  To the defendant?

12          MS. SOLOMON:  Accept.

13          THE COURT:  27 will be our twelfth juror.

14          Okay.  No challenges.  We'll start over now.  Each

15   side has one challenge for the two alternates.  We start over

16   again.  Juror 28, the first alternate, to the United States?

17          MR. STUMP:  Accept.

18          THE COURT:  To the defendant?

19          MS. SOLOMON:  Accept.

20          THE COURT:  Okay.  Our first alternate is Juror 28.

21       (Discussion off the record.)

22          THE COURT:  For our second alternate, Juror 29, to

23   the defendant?

24          MS. SOLOMON:  Accept.

25          THE COURT:  To the United States?

1            MR. STUMP:  Accept.

2            THE COURT:  Okay.  Juror 29 will be our second

3    alternate.

4            All right.  I'll go through them to make sure you're

5    on the same page as I am.  The first juror is Juror 1.  The

6    second is Juror 7.  The third is Juror 8.  The fourth is Juror

7    11.  The fifth is Juror 14.  The sixth is Juror 18.  The

8    seventh is Juror 19.  The eighth is Juror 21.  The ninth is

9    Juror 23.  The tenth is Juror 25.  The eleventh is Juror 26.

10   Then twelfth is Juror 27.  The first alternate is Juror 28.

11   The second alternate is Juror 29.  Does the Government agree?

12           MR. STUMP:  Yes, Your Honor.

13           THE COURT:  Does the defendant agree?  Do you agree,

14   Ms. Solomon?

15           MS. SOLOMON:  I'm sorry.  I lost track.  I think I'm

16   missing seven and eight.

17           THE COURT:  Seven is Juror 19.

18           MS. SOLOMON:  Okay.

19           THE COURT:  Eight is Juror 21.

20           MS. SOLOMON:  Okay.  I accept.

21           THE COURT:  Okay.  Counsel, the next thing I'd like

22   you to do, why don't you come to sidebar and take a look at

23   Court's Instruction No. 1.  I don't think I went over this with

24   you.  It's Pattern Instruction 10.11 regarding the Internet.

25   Did we go over that?

1          MR. STUMP:  We went over something like that, Judge.

2   I don't know if it's the same exact one.

3          THE COURT:  Do you want to take a look?  I didn't

4   have it in my notes.  I just want to make sure there's no

5   objection to it.

6      (Brief pause.)

7          THE COURT:  No objection.

8          MR. STUMP:  No objection, Your Honor.

9          THE COURT:  Ms. Solomon, any objection?

10         MS. SOLOMON:  No objection.

11         THE COURT:  All right.  Court's Instruction 1, which

12  is Seventh Circuit Pattern Instruction 10.11, will be given.

13  So once we impanel the jury and they're sworn, I'll give them a

14  little information about the case, and then I'm going to read

15  several instructions but not all of them.

16         At this time, I think what we have left is the

17  recently filed motion in limine by the defendant at document

18  151.  Ms. Solomon?

19         MS. SOLOMON:  I filed a motion in limine to preclude

20  all references of any kind to any of the groups listed in the

21  motion, including "sovereign citizen" and "patriot people."

22  It's become particularly important in light of the events of

23  the last couple of weeks, during which there have been two

24  incidents that have received a significant amount of publicity.

25  I think that any reference during the course of the trial to

1   any of these groups would have a negative and prejudicial

2   impact on the trial.

3          With respect to the one document that says "patriot

4   people" in it with the apology letter, the "patriot" can easily

5   be redacted from the letter.  It would have the same force and

6   effect and impact as defendant's prior statement.  That would

7   go against her as an admission.  Whether or not it's who she

8   spoke with, as the Court has indicated, ignorance of the law is

9   not a defense.  It won't matter at all whether it's patriot

10  people or people in the public.  So I think that that could be

11  redacted from the statement, and that would take it out of the

12  trial altogether.

13         Now, I have noticed that in much of the discovery --

14  I'm sorry -- in much of the discovery there are references to

15  terrorism in the documents.  That's not part of the exhibits,

16  but I would certainly hope that if any of those documents are

17  at any time introduced during the course of the trial that they

18  would also be redacted with that language excluded.

19         THE COURT:  Mr. Stump?

20         MR. STUMP:  Your Honor, fundamentally, I don't have a

21  problem with the motion.  I see her point of view on this.

22  There are two issues that I have before I could just say that I

23  would agree to it.  One is that we did mention the phrase

24  "sovereign citizen" during the voir dire process, so that cat

25  in a sense is already out of the bag.

1          I would be fine instructing my witnesses to try to

2   avoid that phrase.  I think we can accomplish it, but I can't

3   be 100 percent sure that that phrase isn't going to slip out at

4   some point from some witness, and I don't want to be, you know,

5   held accountable for that.

6          The other thing that I'm concerned about is the

7   apology letters that say "patriot people."  I just don't see

8   the word "patriot" as something that is so prejudicial to the

9   defense or so obviously connected to some extremist group that

10  leaving it in the document would violate Rule 403.

11         Frankly, I think having it blacked out or removed

12  from the document would leave more questions in the jurors'

13  minds about what sort of people we had to keep them from

14  knowing about.  So my inclination would be to ask the Court to

15  allow us to keep those exhibits in evidence without any

16  redaction.

17         One final thing I want to make sure the Court is

18  aware of is that the phrase that Ms. Solomon put in her

19  position was "sovereign citizen."  That phrase doesn't appear

20  in any of the documents that I intend to introduce into

21  evidence, nor does the term "terrorism" or "terrorist," and

22  that's a separate motion which we've agreed to.  But the word

23  "sovereign" does appear in a number of documents.  We'd ask

24  that those documents be allowed in without any sort of

25  redaction because those are the words that she chose, and I

don't think the word "sovereign" by itself necessarily would

violate 403, either.

    MS. SOLOMON:  The motion is not addressed to that at

all.  The insignia on the documents is the Sovereign Consulate

of America, I believe.  So there's no automatic connection

between that phrase on the letterhead and what I'm talking

about, which is the Sovereign Citizen Movement.

    I think had the events of the last couple of weeks

not occurred, there not might have been this automatic

association with patriot people and a negativity, but all you

have to do is go onto the Internet and there are articles that

connect the events in Las Vegas to the Patriot Movement.  I

think that if for any reason anybody has seen those articles,

then that's going to make a direct connection between that

movement and the apology letter.

    I think that there's also -- on the Internet, there

was both the YouTube and commentary afterwards from the Hate

Watch publication of the Southern Law Poverty Center that has

Glenn Beck's take on the Patriot Movement and connecting it to

Terry Nichols who's connected to the Oklahoma bombing.

    So I think it's a very loaded word, and I think it

has loaded connotations and that people will make that

connection.  I think if it's stricken, one can't do a Google

search for the unknown blacked-out word.  One can if it's in

there.

 1          THE COURT:  What is the relevance of the word
 2  "patriot" in the, quote, apology letter?
 3          MR. STUMP:  It's only because it's the word that she
 4  chose, Your Honor.  That's it.
 5          THE COURT:  Okay.  I'm very concerned about the use
 6  of certain buzz words.  I brought up "domestic terrorism," for
 7  example, at the final pretrial.  I think many of the phrases in
 8  defendant's motion in limine in the first paragraph are buzz
 9  words:  sovereign citizens, patriot groups, patriot people,
10  anti-government extremist group, anti-police sentiment, violent
11  extremist group, right-wing extremist group, militia groups,
12  military or anarchist groups.  I agree with defense counsel
13  that those are buzz words that could lead the jury down a path
14  they ought not go.  To that extent, the motion is granted.
15          With respect to the word "patriot" and its use in the
16  apology letter, my initial impression is she used these words,
17  and she's stuck with them.  However, I don't hear any relevance
18  to that word in and of itself, and I think it could lead the
19  jury down the path with the other ones.  So I'm going to grant
20  the motion by the defendant and redact "patriot."
21          MS. SOLOMON:  Thank you.
22          THE COURT:  Tell the witnesses not to use those
23  words, and if we need to revisit it, I'm happy to at any time.
24          MR. STUMP:  Yes, Your Honor.
25          THE COURT:  So the defendant's motion is granted over

1   the objection of the United States.

2          MR. STUMP:  Thank you, Your Honor.  Just for

3   practical purposes, I have a couple witnesses today to whom I

4   was going to show the apology letter that has that word in it.

5   For timing purposes, I don't know if it would be now or later

6   this afternoon that you would like me to take a moment to

7   redact those.

8          THE COURT:  We'll probably have time later.  We'll

9   pick the jury.  I'll make some prefatory remarks to them, and

10  we'll have opening statements.  If nothing else, they won't see

11  it until we send it back with them, unless you intend on

12  passing it around as part of your testimony.

13         MR. STUMP:  Judge --

14         THE COURT:  We have no document camera in this

15  courtroom?

16         MR. STUMP:  No, we have no document camera.

17         THE COURT:  I noticed that.

18         MR. STUMP:  I noticed it last week, and I assumed

19  that someone was going to wheel one in.

20         THE COURT:  We had one at the final pretrial

21  conference in the courtroom.  Was that this courtroom?

22         MR. STUMP:  No, it was a different one.

23         THE COURT:  Okay.  Can we get a document camera?

24         THE CLERK:  Let me call, Judge.

25         THE COURT:  Okay.  If not, you're going to have to do

1   it as I learned, Mr. Stump, that is, handing it around, like

2   shortly after fire was invented.  While Alice is working on

3   that, we can get the jury.

4           Where is Mike?

5           THE CLERK:  I think he's in the hallway.

6           THE COURT:  Okay.  Can you tell Mike to have them

7   come in?

8       (Venire in.)

9           THE COURT:  Okay.  Sit wherever you want.  This is

10  America.

11      (Discussion off the record.)

12          THE COURT:  Okay, folks.  Thanks for your patience

13  and thanks for your kind attention while we asked you the

14  questions.  We have the jury selected.  If your number is not

15  chosen, please call the number that you have been assigned,

16  because you might get lucky and we might need you next week or

17  in the next couple of days.  Otherwise, would the following

18  jurors please come forward:  Juror 1, Juror 7, Juror 8, Juror

19  11, Juror 14, Juror 18 -- and you can sit anywhere -- 19, 21,

20  25, 26, 27, 28, and 29.

21          MR. STUMP:  23?

22          THE COURT:  Oh, 23, yes.  Okay.  That's 14.

23          Counsel for the Government, is this the correct

24  group?

25          MR. STUMP:  Yes, Your Honor.

1          THE COURT:  For the defense?

2          MS. SOLOMON:  Yes.

3          THE COURT:  Okay.  Folks, you're all released.  Thank

4   you very much.  Remember to call.  They may need you next week

5   or this week.  I don't know how things work up there.  Thank

6   you.

7      (Venire excused.)

8          THE COURT:  Okay, folks.  Could you please stand and

9   take one more oath?

10         THE CLERK:  Please raise your right hands.

11     (Jury duly sworn.)

12         THE COURT:  Okay.  Please be seated, folks.

13         Let me tell you a little bit about how we're going to

14  proceed.  We'll start each morning roughly at 9:00 o'clock, so

15  I'd ask you to be here a few minutes early.  As long as you're

16  here and I'm here, we can start, but we need all of you.

17         About an hour and a half into each day, we'll take a

18  break for 15 or 20 minutes, and then we'll break roughly at

19  noon for about an hour for lunch.  We'll then work again for

20  half a day, take another break mid-afternoon, and the goal is

21  to end the testimony at about 5:00 o'clock each day.  If,

22  however, at quarter to 5:00 we're at a point where we're going

23  to call another witness and we're not going to finish with him,

24  we might just break for the day rather than split them up.  By

25  the same token, if we can finish a witness completely by 5:30,

1    we'll go until then, but we'll never stay beyond 5:30.  Okay?

2           If you need to take a break at any time that I

3    haven't scheduled, just raise your hand.  Get Mike's attention

4    or my attention, and I will certainly make sure that we take a

5    break.  Mike is in charge of security here in our courtroom, so

6    if he tells us, you know, to do something because there's some

7    kind of bad weather or anything like that, he'll tell you

8    exactly where to go.

9           Our court reporter is taking down everything that's

10   being said.  You will not have a copy of the transcript, but

11   you will be allowed to take notes if you want to, and I'll have

12   an instruction on that.  You don't have to take notes, and

13   they're for your personal use.

14          We have two courtroom deputies assisting today.

15   They'll help with the evidence, swearing in the witnesses, take

16   care of the calendar, run the docket, that type of thing. Then

17   my law clerk from East St. Louis, Meg, is with me.  She's a

18   lawyer, and she's helped me work on the case so far.

19          We're going to start with me giving you some jury

20   instructions.  It used to be that we gave you instructions all

21   at the end of the case.  So you'd hear all this evidence, you'd

22   hear the attorneys' opening statements, you'd hear the

23   arguments, and then only at the end did you find out what the

24   law is.

25          I asked when I first started why we do it that way,

1   and the answer was because we've always done it that way.

2   Well, that made no sense.  So what I do now is give you many of

3   the instructions at the beginning.  There will be some more

4   instructions during the course of the case and more

5   instructions at the very end.  You're to consider them as a

6   whole, not singling out any one instruction over the other, and

7   you'll be given a written copy of all the instructions to take

8   with you into the jury room at the end of the case.

9           Once I've instructed you preliminarily -- and I

10  assure you that there will be more instructions -- then the

11  Government can make an opening statement.  That's merely them

12  telling you what they think their case is about, what they

13  think they can prove to you.  The defense then has a right to

14  make an opening statement if they want to, also.

15          Those statements are not evidence.  The only

16  evidence, as I indicated, is what you see and hear from the

17  witness stand under oath subject to cross-examination, or if

18  the parties agree to what we call a stipulation, I'll tell you

19  about it and that you can consider it as evidence.  Other than

20  that, you should consider nothing that you see or hear outside

21  of this courtroom.

22          So let me start with some of the instructions.  Some

23  of these are written in the past tense.  I'm going to read them

24  just as they're written, again, because we usually instruct you

25  at the end.  So it's going to sound strange to you because I

1   might say "you have heard evidence that."  Well, you haven't

2   heard anything yet, but you'll understand why I'm doing it.

3          Before we begin the trial, I want to discuss several

4   rules of conduct that you must follow as jurors.  First, you

5   should keep an open mind throughout the trial.  Do not make up

6   your mind about what your verdict should be until the trial is

7   over, you have received my final instructions on the law, and

8   you and your fellow jurors have discussed the evidence.

9          Your verdict in this case must be based exclusively

10  on the law as I give it to you and the evidence that is

11  presented during the trial.  For this reason and to ensure

12  fairness to both sides in this case, you must obey the

13  following rules.  These rules apply both when you're here in

14  court and when you're not in court.  They apply until after you

15  have returned your verdict in this case.

16         Number one, you must not discuss the case with anyone

17  who's involved in this case, among yourselves, until you go

18  into the jury room to deliberate after the trial is completed.

19         Number two, you must not communicate with anyone else

20  about this case, including anyone who's involved in the case,

21  until after you have returned your verdict.

22         Number three, when you are not in the courtroom, you

23  must not allow anyone to communicate with you about the case or

24  to give you any information about the case or about anyone who

25  is involved in the case.  If someone tries to communicate with

1  you about the case or someone who is involved in the case, or

2  if you overhear or learn any information about the case or

3  someone involved in the case when you are not in the courtroom,

4  you must report this to me promptly, and you will do that by

5  notifying Mike or his designee if he's not here.

6         You may tell your family and your employer that you

7  are serving on a jury so that you can explain that you have to

8  be here in court.  However, you must not communicate with them

9  about the case or anyone who's involved in the case until after

10  you have returned your verdict.

11         Number five, all the information that you will need

12  to decide this case will be presented here in court.  You may

13  not look up, obtain, or consider information from any outside

14  source.

15         There are two reasons for these rules.  First, it

16  would not be fair to the parties in the case for you to

17  consider outside information or communicate information about

18  the case to others.  Second, outside information may be

19  incorrect or misleading.

20         When I say that you may not obtain or consider any

21  information from outside sources and you may not communicate

22  with anyone about the case, I am referring to any and all means

23  by which people communicate or obtain information.  This

24  includes, for example, face-to-face conversations, looking up

25  things, doing research, reading, watching, or listening to

reports in the news media, and any communication using any

electronic device or media, such as a telephone, cell phone,

smartphone, iPhone, Android, BlackBerry or similar device,

including PDAs, computers, the Internet, text messaging, chat

rooms, blogs, social networking websites like Facebook,

YouTube, Twitter, GooglePlus, Linkedin, or any other form of

communication at all.  If you hear, see, or receive any

information about the case by these or any other means, you

must report that to me immediately.

I would note parenthetically that over the weekend

the local newspaper where I come is actually the St. Louis

Dispatch.  I'm in Illinois, but St. Louis is right across the

river.  There was an editorial in that particular newspaper

about a jury that had been permitted to deliberate with their

cell phones.  During the deliberations, one of the jurors

looked up the word "punitive damages."  The jurors came back

with a $7 million verdict for a policeman, and that verdict is

now in jeopardy because the jury did something they weren't

supposed to do.

So this something that is really important to us.

This is a very emotionally charged case for both sides.  It's

very expensive to bring these cases.  You'll see the witnesses

are coming in from many parts of the country.  It's emotionally

draining for a defendant who's facing a criminal charge, for

the Government who has to present its case.  So this isn't just

1 a matter of us coming in one day and spending a few hours

2 trying the case. We've been working on this case literally for

3 years.

4          I will now instruct you on the law that you must

5 follow in deciding the case. I will also give you a copy of

6 these instructions to use in the jury room. You must follow

7 all of my instructions about the law, even if you disagree with

8 them. This includes the instructions I gave you before the

9 trial, the instructions that I gave you during the trial, and

10 the instructions that I'm giving you now.

11          As jurors, you have two duties. Your first duty is

12 to decide the facts from the evidence that you saw and heard

13 here in court. That is your job, not my job or anyone else's

14 job. Your second duty is to take the law as I give it to you,

15 apply it to the facts, and decide if the Government has proved

16 the defendant guilty beyond a reasonable doubt.

17          You must perform these duties fairly and

18 impartially. Do not let sympathy, prejudice, fear, or public

19 opinion influence you. In addition, do not let any person's

20 race, color, religion, national ancestry, or gender influence

21 you. You must not take anything I said or did during the trial

22 as indicating that I have an opinion about the evidence or what

23 I think your verdict should be.

24          The charges against the defendant are in a document

25 called an indictment. You will have a copy of the indictment

1 during your deliberations.  The indictment in this case charges

2 that the defendant committed the crime of retaliating against a

3 federal employee by false claim.  The defendant has pled not

4 guilty to the charges.  The indictment is simply the formal way

5 of telling the defendant what crimes he is accused of

6 committing.  It is not evidence that the defendant is guilty.

7 It does not even raise a suspicion of guilt.

8          The defendant is presumed innocent of each and every

9 one of the charges.  This presumption continues throughout the

10 case, including during your deliberations.  It is not overcome

11 unless from all the evidence in the case you are convinced

12 beyond a reasonable doubt that the defendant is guilty as

13 charged.

14          The Government has the burden of proving the

15 defendant's guilt beyond a reasonable doubt.  This burden of

16 proof stays with the Government throughout the case.  The

17 defendant is never required to prove her innocence.  She is not

18 required to produce any evidence at all.

19          You must make your decision based only on the

20 evidence that you saw and heard here in court.  Do not consider

21 anything you may have seen or heard outside the court,

22 including anything from the newspaper, television, radio, the

23 Internet, or any other source.

24          This evidence includes only what the witnesses said

25 as they were testifying under oath and the exhibits that I

allowed into evidence.  Nothing else is evidence.  The lawyers'
statements and arguments are not evidence.  If what a lawyer
said is different from the evidence as you remember it, the
evidence is what counts.

         The lawyers' questions and objections, likewise, are
not evidence.  A lawyer has a duty to object if he or she
thinks a question is improper.  If I sustain objections to any
questions that were asked, you must not speculate on what the
answers might have been.  If during trial I struck testimony or
exhibits from the record or told you to disregard something,
you must not consider it.

         Give the evidence whatever weight you decide it
deserves.  Use your common sense in weighing the evidence, and
consider the evidence in light of your own everyday experience.
People sometimes look at one fact and conclude from it another
fact exists.  This is called an inference.  You are allowed to
make reasonable inferences so long as they are based on the
evidence.

         You may have heard the terms "direct evidence" and
"circumstantial evidence."  Direct evidence is evidence that
directly proves a fact.  Circumstantial evidence is evidence
that indirectly proves a fact.  You are to consider both direct
and circumstantial evidence.  The law does not say that one is
better than the other.  It is up to you to decide how much
weight to give to any evidence, whether it's direct or

1  circumstantial.

2         It is proper for an attorney to interview any witness

3  in preparation for trial.

4         You have heard testimony that the defendant made a

5  statement to agents of the FBI.  You must decide whether the

6  defendant actually made the statement and, if so, how much

7  weight to give to the statement.  In making these decisions,

8  you should consider all the evidence, including the defendant's

9  personal characteristics and the circumstances under which the

10  statement may have been made.

11         You have heard a witness, namely, Monte Swank, who

12  gave opinions and testimony about fingerprint identification

13  and analysis.  You do not have to accept his opinions and

14  testimony.  You should judge his opinions and testimony the

15  same way you judge the testimony of any other witness.  In

16  deciding how much weight to give to his opinions and testimony,

17  you should consider the witness' qualifications, how he reached

18  his conclusions, and the factors I have described for

19  determining the believability of testimony.

20         If you have taken notes during the trial, you may use

21  them during deliberations to help you remember what happened

22  during the trial.  You should use your notes only as aids to

23  your memory.  The notes are not evidence.  All of you should

24  rely on your independent recollection of the evidence, and you

25  should not be unduly influenced by the notes of other jurors.

1    Notes are not entitled to any more weight than the memory or

2    impressions of each juror.

3            A lien or encumbrance includes any document claiming

4    an interest in property as security for a debt.  A lien or

5    encumbrance is false unless a specific statute provides for it,

6    the property owner consents to it, or a court has imposed it.

7    A lien or encumbrance that asserts a fictitious debt or a debt

8    in excess of what is actually owed contains a false or

9    fictitious statement or representation.

10           The indictment charges that the crime happened,

11   quote, on or about, closed quote, certain dates.  The

12   Government must prove that the crimes happened reasonably close

13   to those dates.  The Government is not required to prove that

14   the crimes happened on those exact dates.

15           In deciding your verdict, you should not consider the

16   possible punishment for the defendant.  If you decide that the

17   Government has proved the defendant's guilt beyond a reasonable

18   doubt, then it will be my job to decide on the appropriate

19   punishment.

20           The defendant has been accused of more than one

21   crime.  The number of charges is not evidence of guilt and

22   should not influence your decision.  You must consider each

23   charge separately.  Your decision on each charge, whether it is

24   guilty or not guilty, should not influence your decision on any

25   other charge.

1    An offense may be committed by more than one person.

2  A defendant's guilt may be established without proof that the

3  defendant personally performed every act constituting the crime

4  charged.  If a defendant causes the acts of another, then the

5  defendant is responsible for those acts as though she

6  personally committed them.

7    A person attempts to commit the offense of

8  retaliating against a federal official by filing a false lien

9  if she, one, knowingly takes a substantial step towards

10  committing the offense and, two, does so with intent to commit

11  the offense.  A substantial step must be an act that strongly

12  corroborates that the defendant intended to carry out the

13  offense.

14    There will be more instructions as the case proceeds

15  and at the end, but that's just an initial group of

16  instructions for you.  Please remember your numbers.  You don't

17  need to wear them anymore, but don't forget them because at the

18  end of the case I'm going to refer to you again by juror

19  number.

20    The way I've done this proceeding today is the way I

21  do it in every case to keep your identities confidential

22  because, again, in federal court this is an open court.  People

23  are free to come and go.  This case will be uploaded to the

24  Internet eventually, and so we don't want your personal

25  identifiers or anything about you to be uploaded.  The only

1  thing that will appear on the Interest will be the numbers, so

2  that's why we've referred to you that way.  Also, the

3  questionnaires that you filled out have been collected and will

4  be destroyed so that that information is also outside of the

5  public domain.

6          At this time, this Court recognizes Mr. Stump for

7  opening statement.

8          MR. STUMP:  Thank you, Your Honor.  May it please the

9  Court.

10          THE COURT:  Mr. Stump, can you hang on?  We're going

11  to hand out the notebooks.

12      (Brief pause.)

13          THE COURT:  Okay, Mr. Stump.  Thank you.

14          OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

15          MR. STUMP:  Thank you, Your Honor.

16          Ladies and gentlemen of the jury, good afternoon.

17  From 1997 to 2011, the clerk of the court for this very

18  courthouse was a man named Michael Dobbins.  Now, being the

19  clerk meant that Mr. Dobbins managed the administrative affairs

20  of the courthouse, things like the staff, the finances,

21  information technology, juries and, of course, the filing of

22  court documents.

23          Documents that were filed at the courthouse and

24  documents that were received at the courthouse were

25  date-stamped with his name, Michael W. Dobbins, and his title,

1   Clerk of the U.S. District Court.

2           Well, in the summer of 2011, Mr. Dobbins was engaged

3   in a private real estate transaction.  He owned a condo here in

4   Chicago that came with a parking space, and he was trying to

5   sell the parking space.  Well, he was in the middle of the deal

6   when he was surprised to learn from his attorney that somebody

7   had placed a lien against his property.  You can imagine the

8   even greater surprise when he found out that it was a maritime

9   lien naming Dobbins, the vessel, and claiming that he owed

10  someone named Devon Phillips $100 billion.

11          Well, as it turns out, Mr. Dobbins was not alone in

12  this regard.  Similar liens were recorded in the public record

13  against the property of 11 other federal officials, two federal

14  prosecutors, four federal judges, four federal task force

15  officers, and one federal agent.  Of course, the liens were all

16  false, and the evidence will show that it was this defendant,

17  Cherron Marie Phillips, also known as River Tali, who caused

18  the liens to be filed, knowing when she filed them that they

19  were false.

20          Ladies and gentlemen, my name is Nathan Stump.  I'm

21  an assistant U.S. Attorney in the Southern District of

22  Illinois.  I'm here by special designation of the Attorney

23  General of the United States to present this case to you.  With

24  me at counsel table is Josh Rongitsch.  He's a special agent

25  with the FBI here in Chicago.  He was the lead investigator in

Stump - opening statement

1  the case.  Together he and I represent the United States of

2  America, and we're here today because what the defendant did to

3  those 12 people was not just wrong, but it was against the law.

4           Title 18, United States Code, section 1521, makes it

5  a federal crime for anyone knowingly to file or attempt to file

6  in the public record a false lien or encumbrance against the

7  real or personal property of any officer or employee of the

8  United States on account of the performance of that person's

9  official duties.

10           You may be wondering to yourself why anyone would do

11  that.  Well, to understand why the defendant filed the liens,

12  you have to know a little bit of the back story.  You see, from

13  2006 all the way to 2011 right here in this very courthouse,

14  there was another case called United States versus Phillips.

15  That case was assigned the case number 06 CR 778, and the

16  defendant in that case was Devon Phillips, this defendant's

17  brother.

18           Now, the evidence will show that Devon Phillips was

19  the subject of an investigation by federal task force officers

20  and federal agents with the Drug Enforcement Administration,

21  the DEA here in Chicago.  They caught him selling cocaine, and

22  the U.S. Attorney for this district here in the Northern

23  District of Illinois brought federal drug-trafficking charges

24  against Devon Phillips right here in this building.

25           Pat Fitzgerald was the U.S. Attorney at the time.

1   The lead prosecutor on the case was Assistant U.S. Attorney Tom

2   Shakeshaft, and the presiding judge was District Judge Joan

3   Lefkow.  Now, for a variety of reasons, the case against Devon

4   Phillips dragged on for a few years, but in November of 2008 he

5   pled guilty.

6           While his case was still pending, the defendant in

7   this case regularly attended her brother's court proceedings.

8   Even though she wasn't an attorney of record or a party in the

9   case, you'll hear testimony that she spoke out on a number of

10  occasions in the courtroom and was disruptive.  You'll also

11  hear evidence that she filed in the court record a number of

12  documents with strange legal-sounding names, like

13  administrative notice and demand, writ of quo warrant.

14          Ultimately, her misbehavior prompted Judge James F.

15  Holderman, who was then the chief judge of the U.S. District

16  Court, to convene a meeting of the court's executive committee.

17  On February 4th, 2011, the executive committee issued an order

18  against Cherron Phillips that placed some restrictions on her

19  ability to file document and attend court.

20          Now, five days after that order came out, February

21  9th, 2011, Judge Lefkow sentenced Devon Phillips, her brother,

22  to six and a half years in federal prison.  Even though the

23  case at that point was essentially over and in spite of the

24  executive committee's order, the filings continued.

25          On February 18th, 2011, nine days after the

1  sentencing, a document was filed in the record titled "Summons

2  to Appear."  The document bore the signature of someone named

3  "River Tali" and a thumb print.  The document ordered Judge

4  Holderman, who as you'll remember was the chief judge at that

5  time, to appear at a hearing before something called the common

6  law court.  It warned him that if he didn't appear at the

7  hearing, he would be arrested.

8          Then on March 7th, 2011, just a few weeks later, a

9  large envelope arrived at the courthouse by registered mail

10  addressed to Chief Judge Holderman.  In the envelope were a

11  number of documents, including one called "Common Law Bill of

12  Indictment," which called for the arrest of Judge Holderman for

13  failing to appear at the hearing as required by the summons.

14          Now, like the summons, many of the documents in this

15  packet included the signature of River Tali and a red thumb

16  print.  Well, the return address on the envelope said that it

17  came from Devon Phillips, but by that point he had been

18  sentenced and was incarcerated and wouldn't have had access to

19  registered mail.  So they strongly suspected that it was his

20  sister, Cherron Phillips, responsible for this mail.

21          Considering the bill of indictment as a potential

22  threat to the safety of the chief judge, the U.S. Marshal

23  referred the matter to Special Agent Rongitsch of the FBI here

24  in Chicago.  Agent Rongitsch was working on another case that

25  involved similar kinds of documents.  He'll tell you that

Stump - opening statement

1   because of that experience, when he found out about this, he

2   immediately became concerned that false maritime liens had been

3   filed against Chief Judge Holderman and other Government

4   officials.

5           Unfortunately, Agent Rongitsch was exactly right, but

6   he couldn't find the liens right away.  The breakthrough came

7   in August of 2011 when Mr. Dobbins found the lien on his

8   parking space.  Using the Dobbins lien as a guide, Agent

9   Rongitsch went down to the Cook County Recorder of Deeds and

10  quickly found eight other false maritime liens that had been

11  filed against Chief Judge Holderman, Judge Lefkow, U.S.

12  Attorney Fitzgerald, Assistant U.S. Attorney Shakeshaft, and

13  four federal task force officers who had all been involved in

14  the investigation and prosecution of Devon Phillips.

15          Well, in time Agent Rongitsch was able to find three

16  more liens.  He found one against DEA Special Agent Jesse

17  Williams and two more against Federal Magistrate Judges

18  Geraldine Soat Brown and Arlander Keys.  That made 12 total,

19  and these 12 liens were filed in March and April of 2011.

20          What you'll see is that the 12 liens are all signed

21  River Tali.  They all bear a red thumb print.  They all

22  reference the case of the defendant's brother, Devon Phillips,

23  by case number, and they all claim that the victims owe Devon

24  Phillips $100 billion.  Those 12 maritime liens are the reason

25  that we're all here today.

Stump - opening statement

1          When the trial is over, the overwhelming weight of

2     the evidence will show that the defendant, although she may not

3     have acted alone, Cherron Marie Phillips, also known as River

4     Tali, is the person responsible for the filing of the liens.

5     The evidence will also show that she knew they were false when

6     she filed them and that she filed them anyway as an act of

7     retaliation against the people she felt were responsible for

8     the investigation and the prosecution of her brother.

9          Now, ladies and gentlemen, the indictment in this

10    case charges 12 counts.  That's one for each lien.  It may take

11    the better part of several days for us to get through all the

12    evidence that we have to present to you.

13         I expect, for instance, that you're going to see more

14    than 40 exhibits, including some documents that were seized

15    from the defendant's home which definitively link her to the

16    commission of the crime.

17         I also expect that you're going to hear from over a

18    dozen of witnesses, including Mr. Dobbins, Chief Judge

19    Holderman, Judge Lefkow, former U.S. Attorney Pat Fitzgerald.

20    I also expect you're going to hear from an FBI fingerprint

21    examiner named Monte Swank, who will tell you that he found the

22    defendant's fingerprints on the mailing to Judge Holderman and

23    nine of the 12 maritime liens.

24         Now, when you've heard all of the testimony in this

25    case and you've seen all of the exhibits that there are to see,

Solomon - opening statement

1   I'm going to come back up before you and I'm going to deliver
2   my closing argument.  At that time, I'm going to ask you to
3   return the only verdict that the evidence in this case will
4   allow, and that's a verdict of guilty as charged on all 12
5   counts.  Thank you.
6           THE COURT:  Thank you, Mr. Stump.
7           Ms. Solomon?
8           OPENING STATEMENT ON BEHALF OF THE DEFENDANT
9           MS. SOLOMON:  Judge, Mr. Stump, and ladies and
10  gentlemen of the jury, good afternoon.
11          The Government brings criminal charges in a criminal
12  case and, as Mr. Stump said, the Government also bears the
13  burden of proof, and that's proof beyond a reasonable doubt.
14  That's a heavy burden, and that's a burden that you must hold
15  him to as you listen during the course of the trial and you
16  then go back to deliberate.
17          Now, some people think of trials as the modern day
18  battles or the modern day gladiator conflicts and, really,
19  that's not really true.  Lawyers are opposing one another in a
20  case, but what we really are are story tellers.  We're the
21  modern day story tellers with formal rules and requirements.
22  In the past, stories were told around the hearth of the
23  fireplace, and they were probably more interesting.  Lots of
24  times, the evidence or the witnesses that you're going to hear
25  are not really exciting or thrilling, but it's important

1  nonetheless that you listen to it all.

2          What's also important is that you keep an open mind.

3  So you have to think of a trial like reading a book, listening

4  to an audio book, or watching a film.  Sometimes if you go into

5  it and read a book or you go into a film and have read a

6  review, then you come in with a preconceived idea of what

7  you're going to see or what you're going to read.  Or if you're

8  like I am, I can't resist going to the end of the book to find

9  out what happens.

10          I don't want you to do that in this case.  I want you

11  to listen to the evidence, listen to the witnesses, and keep an

12  open mind about what this case is about and ultimately whether

13  or not Ms. Phillips is guilty of the crimes with which she's

14  charged.

15          As Mr. Stump indicated, this case did not start with

16  a criminal case involving Ms. Phillips.  It started with the

17  case of her brother, Devon.  She had no connection to that case

18  other than her brother having been charged with that.  So what

19  you have to think of, like a book or a movie, everything starts

20  with a seed.  The seed in this case was Ms. Phillips' loyalty

21  and love for her brother.  Now, she may have acted that out in

22  a misguided way, but what's important for you is to remember

23  that and to see how that seed develops in this case.

24          So I want you to listen carefully, be patient, be

25  tolerant, and at the end of the case reach a verdict of not

1 guilty. Thank you.

2          THE COURT: Thank you, Ms. Solomon.

3          Mr. Stump, your first witness, please?

4          MR. STUMP: Your Honor, the United States calls

5 Michael Dobbins.

6     (Brief pause.)

7          THE CLERK: Raise your right hand.

8     (Witness duly sworn.)

9          MR. STUMP: If it's all right with you, I'm going to

10 stand here.

11          THE COURT: As long as we can hear you.

12          MR. STUMP: Thank you.

13                    MICHAEL W. DOBBINS,

14               GOVERNMENT'S WITNESS, DULY SWORN

15                    DIRECT EXAMINATION

16 BY MR. STUMP:

17 Q. Sir, could you start by saying your full name and spelling

18 your last name for the record?

19 A. My name is Michael W. Dobbins, D-o-b-b-i-n-s.

20 Q. Mr. Dobbins, what do you do for a living right now?

21 A. I'm a court administrator consultant.

22 Q. In what city and state do you live?

23 A. I live in Chicago.

24 Q. What did you do before you had your current job?

25 A. I was the Clerk of the United States District Court here

1  for the Northern District of Illinois.

2  Q.  How long were you the clerk of the court in this

3  courthouse?

4  A.  From 1997 to December of 2011.  I retired in 2011.

5  Q.  Can you tell us a little bit about what the clerk of the

6  court does?

7  A.  Sure.  The clerk of the court is a federal position.  It's

8  a statutory position appointed by the district judges, and the

9  position is responsible for the administrative and operational

10  support for the court.  Administrative responsibilities are

11  human resources, budget, financial, fiscal, procurement.  On

12  the operational side, we're responsible for filing cases,

13  maintaining the court record, the proceedings of the court.

14  Q.  Can you tell us a little bit more about how documents are

15  filed at the courthouse?

16  A.  Yes.  On the operational side, when a new case comes in, we

17  are responsible for filing that case and assigning it to a

18  judge.  Then all subsequent pleadings and documents in that

19  case get filed in and chronologically entered on the docket of

20  the court.  In the course of filing that, we put the date and

21  the time of the proceedings.

22  Q.  You just mentioned that you put the date and time of

23  proceedings.  Is that a stamp that goes on the document?

24  A.  Correct.  It is a stamp.  It has the court, the date, the

25  time, and my name.

Dobbins - direct by Stump

1  Q.  It has your name on it?

2  A.  It did -- or it does.  Sorry.

3  Q.  Well, it did.

4  A.  Yes, correct.

5  Q.  Did it also have your title on the stamp?

6  A.  Yes, clerk of the court.

7  Q.  I want to show you what's been marked for identification as

8  Government Exhibit 13.4.  If you could take a look at that,

9  it's a one-page document.  Just tell me if you recognize it.

10  A.  I do.

11  Q.  Where did you first see this document?

12  A.  In the course of a real estate transaction.  I owned a

13  condominium, and with that condominium I had a parking space.

14  I was selling it.  There's one mortgage, but two different

15  properties, meaning that you get a different deed for the

16  parking space and you get a different deed for the condo.  In

17  the course of selling my parking space, my attorney called me

18  and said:  There's a lien filed against your property.

19  Q.  What was your reaction when he told you that?

20  A.  Well, I was shocked.  I didn't know anything about it at

21  the time, so I learned about it through that real estate

22  transaction.

23  Q.  And this document that I handed to you, what is it?

24  A.  It says "Notice of Claim of Maritime Lien" with my name on

25  it.

 1  Q.  And this particular document, have you seen this before?

 2  A.  Only when my attorney brought it to my attention.

 3  Q.  All right.  How much does it say for the lien that you owe?

 4  A.  $100 billion.

 5  Q.  And what was your reaction when you saw that?

 6  A.  I actually kind of laughed.  My attorney, when he called

 7  me, told me that he spoke with the title company and they said

 8  that this is kind of a bogus thing.

 9  Q.  Now, as you see on the top of the document, there is a

10  number.  There's a number of boxes, right?

11  A.  Correct.

12  Q.  Do you see your name at the top?

13  A.  I do:  "Name of vessel, Michael W. Dobbins."

14  Q.  And next to that box that says "Name of vessel, Michael W.

15  Dobbins," there's another box that references a case number.

16  Do you recognize that case number?

17  A.  I do not.

18  Q.  All right.  When you saw this, did you recognize the name

19  Devon Phillips on the document?

20  A.  No, I did not.

21  Q.  Do you know personally the defendant in this case?

22  A.  I do not.

23  Q.  Did you have any involvement with Devon Phillips or any

24  member of his family outside of your role as the Clerk of the

25  U.S. District Court?

1  A.  I did not.

2  Q.  And do you owe Devon Phillips or anyone in his family any

3  money at all?

4  A.  I do not.

5  Q.  I'll take that back.

6  A.  (Handing document to counsel.)

7       MR. STUMP:  One moment.

8    (Brief pause.)

9       MR. STUMP:  Your Honor, that's all the questions I

10  have.

11       THE COURT:  Ms. Solomon?

12                    CROSS-EXAMINATION

13  BY MS. SOLOMON:

14  Q.  Hello, Mr. Dobbins.

15  A.  Hello.

16  Q.  I'm Lauren Solomon, and I represent Ms. Phillips in this

17  case.  Now, you're retired since December of 2011?

18  A.  I retired at the end of December 2011.

19  Q.  Congratulations.

20  A.  Thank you.

21  Q.  You indicated that as clerk of court, you did not -- as

22  clerk of court, you did not actually receive every filing that

23  occurred in this building.

24  A.  Not me personally, it was filed at our public intake desk

25  or electronically.

1  Q.  At some point, this district transferred from in-person

2  filing to electronic filing.

3  A.  Correct.

4  Q.  And at the time of the transition or currently, there is no

5  one physically accepting filings in this district, unless you

6  do not have an electronic filing number, is that correct?

7  A.  I would only be guessing.  I don't think they changed that

8  policy since I've left, but I don't know that for sure.  I

9  mean, at that time that was correct when I was there.

10 Q.  That's correct.  The transition occurred during the time

11 that you were still the court clerk, right?

12 A.  Right.

13 Q.  And you indicated that you had no recognition of the case

14 number?

15 A.  I don't recall it.  We had thousands of cases, and I wasn't

16 involved in them.

17 Q.  This is a pretty busy courthouse.

18 A.  Right.

19 Q.  You didn't recognize the name, and you didn't have any

20 personal contact with Ms. Phillips.

21 A.  No.

22 Q.  And you are not even aware of whether or not she came into

23 the courthouse and filed the documents herself.

24 A.  I have no idea.

25 Q.  And you indicated that this lien was placed against the

1  parking place.

2  A.  It was -- when they did the title search, it was listed

3  against both properties.  But it was the parking space

4  transaction where it was discovered, because I wasn't selling

5  the condominium.  But it was listed against both.  It was one

6  mortgage, but it was listed against both as I understand it.

7  Q.  Okay.  So it had been listed against both, but the condo

8  was not of concern because there was no transaction that was

9  pending.

10 A.  Correct, correct.

11 Q.  So it was the transaction with the parking space that

12 alerted you to this lien.

13 A.  Correct.

14 Q.  And prior to that, do you know how long that lien had been

15 on the parking space prior to your becoming aware of it?

16 A.  No, I'm not sure.  The real estate transaction where I

17 discovered this occurred in the late spring or the summer of

18 2011.

19 Q.  And you said that your attorney contacted the title

20 company?

21 A.  Yes, he did.

22 Q.  And the title company cleared the lien off the title?

23 A.  Well, once I became aware of it, once I became aware of it,

24 I notified the U.S. Attorney's office and the U.S. Marshal, but

25 also I understand that the U.S. Attorney's office had sent

1  something to the county about it.  But my lawyer had spoken

2  with the title company, and the title company and my lawyer

3  determined that it was a bogus claim, and the transaction went

4  forward.

5  Q.  So you were successful in selling the parking space.

6  A.  Correct, yes.

7  Q.  And were you aware that at some point there was a

8  revocation of the lien that was filed?

9  A.  No, I'm not.

10  Q.  So that might have been after this transaction?

11  A.  It could have been, but I'm not aware.

12  Q.  But as far as you know, there's no lien any longer on any

13  property that you own?

14  A.  Not that I'm aware of, no.

15  Q.  Certainly not involving this.

16  A.  Well, I don't know that they've done away with the lien,

17  other than they don't acknowledge it.  I don't know.  I have

18  received no notice that the lien has been taken off.  My lawyer

19  and the title company just said it was bogus.

20  Q.  Okay.  So you were able to go through with the transaction.

21  A.  I was, yes.

22          MS. SOLOMON:  Okay.  Thank you.  Nothing further.

23          THE COURT:  Mr. Stump?

24          MR. STUMP:  Just two brief follow-up questions.

25          THE COURT:  All right.

```
1                    REDIRECT EXAMINATION
2  BY MR. STUMP:
3  Q.  Mr. Dobbins, you said the transaction occurred around the
4  summer of 2011?
5  A.  Correct.
6  Q.  At that time, were you still the clerk of the court?
7  A.  Yes, I was.
8  Q.  And you said that you are not sure if the lien is still on
9  your property, is that right?
10 A.  Correct.  What I understood was the U.S. Attorney's office
11 on behalf of the people who are listed sent something to the
12 county to get it cleared up, but I didn't receive anything
13 saying it's actually taken off.  It's just that they took care
14 of it, I suppose, as far as I know.
15          MR. STUMP:  All right.  Thank you, Your Honor.
16 That's all I have.
17          MS. SOLOMON:  Nothing further.
18          THE COURT:  May Mr. Dobbins be released from further
19 testimony?
20          MR. STUMP:  Yes, Your Honor.
21          THE COURT:  Ms. Solomon?
22          MS. SOLOMON:  Yes, Your Honor.
23          THE COURT:  Thank you, sir.  We won't need you again.
24          THE WITNESS:  Thank you.  I appreciate it.
25     (Witness excused.)
```

1        THE COURT:  Mr. Stump?

2        MR. STUMP:  Your Honor, the United States calls

3   Ms. Wendy Holderman.

4      (Brief pause.)

5        THE COURT:  Raise your right hand.

6      (Witness duly sworn.)

7                      WENDY HOLDERMAN,

8             GOVERNMENT'S WITNESS, DULY SWORN

9                    DIRECT EXAMINATION

10  BY MR. STUMP:

11  Q.  Good afternoon, ma'am.

12  A.  Good afternoon.

13  Q.  Could you start by just telling us your name, spelling your

14  last name, please?

15  A.  Sure, Wendy Holderman, H-o-l-d-e-r-m-a-n.

16  Q.  Ms. Holderman, I have to ask this.  Are you any relation to

17  a judge here in this courthouse named James Holderman?

18  A.  No, sir.

19  Q.  Where do you work, Ms. Holderman?

20  A.  At the Cook County Recorder of Deeds office.

21  Q.  Where is that office located?

22  A.  118 North Clark is the headquarters.  We also have the six

23  satellites.

24  Q.  Six satellite offices?

25  A.  Suburban courthouses.

W. Holderman - direct by Stump

1  Q.  Okay.  What do you do for the Cook County Recorder of

2  Deeds?  If you don't mind, I'm going to call it the CCRD.

3  A.  I know, and I don't.

4  Q.  Okay.

5  A.  My title is attorney title examiner.  My function there is

6  I'm a staff attorney trained in all aspects of recording from

7  document review to cashiering.

8  Q.  In that position, are you familiar with the way in which

9  documents are recorded at the Cook County Recorder of Deeds?

10  A.  Yes.  I also recorded documents myself for 15 years.

11  Q.  All right.  Can you --

12  A.  I've been there 25 years.

13  Q.  You know, first before I ask you the question, let me show

14  you what we've marked for identification as Government Exhibits

15  20.1 through 20.5.

16  A.  A picture of my office.

17  Q.  Could you just look through those documents and tell the

18  jury, if you don't mind, if you recognize what I've handed to

19  you?

20  A.  Yes.  This is the front entrance of my office across from

21  the Daley Center, the County Building.  This is our entrance

22  door, our review counter, and our cashier section, and another

23  of the cashier section.

24  Q.  All right.  These are all photographs, is that right?

25  A.  They're scanned.  I don't know if this is a photograph.

W. Holderman - direct by Stump

1  It's a scanned image.

2  Q.  A scanned image of a photograph.

3  A.  Uh-huh.

4  Q.  And are those scanned images true and accurate in the sense

5  that they fairly depict the way that your office at 118 North

6  Clark Street looks today?

7  A.  100 percent.

8  Q.  And did your office look that same way in March and April

9  of 2011?

10 A.  The only difference might have been that we have a prettier

11 information desk.

12 Q.  Today.

13 A.  Yes, new furniture.

14 Q.  Okay.

15 A.  Just the information desk.

16 Q.  Otherwise, this is a fair and accurate depiction of how the

17 office looks inside and out?

18 A.  Identical, identical.

19       MR. STUMP:  Your Honor, I just want to move for the

20 admission of Government Exhibits 20.1 through 20.5.

21       THE COURT:  Any objection?

22       MS. SOLOMON:  No objection.

23       THE COURT:  20.1 through 20.5 are admitted with no

24 objection.

25       (Government Exhibits 20.1, 20.2, 20.3, 20.4, and 20.5

W. Holderman - direct by Stump

 1      received in evidence.)

 2          MR. STUMP:  Your Honor, permission to publish them to

 3  the jury by passing them around?

 4          THE COURT:  Okay.  Folks, you can pass those around

 5  and look at them, but we're going to continue with the

 6  testimony, recognizing that you're able to chew gum and walk at

 7  the same time.

 8      (Laughter.)

 9  BY MR. STUMP:

10  Q.  Now, Ms. Holderman, can you tell us a little bit about how

11  documents are recorded at the Cook County Recorder of Deeds?

12  A.  Sure.  It's a very short process.  The customer walks in

13  with the paper document, the live document with ink signatures.

14  The document is reviewed for basic requirements at the review

15  desk.  Then when ready, they're directed to the cashier.  The

16  cashier will issue the bar code, which assigns a recording

17  number.  The cashier will then scan the document to make a

18  permanent image and hand the document immediately back to the

19  customer.  We store no originals.  Forgive me for being

20  nervous.  Then the fee is collected, and we conclude our

21  transaction by issuing a register receipt to the customer and

22  say bye-bye.

23  Q.  Now, you said something about there being a review of the

24  document before it's recorded.  What sorts of things does

25  someone who works at the CCRD look for when they're recording a

1  document?

2  A.  Sure.  Basic review, for example, for a mortgage, a routine

3  document we see every day.  A mortgage has several

4  requirements, and we're required to look for them before we can

5  record.  So there is the PIN number requirement by county

6  ordinance.  There's the anti-pred certificate on the front of

7  the mortgage.  There's the contents of the mortgage that's in

8  the conveyances statute.  Everything is a statute or an

9  ordinance I'm referring to.  Then the finale is the preparer's

10  information that's also required by the recorder's statute so

11  that you know who prepared the document and presented it.

12  That's a routine document.

13  Q.  I'm going to ask you a couple more things about the way

14  documents are filed and recorded.

15  A.  Okay.

16  Q.  You said something about how the document is not retained,

17  that it's just scanned.

18  A.  Uh-huh.

19  Q.  What happens to the original?

20  A.  It's handed immediately back to the customer.

21  Q.  You said also something about -- did you say a sticker or

22  something like that, some bar code?

23  A.  Uh-huh.

24  Q.  Can you tell us what that is?

25  A.  Sure.  Again, the process is they present the document.  We

1  give it a basic review, like I explained, and then afterwards
2  the document is directed to the cashier.  The cashier has the
3  ability to issue the bar codes.  They are a sticker that goes
4  on the doc.  But by statute, even before there were such things
5  as bar codes, we had to manually punch document numbers onto
6  the document.  That's the way that you find the document again.
7  We index by document number.  We index by property, if there's
8  a property relation to the document.  We index by the parties
9  to the document.
10        If you record your living will, which is a medical
11 document, it's not going to be real estate.  We're going to
12 pick up the parties to the document, and that's all, and your
13 recording number.  If you record a real estate document, we're
14 going to pick up PINs -- property tax numbers.  Sorry.  We're
15 going to pick up parties.  We're going to pick up the doc
16 number.  So it's three or it's two, technically.
17 Q.  Now, you say a document number.  How does a document that's
18 recorded at the CCRD get assigned a document number?
19 A.  Sure.  It's sequential numbers, but they're random, which
20 means that if a customer walks into our Skokie office or walks
21 into our Rolling Meadows office or walks in Downtown all at the
22 same second, they're not going to get sequential numbers
23 because obviously they're in different places.  But our numbers
24 are all 1 through, and the number that the machine generates
25 automatically spits out the next one.  Then there's a bank of

 1   numbers.

 2          It's required by statute that these things be found

 3   again.  Think of it like -- I always say this to customers --

 4   like the Dewey Decimal System.  I'm not familiar with that, but

 5   I've been to libraries.  If you don't assign a number to this

 6   thing, then maybe this document doesn't have a PIN number, so

 7   you can't track it that way.  Maybe it doesn't have legible

 8   names, so you can't track it that way.  That document number is

 9   the last and only hope to find it.  So the statute, the

10   recorder's statute requires it, but it's really, really

11   essential.

12          So we're now automated, so everything has bar codes.

13   So we can scan it, and the bar code shows on the front of the

14   document in the upper right as required by law.  But we have a

15   design law as well, how the document should look when it's

16   presented.

17   Q.  Just to make sure I understood, the number that's assigned

18   to a document at the CCRD, is that a unique number, or is it

19   possible that there's other documents with the same exact

20   number?

21   A.  Okay.  No, they cannot be the same number.  In fact, when

22   that happens, it throws the image out.  So it kind of raises an

23   alarm.  Everything is a separate number.  So she gets her own

24   separate number only, and he gets his own separate number only.

25   Q.  And this bar code that you're talking about, you said

1  before you used to just stamp it on the --

2  A.  Peel the sticker and put it on.  In the old days, it was

3  the Bates stamper.

4  Q.  In the old days, it was a Bates stamper.  Now it's a

5  sticker?

6  A.  Yeah.  I'm old school, so I've been around during the Bates

7  days, too.  You get a nice big muscle when you're pumping away

8  at the stamper.  If you had 50 documents in a sequence from a

9  closing, then bam, bam, bam, bam, bam.  Today it's a peeled

10  sticker, very nice.

11  Q.  How old is the CCRD?  How long has it been around?

12  A.  1871 to the present.

13  Q.  And do you still have documents there that are recorded

14  that go back that far?

15  A.  Absolutely.

16  Q.  How long did you say you've been working there?

17  A.  This is my 25th year.

18  Q.  And is the CCRD, is that a public record?

19  A.  Yes.

20  Q.  Are all those documents available to anyone that wants to

21  go look at them?

22  A.  Yeah.  The Cook County Recorder of Deeds is the official

23  public records library for the Cook County area.  Our records

24  date from 1871 to the present.  Our records are permanent.

25  Anything recorded, there is no provision to erase, remove,

1  delete, expunge.  If we do it, it's forever.  Hopefully, your

2  documents are drafted properly; otherwise, you spend more money

3  fixing and fixing and fixing.

4  Q.  Let me show you what we've marked for identification as --

5     (Discussion off the record.)

6  BY MR. STUMP:

7  Q.  -- Government Exhibits 13.1 through 13.12.  Could you take

8  a look at those and let me know after you're done flipping

9  through them if you recognize them?

10  A.  Yes.  They all have a bar code, and they all have a

11  certification seal.  So the certification seal means that this

12  is an exact duplicate of a scanned original image presented by

13  the customer.

14  Q.  Okay.  Now you're talking about different markings that are

15  on the documents.  Let me ask you more of a broader question.

16  A.  Okay.

17  Q.  Can you tell looking at these documents -- again, this is

18  13.1 through 13.12 -- were these documents recorded at the Cook

19  County Recorder of Deeds?

20  A.  Yes.  I see that there's a bar code image on the top, but

21  obviously bar codes can be cut and paste, right?  On the back,

22  there's the certification seal.  The certification means that

23  this is -- that we stand by this.  By statute and by our honor,

24  we stand behind the certification.  It means the document is an

25  exact duplicate of a scanned original image.  We don't issue

1   certifications unless the image is printed from our library.

2   We accept no records brought in by a customer after the fact

3   who says:  Hey, I made a copy to save you paper.  Can you seal

4   it?

5           We say:  Thank you very much.  Put that away, please.

6           Then we go to our database and we print.

7   Q.  Now just to be clear, these documents I handed to you, 13.1

8   through 13.12, are they originals or are they copies of the

9   original image?  Do you understand my question?

10  A.  Yes.

11  Q.  All right.

12  A.  Okay.  So a bar code is a raised seal or a raised sticker.

13  I can see there is no raised sticker.  I can't peel anything

14  off.  The certification tells the recorder's staff and the

15  public and the court, because these are used in court, that

16  this is an exact duplicate, a duplicate of an original scanned

17  image.

18          So the original was presented back on March 14th,

19  2011, and that one laid around.  A certified copy was

20  requested.  Let's say the person says they lost their deed and

21  want to get a backup copy.  Well, our statute allows us to

22  charge for a copy, $10 and change, and a certified which is

23  good enough to replace an original or to use in court, which is

24  $20 plus.

25          So these are copies that have been officially

1  certified by our office as an exact document copy of what was

2  recorded at that moment in time, March 14th, 2011, 4:12 p.m.

3         MR. STUMP:  All right.  At this time, Your Honor, I'm

4  going to move for the admission of Government Exhibits 13.1

5  through 13.12.

6         MS. SOLOMON:  I would like to see them.

7    (Discussion off the record.)

8         MS. SOLOMON:  No objection, Your Honor.

9         THE COURT:  13.1 through 13.12 admitted, no

10  objection.

11   (Government Exhibits 13.1, 13.2, 13.3, 13.4, 13.5, 13.6,

12       13.7, 13.8, 13.9, 13.10, 13.11, and 13.12 received in

13       evidence.)

14  BY MR. STUMP:

15  Q.  Now, Ms. Holderman, recognizing the limitations of our

16  courtroom, I can't show to the jury right now what we're

17  talking about, so I'd like, if I could, to just walk through a

18  couple of things on this exhibit.  I'm looking now -- you know,

19  I'm going to look at 13.4 here.  Can you just read for us where

20  it says "name of vessel" what it says there?

21  A.  "Michael Dobbins."

22  Q.  Okay.  Michael Dobbins, D-o-b-b-i-n-s?

23  A.  Yes, sir.

24  Q.  And if you can tell us, just read for me in box 2 what it

25  says there where my finger is (indicating).

1  A.  "Unique identifier."

2  Q.  Okay.  Then underneath that?

3  A.  It's got some kind of a case.

4  Q.  Can you just read it for us?

5  A.  "Case No. 06 CR 778."

6  Q.  All right.  Now, this kind of a document, it says "Notice

7  of Claim of Maritime Lien."

8  A.  Okay.

9  Q.  Is that something that is reviewed?  Is the substance of

10 the document reviewed at the Cook County Recorder of Deeds

11 before it's recorded?

12 A.  No.

13 Q.  What sorts of things would prevent something like this from

14 being recorded?

15 A.  Having no statute to base it on, having no knowledge of the

16 document, having no understanding of the contents, "maritime,"

17 that's boats.  We're the real estate library.  We don't deal

18 with boats, so I would have no idea what to do with this.  We

19 would assume it's public storage.

20 Q.  What does that mean?

21 A.  Well, people record docs that they just want in the public

22 records office.  I've seen poetry recorded.  I've seen artwork

23 recorded.  So if it's a doc we don't know what to do with and

24 the customer insists it gets recorded, we record it.  Our

25 function is as the public records library.  Remember, I said

1 part of it is real estate and part of it is non-real estate.

2 So there's non-real estate which is our storage aspect.  There

3 are docs you might want to record just for your own purposes,

4 and people do.

5 Q.  In a sense then, is anybody at the Cook County Recorder of

6 Deeds fact-checking documents like that before they're

7 recorded?

8 A.  Sir, we have no training in this document, no training.

9 Q.  Okay.  Just to be clear, the answer is no?

10 A.  No, sir.

11 Q.  All right.  There is a sticker.  I want to go back to 13.4.

12 You talked about a sticker that was placed on the document.  Do

13 you see --

14 A.  The bar code?

15 Q.  -- the bar code there?

16 A.  I see the bar code.

17 Q.  All right.  Can you tell us, because the jury doesn't have

18 the benefit of looking at this right now, what sort of

19 information is captured there on Exhibit 13.4 under the bar

20 code?

21 A.  Okay.  So all the routine bar codes read a document number,

22 that unique number that I said gets assigned so that you can

23 find it again.  It shows the price, the recording fee.  It

24 shows the then recorder or the current recorder.  So this was

25 done in the prior administration of Eugene Moore.  The current

1    administration is Karen Yarbrough.  I better remember that.

2    She signs my checks.  The Cook County Recorder of Deeds is

3    identified here, too, and the date, time, and the page count,

4    one of one, one of one.

5    Q.  Is there also a price listed there?

6    A.  Yes, that's the fee, $38.

7    Q.  How do fees work at the Cook County Recorder of Deeds?

8    A.  Real estate documents, there's a lot of add-ons or tack-ons

9    or surcharges, so I'm just going to give you the base.  The

10   base fee for real estate is actually not the base.  It's the

11   bottom line.  The base -- sorry -- the bottom line is $50 for a

12   real estate filing, and it will say on there RHSP, the rental

13   housing surcharge, real estate, and a dollar for the recorder's

14   real estate surcharge.  So the base recording fee is 40, but

15   for real estate you're always going to tack on 10.  So now it's

16   50, and you're stuck.  That's it.

17          Non-real estate filings, like this one here, don't

18   identify the RHSP and the recorder's fee.  So the 10 is not

19   showing.  Our bar codes are very money-detailed because we need

20   to identify like all the statutes and everything.  It reduces

21   the amount of questions:  How come you're charging me this?

22   How come you're charging me that?

23          So we make it very detailed.  The receipt is even

24   more detailed on the breakdown of fees because taxpayers have a

25   right to know.  So $38 was the base fee on this one back in

1   2011, but actually now it's $40 for a non-real estate filing.

2   The bar code also shows, if I didn't say it already, the time,

3   date, and the page count.

4   Q.   Can you tell us or read aloud then the date and time on

5   that particular document, which is 13.4?

6   A.   Yes, sir.  Do you want the document number or the time?

7   What are you asking for again?

8   Q.   I'm sorry.  The date and the time.

9   A.   Okay.  The date is March 14, 2011.  The time is 4:13 p.m.

10  So it's not too far from closing.

11  Q.   And what is the significance then of that date and time?

12  What does that mean?

13  A.   It's required that we identify the second in time and the

14  date in time when something is recorded.  Think of it this way.

15  If you have a foreclosure and you have a deed and then there's

16  a mortgage and another mortgage, somebody gets paid first in

17  the foreclosure.  So the time and date are essential to show

18  who's first in time in priority of documents.  So it may not

19  mean anything to a non-real estate document, a public storage

20  doc, whatever, but it means a lot in other documents.

21  Q.   The first to the courthouse.

22  A.   First to the courthouse, yeah.

23  Q.   I want to go back to the payment, the fee.

24  A.   Okay.

25  Q.   What sorts of methods of payment does the CCRD accept?

1    A.   Cash, check, and just this last year or this year charge

2    for the first time.

3    Q.   In 2011?

4    A.   No, cash or check.

5    Q.   Just cash or check.

6    A.   We only went live charges in 2014.

7    Q.   Now, you said, I think, that after a patron pays to have a

8    document recorded, they are issued a receipt, is that right?

9    A.   It's required in the recorder's statute that we give them a

10   receipt.

11   Q.   Does the CCRD also maintain a copy of that receipt?

12   A.   No, sir.  They have a period of time where we can reprint

13   and reprint and reprint.  Then if enough years pass, like I

14   can't pull a 2005 or 2004 receipt, probably too old.

15   Q.   Could you pull a 2011 receipt?

16   A.   Absolutely.

17   Q.   I'm going to show you what we've marked for identification

18   as Government Exhibits 14 through 17.

19   A.   Okay.

20   Q.   Each one is just a single piece of paper.  Could you just

21   look those four pieces of paper and let me know if you

22   recognize them?

23   A.   They're our official receipts.

24   Q.   These are official receipts from the CCRD?

25   A.   From the Cook County Recorder of Deeds office, yes.

W. Holderman - direct by Stump

1  Q.  How can you be so sure?

2  A.  I handle these all the time, every single day, and I've

3  issued for 15 years my own receipts when I headed up the Skokie

4  recorder's office.  This is our paper, which is kind of like

5  nasty fax paper.  It shows the "Recorder of Deeds" at the top.

6  It shows "issued to."  So we try to put the customer's contact

7  information in the receipt, but most of time the customers

8  don't always offer.

9          Then it shows the pricing breakdown like I said but

10  in much more detail.  So in the document ending 8083, it shows

11  "miscellaneous," which was the way we recorded it, not knowing

12  how to index it, and "RHSP."  So there must have been real

13  estate on that particular document because they charged them

14  the 10 bucks.  Then again there appears another 10 bucks for

15  the doc ending in 8085.  It shows a cash payment, change due,

16  and Karen Yarbrough.  So this was during the current recorder's

17  administration.

18  Q.  What was during the current recorder's administration?

19  A.  The recording of this one.

20  Q.  The recording or the printing of it?

21  A.  Oh, the reprint, that's right.  The reprint is 2013.  I

22  don't know why they do that.  When you reprint a receipt, it

23  gives a plug to the current recorder, and her name comes on the

24  receipt.  I love her, so I'm not picking on anyone.  But if you

25  wanted a mirror image receipt, it shows reprint.  But then it

1    should say "Eugene Moore," but it's plugging the new recorder.

2    Q.   Now, can you tell just from looking at those receipts what

3    documents they match up with?

4    A.   Yes.  As I was saying to the jury, the last four digits of

5    the docs, they have actually the full number on there.  So we

6    can match the numbers very quickly.

7    Q.   Would you do that real quickly?  I'd like you to use

8    Government Exhibits 13.1 through 13.12.

9    A.   Okay.

10   Q.   And those are Exhibits 14 through 17.  See if you can match

11   up any receipts with any of the liens there.

12   A.   Okay.  So I have on this receipt 8081.  We don't like to

13   read the whole number.  We get lazy.  So the last four digits

14   is how we go, 8081, 8082, 8083, 8084, 8085.  Do we have a 8086?

15   Q.   No, I think that's it.

16   A.   Okay.  So this receipt matches to this group.  Do you want

17   me to move them, sir?

18   Q.   If you wouldn't mind, just tell us which exhibit matches

19   with which exhibit.

20   A.   Okay.  So Exhibit 14 has the majority of the documents from

21   Exhibit 13.1.

22   Q.   Through?

23   A.   13.5.

24   Q.   Okay.  What about 15?

25   A.   I'm on that one.  15 has 0034, 35, 36, 37, okay.  So the

1  grouping of Exhibits 13.6 through 13.9, the documents match

2  this cash register receipt, Government Exhibit 15.

3  Q.  Okay.  Thank you.  How about Government Exhibit 16?

4  A.  Okay.  This was a single recording.  The document ending in

5  7043, Exhibit 13.10 and Government Receipt Exhibit 16 are a

6  match.

7  Q.  Okay.  The last one is Government Exhibit 17.  What does

8  that match?

9  A.  Receipt 17, documents 1007 and 1008, it's a match to docs

10  13.11 and 13.12, and that's it.

11  Q.  So just to summarize what we just did, for Exhibits 13.1

12  through 13.12, what is the relationship between those exhibits

13  and Exhibits 14 through 17?

14  A.  They're the two parts of the transaction at the cash

15  register.  You have the scanning and recording of the doc, you

16  have the fee collected and the receipt issued directly to the

17  customer.

18         MR. STUMP:  At this time, Your Honor, I'd move for

19  the admission of Governments Exhibits 14 through 17.

20         MS. SOLOMON:  No objection.

21         THE COURT:  14 through 17 admitted, no objection.

22  (Government Exhibits 14, 15, 16, and 17 received in

23     evidence.)

24         MR. STUMP:  Your Honor, at this time I'm going to ask

25  for permission to publish to the jury by passing around

W. Holderman - direct by Stump

1  Government Exhibit 13.4.

2        THE COURT:  Granted.

3        MR. STUMP:  With that, I'm then also going to publish

4  Government Exhibit 14.

5      (Discussion off the record.)

6  BY MR. STUMP:

7  Q.  All right.  When a person records a document at the CCRD,

8  is there any information that's taken down by the Cook County

9  Recorder of Deeds as to who they are?

10 A.  No, we don't ask for an ID, like a driver's license or

11 something when someone walks in the door.  It's a public

12 records library.  The only time we actually are talking about

13 identification or things like that is when they're paying.  So

14 the receipt sometimes has the name and address of the person

15 filing or the title company or whoever is doing the filing.

16 Other than that, we don't -- as a public records library, we

17 don't accost them and say:  Give me your ID.

18 Q.  So if there's information reflected on the receipt about a

19 person, where does that information come from?

20 A.  The person standing before the cashier.  The cashier will

21 actually ask the customer, sir.

22 Q.  And does the cashier do anything to verify the information

23 that the customer gives him?

24 A.  No, sir.

25 Q.  I want to look at the ones I have here.  This is Exhibits

1   15, 16, and 17.  Can you tell us, is there anywhere on these

2   exhibits that reflects some information about who recorded

3   those documents?

4   A.  Yes.  It looks like the cashier would have asked -- sorry,

5   the cashier asked, not looks like.  This is not much

6   information here.  The cashier would have asked at the time of

7   paying:  Can I have your name?

8           Then they start typing because there's a typing

9   screen by the cash register, and very little was provided.  The

10  first one, Exhibit 15 shows a name which I can't pronounce.

11  Q.  Can you spell it for the record?

12  A.  It says:  Issued to T-s-a-m-a-r-a, space, E-l, and a phone

13  number.

14  Q.  All right.  How about Exhibit 16?

15  A.  Cherron.

16  Q.  I'm sorry.  Can you spell that for the record?

17  A.  C-h-e-r-r-o-n.

18  Q.  Okay.  C-h-e-r-r-o-n?

19  A.  Uh-huh.

20  Q.  And what about the last one there, Exhibit 17?

21  A.  That's Wayne, W-a-y-n-e, and the phone number.

22  Q.  All right.  Thanks.

23  A.  It's what little the customer is willing to give to our

24  cashier when they type it in.

25  Q.  Now I want to show you what's been marked for

1  identification as Government Exhibits 18 and 19.

2  Ms. Holderman, do you recognize those documents as having been

3  recorded at the Cook County Recorder of Deeds?

4  A.  Okay.  So I see a bar code on the front, but I have to look

5  it over to look for the certification seal.  Again, here's our

6  official seal, meaning that this is an exact duplicate of a

7  scanned original image suitable for using in court or to

8  replace lost originals.  We charge half the recording fee.  So

9  a recording fee starts at 40 unless it's real estate, 20 for

10 the certifieds for the first two pages, and then $2 for each

11 page after that.  So this was an expensive certified, not that

12 anyone cares.

13 Q.  Just to be clear, these two documents, Exhibits 18 and 19,

14 are they, in fact, certified copies of scanned images that were

15 recorded at the CCRD?

16 A.  100 percent.

17         MR. STUMP:  All right.  At this time, Your Honor, I'd

18 move for admission of Government Exhibits 18 and 19.

19         THE COURT:  Any objection?

20         MS. SOLOMON:  No objection.

21         THE COURT:  18 and 19 admitted, no objection.

22   (Government Exhibits 18 and 19 received in evidence.)

23 BY MR. STUMP:

24 Q.  Now, Ms. Holderman, what I want to ask you is this.  Can

25 you tell us -- and just read it for the jury because they don't

1 have the benefit of seeing these right now -- is there a title

2 on these documents?

3 A.  Yes, sir.

4 Q.  Can you read that, where I've got my finger (indicating)?

5 A.  Uh-huh.

6 Q.  What does it say?

7 A.  "Revocation of Maritime Lien."  Both of them share the same

8 title.

9 Q.  Okay.  So both documents, 18 and 19, say "Revocation of

10 Maritime Lien," is that right?

11 A.  Uh-huh.

12 Q.  All right.  Then let's just take No. 19.  Would you read

13 into the record this little paragraph right here which starts

14 with "please take notice"?

15 A.  "Please take notice in the Cook County Recorder of Deeds

16 that the following notice of maritime lien registered mail

17 RE262739636 U.S., associated with the United States District

18 Court, Northern District Case No. 06 CR 778, recorded on the

19 follow dates have been revoked."

20         Okay?

21 Q.  Okay.  That language there, "take notice that the following

22 documents have been revoked," what is the practical effect of

23 that at the Cook County Recorder of Deeds?

24 A.  None.

25 Q.  Okay.  What happens then to those liens that we were just

1  looking at, Exhibits 13.1 through 13.12?  These documents here,

2  18 and 19, do they undo those liens?

3  A.  I told you we don't know what these documents do or what

4  purpose they have.  So, no, we would have no way of knowing

5  what they do and what they don't do.  I would think the filer

6  knows what they do or what they don't do.  We do not know what

7  they do or don't do, and we don't even know the purpose.  We

8  don't deal with boats at all.

9  Q.  Let me put it this way then.  As a result of having these

10  two documents, 18 and 19, recorded at the Cook County Recorder

11  of Deeds, were those liens, 13.1 through 13.12, were they

12  expunged from the records at the CCRD?

13  A.  I said that our records are permanent and forever.  Nothing

14  is ever erased, expunged, deleted, or removed.  There's no

15  provision in the recorder's statute for erasing, deleting,

16  expunging, or removing.

17  Q.  And let me, if I can, just have you match up it for me.

18  We'll do this little exercise one more time.  There are some

19  document numbers listed on these two exhibits, is that right,

20  where I'm looking is, I guess, where it says "docket"?

21  A.  We don't use the word "docket."

22  Q.  But do you recognize these numbers here as being numbers

23  that would have been document numbers issued by the Cook County

24  Recorder of Deeds?

25  A.  No way of knowing, but I see here that the author wrote the

 1  words "date recorded."  So if we want to make an assumption, we
 2  can make an assumption.  This is not a document I'm familiar
 3  with, but I can certainly read.
 4  Q.  Okay.  Could you look and see -- well, I want you to look
 5  first at 18 maybe.
 6  A.  Okay.
 7  Q.  Could you see if these numbers that are listed here under
 8  "docket" have any relationship to numbers that are here on the
 9  bar code that was assigned by CCRD?
10  A.  Okay.  Using the reference in the document that uses the
11  word "docket," I see a number that seems to be identical.
12  Q.  All right.  Can you read that number into the record?
13  A.  The Exhibit 3.3 has a recording number of 11-07318083.  The
14  reference in the revocation doc shows "Docket 11-073118083."
15  So it seems to be typing the identical number in both spots.
16  Q.  And you've matched it to --
17  A.  It's more common when you have a mortgage and a release,
18  where the release mentions the mortgage number.  We can match
19  those up.  If we're familiar with the document, it's easier.
20  Q.  Just to be clear, you could match up then the number for
21  13.3 with a number that appears on Exhibit 18.  Is that what
22  you just testified to?
23  A.  Say that again.
24  Q.  I'm sorry.  You just matched up this number right here that
25  is just under the bar code on 13.3 with a number that appears

1  on the front of Exhibit 18, is that right?

2  A.  Right, right.

3  Q.  And what is the name on the lien associated with 13.3?

4  A.  James Holderman.

5     (Discussion off the record.)

6  BY MR. STUMP:

7  Q.  Okay.  If you could look at the bottom of 18 and 19, is

8  there a signature on those documents right here (indicating)?

9  A.  On the bottom of 19?  Yes.

10 Q.  All right.  Can you make out what the signature says?  Can

11 you read it?

12 A.  No, but I can see that there's a similar spelling at the

13 top where it says "prepared by."

14 Q.  All right.  Well, tell us what does it say under "prepared

15 by," and what part of the document are you looking at?

16 A.  In the upper left, it says "prepared by Cherron Phillips."

17 Q.  I'm sorry.  Say that again.

18 A.  "Cherron Phillips."

19 Q.  Okay.  Can you spell it?

20 A.  C-h-e-r-r-o-n, space, P-h-i-l-l-i-p-s, "prepared by."

21 Q.  Then at the bottom of the page, do you see a signature

22 there?

23 A.  Uh-huh.

24 Q.  And can you tell us, as best as you can, can you read that

25 signature?

1 A.  I'm not a signature expert.  It shows "by Cherron Marie,"

2 and it looks like "Phillips."

3 Q.  All right.  How about for Exhibit 18?  Can you turn to the

4 second page of Exhibit 18, and do you see a similar signature

5 on that page, just to your layperson's eye?

6 A.  They look very similar.

7 Q.  And could you tell us on the first page of Exhibit 18, is

8 there a similar notation at the top?

9 A.  It's the same name, "Cherron Phillips."  It's the same

10 name, same spelling.

11        MR. STUMP:  All right.  That's all I have, Your

12 Honor.

13        THE COURT:  Ms. Solomon?

14                    CROSS-EXAMINATION

15 by MS. SOLOMON:

16 Q.  Good afternoon, Ms. Holderman.

17 A.  Good afternoon.

18 Q.  My name is Lauren Solomon, and I represent Ms. Phillips.  I

19 hope I don't make you nervous.

20 A.  What?

21 Q.  I hope I don't make you nervous.

22 A.  No, no, I'm just exhausted.

23 Q.  Okay.  I have a couple of questions.  At the very

24 beginning, you said or you described documents with which you

25 were familiar --

W. Holderman - cross by Solomon

1   A.  Yes.

2   Q.  -- is that correct?

3   A.  Yes.

4   Q.  And those documents are mortgage documents.

5   A.  I'm familiar with a lot of documents in my 25 years at

6   working with the recorder.

7   Q.  Okay.

8   A.  Most of our documents are --

9   Q.  You gave as an example the mortgage documents, and you

10  indicated when someone comes to the Cook County Recorder of

11  Deeds office, the document is reviewed as long as someone in

12  the office recognizes the document.

13  A.  100 percent.

14  Q.  And they know what to look for.

15  A.  100 percent.

16  Q.  Okay.  So in looking at the documents --

17      (Discussion off the record.)

18  BY MS. SOLOMON:

19  Q.  So I'm going to hand this back to you (indicating).

20  A.  Okay.

21          MS. SOLOMON:  May I approach?

22          THE COURT:  Sure.

23  BY MS. SOLOMON:

24  Q.  Government Exhibit 13.4, you previously saw that?

25  A.  Uh-huh.

 1  Q.  And it says at the top "Maritime Lien"?

 2  A.  Uh-huh.

 3  Q.  And you indicated that it's a notice of claim of a maritime

 4  lien, is that correct?

 5  A.  Uh-huh.

 6  Q.  And you indicated that you were not familiar with that kind

 7  of document.

 8  A.  I looked to the left of it, and it says "U.S. Coast Guard."

 9  We don't handle boats.

10  Q.  You don't handle boats.

11  A.  No.

12  Q.  So in the case of someone bringing this kind of a document

13  in, they wouldn't review it for any content.

14  A.  Under what statute or what?

15  Q.  They didn't have any means of knowing what to review it

16  for.

17  A.  Right.

18  Q.  In this case, the CCRD goes ahead and records it anyway.

19  A.  A public records office.

20  Q.  Public records.

21  A.  We have two functions within the same library.  We can do

22  your real estate indexes, and we can do your public.  The

23  public records might be someone's poetry.

24  Q.  Okay.

25  A.  It might be someone's document, and we don't understand

1  what it's for.  That's required by law.  We welcome the public.

2  We don't throw them out.

3  Q.  Okay.  I understand that.  When I ask you a question, you

4  don't need to repeat what you've already told us on direct.  I

5  just want to get some additional information, and then we'll be

6  done and you can go home.  Okay?

7  A.  Okay.

8  Q.  So the more, I guess, the more usual function is real

9  estate?

10  A.  Yes, predominant.

11  Q.  Predominant.  When you said that when something is recorded

12  it's recorded forever, it's never deleted or expunged.

13  A.  Correct.

14  Q.  But that doesn't mean that it still has force and effect,

15  isn't that right?

16  A.  Sure.

17  Q.  Okay.  So, for example, if I buy a house and I have a

18  mortgage on it, when I sell my house my mortgage does not stay

19  in force and effect on that real estate property, right?

20  A.  If a release is filed.

21  Q.  So what you need, you indicated, is a release.  That's the

22  legal term for the document?

23  A.  Release of mortgage, discharge of mortgage.

24  Q.  That's a document that is issued by?

25  A.  By the lender when they get paid in full.

W. Holderman - cross by Solomon

1  Q.  Okay.  So at that point in time there would be a release,
2  and while the actual lien would appear if you did a title
3  search, it no longer has any force or effect, is that correct?
4  A.  I don't --
5  Q.  If there's been a release, a subsequent release.
6  A.  I don't know how credit bureaus would look at it or how
7  future title companies would look at it, but we have the
8  understanding that when a mortgage is filed and then it's
9  followed by a release with a matching document number, the
10 release probably canceled the mortgage.
11 Q.  Well, if it was for the full amount, there would be no
12 further claim.
13 A.  We don't see the full amount.  We don't see that they've
14 paid in full.  We've had releases that are presented that we
15 find out later it was forged by the customer.  We don't make
16 those judgment calls.
17 Q.  Again, you don't check for that.
18 A.  No.  Do we contact the lender or the credit bureau or the
19 title company?  No.
20 Q.  So in Cook County anyone can go into the office and file
21 anything in the public record.
22 A.  Remember -- yes.  If you mean the public records side,
23 unfortunately, yes.  But if you mean the documents side, where
24 we know the document and there are statutes that say the
25 recorder cannot record without X, Y, and Z, then that is

1  correct.

2  Q.  So these documents were filed in the public records side of

3  the Cook County Recorder of Deeds?

4  A.  Well, they're not real estate.  They're not mortgages.

5  They're not deeds.  They're not assignments of mortgage.  It

6  says "U.S. Coast Guard maritime."  We don't handle boats.

7  Q.  Therefore, it would be in the public records.

8  A.  Yes, I would assume, yes.

9  Q.  And when it's filed in the public records versus the real

10  estate side, what is the difference in meaning for someone who

11  goes and looks something up in the recorder of deeds office?

12  A.  We don't put a meaning to that.  We would not be able to

13  answer that question.

14  Q.  There is no meaning to the document.

15  A.  We don't answer that question.

16  Q.  And so if I went into or one of the jurors went into the

17  Cook County Recorder of Deeds -- well, they're not going to do

18  that because that would be outside the courtroom.  Say someone

19  went into the office and looked up something in the public

20  record.  You're saying the office attaches no meaning to that.

21  A.  Right.  We don't advise.  We don't give analysis or advise

22  and say:  That's great poetry you recorded.

23        In the public record area, the public record, we

24  don't have that ability to say:  Gosh, that's an interesting

25  document.  We're grateful you recorded it.  Someday you'll get

1  a boat.

2          We don't.  That's not our function.

3  Q.  So your function --

4  A.  Do you know what a library is?  A library function is a

5  library, chiefly.

6  Q.  But a library knows what it's taking in.

7  A.  Not really, that's not accurate.

8  Q.  It doesn't?

9  A.  No, I go to the public library, and they don't say:  That's

10  a great book.  Get it.

11          I go in and choose the book I want.

12  Q.  I'm talking about what goes into the public library.

13  A.  Well, they code it, and they put it in.  Let's go back to

14  the days of banned books.  They'd receive their book and code

15  it in the Dewey Decimal System, and they'd put it on the shelf.

16  Q.  Right.  But they order the books they receive.

17  A.  I'm not a librarian at a public library.

18  Q.  Okay.

19  A.  But I'm telling you that this is a library, and the

20  customer is allowed to walk in our door.  Do we analyze the

21  customer's document and say that that's a great boat lien?

22  That's not our function.

23  Q.  So then your function as a public library, to use the

24  analogy, is to accept everything that comes into it, is that

25  correct?

1  A.  On the public side, correct.

2  Q.  On the public side.

3  A.  Correct.

4  Q.  But a public library in the normal sense of a public

5  library is a lending library.  It gives people things on a

6  temporary basis to take out, and they know what they have and

7  what they're lending.

8  A.  They're not making a judgment call on those books.

9  Q.  They're not making a judgment call.

10  A.  And neither are we.

11  Q.  But they know what it is that they're lending out.

12  A.  No, I don't agree.

13  Q.  They track it by the Dewey Decimal System, as you said.

14  A.  I get it, but I'm talking content.

15  Q.  They would also be aware of the content because they know

16  what the book is.

17  A.  I don't believe a librarian in a public library has read

18  every single book on the shelf.

19  Q.  I'm not saying --

20  A.  They know the title.  They know the author.  They know the

21  Dewey Decimal System assigned.  They know the type of document.

22  I'm telling you that we don't know the content of every

23  document that's submitted.

24  Q.  I'm not saying that a librarian in a public library knows

25  the content of every book in the library.  That's not what I'm

1  asking.  Okay?  If you'll bear with me, just listen to the

2  question.  A librarian who lends out a book does not need to

3  know the contents of the book to know that that book is in its

4  collection, is that correct?

5  A.  Okay.

6  Q.  Okay.

7  A.  I think I understand that.

8  Q.  So the library knows what book it lends because it

9  anticipates that it will get it back, is that right?

10 A.  Okay.

11 Q.  Okay.  If it didn't know what it had in its library, it

12 couldn't get it back because there'd be no way of tracking it.

13 A.  We know the document numbers that have been assigned.

14 Q.  I understand.  I understand that.  I'm just talking about a

15 public library that's a lending book library.

16 A.  Okay.

17 Q.  Okay.  Then similar to your system, there's a bar code on

18 the book.  They know when it goes out, and they know when it

19 comes back in, is that correct, for a book?

20 A.  Okay.

21 Q.  Okay.  I take it out of the library.

22 A.  We don't know when it goes out.

23 Q.  The library knows when it lends a book out.

24 A.  But what's the recorder of deeds question?  Because I'm

25 losing you.

1  Q.  No, I'm focusing on the lending library right now.

2  A.  Okay.

3  Q.  Okay.  So the library knows when it lends a book out.  We

4  can agree with that, right?

5  A.  Yeah.

6  Q.  It also knows when it brings it back, when that person who

7  took it out or another person brings it back.

8  A.  Okay.

9  Q.  Okay.  But in the recorder of deeds public side, what

10  you're telling me is, one, it never goes out because once it's

11  recorded it's there.

12  A.  Okay.

13  Q.  Okay?  Is that true?

14  A.  I don't think that's a correct correlation.  Our images are

15  permanent.

16  Q.  The images are permanent, correct.

17  A.  In the same way a public library's book load is permanent.

18  Q.  That's correct.

19  A.  They may lend it out.

20  Q.  So the difference is that since you never look at what is

21  the image that is recorded --

22  A.  I never said we don't look at it.

23  Q.  Well, you look at it --

24  A.  I said we don't understand it.

25  Q.  -- but you don't recognize it.  Okay.  If you don't

1 recognize it, you don't screen it for anything because you

2 don't know what to screen it for.

3 A.  Correct.

4 Q.  And it goes into the record.

5 A.  Correct.

6 Q.  Then you don't know after that what happens to it on the

7 public records side?

8 A.  Right.  We don't know the effect of the particular thing,

9 correct.

10 Q.  Because there's nothing by statute that permits you to get

11 rid of it?

12 A.  Correct.

13 Q.  Correct.  So, for example, if somebody puts their poetry in

14 there, there's not a state law on poetry in the public record.

15 A.  Under the recorder's statute, there's nothing that tells us

16 to -- there's no provision for erasing, expunging, deleting,

17 and removing.

18 Q.  Right.  So if it's in the public library side of the

19 recorder's office, it doesn't have the same force and effect as

20 if it was in the real estate side of the recorder of deeds?

21 A.  Okay.  Again, I'm not a title company.  I'm not the credit

22 bureau.  It's not for us to say force and effect, so the answer

23 is I can't answer that.

24 Q.  You don't know.

25 A.  Yeah, I can't possibly answer that.

W. Holderman - cross by Solomon

1  Q.  Okay.  That's valid.  Do you get very many maritime liens

2  in the public side of the recorder of deeds?

3  A.  I'm going to guess, if I can, maybe a few hundred.

4  Q.  A few hundred out of how many documents does the recorder

5  of deeds office have?

6  A.  Tens of millions.

7  Q.  Tens of millions.  Now, Mr. Stump had you identify just one

8  exhibit, which was -- I'm going to hand it back to you -- 13.3.

9  He had you correlate that to the document that's -- well, let

10  me make sure -- Government Exhibit 18.

11         MS. SOLOMON:  May I approach?

12         THE COURT:  Sure.  You don't need to ask.

13         MS. SOLOMON:  Thank you.

14  BY MS. SOLOMON:

15  Q.  You indicated that they're the same number on both

16  documents.

17  A.  Correct.  I recognize the number that appears on both

18  documents.

19  Q.  Then underneath that first entry, there's a second entry?

20  A.  Which document?

21  Q.  I gave you the document, Government Exhibit 18.

22  A.  Okay.  So under 18.

23  Q.  Okay.  So there's a second number under the "docket," the

24  second word "docket"?

25  A.  Okay.

W. Holderman - cross by Solomon

1   Q.  Then there's another number there, is that correct?

2   A.  You're asking me about -- I see the word "docket" in one,

3   two, three spots.  Is that what you're asking.

4   Q.  Right.  The first one you said correlated to the docket in

5   front of you?

6   A.  I didn't say "correlated."

7   Q.  It was the same.

8   A.  I said they used the word "docket," and they were the same.

9   Q.  They were the same.

10  A.  Right.

11  Q.  Okay.  Then "docket" is written a second time?

12  A.  Right.

13  Q.  And under that second "docket" word, there is another

14  number?

15  A.  Yes.

16  Q.  And I'm going to hand you a --

17      (Discussion off the record.)

18          MS. SOLOMON:  Could we just stipulate to that?

19          MR. STUMP:  Judge, just to speed this up, I would

20  stipulate that the numbers that are in Exhibits 18 and 19 where

21  it says "docket," those numbers correlate to the docket numbers

22  of Government Exhibits 13.1 through 13.12.

23          THE COURT:  Do you accept the stipulation, counsel?

24          MS. SOLOMON:  I accept the stipulation.

25          THE COURT:  You can consider that as evidence then,

1  folks.

2  BY MS. SOLOMON:

3  Q.  I'll take the documents back from you then.

4  A.  (Handing exhibits to counsel.)

5  Q.  You indicated that you're not a handwriting expert?

6  A.  Correct.

7  Q.  You just looked at the signature, and it was your best

8  guess that that was the same signature.

9  A.  Correct.

10  Q.  And perhaps that it matched the name at the top.

11  A.  Correct.

12  Q.  But you're not an expert at that.

13  A.  No.

14  Q.  Okay.  You also said that the receipt reflects the

15  information that the recorder --

16  A.  The customer.

17  Q.  The customer, that's right, gives to you.

18  A.  Yes.

19  Q.  They don't need to give you any information at all, do

20  they?

21  A.  No.

22  Q.  And it's completely up to the customer whether they give it

23  to you or not.

24  A.  Correct.

25  Q.  Okay.

W. Holderman - redirect by Stump

1    A.   We ask, and they decide.

2         MS. SOLOMON:   Okay.   Thank you.   Nothing further.

3         (Discussion off the record.)

4         MR. STUMP:   One very brief follow-up question.

5                      REDIRECT EXAMINATION

6    BY MR. STUMP:

7    Q.   I didn't have in front of you before Exhibit 14.   On the

8    last point by Ms. Solomon, could you tell us for this one what

9    information is listed here on the receipt where it says "issued

10   to"?

11   A.   Okay.   In the spot where the cashier would have asked and

12   typed in information provided by the customer, it says "River."

13   Q.   And then underneath that?

14   A.   "P.O. Box 8503, Chicago, Illinois 60680."

15        MR. STUMP:   All right.   That's all I have.

16        MS. SOLOMON:   Just one question.

17                     RECROSS-EXAMINATION

18   BY MS. SOLOMON:

19   Q.   If someone has given their information to the cashier and

20   it appears on the receipt, then that would indicate that that

21   person doesn't care whether your office has that information,

22   is that right?

23   A.   Care?

24   Q.   It's okay with them for you to have that information.

25   A.   I don't understand.

W. Holderman - recross by Solomon

1  Q.  Okay.  So if I don't want you to have that information, I

2  don't give it to you.  But if I do, I'm okay with it, right?

3        MR. STUMP:  I object.

4  BY THE WITNESS:

5  A.  I don't know what you're okay with.

6        MR. STUMP:  It's outside the witness' personal

7  knowledge what someone else may be thinking.

8        THE COURT:  That's overruled, but I think you need to

9  clarify the question.

10        MS. SOLOMON:  Okay.

11  BY MS. SOLOMON:

12  Q.  You said if you pay your money, you don't need to identify

13  who you are.

14  A.  Correct, especially with cash receipts.

15  Q.  Right.

16  A.  They're anonymous.

17  Q.  They would be totally anonymous, right?  But in this

18  instance the person identified as River Tali gave you that

19  information, gave the cashier that information.

20  A.  There's only one word on there.

21  Q.  "River."  I'm sorry.  "River."

22  A.  What about River?

23  Q.  She identified herself.

24  A.  How do you know it was a she?

25  Q.  The individual who paid this money.

 1  A.  We don't know that they're identified.  Customers can come

 2  in --

 3  Q.  Do you need to look at this again?

 4  A.  -- and give John Hancock.

 5  Q.  Do you need to look at this again and see what's written on

 6  it?

 7  A.  The word "River."

 8  Q.  "River," okay.  So an individual who identified himself or

 9  herself as River gave that information.

10  A.  No.

11  Q.  No?

12  A.  No.

13  Q.  Then how did it get there?

14  A.  Can I have your information?

15          Then they just start saying what they want to say.

16  Q.  Right.

17  A.  We don't know.  We're not asking for driver's licenses.

18  Q.  No, no, no.  I'm sorry.

19  A.  It might say "River."  It might say "Mountain."  It might

20  say "Stream."  The point is, we're are not looking for an ID.

21  We're not fingerprinting.

22  Q.  I'm sorry.  I must not have been clear because you

23  misunderstood my question.  Okay.  I didn't ask if you checked

24  to make sure that that information is accurate.  What I asked

25  was this.  An individual who's before a cashier volunteers the

1  information --

2  A.  Yes.

3  Q.  -- that is on the receipt.

4  A.  100 percent, 100 percent.

5          MS. SOLOMON:  Okay.  Thank you.  Nothing further.

6          MR. STUMP:  That's all I have, Your Honor.

7          THE COURT:  Who does?

8          THE WITNESS:  Oh, the Bureau of Natural Resources and

9  the U.S. Coast Guard.

10          THE COURT:  Thank you.

11          THE WITNESS:  Apparently he's got a boat.

12          THE COURT:  I used to have a boat, and then I had

13  kids.  You know, a boat is a hole in the water into which you

14  pour money.

15          Any further questions?  Any further need for the

16  witness in the future?

17          MR. STUMP:  No, and we'd ask that she be released

18  from her subpoena.

19          THE COURT:  Okay.  Any objection to that,

20  Ms. Solomon?

21          MS. SOLOMON:  No objection.

22          THE COURT:  Okay.  You're released from further

23  testimony.  Thank you.

24          THE WITNESS:  Thank you.

25      (Witness excused.)

Bruton - direct by Stump

1        THE COURT:  Folks, let's take about a 20-minute

2   break.  Please come back here.

3      (Jury out.  Recess.)

4        THE COURT:  Okay.  We're bringing them in.

5      (Jury in.)

6        THE COURT:  Okay.  Please be seated.

7        Mr. Stump, your next witness?

8        MR. STUMP:  Thank you, Your Honor.  The United States

9   calls Tom Bruton.

10        THE CLERK:  Raise your right hand.

11      (Witness duly sworn.)

12                        THOMAS BRUTON,

13            GOVERNMENT'S WITNESS, DULY SWORN

14                    DIRECT EXAMINATION

15   BY MR. STUMP:

16   Q.  Sir, could you start by just telling us your full name,

17   please, and spell your last name for the record?

18   A.  Sure.  My name is Thomas Bruton.  The last name is spelled

19   B-r-u-t-o-n.

20   Q.  Mr. Bruton, where do you work?

21   A.  I'm the Clerk of the Court for the Northern District of

22   Illinois.

23   Q.  Is your office located in this building right here?

24   A.  It is.

25   Q.  On what floor?

1    A.   20th floor.

2    Q.   Just one below us.

3    A.   Correct.

4    Q.   How long have you been the clerk of court?

5    A.   I began January 1st, 2012.

6    Q.   How did you get the job to be clerk of court?

7    A.   Well, it's a statutory position.  We are the administrators

8    of the court, and the rules are that the district judges and

9    senior judges, you apply for the position.  It's an application

10   process that you go through, and you are selected amongst the

11   other applicants.

12   Q.   When you're the clerk of court, who are you employed by?

13   A.   I'm employed by the federal judiciary.

14   Q.   As a clerk of court, are you a federal officer then?

15   A.   Yes.

16   Q.   How many employees do you manage or supervise?

17   A.   I'm allotted about 165 positions for clerk's office staff.

18   We also oversee a number of the chambers staff with HR issues,

19   court reporters.  So all tolled in the courthouse in the

20   district court, I'd say we have about 325 employees.

21   Q.   Now, as part of your job as a clerk of court, do you

22   oversee -- is there a process by which documents are filed in

23   the court record?

24   A.   That is correct.  I am the person that is in charge of

25   overseeing all the court records.

1  Q.  Can you tell us, for the jury just briefly, how does that
2  process work?  How does a document get filed, say, in a
3  criminal case like this one?
4  A.  Sure.  In a criminal case, the start of it would be a
5  United States Attorney, an assistant United States Attorney
6  coming into my office where the intake staff, a deputy clerk
7  that works for me, would accept that document.  It would come
8  in, and we'd review it for its accuracy.  If it's accurate,
9  they'll accept it.  They'll stamp it.  They will enter it into
10  our computer-managed system.  It will become a permanent
11  record.  That permanent record then is stored on a system
12  called CM/ECF, computer-managed electronic court filing, and
13  that system is something that is not only accessed by court
14  personnel, but that system is also accessed by the parties in
15  the case.
16  Q.  The documents that are filed in a criminal case, can they
17  be accessed by the public as well, or do you have to be a party
18  or an attorney of record to see them?
19  A.  You can access them as a member of the public.  You can
20  access them in one of two different ways that I'm am aware of.
21  The first would be at our public terminals.  In the clerk's
22  office, there's a series of approximately six public terminals
23  that anyone can sit at and review the documents.  Also, there's
24  a system that you can go on and review online and see the
25  documents.

Bruton - direct by Stump

1  Q.  Do you have to pay a fee to be able to see the documents?

2  A.  Not at our public terminals.  At our public terminals, it

3  is free access.

4  Q.  And if you used one of the public terminals to access a

5  document in the criminal case, would there be any mechanism in

6  that computer for tracking who had done that?

7  A.  None whatsoever.

8  Q.  I want to show you now what we've marked for identification

9  as Government's Exhibit 21.  I'm also bringing up here, just

10  for the record, a binder of my proposed exhibits.

11       MR. STUMP:  So what I'd like to do with Your Honor's

12  permission is to leave this at the witness stand for future

13  testimony.

14       THE COURT:  Okay.

15  BY MR. STUMP:

16  Q.  If you could, sir, just take a look at Exhibit 21.

17  A.  Okay.

18  A.  It's a multipage document.  It's got a cover, and it's

19  bound.  Do you recognize what I handed to you?

20  A.  I do.

21  Q.  What is it?

22  A.  It's an exemplification certificate in 06 CR 778.  This is

23  a document that I am familiar with which we routinely handle in

24  our court, an exemplification certificate in the case that I

25  just recited.

1  Q.  And can you just tell us briefly what is an exemplification

2  certificate?

3  A.  Sure.  An exemplification certificate is an official

4  document that I first sign that I'm attesting to as the keeper

5  of the record, as the clerk of the court, that I've reviewed

6  the document, it is accurate, it's official, and then I provide

7  it to the chief judge or to the person that's acting chief

8  judge.  They review my signature, and they're swearing that I

9  am the keeper of the records, that it is accurate, and it is

10 official.

11        The third line of the document is my signature to say

12 the chief judge or the acting chief judge also reviewed that

13 document and that it is now official.  There's three signatures

14 on an exemplification certificate.

15 Q.  And you've explained those three signatures.  What is the

16 overarching purpose of having them?

17 A.  It documents the exemplification certificate.  It is a

18 document that the court produced.  It is the official record of

19 the court that the court provided.

20 Q.  And in this particular instance with Exhibit 21, what is

21 the record here that the court is certifying is generated by

22 the court?

23 A.  Sure.  This exemplification is the docket for 06 CR 778.

24 Q.  What sort of information is reflected on a docket?

25 A.  Sure.  A docket is the record of a case.  It is everything

Bruton - direct by Stump

1  from the start of the filing to the end.  Everything is in

2  chronological order.  It lists who filed it, the date it was

3  filed, the parties that filed it, and the staff member, my

4  staff member's initials that reviewed it.

5  Q.  And who is the defendant associated with this case number

6  in Exhibit 21?

7  A.  Devon Phillips.

8          MR. STUMP:  All right.  At this time, Your Honor, I'd

9  move for admission of Government Exhibit 21.

10          MS. SOLOMON:  No objection.

11          THE COURT:  Government's 21 is admitted, no

12  objection.

13      (Government Exhibit 21 received in evidence.)

14  BY MR. STUMP:

15  Q.  What I'm going to do, Mr. Bruton, I'm going to take this

16  original, and with the Court's permission I'm going to publish

17  this to the jury at this time by passing it around.  What I'm

18  going to ask you to do is refer to what's been marked in here

19  as Government Exhibit 21 so that we can follow along.

20  A.  Okay.

21  Q.  Can you tell us on what page the signatures appear that you

22  were describing?

23  A.  Sure.  The triplicate signature on the exemplification

24  certificate is just after the blue cover sheet.  It is the very

25  first page of the bound material there.

Bruton - direct by Stump

1  Q.  All right.  Is that your signature there in two different

2  places on that page?

3  A.  That is correct.

4  Q.  All right.  I want to turn now to the next page of the

5  exhibit and ask you if you could explain it to us.  What is

6  this page here?  What are we looking at?

7  A.  This is what I would refer to as the header of the docket.

8  This is -- you will see up at the top, you will see that it

9  says "United States District Court for the Northern District of

10 Illinois."  That is this court.  That is the court that I'm the

11 clerk of court.  You'll also see just below that on the third

12 line the case, 06 CR 778.  Below that is the caption of the

13 case, U.S. versus Phillips.  Just below that, you will see

14 Judge Joan Lefkow, who was the district judge assigned to this

15 matter.  Then the second judge listed there is Judge Arlander

16 Keys, who is the magistrate judge that was listed as the

17 referral judge on this matter.

18 Q.  Now, can you tell us the difference between these two

19 judges that you've described, a district judge and a magistrate

20 judge?

21 A.  Sure.  A United States District Court judge is a judge

22 that's appointed by the President of the United States on the

23 advice and consent of the United States Senate.  They serve for

24 life.  A magistrate judge is a judge that is hired by the

25 district court judges.  They serve a term.  They serve

1  approximately seven years, and they can be reappointed.  They

2  serve at the pleasure of the court.

3  Q.  And what is the difference between sort of the roles that

4  they play in a criminal trial?

5  A.  Sure.  A magistrate judge would be the person that would in

6  our court handle things such as the search warrant, an

7  application for a search warrant.  They would see if there's

8  probable cause for that application.  They would also see if

9  there was an arrest in the matter.  They would be the first

10  judge that that criminal defendant would appear before for a

11  detention hearing or a bond hearing.  They are the first level

12  judge that someone in this court would get to see on a new

13  criminal case.

14  Q.  And who was -- can you tell in looking at Exhibit 21 who

15  was the magistrate judge assigned to this case here?

16  A.  What I see here is Judge Arlander Keys is listed as the

17  magistrate judge.

18  Q.  All right.  Now, who did you say was assigned as the

19  district judge?

20  A.  Judge Joan Lefkow.

21  Q.  And can you tell us, very generally speaking, what roles a

22  district judge would have then in a case like this, a criminal

23  case?

24  A.  After the first appearance or bond hearing, the district

25  judge handles all matters after that.  They would handle

1  everything from pretrial motions to trial, sentencing, all the

2  way through to the disposition at the end of the case.

3  Q.  All right.  I want you to take a look at the page in the

4  exhibit where the docket entries begin.

5  A.  Okay.

6  Q.  I don't have a good page number for it, but if you could

7  just find the page that looks like this one (indicating).

8  A.  Sure.

9  Q.  It's a table.  Could you just tell us if -- well, first of

10  all, above the table I see there's some names listed and some

11  addresses.  Can you just tell us what those are?

12  A.  Sure.  On that, before you get to the table, you will see

13  names of assistant United States Attorneys that are assigned to

14  the case.  That is information entered by my staff.  You'll see

15  pretrial service officers may be listed there.  Probation

16  officers may be listed there.  You'll see, if we had the

17  information, you'll see the names of the attorney or attorneys

18  that may be representing the defendant in the case.

19  Q.  All right.  Is everyone that's on that list associated with

20  the case in some way?

21  A.  That is correct.

22  Q.  Now, the table that's underneath those names, can you just

23  walk us through a little bit how to read it, the different

24  columns and what they signify?

25  A.  Sure.  Chronologically from left to right I will go.  The

1  first column over at the far left is the date filed, and that's

2  pretty self-explanatory.  That's the date that that document

3  was filed in our court, that my staff accepted it.  The second

4  from the left to the right is the number assigned, and that is

5  what we call the docket number.  That's how we refer to the

6  documents.  In any docket, we go in chronological order from

7  the start to the finish, number 1 until the end of the case.

8  Q.  Is the court the one that assigns that docket number, your

9  office?

10 A.  That is correct, the clerk's office.

11 Q.  All right.  What's the next column?

12 A.  The next column is the docket text.  You will see in bold

13 or in capital letters the main entry.  For example, on document

14 number 1, the docket text is "complaint."  The complaint was

15 the initiating document here.  There's usually a few sentences

16 that follow in that docket describing that entry.  So someone

17 reviewing the document can easily see what that document number

18 is referring to.  For example, document number 1 is a complaint

19 signed by Magistrate Arlander Keys.

20 Q.  And what is the date of that docket entry?

21 A.  Sure.  The document was filed on 10/20/2006 and entered by

22 my staff on the docket on 10/25/2006.

23 Q.  All right.  If you could, I want you to flip to docket

24 entry number 136.

25 A.  I'm there.

1  Q.  Okay.  Could you read aloud the text that's there in that

2  box for docket number 136?

3  A.  Sure.  It's an administrative notice and demand from

4  Cherron Phillips dated 2/1/2010, the initials "LAS," and the

5  date entered by my staff of 2/8/2010.

6  Q.  Now, do you happen to know or can you tell by looking at

7  this docket entry how that document came to be filed?  I'll

8  direct you to the entry right below it, number 137.

9  A.  Okay.  May I read 137?

10  Q.  Yes, please.  Would you read it out loud?

11  A.  "Minute entry.  Docket 137.  Minute entry before the

12  Honorable James F. Holderman as to Devon Phillips.  I have

13  received defendant's pleading entitled Administrative Notice

14  and Demand, and am placing it on the electronic document of the

15  criminal case 06 CR 778.  The administrative notice and demand

16  is referred to Judge Joan H. Lefkow, who is presiding -- who is

17  the presiding judge in the case.  Mailed notice" -- and the

18  initials of my staff person entered 2/8/2010.

19  Q.  All right.  This "minute entry" is what it's called, is

20  that right?

21  A.  That's correct.  A minute entry in our court is a docket

22  text that a judge would enter or direct my staff to enter with

23  an order, with a judicial order.

24        MR. STUMP:  All right.  Thank you, Mr. Bruton.

25  That's all the questions I have for you.

Bruton - cross by Solomon

1        THE COURT:  Ms. Solomon?

2        MS. SOLOMON:  Thank you.

3                    CROSS-EXAMINATION

4  BY MS. SOLOMON:

5  Q.  Good afternoon, Mr. Bruton.

6  A.  Good afternoon.

7  Q.  My name is Lauren Solomon, and I represent Ms. Cherron

8  Phillips in this matter.  I just wanted to go back to the

9  beginning of your testimony today.  You said that the way

10  something got filed in the district court was if a U.S.

11  Attorney went up to the court -- the clerk's office, and then

12  it would be filed.  You didn't mean that you were excluding

13  defense lawyers' documents, did you?

14  A.  No, I did not.  That was the -- my explanation was how a

15  case would first be opened in my court, a criminal case.

16  Q.  Okay.  Thank you for that clarification.  Okay.  After

17  that, documents that are filed by either side, whether

18  plaintiff or defendant, are then filed and reflected in the

19  docket, is that right?

20  A.  That's correct.

21  Q.  And other parties can also file documents in the case, is

22  that correct?

23  A.  Can you clarify that question, please?

24  Q.  Pretrial Services might file something, or there might be

25  -- it's not open to the public.  It is a public docket.  It's

1   accessible by the public, but it's not against the law for

2   something else to be filed in the docket.

3   A.  You must be associated with the case in order to file in

4   the case.

5   Q.  Okay.  And "associated" means the defendant --

6   A.  Correct.

7   Q.  -- or an attorney who is involved in it?

8   A.  It would be -- in our court, it is the attorney that is

9   representing the plaintiff or the defendant, if it was a civil

10  matter or a criminal matter, or if the person is appearing

11  without an attorney, they can also file documents.

12  Q.  And that would be if a defendant is representing himself or

13  herself pro se?

14  A.  That is correct.  Excuse me.

15  Q.  In this case, Judge Holderman, who was not the judge in the

16  case, also filed something on the docket?

17  A.  He was the judge on document number 137, the judicial

18  officer that entered the order, the minute order on February

19  5th, 2010.

20  Q.  But he wasn't the presiding judge in that case.

21  A.  On that case?  It does not appear to be.  From my read on

22  the docket, the judge was Judge Joan H. Lefkow.

23  Q.  That's what the entry says, doesn't it?

24  A.  I'm sorry?

25  Q.  That's what that entry 137 says, that he's referring it to

Bruton - cross by Solomon

1  Judge Lefkow, who is the presiding judge?

2  A.  That's correct.

3  Q.  Okay.  Now, you became the clerk of the court in 2012, you

4  said?

5  A.  January 1st, 2012, I believe it was.

6  Q.  So a lot of what's in this docket was entered in the docket

7  prior to your term?

8  A.  That is correct.

9  Q.  Okay.  You were not named in -- no liens were filed against

10  you?

11  A.  To the best of my knowledge.

12  Q.  That you're aware of?

13  A.  To the best of my knowledge, not at this time.

14  Q.  And you've come to testify about the process that occurs in

15  the clerk's office?

16  A.  That is correct.

17  Q.  And to explain the docket.

18  A.  That is correct.

19  Q.  Okay.  Thank you.

20  A.  Thank you.

21  Q.  Oh, one more thing.  So when you came into the clerk's

22  position, the computer filing system already was set up and

23  running.

24  A.  That is correct.  In the Northern District of Illinois, we

25  began live with CM/ECF January of 2005.

 1  Q.  Okay.  When you look at the docket, unless you actually

 2  access them, you wouldn't know the contents of the docket.

 3  A.  All you would see is the caption that follows in that third

 4  column.  You would see probably what I would describe as a

 5  brief description of what that document is.  You would not see

 6  the full document until you click on the document number which

 7  is hyperlinked.

 8  Q.  So that's that second column, the number there?  If you

 9  clicked on that, then the document would appear.

10  A.  That's correct.

11  Q.  And anybody would have access to that from the public

12  terminal?

13  A.  That is correct.

14  Q.  Or by paying from the electronic --

15  A.  Correct.

16  Q.  -- electronically anywhere you are?

17  A.  That's correct.

18  Q.  Can anybody access the electronic system?

19  A.  Yes.

20  Q.  All right.  You don't need to be connected to a case in

21  order to access it and look at the documents?

22  A.  No, you do not.  You do not have to be a party in the case

23  to review the documents.

24          MS. SOLOMON:  Okay.  Thank you.

25          MR. STUMP:  A brief redirect, Your Honor?

1        THE COURT:  All right.

2                      REDIRECT EXAMINATION

3  BY MR. STUMP:

4  Q.  Mr. Bruton, you don't have to be a party to access the

5  documents, but you said you do have to be, however, a party or

6  associated with the case in order to be able to file a document

7  in a case, is that right?

8  A.  That is correct.

9  Q.  Is it still possible that a person could file a document

10  that ends up making it onto a docket like this even though

11  they're not associated with the case?  Does that happen

12  sometimes?

13  A.  It does happen periodically.

14  Q.  How can that happen?

15  A.  When my staff receives a docket -- a document, I should

16  say, they're reviewing the document and they would see a case

17  number.  They would look at it and review it, and if it appears

18  to be a filing in that case, they are going to enter it on the

19  docket and wait for a judge to direct us for official action.

20  My staff would never just throw away a document.

21        MR. STUMP:  Okay.  Thank you, Your Honor.

22                      RECROSS-EXAMINATION

23  BY MS. SOLOMON:

24  Q.  Just a couple questions.  It's not illegal to file a

25  document if you're not a party to a case, is it?

1  A.  I'm not familiar with the criminal statutes.  I'm familiar

2  with our local rules.  So I wouldn't be able to speak to the

3  criminal statutes.

4  Q.  Is it prohibited by local rule?

5  A.  My understanding is that you must be a party in the case to

6  file in the case.  That is the local rule.

7  Q.  However, as you indicated, documents can be filed, and it's

8  up to the presiding judge to decide?

9  A.  A judge.

10  Q.  Any judge?

11  A.  No, the judge presiding in the matter would be a common

12  occurrence.  For example, another common occurrence that I've

13  experienced is a member of the executive committee of judges

14  who would review the matter as well.  They can be providing us

15  direction.

16  Q.  But if there's no action by the presiding judge or the

17  executive committee, then the filing would remain on the

18  docket.

19  A.  Correct, until there was a direction for us to either leave

20  it or remove it.

21  Q.  So would there be some trigger that would automatically

22  notify your office that this is not a party's filing?

23  A.  It would not be notifying me.  The judge assigned to the

24  case would be the person that would be reviewing the docket.  I

25  wouldn't personally review the docket.

1   Q.  So if the judge did not bring it to the clerk's office's
2   attention, then it would stay on the docket.
3   A.  It could.
4   Q.  And that would be fine.
5   A.  Again, I'm not a judge, so I'm not going to speak to how a
6   judge would --
7   Q.  Well, in the same way that speeding is also against the
8   law, right, but unless you're caught you're not charged?
9   That's within your knowledge, right?
10  A.  Speeding?  Sure.
11  Q.  Sure.  I'm not impugning that you do that, but we're all
12  aware that speeding is against the law.
13  A.  Sure.
14  Q.  And occasionally I've heard some people do it.
15  A.  Correct.
16  Q.  But if we don't get -- if someone doesn't get caught, then
17  the speeding is permitted.
18  A.  I think there's still a law on the books that says you're
19  not supposed to speed.
20  Q.  That's correct.  But my point is that once it's filed,
21  unless someone determines that it doesn't belong there and it
22  needs to be removed, it stays on the docket.
23  A.  I cannot remove a document from the docket without an order
24  from a judge.
25          MS. SOLOMON:  Okay.  Thank you.

1          MR. STUMP:  Thank you, Your Honor.  That's all I

2    have.

3          THE COURT:  May I release Mr. Bruton from further

4    testimony?

5          MS. SOLOMON:  Yes, Your Honor.

6          MR. STUMP:  Yes, Your Honor.

7          THE COURT:  Thank you, sir.  You may step down.  We

8    won't need you again.

9          THE WITNESS:  Thank you.

10     (Witness excused.)

11         MR. STUMP:  At this time, Your Honor, the United

12   States calls Thomas Shakeshaft.

13     (Brief pause.)

14         THE CLERK:  Raise your right hand.

15     (Witness duly sworn.)

16                    THOMAS SHAKESHAFT,

17               GOVERNMENT'S WITNESS, DULY SWORN

18                      DIRECT EXAMINATION

19   BY MR. STUMP:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  Could you start by just telling us your name and spelling

23   your last name, please?

24   A.  Yes.  My name is Thomas Shakeshaft.  It's

25   S-h-a-k-e-s-h-a-f-t.

1  Q.  Mr. Shakeshaft, what do you do for a living?

2  A.  I am a federal prosecutor.

3  Q.  Do you have a specific title as a federal prosecutor?

4  A.  I do.  I'm an assistant United States Attorney here in this

5  building in the Northern District of Illinois.

6  Q.  And how long have you been an assistant United States

7  Attorney in the Northern District of Illinois?

8  A.  A little over ten years.

9  Q.  Can you tell us -- I'm going to abbreviate it as "AUSA."

10  Is that okay?

11  A.  That's fine.

12  Q.  Can you tell us what an AUSA does?

13  A.  We are -- there are about 140 criminal prosecutors and

14  about 15 or 20 civil litigators in the U.S. Attorney's office.

15  We prosecute federal crimes in this district, and this district

16  is about the top third of the state of Illinois.  So we work

17  with the FBI, the DEA, and ICE to prosecute violations of

18  criminal -- of U.S. criminal law.

19  Q.  As an AUSA, are you an employee of the United States?

20  A.  I am.

21  Q.  I want to show you now what I've marked for identification

22  and what has been admitted as Government Exhibit 13.1.  It's a

23  one-page document.  Do you recognize it?

24  A.  I do.

25  Q.  And what did I hand you?

1   A.  It is what purports to be a lien that I understand was

2   filed against myself and a number of others, both judges and my

3   boss, Pat Fitzgerald, or my old boss, Pat Fitzgerald, other

4   members of the court system.

5   Q.  Okay.  Under what circumstances did you first see this

6   particular document?

7   A.  It was brought to our attention.  I was first informed of

8   it by a member of my office, but I understand it was brought to

9   the attention of the FBI after it had been filed.

10  Q.  So who was it that brought it to your attention?

11  A.  My recollection, it was a colleague in my office whose name

12  is Nancy DePodesta.  She's another prosecutor who at that time

13  was looking into the filing of these liens on myself and other

14  people.

15  Q.  Before it was brought to your attention, did you have any

16  idea that there had been this lien filed against your property?

17  A.  No.

18  Q.  If I can, what I'm going to do is I'm going to publish this

19  to the jury and ask you to look in that binder and follow along

20  at Exhibit 13.1.

21  A.  Okay.

22  Q.  Can you tell us, do you see your name there at the top of

23  the exhibit?

24  A.  I do.

25  Q.  And what's the name of the box that it appears in?

Shakeshaft - direct by Stump

1  A.  "Name of vessel."  Then it also appears in box number 4,

2  which is "Name and Address of Owner of Vessel."

3  Q.  While we're on that subject, the address that's under there

4  in box 4 under your name, is that an address that you recognize

5  in San Juan, Puerto Rico?

6  A.  No.

7  Q.  Looking now at box number 2, it's at the top and to the

8  right of your name.

9  A.  Yes.

10  Q.  It says "Unique Identifier," and there's a case number

11  listed.  Do you see that?

12  A.  I do.

13  Q.  Can you read aloud what the case number is?

14  A.  It's case number 06 CR 778.

15  Q.  Do you recognize that case number, Mr. Shakeshaft?

16  A.  I do.  It appears it's the number that was given to a case

17  that I was prosecuting in 2006.  The number, it's a 2006 case.

18  It's a criminal case, hence the "CR," and "778" was the number

19  assigned to it, and the defendant's name was Devon Phillips.

20  Q.  And do you see the name "Devon Phillips" anywhere on

21  Exhibit 13.1?

22  A.  I do.  It's in box number 5, the name and address of the

23  claimant.  Devon Phillips' name appears then together with, you

24  know, a copyright and registered trademark sign as bailee for

25  Devon Dramaine Phillips El.  But, yeah, Devon Phillips' name is

1  the first one there.

2  Q.  Can you tell us how you first became involved in this

3  prosecution of Devon Phillips?

4  A.  Sure.  The Devon Phillips case came to me on what in the

5  U.S. Attorney's office is called a duty day case.  It's a case

6  that just sort of comes in the door.  We are all on duty for a

7  24-hour period.  So in this instance I happened to be on duty

8  in 2006, and DEA agents called me to say that Devon Phillips

9  had just been arrested with three kilos of cocaine in his car.

10 So I became the prosecutor of Devon Phillips in what ultimately

11 ended up being three separate transactions, a crack and cocaine

12 prosecution.

13 Q.  So can you tell us, just generally speaking, were you the

14 prosecutor that handled the case from its inception all the way

15 through its conclusion?

16 A.  Certainly from the time that it was presented to our case

17 -- to our office.  It was a DEA case.  But, yes, in terms of

18 having a prosecutor assigned, I was the prosecutor from

19 beginning to end.

20 Q.  Were there any other prosecutors from your office involved

21 in the case?

22 A.  There was another one.  Her name is Marny Zimmer.  It's

23 misspelled, but she is also listed in box 3.  She was what we

24 would call my second chair or my trial partner.  If Devon

25 Phillips' case had actually gone to trial, she would have tried

1   it with me.

2   Q.  Now, do you remember what year the case was initiated in

3   the courthouse?

4   A.  2006.

5   Q.  And did the case go to trial?

6   A.  It did not.

7   Q.  What happened?  How was it resolved?

8   A.  Well, after a long time, ultimately Devon Phillips

9   ultimately pled guilty.

10  Q.  Was there a sentencing hearing held in that case?

11  A.  There was.

12  Q.  And do you recall what the result of the sentencing was?

13  A.  He was ultimately -- Devon Phillips was ultimately

14  sentenced to 78 months in prison with some usual terms and a

15  period of supervised release that followed.

16  Q.  I'm going to show you what's already been admitted as

17  Government Exhibit 21.  Can you flip through that docket and

18  find the entry that shows the actual date of the sentencing?  I

19  believe if you --

20  A.  Yes, it was on or about February 9th, 2011.

21  Q.  On February 9th of 2011, Devon Phillips was sentenced.

22  A.  Correct.

23  Q.  Can tell us who was the district judge assigned to the

24  case?

25  A.  Judge Joan Lefkow.

1 Q.  And who was the magistrate judge assigned to the case?

2 A.  Actually assigned?  I'm not -- I don't -- let's see.

3 Q.  Now you're referring to the exhibit, right?

4 A.  I am.  Arlander Keys.

5 Q.  I want you to take a look at -- well, before I get there,

6 do you recognize, just looking at your lien, 13.1, that there's

7 some other names that are listed there?  Would you mind walking

8 through with us any of those names if you know who you are?

9 A.  Sure.  The first is James F. Holderman with a doing

10 business as chief judge.  Chief Judge Holderman at the time was

11 the chief judge of the district court here in the Northern

12 District of Illinois, which means he was the chief judge.  Just

13 as the name would connote, he's the head district court judge.

14 They serve for a period of six years.

15        Joan Humphrey Lefkow was the judge who presided over

16 the Devon Phillips case and before whom I appeared for every

17 proceeding related to his criminal case.

18        Arlander Keys was the magistrate judge who, my

19 recollection is, did the initial appearance, a first appearance

20 when somebody is charged with a crime, and perhaps a couple of

21 other sort of rudimentary proceedings that take place before a

22 case really gets going.

23        Geraldine Soat Brown is also a magistrate judge in

24 this building who presided over, I believe, the arraignment

25 when we returned what's called a superseding indictment in the

1    case.  So she is also a magistrate judge.

2           Patrick Fitzgerald at the time was the U.S. Attorney

3    here.  He was the U.S. Attorney between 2001 and 2011.  So he

4    was my ultimate boss in this district, and he is a presidential

5    appointee.

6           Michael Dobbins was the clerk of the court at the

7    time.

8           Marny Zimmer was also an assistant U.S. Attorney who

9    was, as I said, my second chair or my trial partner.

10   Q.  I want to ask you about a couple names that aren't on the

11   lien and just tell me if you know these people.  One is Andre

12   Thompson.  Do you know that name?

13   A.  I do.

14   Q.  Who's Andre Thompson?

15   A.  Andre Thompson is a Chicago police officer.  When DEA

16   arrested Devon Phillips, he was what's called a task force

17   officer with DEA, which means that he had been temporarily

18   assigned to DEA at the time.

19   Q.  So was he involved in the investigation of Devon Phillips?

20   A.  He was.  In fact, if recollection serves, he started the

21   investigation of Devon.

22   Q.  What about a gentleman named Eric Cato?  Do you know that

23   name?

24   A.  I do.

25   Q.  Who's Eric Cato?

1  A.  Eric Cato is a sergeant with the Chicago Police Department.

2  Likewise, I believe at the time he was deputized as a TFO with

3  DEA.  Eric Cato came into the case and played the same role in

4  a sense that Andre Thompson did.  He was the undercover officer

5  who was actually the guy who at the time Andre Phillips was

6  arrested played the role of a cocaine purchaser who was

7  attempting to obtain the three kilos of cocaine that were in

8  Devon Phillips' car at the time.

9  Q.  Let me ask you about Justin Williams.  Do you know that

10 name?

11 A.  I do.

12 Q.  Who's Justin Williams?

13 A.  Justin Williams is a special agent with the Drug

14 Enforcement Administration, DEA, who I asked to help us out on

15 one particular occurrence in this case where he sat in on an

16 interview of Devon Phillips at my request.

17 Q.  Now, the information that you just described, these

18 different officers and the roles that they played in the case,

19 is that information that would have been made available through

20 your prosecution to Devon Phillips?

21 A.  In the ordinary course, yes.

22 Q.  Can you explain that?

23 A.  Sure.  As part of what we call discovery in a criminal

24 case, any criminal defendant is entitled to see reports and the

25 evidence against them.  In the ordinary course, we turn over

1  most of that.

2       So taking those people one by one, Andre Thompson

3  both would have probably authored and have been mentioned in

4  reports that we would have turned over.  Eric Cato also likely

5  would have been mentioned and have perhaps authored reports

6  that we would have turned over as part of discovery.  Justin

7  Williams sat in on what we call the safety valve proffer at the

8  time, an interview of the defendant, and his name also would

9  have been disclosed in the ordinary course in parts of reports

10  that we as prosecutors turn over to defendants when they have

11  been charged with a crime.

12  Q.  Now, in the ordinary course after you've turned over those

13  reports to a criminal defendant, do you have any control over

14  where they go after that?

15  A.  It depends on the case.  More often than not, we ask

16  defendants and their lawyers to enter into what we call a

17  protective order.  In that case, you know, it was not a case

18  where we were all that concerned about it.  So, no, we don't

19  have any physical control over it.  Once we've turned it over,

20  most lawyers are bound not to show it to the world.  But in

21  this particular case, no, we don't have any control over where

22  it goes.

23  Q.  Now I want to direct your attention back to Exhibit 21 and

24  have you take a look at docket entry 136.

25  A.  Okay.

Shakeshaft - direct by Stump

1  Q.  Can you just read the first couple of lines there of the

2  docket entry?

3  A.  Okay.  It's from February 5th of 2010, and it says

4  "administrative notice and demand from Cherron Phillips dated

5  February 1, 2010."

6  Q.  Do you know that name, "Cherron Phillips"?

7  A.  I do.

8  Q.  How do you know that name?

9  A.  I understand her to be Devon Phillips' sister.

10  Q.  And have you ever had any interactions with her or seen her

11  in person?

12  A.  I have.

13  Q.  In what context?

14  A.  She attended several, if not most, of her brother's court

15  appearances.  She also was a signatory to a bond that allowed

16  him to be released on bond pending trial.  So she had some

17  interaction with our office in terms of signing paperwork that

18  secured property for his release.  I had nominal interactions

19  with her on the way in and out of court, but not much.

20  Q.  Do you recognize her here in court today?

21  A.  I do.

22  Q.  Can you point her out?

23  A.  She is wearing the blue and sitting at defense counsel

24  table with the head scarf on.

25              MR. STUMP:  All right.  I'm going to ask that the

1  record reflect that the witness has identified the defendant.

2      THE COURT:  So noted.

3  BY MR. STUMP:

4  Q.  Mr. Shakeshaft, from your being able to observe

5  Ms. Phillips in court, were you able to determine anything

6  about how she felt about the prosecution against her brother?

7  A.  Not so much from what she said, but from some of the things

8  that she filed.

9      MS. SOLOMON:  Objection, Your Honor, for the reasons

10  stated in the motion in limine.

11      THE COURT:  Let's go to sidebar.

12  (Discussion at sidebar on the record.)

13      THE COURT:  Ms. Solomon?

14      MS. SOLOMON:  I anticipate that he's going to go into

15  the conduct of Ms. Phillips in the courtroom, so I wanted to

16  have the record note our objection.

17      THE COURT:  You are preserving the record,

18  understood.

19      MS. SOLOMON:  I'm preserving the record on this whole

20  line of questioning.

21      MR. STUMP:  I'll also note that he'll probably get

22  into some of the documents that she filed.

23      THE COURT:  So a continuing objection.

24      MS. SOLOMON:  It's a continuing objection.

25      THE COURT:  And you'll stipulate to that?

Shakeshaft - direct by Stump

1          MR. STUMP:  Correct.

2          MS. SOLOMON:  Correct.

3          THE DEFENDANT:  For the record, I have a housekeeping

4    matter.  I've given the Court notice, and I'm asking the Court

5    to reconsider its position on the trial and am demanding bond.

6          THE COURT:  Denied.

7          THE DEFENDANT:  Who will be liable to me in the event

8    that I'm injured in this matter?

9          THE COURT:  You've made your record.

10         MS. SOLOMON:  Just one other matter, Judge.

11   Ms. Phillips has informed me that she needs to get child care

12   for her children, and so she cannot go past 5:00 o'clock.

13         Is that correct?

14         THE DEFENDANT:  I cannot.

15         MS. SOLOMON:  She needs to get out by 5:00.

16         THE COURT:  Well, this is off the record.

17      (Discussion at sidebar on the record concluded.)

18         THE COURT:  Okay, folks.  We're done telling secrets.

19         Counsel?

20         MR. STUMP:  Thanks, Your Honor.

21   BY MR. STUMP:

22   Q.  Mr. Shakeshaft, when I left off, my question to you was:

23   Was there anything about her demeanor that gave you any

24   impression of how she felt about the prosecution?

25   A.  There was.

1  Q.  And can you explain that?

2  A.  Both in court and through some of her filings, I got the

3  impression that she was not happy with the fact that we were

4  prosecuting her brother.

5  Q.  And what specifically did you observe that led you to that

6  conclusion?

7  A.  At most court appearances, she would bring a lot of people

8  with her.  There were times when she would interrupt court

9  proceedings and try to instruct her brother on how to answer

10  questions.  Her brother proceeded pro se, which means he didn't

11  have a lawyer, and she would try to instruct him on how to

12  answer questions.  There were these filings that said that he

13  was not subject to the laws of the United States.

14  Q.  You said there were filings that said he wasn't subject to

15  the laws of the United States.  Were these filings that came

16  from her or came from somewhere else?

17  A.  I think they came both from her brother and from her.

18  Q.  All right.  Were they recorded in the docket?

19  A.  Certainly the one that you pointed me to, which is document

20  136, was filed by her because it says "Notice and Demand from

21  Cherron Phillips."  So I do recall that she filed.  You know,

22  there were a lot of filings of this sort.  A good number of

23  them came from her.

24  Q.  Okay.  Just to be clear, was she a defendant in the case?

25  A.  No.

Shakeshaft - direct by Stump

1  Q.  Was she an attorney of record in the case?

2  A.  No.

3  Q.  I want to go back to your lien, 13.1.

4  A.  All right.

5  Q.  Other than your role as the lead prosecuting attorney in

6  the case against Devon Phillips, did you have any association

7  with Devon Phillips, Cherron Phillips, or anyone in their

8  family?

9  A.  No.

10  Q.  Has anybody in their family performed any services for you

11  of any kind?

12  A.  No.

13  Q.  Do you owe any of them $100 billion?

14  A.  No.

15  Q.  Do you owe any of them any money whatsoever?

16  A.  No.

17          MR. STUMP:  Could I have a moment, please, Your

18  Honor?

19     (Discussion off the record.)

20  BY MR. STUMP:

21  Q.  Mr. Shakeshaft, at the bottom of your lien, there's a

22  signature there.  Do you see it?

23  A.  There are a couple of them.  One is River Tali, and the

24  other appears to be at least what purports to be a notary

25  public.

1  Q.  All right.  Do you recognize the name River Tali?

2  A.  I do from a number of the filings.  A good number of them

3  purported to be on behalf of her, and they were always -- I

4  think I remember seeing Cherron Phillips, but also River Tali,

5  River Tali El Bey, a number of various iterations on River

6  Tali.  So, yes, I associated those with being one and the same

7  person as Cherron Phillips.

8            MR. STUMP:  Thank you.  That's all I have, Your

9  Honor.

10            THE COURT:  Ms. Solomon?

11                        CROSS-EXAMINATION

12  BY MS. SOLOMON:

13  Q.  Good afternoon, Mr. Shakeshaft.

14  A.  Good afternoon.

15  Q.  I'm Lauren Solomon, and I represent Ms. Phillips.

16  A.  Okay.

17  Q.  We've never had the opportunity to work as opposing

18  counsel?

19  A.  We have not.

20  Q.  You said that you recognize the name River Tali on the

21  bottom of the document, 13.1?

22  A.  I do.

23  Q.  You're not recognizing the signature.  You're not a

24  signature or handwriting expert.

25  A.  No, I'm not.

Shakeshaft - cross by Solomon

1  Q.  You just recognize the name.

2  A.  Correct.

3  Q.  And there's nothing wrong with using another name?

4  A.  Is there something wrong?  No.  I mean, I could posit some

5  reasons that it would be wrong if it was fraudulent, yes.

6  Q.  If you have changed your name legally, there's nothing

7  wrong with it?  It's acceptable that that would be your new

8  name, right?

9  A.  Sure.  I mean, I suspect you could do that.

10  Q.  And you said that Ms. Phillips appeared to be advising her

11  brother who was proceeding pro se?

12  A.  Correct.

13  Q.  Now, if Mr. Phillips filed a document, whether or not he'd

14  been advised by Ms. Phillips or otherwise, that document would

15  be perfectly acceptable in his case, is that right?

16  A.  In his case?  Yes, it would be fine.  Actually, no, not

17  while he's represented by counsel.  So it depends on what stage

18  you're talking about.

19  Q.  If he was -- well, you indicated he was proceeding pro se.

20  A.  At times he was proceeding pro se, and at times he was

21  represented by a lawyer.

22  Q.  And at the times that he was proceeding pro se, if he filed

23  his own documents, that would be expected.

24  A.  Yes.

25  Q.  And it wouldn't matter if he had been advised by someone

1  else outside of the case as long as they were in his name and

2  he was filing them pro se.

3  A.  I don't -- to clarify what you mean on whether it would

4  matter or not, if they're frivolous, he can't file them even on

5  his own behalf, no.

6  Q.  Well, of course, if you're filing matters pro se, they're

7  held to a different standard than if you're filing them through

8  an attorney.

9  A.  That's certainly true.

10  Q.  Right.

11  A.  But frivolous ones would still -- I'm not going to fight

12  with you.  Yes, he is entitled as a pro se defendant to file

13  documents on his own behalf.

14  Q.  Thank you.  Now, you said that this lien came to your

15  attention through others in your office.

16  A.  I believe.  That's my recollection.  That is how I first

17  learned of it.

18  Q.  You weren't aware that this lien had been placed?

19  A.  I don't really remember when it was first brought to my

20  attention.  But, no, I did not learn of it through my own

21  diligence or looking for it or anything.  I had not been told

22  about it.  I had learned about it.  I believe I learned about

23  it at about the same time other people in my office found out

24  that these liens had been filed.

25  Q.  And you didn't try to change ownership, sell or buy any

1  property during this period of time?

2  A.  No, I didn't learn about this on my own.  I learned about

3  it through work, through my office.

4  Q.  It didn't have any impact on you in terms of any kind of

5  monetary impact?

6  A.  No.

7  Q.  Now, you talked about document number 136, and that was

8  filed by Cherron Phillips because it has her name on it?

9  A.  I mean, I don't have an independent recollection of that

10  document right now, but it says it was filed by Cherron

11  Phillips on the docket so I assume that to be true.

12  Q.  You don't have any independent recollection of what the

13  document is?

14  A.  No.  A lot of documents like this were filed over the

15  course of a couple of years, and I at one point had all of

16  them.  I haven't gone back to look at them.

17  Q.  But isn't it generally the case that documents that are

18  filed by pro se defendants are difficult to understand or --

19  A.  I don't know that that's always the case.  I mean, they

20  certainly are -- they tend not to be as well written or as

21  organized as documents that are written by lawyers, but we see

22  a lot of these.  Take your average 2255, for example.

23  Q.  In many cases, there's jailhouse lawyers who help these pro

24  se defendants out?

25  A.  No doubt.

1  Q.  Now, Ms. Phillips was not in any way connected to the

2  allegations against Devon Phillips?

3  A.  No, she was not.

4  Q.  She was not part of the investigation.

5  A.  She wasn't with one exception, which I'll -- we did seek to

6  forfeit her car because her brother drove it to one of the drug

7  deals.

8  Q.  But that was based on her brother's actions.

9  A.  Correct.  You asked whether she was connected.  She was not

10  a target or a subject of the investigation; he was.

11  Q.  Okay.

12  A.  But we did forfeit one of her cars.

13  Q.  But that was her car.

14  A.  To the best of my knowledge, yes.

15  Q.  And that was forfeited in his case.

16  A.  Correct.

17  Q.  As a result of his actions.

18  A.  Correct, no doubt.

19  Q.  And you indicated in this case there was no protective

20  order on the documents that were disclosed in discovery?

21  A.  I don't believe so.

22  Q.  There was no violation of having someone other than

23  Mr. Phillips and his attorney look at these documents?

24  A.  That's my recollection.  I mean, if I flipped through the

25  docket, I could clarify that, but my recollection is we did not

1  have a protective order in this case.

2  Q.  It would have been pretty difficult to keep track of the

3  documents in this case anyway as there were so many different

4  lawyers at different times?

5  A.  I've done it in more complicated cases than this.

6  Q.  There were a number of lawyers?

7  A.  No doubt, yes.

8  Q.  And this case lasted over a number of years?

9  A.  It did, almost five.

10  Q.  Almost five.  That's unusual in itself?

11  A.  For a case that doesn't have a cooperating defendant, yes,

12  that is a very -- that's a long case for your run-of-the-mill

13  buy-bust drug case, yes.

14  Q.  Particularly with one defendant?

15  A.  Yes.

16  Q.  You stated that you recognized Ms. Phillips from the

17  courtroom?

18  A.  Yes.

19  Q.  You never had any personal contact with her?

20  A.  I have a recollection of having talked to her at least once

21  in relation to the documents that she signed or was involved

22  with in securing the bond for her brother.  I don't have a -- I

23  know that I talked to her very briefly.  We have other people

24  in our office who actually do the paperwork to secure a bond,

25  but I have one recollection of talking to her to help, you

1  know, a colleague of mine get that paperwork together for the

2  bond for her brother.

3  Q.  And that's the ordinary process for bonds, that you have to

4  speak to family members or friends who are posting the bond for

5  that individual?

6  A.  It's certainly not uncommon.

7         MS. SOLOMON:  Nothing further.

8                      REDIRECT EXAMINATION

9  BY MR. STUMP:

10  Q.  Mr. Shakeshaft, you alluded to the fact that there was a

11  time period where Devon Phillips was representing himself.

12  A.  Correct.

13  Q.  I think the phrase that we've been using in the courtroom

14  so far has been "pro se," is that right?

15  A.  Correct.

16  Q.  "Pro se," do you understand what that means?

17  A.  I do.

18  Q.  Can you explain it to us so that we have it clarified?

19  A.  Yeah.  I mean, very briefly, under the Constitution

20  defendants have a right to a lawyer.  In most circumstances,

21  they also have a right to represent themselves.  When they

22  represent themselves, we say that they are proceeding pro se.

23  It means that they are acting in their own defense.

24  Q.  Were there times also when Mr. Phillips was represented by

25  counsel?

1  A.  Yes.

2  Q.  And do you recall whether he was represented by counsel

3  when he pled guilty?

4  A.  He was.

5  Q.  Going back to docket entry 136, you said you didn't have

6  any independent recollection of the document.  If you saw a

7  copy of the document, would it refresh your recollection?

8  A.  Probably.

9  Q.  Let me show you what we've marked for identification as

10  Government Exhibit 28.  It's a two-page document.  I'll ask you

11  to focus primarily on the first page, and after you've looked

12  at the document let me know if it refreshes your recollection

13  about docket entry 136.

14  A.  Okay.

15  Q.  Did that refresh your recollection?

16  A.  It does in that I at the time was monitoring what was on

17  the docket.  So it didn't -- I mean, it was not addressed to

18  me.  It's addressed to Chief Judge Holderman.  It was not

19  addressed to me, but it was filed.  So I recognize it as being

20  one of myriad documents like that that I reviewed while I was

21  prosecuting her brother.

22  Q.  Now, Mr. Shakeshaft, you also just testified about the

23  forfeiture of Ms. Phillips' car --

24  A.  Correct.

25  Q.  -- in the case against Devon Phillips.

1  A.  Correct.

2  Q.  What I want to ask you is this.  First of all, is that

3  something that was done through the court system or something

4  that you did outside of the court system?

5  A.  I think it was a forfeiture allegation that was part of the

6  -- my recollection is it was a Mercedes, and it was one of the

7  cars that Devon Phillips drove to one of the drug deals that we

8  charged him with.

9  Q.  I guess what I mean is:  Was this something that you did in

10 your private capacity or something that was done through the

11 power of the U.S. Government?

12 A.  I didn't do anything in my private capacity.  I did it on

13 behalf of the United States as facilitating the commission of a

14 federal crime.

15 Q.  And the timing of it, did you know that there was this lien

16 against your property when you forfeited that car?

17 A.  I didn't know that this lien was against me or this

18 property until this case was over.

19 Q.  Until the entire case was over.

20 A.  Until the entire case was over.

21 Q.  So was that after the forfeiture of the car?

22 A.  No, no, no.  The forfeiture of the car would have come as

23 part of, you know, the sentencing proceeding.

24 Q.  Okay.  So I just want to make sure I have my timeline

25 right.

Shakeshaft - recross by Solomon

1    A.   Okay.

2    Q.   Do you recall the date that he was sentenced?

3    A.   February of 2011, right?

4    Q.   Right.  Can you tell either from your own memory or from

5    Exhibit 21 approximately when that forfeiture occurred?

6    A.   In the ordinary course, the forfeiture would have taken

7    place at the sentencing proceeding.  So it would have been part

8    of the sentencing judgment.  In fact, if I look at docket

9    number 170, which is from the sentencing, it lists a

10   preliminary order of forfeiture.  So we would have dealt with

11   the forfeiture at the sentencing in February of 2011.

12   Q.   All right.  The date that's on your lien, can you tell us

13   the date that's on that document where it's stamped?

14   A.   I can.  It's in the upper right-hand corner, and it

15   indicates that it was filed with the Cook County Recorder of

16   Deeds on or about March 14th of 2011, so more than a month

17   later.

18        MR. STUMP:  All right.  That's all I have.  Thank

19   you, Your Honor.

20                    RECROSS-EXAMINATION

21   BY MS. SOLOMON:

22   Q.   You said that the forfeiture is dealt with at sentencing?

23   A.   Generally speaking, yes.

24   Q.   Okay.  You looked at the judgment, entry number 170?

25   A.   Yep.

Shakeshaft - recross by Solomon

1  Q.  And that says "preliminary order of forfeiture"?

2  A.  Correct.

3  Q.  And that's not the final order of forfeiture, is it?

4  A.  It's not, and I don't remember.  I didn't have any personal

5  involvement thereafter in dealing with the final order of

6  forfeiture.  We have an entire forfeiture unit that deals with

7  it.  So I may stand corrected.  I mean, there may have been

8  proceedings for the final order of forfeiture that I wasn't

9  involved with.

10  Q.  All right.  Generally, a final order of forfeiture does not

11  enter at the time of sentencing.

12  A.  That's correct.  When I say that we generally deal with

13  forfeiture issues at sentencing, that's generally as an AUSA

14  where I deal with them.

15  Q.  That's right, because you would not be involved in that

16  proceeding on the criminal side.  It's turned over to a civil

17  side attorney.

18  A.  Correct.

19  Q.  Who then has to go through the process and get the court

20  order from the same judge.

21  A.  It doesn't necessarily get turned over to a civil attorney,

22  but we do have an FLU unit.

23  Q.  Forfeiture.

24  A.  Forfeiture folks who deal with these things after the

25  criminal case is more or less done.

Shakeshaft - recross by Solomon

1  Q.  And there's no indication on the docket when that final

2  order of forfeiture happened?

3  A.  Well, there may be, but I don't know if you want me to take

4  the time to find it.  There may or may not be.  I don't see it

5  with a quick perusal, but I also don't remember it.

6  Q.  And that goes through -- that docket goes through

7  6/14/2012?

8  A.  Correct.

9  Q.  That would have been following the date of the lien?

10  A.  Well, yeah.  Don't misinterpret the fact that I can't find

11  it by looking at it really quickly.  I'm not sure whether it's

12  here or not.

13  Q.  You can take the time to take a look.

14  A.  Well, I would assume it would be done, because as of June

15  30th, 2011, we had filed a motion for the return of certain

16  property to Devon Phillips.

17  Q.  You would assume, but the order is not in there.

18  A.  No.  Again, in July of 2011, there's an entry of a

19  preliminary order of forfeiture and a second.  So Judge Lefkow

20  signed the preliminary order of forfeiture July of 2011, in

21  July of 2011.

22  Q.  July of 2011 would have been following the March 14th entry

23  of the lien?

24  A.  Correct.

25          MS. SOLOMON:  Okay.  Nothing further.

 1          MR. STUMP:  Very briefly.

 2          THE COURT:  All right.

 3                    REDIRECT EXAMINATION

 4  BY MR. STUMP:

 5  Q.  The bottom line, Mr. Shakeshaft, did you set in motion the

 6  process for forfeiting the defendant's car in retaliation or in

 7  response to the filing of the lien against you?

 8  A.  No, I didn't know the lien had been filed.  Frankly, even

 9  if I had known about it, it would have been irrelevant.

10          MR. STUMP:  Okay.  Thank you.

11          MS. SOLOMON:  Nothing further.

12          THE COURT:  May I release the witness permanently?

13          MR. STUMP:  Yes.  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you, sir.  We won't need you

15  again.

16          THE WITNESS:  Thank you, Your Honor.

17      (Witness excused.)

18          THE COURT:  Counsel?

19          MR. STUMP:  Your Honor, the United States calls Judge

20  James Holderman.

21          THE COURT:  Folks, I'm going to try to get you out of

22  here for the World Cup, so it may be 5:00 or ten to 5:00 that

23  we get you out of here today.

24      (Brief pause.)

25          THE CLERK:  Raise your right hand.

J. Holderman - direct by Stump

1      (Witness duly sworn.)

2                    JAMES FRANKLIN HOLDERMAN,

3               GOVERNMENT'S WITNESS, DULY SWORN

4                         DIRECT EXAMINATION

5  BY MR. STUMP:

6  Q.  Sir, could you start by telling us your full name and

7  spelling your last name for the record?

8  A.  Yes.  My name is James Franklin Holderman,

9  H-o-l-d-e-r-m-a-n.

10  Q.  Mr. Holderman, what do you do for a living, sir?

11  A.  I'm a United States District Court judge.  I'm a senior

12  judge of this court.

13  Q.  And "of this court," is that in this very building?

14  A.  Yes, the Northern District of Illinois.

15  Q.  How long have you been a United States District Court judge

16  in the Northern District of Illinois?

17  A.  Since 1985.

18  Q.  Is there a position in the courthouse called chief judge?

19  A.  Yes, there is.

20  Q.  Have you ever held that position?

21  A.  Yes, I have.

22  Q.  And can you tell us the dates that you were the chief

23  judge?

24  A.  I became the chief judge on July 1st, 2006, and completed a

25  seven-year term that's allowed by statute on June 30th of last

1   year.

2   Q.  You said it's a term that's prescribed by statute?

3   A.  Yes.

4   Q.  So how do you become a chief judge then, I guess?

5   A.  You become the chief judge by being the most senior active

6   judge who at the time you're eligible to become the chief judge

7   has not reached the age of 65.  I'm now older than 65, but you

8   can continue on as chief once you become the chief judge before

9   you turn 65.

10  Q.  And is it possible then that you could have another cycle

11  as chief judge anytime in the future?

12  A.  No, not in this district because of the number of judges

13  that we have.  A smaller district, it's possible that you could

14  serve a second term.

15  Q.  Can you tell us, generally speaking, what does the chief

16  judge do, and how is that different than just being a regular

17  United States District Judge?

18  A.  The chief judge is the judge that administratively is in

19  charge of the court, all aspects of the court.  Basically, it's

20  the chief executive officer of the court.

21  Q.  Can you give us some examples of the kinds of matters that

22  would come before a chief judge?

23  A.  Sure.  You preside at the monthly judges' meetings.  You

24  preside at court proceedings involving the entire court.  You

25  set the agenda for judges' meetings.  You deal with the General

1  Services Administration when they aren't providing adequate air

2  conditioning in the courtrooms.  There are all kinds of

3  different aspects to the job.

4  Q.  Is the position United States District Judge, is that

5  something that's presidentially appointed?

6  A.  Yes.

7  Q.  And what's the term for a district judge?  How long do you

8  serve?

9  A.  You're appointed for life, or as your commission says,

10  during good behavior.

11  Q.  And can you tell us as a United States District Court

12  judge, are you a judicial officer of the United States?

13  A.  Yes.

14  Q.  I want to show you now what we've marked for identification

15  as Government's Exhibit 28.

16  A.  Okay.  Is that in this book up here?

17  Q.  It sure is.

18  A.  Okay.  All right.

19  Q.  All right.  It's a two-page document, and what I'd ask you

20  is if you could take a look at it and let me know if you

21  recognize it.

22  A.  Yes, I do.

23  Q.  And what is it that I handed to you, Judge?

24  A.  Well, this is a letter communication that I received in my

25  chambers back in early February of 2010.

J. Holderman - direct by Stump

1  Q.  And how do you recognize this document as being the same
2  document that you received back in 2010?
3  A.  Well, actually I had it photocopied this way so that the
4  envelope was also photocopied.  Through an order that I
5  entered, I had this letter and the copy of the envelope placed
6  in the court file of this criminal case, 06 CR 778.
7  Q.  Now, do you see the envelope in this exhibit?
8  A.  Yes.
9  Q.  You do.  Is that on the second page?
10 A.  Yes.
11 Q.  And is this now a true and accurate copy of the letter that
12 you received on or about February 5th, 2010, and that you
13 placed in the document -- in the docket of court case 06 CR
14 778?
15 A.  Yes.
16         MR. STUMP:  Your Honor, at this time I'd move for
17 admission of Government's Exhibit 28.
18         MS. SOLOMON:  Standing objection.
19         THE COURT:  Admitted over objection, 28.
20     (Government's Exhibit 28 received in evidence.)
21         MR. STUMP:  Your Honor, I'm going to publish this to
22 the jury in the same manner that I have been.
23         THE COURT:  Okay.
24 BY MR. STUMP:
25 Q.  Now,  Judge Holderman, you said that you placed this in the

1    docket for this particular criminal case number that's listed

2    at the top, 06 CR 778, is that correct?

3    A.   That's correct.

4    Q.   Why did you do that?

5    A.   Well, because this letter pertained to that case.  As chief

6    judge, on occasion I would receive communications from members

7    of the public that relate to a particular case that's pending

8    before another judge of the court.  So it was my practice to go

9    ahead and have the communication forwarded to the judge, or if

10   it seemed to be related directly to the case, have it placed in

11   that court file so that all the parties to that case could be

12   aware of the communication.

13   Q.   Did you do that in your role as chief judge?

14   A.   Yes.

15   Q.   Do you recall who the district judge was who was assigned

16   the case?

17   A.   Yes.

18   Q.   Who was it?

19   A.   It was Judge Joan Lefkow.

20   Q.   Now, did you read this document when you received it?

21   A.   I scanned through it.  I have to admit I maybe didn't take

22   time to read it word for word because I realized it was related

23   to Judge Lefkow's case, United States versus Phillips.

24   Q.   And can you tell us what part of the document caused you to

25   realize which case it related to?

1   A.  Well, the individual who sent this to me said she's writing

2   this letter because she's a witness to a crime involving that

3   case, and I thought, well, then we should make it available.

4   Q.  And do you see a name that's at the bottom of this document

5   sort of in the signature line?

6   A.  Yes.

7   Q.  What's the name there?

8   A.  Cherron Phillips El.

9   Q.  Did you recognize that name when you got this?

10  A.  No.

11  Q.  Did you know anything about this particular case before you

12  got this?

13  A.  Not really, no.  It was just another case in the court, and

14  I'm not aware of all the cases that are pending in our court.

15  Q.  Did you have an occasion to have any further involvement

16  with either this person, Cherron Phillips, or this particular

17  case?

18  A.  Yes, I did.

19  Q.  How did that come about?

20  A.  Well, in connection with Cherron Phillips, there was an

21  executive committee matter.  With respect to the case, there

22  were other matters that came up.

23  Q.  Let me start with the "other matters."  What specifically

24  are you referring to when you say "other matters" came up in

25  the case against Mr. Phillips?

1 A.  There were disruptive proceedings that were taking place in

2 that case, and as the chief judge I had to issue at least one

3 rule to show cause in connection with that matter.  That wasn't

4 personally involving Cherron Phillips.

5 Q.  Okay.  Now, were there some issues that personally involved

6 Cherron Phillips?

7 A.  Yes.

8 Q.  Can you tell us what those were?

9 A.  Yes.  It came to my attention as the chair of the executive

10 committee that Cherron Phillips had engaged in disruptive

11 activities before the court in that case.  She had filed

12 documents in that case, and she's not a lawyer.  She didn't

13 represent under the law the defendant in that case, who I

14 understand was her brother.

15 Q.  Is that a problem, to file documents in a case where you're

16 not a party or an attorney?

17 A.  Yes, that's an abuse of the judicial process, and we have

18 to stop it.  It's not the first time it's happened, nor

19 unfortunately is it the last, but we have to put an end to it

20 administratively.

21 Q.  Did you take steps to put an end to it administratively?

22 A.  Yes.

23 Q.  What did you did?

24 A.  Well, we conducted an executive committee meeting, and

25 after that meeting, after the vote of the executive committee

1  to place Ms. Phillips on what's called a restricted filer list

2  as well as place Ms. Phillips in the position of banning her

3  from the courthouse, except when she personally has proceedings

4  in the courthouse; then during the times when she has

5  proceedings in the courthouse, requiring that she be escorted

6  by someone from the Marshal's Service.

7  Q.  Now I want to unpack that a little bit.

8  A.  Okay.

9  Q.  You mentioned the executive committee.

10  A.  Yes.

11  Q.  Can you tell us what the executive committee is?

12  A.  Yes.  The executive committee is the primary administrative

13  body of judges of the court.

14  Q.  Who comprises the executive committee?  Who sits on it?

15  A.  The executive committee itself is comprised of four judges

16  and then the chief judge.  It is the four judges who have the

17  longest tenure on the court, but we rotate the judges every

18  four years.  So it's not the oldest four judges on the court.

19  It rotates down the line.

20  Q.  Is there anybody else that comes to a meeting of the

21  executive committee aside from the chief and the four judges

22  you mentioned?

23  A.  Yes.  The next person in line to become the chief judge is

24  an ex officio member, the presiding magistrate judge is an

25  ex officio member, and the clerk of the court is the secretary

1   of the executive committee.

2   Q.  You said now the "presiding magistrate judge."  Could you

3   just explain that concept to us?

4   A.  The presiding magistrate judge is a position appointed by

5   the district judges.  It's a member of our magistrate judge

6   bench who is specifically appointed by the district judges to

7   serve in that capacity.

8   Q.  Is that just for purposes of the executive committee, or

9   does the presiding magistrate judge have other special duties?

10  A.  The presiding magistrate judge has other duties as well,

11  and we rotate that on a term basis as well.

12  Q.  If we were to understand the presiding magistrate judge to

13  be sort of like the same thing as the chief judge but just

14  among the magistrate judges, is that a fair analogy?

15  A.  Yes, that's a good way to look at it because they're the

16  chief judge of the magistrate judge bench.

17  Q.  Now, at the time when this came in front of you, were you

18  chairing the executive committee?

19  A.  Yes.

20  Q.  And you mentioned that you took action.  I want to show you

21  what we've marked for identification as Government's Exhibit

22  29.

23  A.  Okay.

24  Q.  It is a three-page document.

25  A.  Yes.

J. Holderman - direct by Stump

1  Q.  Do you recognize that?

2  A.  Yes, I do.

3  Q.  Okay.  Well, what is Exhibit 29?

4  A.  This is an executive committee order that I drafted at the

5  request of the executive committee and issued on behalf of the

6  executive committee the day after the executive committee

7  meeting that I was talking about.

8  Q.  And what's the date of that order?

9  A.  The date of this order is February 4th, 2011.

10 Q.  Do you see your signature there above the date on the last

11 page?

12 A.  Yes, that's my signature entered for the executive

13 committee, "James F. Holderman, Chief Judge."

14 Q.  Judge, Exhibit 29, is it a true and accurate copy of the

15 executive committee order that you entered on February 4th,

16 2011, against Cherron Phillips?

17 A.  Yes.

18        MR. STUMP:  Your Honor, at this time I'd move for

19 admission of Government's Exhibit 29.

20        THE COURT:  Admitted over objection of defense

21 counsel.

22    (Government's Exhibit 29 received in evidence.)

23        MR. STUMP:  Now I'm going to publish this to the jury

24 as well.

25 BY MR. STUMP:

J. Holderman - direct by Stump

1  Q.  Judge Holderman, did you have any involvement or

2  interaction with the criminal case against Devon Phillips or

3  Cherron Phillips after that executive committee order was

4  entered?

5  A.  Yes.

6  Q.  Can you tell me sort of what else happened after that?

7  A.  Well, there were some other executive committee orders that

8  I had to enter as a result of further actions by her.

9  Q.  I want to show you what we've marked for identification as

10  Government's Exhibit 44.

11  A.  Okay.

12  Q.  This is a multipage document.  There's a file stamp at the

13  top.  Do you recognize that document that I handed to you?

14  A.  Yes.

15  Q.  And what is Exhibit 44?

16  A.  Well, this is not an executive committee order.

17  Q.  Right.

18  A.  This is a document that I received sometime in the early to

19  the middle part of February of 2011.  I received it in my

20  chambers.

21  Q.  And how do you recognize it to be a document that you

22  received in your chambers?

23  A.  Well, I remember receiving this document, and I looked

24  through it briefly enough to determine what I should do with

25  it.

1  Q.  What sticks out in your mind about it that allows you to

2  remember it so many years later?

3  A.  Well, first of all, it's addressed to me, and it is a

4  summons to appear.  It's a summons to appear at what's called a

5  common law proceeding before this "Office of Common Law

6  Sovereign American Consulate."  That's the name there.  It said

7  if I didn't show up, I would be arrested.

8  Q.  Okay.  Judge Holderman, is this a true and accurate copy,

9  what we've marked as Government's Exhibit 44, of that

10  communication you received at that time?

11  A.  Yes.

12       MR. STUMP:  At this time, I'd move for admission of

13  Government's Exhibit 44, Your Honor.

14       MS. SOLOMON:  Standing objection.

15       THE COURT:  It's admitted over the objection of

16  defense counsel.

17     (Government's Exhibit 44 received in evidence.)

18       MR. STUMP:  Your Honor, may I publish this to the

19  jury?  I'm sorry that I'm starting to sound redundant.

20       THE COURT:  Okay.

21  BY MR. STUMP:

22  Q.  You said that after you looked at it, you knew what to do

23  with it.  What did you do with it, Judge Holderman?

24  A.  Well, first of all, it listed that same criminal case, the

25  Devon Phillips case, and I notified the United States Marshal's

1  Service.

2  Q.  And why did you notify the Marshal's Service?

3  A.  Because the Marshal's Service are the people charged with

4  the responsibility of protecting federal judges from people who

5  would want to harm them.

6  Q.  And what did you think?  What was your reaction when you

7  read this?

8  A.  My reaction was that these people are attempting to

9  intimidate me in some way by ordering me to appear before them

10  in connection with their client, Devon Phillips El, and they

11  were trying to influence me in my official capacity as chief

12  judge.

13  Q.  And did you associate this particularly with that case

14  against Devon Phillips?

15  A.  Yes, because it named him and then it had the case number

16  there.

17  Q.  Did you comply with this summons to appear and show up at

18  this hearing of the common law court?

19  A.  No.

20  Q.  I want to show you now what we've marked for identification

21  as Government's Exhibit 30.

22  A.  All right.

23  Q.  This is a mailing envelope that contains a series of

24  documents, approximately 50 pages of documents.  I'd like you,

25  if you could, to take a look at the envelope and take a look at

1  the documents inside, and after you flip through it, make sure

2  that the exhibit I handed to you is one that you recognize.

3  A.  Yes.

4  Q.  What did I hand you there, Judge Holderman?

5  A.  Well, this is a group of documents that I received sometime

6  in late February, early March, that I turned over or asked my

7  judicial assistant to turn over to the United States Marshal's

8  Service.

9  Q.  All right.  Do you recognize this packet that I handed to

10  you, the envelope and everything, to be a true and accurate

11  copy or actually the original of what you received?

12  A.  Yes.

13        MR. STUMP:  At this time, Your Honor, I'd move for

14  admission of Government's Exhibit 30.

15        THE COURT:  It's admitted over the objection of

16  defense counsel.

17     (Government's Exhibit 30 received in evidence.)

18  BY MR. STUMP:

19  Q.  Judge, if you could, I'd ask you to turn a few pages in.

20  A.  Okay.  Do you want me to work with the original?

21  Q.  Do you know what?  I'll take the original back, and I will

22  publish it to the jury, starting in the back row.

23  A.  Yes.

24  Q.  Could you --

25  A.  I've got this copy here that you've got in the notebook for

1   me.

2   Q.  Perfect.  Would you turn a couple of pages in until you

3   find a page that looks like this (indicating)?  At the top, it

4   says "Office of Common Law Sovereign American Consulate."

5   A.  Right.

6   Q.  Do you see that?

7   A.  Yes, I'm on it.

8   Q.  Okay.  Underneath that, it says "Common Law Bill of

9   Indictment."  Do you see that?

10  A.  Yes.

11  Q.  Do you remember seeing this particular document?

12  A.  Yes.

13  Q.  And what was your reaction when you read this?

14  A.  I looked at it and told my staff:  I've been indicted.

15  Q.  I guess I should ask, did you take it seriously, Judge?

16  What was your reaction?  What did you think?

17  A.  Well, I didn't take it seriously that I had been indicted,

18  but this follow-up by this organization as a result of my

19  failure to appear on the 7th of February I did take more

20  seriously because these people apparently did gather on the 7th

21  of February.  They all signed this document.  I did not show

22  up, and they seem to be earnest about their intimidation of me.

23  Q.  And what did you do with this mailing after you received

24  it?

25  A.  I sent it to the Marshal's Service.

J. Holderman - direct by Stump

 1  Q.  All right.  Then did you have --

 2  A.  Or had my judicial assistant give it to the Marshal's

 3  Service.

 4  Q.  Okay.  Let me show you now what we've marked for

 5  identification, well, actually it's already admitted as

 6  Government's Exhibit 13.3.

 7  A.  Okay.

 8  Q.  That's a multipage document.  It says "Notice of Maritime

 9  Lien" at the top.

10  A.  Yes.

11  Q.  Do you recognize that?

12  A.  I do.

13  Q.  When did you first see this, Judge?  Under what

14  circumstances, I guess I should say.

15  A.  I saw it sometime in -- well, I'm not exactly sure of the

16  date.  I saw it after this whole matter started to uncover or

17  be uncovered.

18  Q.  How did you see it?  How was it brought to your attention,

19  do you remember?

20  A.  I believe the Marshal's Service or some law enforcement

21  person brought to my attention that this existed.

22  Q.  Before that happened, did you have any idea that there had

23  been a lien placed against your property or was purported to be

24  placed against your property?

25  A.  No.

1  Q.  There are some other pages attached to that exhibit.

2  A.  Sure.

3  Q.  Have you looked through those?

4  A.  I have.

5  Q.  Do you know what they are or what they purport to be at

6  least?

7  A.  Yes.

8  Q.  What are they?

9  A.  Well, these are indicators of the properties that relate to

10  the PIN numbers, the property identification numbers, PIN,

11  P-I-N, the property identification numbers that are listed at

12  the bottom of box 7 on the first page of this Government's

13  exhibit, Government's Exhibit 13.3.

14  Q.  And the property that's associated with those PIN numbers,

15  is that property that belongs to you?

16  A.  It's property that -- some of them are properties that my

17  name was a part of the chain of title in some respect.  Two of

18  the properties, well, one of the properties belongs to the

19  United States Government.  The other property is private

20  property, but it is across the street from the post office

21  that's just across the street from this building.

22  Q.  And any of the documents there that describe property, do

23  any of them describe your personal residence?

24  A.  No.

25  Q.  Has this lien gotten in the way of any sort of financial

1  transaction that you've tried to do?

2  A.  No.

3  Q.  Have you attempted any real estate transactions since this

4  lien was filed?

5  A.  Actually, those properties, my interest in each of those

6  properties had already ended.  That's why I said my name was in

7  the chain of title.  It already ended by the time the lien was

8  placed on those properties that had at one point related to me.

9  Q.  So you no longer had an interest in the properties.  Is

10  that what you're saying?

11  A.  That's correct.

12        MR. STUMP:  Your Honor, with your permission, I'm

13  going to ask this be published to the jury as well, 13.3.

14        THE COURT:  Granted.

15        MS. SOLOMON:  Over our objection.

16        MR. STUMP:  It's in evidence.

17        MS. SOLOMON:  Oh, I'm sorry.

18  BY MR. STUMP:

19  Q.  Aside from your role, Judge --

20        THE COURT:  13.3 was admitted without objection.

21        MS. SOLOMON:  I'm so sorry, Judge.

22        THE COURT:  All right.  Go ahead.

23  BY MR. STUMP:

24  Q.  Aside from your role as chief judge for the United States

25  District Court, did you have any involvement with Devon

J. Holderman - direct by Stump

1  Phillips or his criminal case?

2  A.  No.

3  Q.  What about Cherron Phillips?  Did you have any personal

4  interactions with her or a personal relationship with her

5  outside of your role as chief judge?

6  A.  No.

7  Q.  Has anyone in the Phillips family to your knowledge ever

8  performed any services for you?

9  A.  No.

10  Q.  And do you owe Devon Phillips or anyone in his family

11  $100 billion?

12  A.  No.

13  Q.  Do you owe any of them any money whatsoever?

14  A.  No.

15  Q.  I want to show you now what we've marked for identification

16  as Government's Exhibit 24.

17  A.  All right.

18  Q.  Judge, this is a one-page document.  Do you recognize it?

19  A.  Yes.

20  Q.  All right.  What did I hand to you?

21  A.  This is a communication I received in late February of

22  2013.  It's signed Cherron Marie Phillips.

23  Q.  Now, this is late February of 2013.

24  A.  Right.

25  Q.  So it's two years after some of these other documents we've

1  been looking at.

2  A.  Right.  I was still the chief judge, but it was years

3  after.

4  Q.  And is there anything on this document that we've marked as

5  24 which allows you to tell that it's the particular document

6  that you received?

7  A.  Well, I remember the document --

8  Q.  Oh, okay.

9  A.  -- when I received it.

10  Q.  And there's a stamp on this document, too.  Can you explain

11  the stamp to us?

12  A.  Yes.  That's the stamp that my administrative assistant put

13  on there.

14        MR. STUMP:  Your Honor, at this time I'd move for

15  admission of Government's Exhibit 24.

16        MS. SOLOMON:  No objection.

17        THE COURT:  24 is admitted, no objection.

18    (Government's Exhibit 24 received in evidence.)

19  BY MR. STUMP:

20  Q.  Judge, what was your reaction to -- well, let me ask it

21  this way.  What did you do with this letter after you received

22  it, do you remember?

23  A.  I believe I had it filed in the file.  I provided it to the

24  authorities at the time.

25  Q.  The title on the exhibit, the title of the letter anyway

1  appears to be "Forgive Me."  Do you see that?

2  A.  Yes, yes.

3  Q.  At the bottom, it appears to be a signature above a printed

4  name.  Can you read the printed name?

5  A.  Yes.  The printed name is "Cherron Marie Phillips."

6  Q.  And what did you understand the purpose of the letter to be

7  when you got it?  What did you understand it to mean?

8  A.  My understanding was that Cherron Phillips had realized her

9  wrongdoing and was seeking forgiveness.

10         MR. STUMP:  Okay.  One moment, please, Your Honor.

11     (Discussion off the record.)

12         MR. STUMP:  Your Honor, that's all the questions I

13  have.  Thanks.

14         THE COURT:  Ms. Solomon?

15                     CROSS-EXAMINATION

16  BY MS. SOLOMON:

17  Q.  Good afternoon, Judge Holderman.  I'm Lauren Solomon, and I

18  represent Ms. Phillips in this matter.

19  A.  Good afternoon.

20  Q.  You said that you had no personal contact with

21  Ms. Phillips, is that correct?

22  A.  That's correct.

23  Q.  And you also didn't have any personal contact with Devon

24  Phillips, her brother?

25  A.  That's correct.

1 Q.  And you were not the presiding judge during the course of

2 the Devon Phillips trial?

3 A.  That's right.  Judge Joan Lefkow was the presiding judge.

4 Q.  The only relationship you had to that case was matters that

5 were brought to you as chief judge.

6 A.  That's correct.

7 Q.  Now, you have Exhibit 24, Government's Exhibit 24 in front

8 of you?

9 A.  I do.  I have a copy of it in front of me, yes.

10 Q.  Okay.  And Ms. Phillips entitles it "Forgive Me"?

11 A.  Yes, it's titled "Forgive Me."

12 Q.  And she goes on to state that she was influenced by other

13 people.

14 A.  Words to that effect, yes.

15 Q.  And that she was -- that it was her mistake and she had no

16 intentions on causing harm.

17 A.  Words to that effect, yes.

18 Q.  And she also states in there that she understands that

19 public servants have very difficult jobs and she was sorry to

20 have made -- to have been one of those difficult people with

21 whom public servants had to deal.

22 A.  Yes, words to that effect, that's what it says.

23 Q.  So it clearly was an apology letter.

24 A.  That's right.  It was.

25 Q.  And you said that you had received the summons and you had

1  turned that over to the U.S. Marshal?

2  A.  That's right.

3  Q.  But there was no -- you never came in contact with anyone,

4  whether Ms. Phillips or anyone else, who signed the summons as

5  a result of it?

6  A.  I have in my official capacity as the chief judge, and I

7  never had any personal contact with any of those people.

8  Q.  Right.  But you didn't take this summons seriously to the

9  effect that you would have gone.  You did not feel any legal

10  obligation to go based on the summons.

11  A.  I did not -- well, first of all, it wasn't an official

12  summons of the United States Government or of a governmental

13  body.  It was this group that had called itself the Common Law

14  Sovereign Consulate, and I felt no legal obligation to go.

15  Q.  Because they're not a legally sanctioned, recognizable

16  organization that has that power.

17  A.  And because I thought what they were trying to do was

18  influence me.

19  Q.  Influence you in the prosecution of the Devon Phillips

20  case?

21  A.  Influence me and intimidate me as the chief judge of the

22  United States District Court for the Northern District of

23  Illinois.

24  Q.  And how would that have helped Devon Phillips?

25  A.  I have no idea because I wasn't about to be influenced or

1  intimidated.

2  Q.  But you didn't have any influence on the case itself

3  because you weren't the presiding judge.

4  A.  That's right.

5  Q.  So if that was their intention, it was somewhat misguided.

6  A.  That's correct.  It happens on occasion.  People think the

7  chief judge can overrule or override the decisions of any of

8  the other judges in this court, and that's just not true.

9  Q.  Okay.  Now, Government's Exhibit 28 is called

10  "Administrative Notice and Demand."

11  A.  Yes.

12  Q.  Does that mean anything in a criminal case?

13  A.  No.

14  Q.  Is this a responsive criminal document?

15  A.  No, this is or would be a frivolous document in connection

16  with that case, but it referenced that case.

17  Q.  It referenced it, but it certainly wasn't a responsive

18  criminal document.

19  A.  No.  This individual, when I received this document,

20  Government's Exhibit 28, this individual was telling me that

21  she was a witness to a crime involving that case, and I didn't

22  know what further that was.  So I thought the presiding judge

23  ought to know and that the parties to that case ought to know.

24  So that's why I had it filed in that case, so that the judge

25  and the parties would know.

J. Holderman - cross by Solomon

1  Q.  Because you were concerned that something unusual or
2  illegal would have been involved in that case.
3  A.  I didn't know, but I thought Judge Lefkow ought to know.
4  If Judge Lefkow knows then the parties ought to know as well.
5  Q.  And at that time, you did not know who Cherron Phillips
6  was.
7  A.  No.
8  Q.  And you didn't have any familiarity with 06 CR 778.
9  A.  Not other than I knew it was a case that was pending in our
10 court and that Judge Lefkow was presiding over it.  I pulled
11 the docket sheet so I knew what was going on in that case from
12 the court entries and the filings that had occurred, and that's
13 what I knew when I placed this or had this placed in the court
14 file.
15 Q.  And as a lawyer or a judge, does this language make any
16 sense?
17 A.  Well, some of it does, yes, in different contexts.
18 Q.  But not in the criminal context.
19 A.  Well, I mean, "outside the venue and subject matter,"
20 that's a concept.  The word "crime," of course, is a criminal
21 concept.
22 Q.  So you sent it on to Judge Lefkow, and Judge Lefkow dealt
23 with it in any way she thought she should?
24 A.  I had it filed in the case file.  I didn't send it directly
25 to her where only she would know.

J. Holderman - cross by Solomon


1  Q.  I'm sorry.  I misspoke.

2  A.  I wanted the parties to know as well as her.

3  Q.  That's correct.  It was a docket entry.

4  A.  Correct.

5  Q.  Okay.  Now, with respect to Government's Exhibit 44, is

6  this a document that is responsive to a criminal case?

7  A.  I don't understand your question.

8  Q.  Well, would a document like this appear as a responsive

9  pleading in a criminal case pending in the Northern District of

10  Illinois?

11  A.  No.

12  Q.  The summons to appear, in order to have a summons to appear

13  in this courthouse, it would have to come from the U.S.

14  District Court.

15  A.  Correct.

16  Q.  And this does not.

17  A.  That's right.  They didn't want me to appear in this

18  courthouse.  They wanted me to appear where it was indicated.

19  Q.  At a Chicago Public Library, the Woodson Regional Library.

20  A.  Right, at 95th and Halsted.

21  Q.  That's not a courthouse.

22  A.  No.

23  Q.  It's not a federal courthouse.

24  A.  It's a public regional library.

25  Q.  So it wouldn't be someplace where someone was summoned to

1  appear in a criminal case.

2  A.  Correct.

3  Q.  And with respect to Government's Exhibit 30, that was the

4  common law bill of indictment.  That wasn't issued by the

5  Northern District of Illinois.

6  A.  No.

7  Q.  As a matter of fact, it's not issued by any recognized

8  court in this state.

9  A.  That's correct.

10  Q.  Again, it's issued from the "Office of Common Law Sovereign

11  Consulate"?

12  A.  Right.  What was important to me was it was issued,

13  according to the signatures, on February 7th, 2011.

14  Q.  On the date that you were supposed to appear.

15  A.  Right.  So obviously those people were together, and they

16  knew I didn't appear.

17  Q.  But they also never had any contact with you.

18  A.  Not that I'm aware of.

19  Q.  Not subsequent to this non-appearance on February 7th.

20  A.  Not that I'm aware of, other than, you know, the lien.

21  Q.  Which actually wasn't against any property of yours.

22  A.  Not against any property that I owned at the time that the

23  lien was placed on it.

24  Q.  And some of it was United States Government property?

25  A.  Yes, one was the MCC.

1   Q.   Oh, the MCC.  So you have no interest in the MCC.

2   A.   Only as chief -- only as a district judge.

3   Q.   You have no monetary interest in the MCC.

4   A.   That's correct.

5   Q.   And the other property was also U.S. Federal Government

6   property that the lien was on?  You mentioned there were two

7   pieces of property?

8   A.   There were five pieces of property on my demand, my

9   $100 billion demand, five pieces of property.

10  Q.   Okay.

11  A.   One was the MCC.  One was 204 South Clark, which is right

12  across the street from the post office, just a block from here.

13  Q.   Is that federal property?

14  A.   I'm not aware that it is federal property.  Then there were

15  three properties that my name was listed in the chain of title.

16  Q.   And that had been something you had previously owned.

17  A.   I previously owned, or one was actually a mistaken entry.

18  They had listed my name because I entered an official order in

19  connection with that property, and my name was on the chain of

20  title as the person who entered the order.

21  Q.   And so your name has never been removed, but it never

22  showed that you had any kind of ownership in that piece of

23  property.

24  A.   Other than the way it was erroneously stated, yes.

25  Q.   And that was in the title of that property?

1  A.  Yes, the search, the title search.

2  Q.  And the 204 South Clark Street property, is that federal

3  property?

4  A.  Not that I'm aware of.

5  Q.  So that's just random property?

6  A.  Well, it's right across the street, a block away from here.

7  We're at 219 South Dearborn.  Across the street would be the

8  even numbers.  There's the post office.  There's Federal Plaza.

9  There's the post office.  Then across Clark Street is a large

10  building, and 204 is in that building.

11  Q.  So under this kind of randomness, any piece of property in

12  this area could have had a lien on it as well?

13  A.  I don't know.

14        MR. STUMP:  Your Honor, objection.

15        THE COURT:  Sustained, lacks firsthand knowledge.

16  BY MS. SOLOMON:

17  Q.  Okay.  So the three properties, two of them, your name was

18  in the chain of title and you did have some connection to?

19  A.  Well, all three I had some connection to.  Two I had had an

20  ownership interest in.

21  Q.  Okay.  A prior ownership interest.

22  A.  Correct, it was not an ownership interest at the time the

23  lien was placed.

24  Q.  So there was no monetary impact on you whatsoever from

25  these liens.

 1  A.  No.

 2  Q.  And you said you didn't recall exactly when you became

 3  aware of the lien against your property or of the lien in

 4  Government's Exhibit 13.3?

 5  A.  I know it was after Mike Dobbins explained to me about his

 6  lien.

 7  Q.  Now, subsequent to the entering of the executive order

 8  against Ms. Phillips, are you aware that there has not been any

 9  kind of conduct that has required -- that's been in violation

10  of the executive order?

11  A.  Which order is that?

12  Q.  That is the first order that was entered.  I'm sorry.

13          MR. STUMP:  February 4th, Exhibit 29.

14  BY MS. SOLOMON:

15  Q.  I'm sorry.  That's Exhibit 29.  That was the order that was

16  entered February 4th.

17  A.  Yes, I had to enter it.  When I was chief judge, I had to

18  enter additional executive committee orders because of

19  Ms. Phillips' further conduct.

20  Q.  Was that related to filings?

21  A.  It was related to filings, yes.  It's all -- they're all

22  spelled out in the executive committee docket sheet.

23  Q.  Essentially, the majority of the executive order is related

24  to the filing of documents.

25  A.  I don't know what you mean by "the majority."

 1  Q.  Well, okay.  If you would, look at page 2 of 3 of the

 2  executive order that was entered on February 4th, 2011.

 3  A.  There were two parts to this because she engaged in two

 4  types of misconduct.

 5  Q.  That's correct.  So I'm just looking at page 2.

 6  A.  Yes.

 7  Q.  It is directed towards the filing of documents?

 8  A.  Yes.

 9  Q.  And essentially they had to be pre-screened before they

10  would be accepted for filing.

11  A.  Yes, that's the normal procedure for a restricted filer.

12  Q.  Okay.  Then the other part of it was that she would have to

13  be accompanied when in the courthouse?

14  A.  Well, first of all, she couldn't come to the courthouse

15  unless she had a court proceeding involving herself.  Then when

16  she came to the courthouse, she had to report to the front desk

17  in the lobby, and then she had to allow herself to be escorted

18  so as to minimize the disruption.  That's the normal procedure

19  for those types of individuals who engage in disruptive

20  conduct.

21  Q.  So that's a procedure that exists in the Northern District

22  of Illinois.

23  A.  That's correct.

24  Q.  And it's a standard procedure.

25  A.  Yes.

J. Holderman - redirect by Stump

1  Q.  And as far as you know, there has not been -- in the course

2  of the proceedings in this case, there have been no violations

3  of the executive order with respect to entry into the

4  courthouse.

5  A.  By "this case," you mean the case that's on trial?

6  Q.  The case against Ms. Phillips.

7  A.  Yes, I'm not aware of any such problems.

8         MS. SOLOMON:  Okay.  Thank you, Judge.

9                       REDIRECT EXAMINATION

10 BY MR. STUMP:

11 Q.  Judge, you were asked about whether the lien had any

12 monetary impact on you, and I think you said no.  Is that

13 right?

14 A.  That's correct.

15 Q.  Did it have any other impact on you?

16 A.  Well, yes.  It's concerning, and it was concerning, like

17 anyone else, that people would take such action.  So it's been

18 a concern, but I never let it influence or intimidate me.

19         MR. STUMP:  Thank you.  That's all I have.

20         MS. SOLOMON:  Nothing further.

21         THE COURT:  May I release Judge Holderman from future

22 testimony?

23         MS. SOLOMON:  Yes.

24         MR. STUMP:  Yes, Your Honor.

25         THE COURT:  You're excused.

1          THE WITNESS:  Thank you, Your Honor.

2      (Witness excused.)

3          THE COURT:  Okay, folks.  I think I've worked you

4  hard enough today, so we will start tomorrow morning at 9:00

5  o'clock.  Please be here a few minutes before then.  I remind

6  you not to discuss the case with anybody.  Don't do any

7  independent research.

8          The first thing I'm going to say tomorrow morning is:

9  Is there anybody on the jury who did not follow the Court's

10  instructions and discussed the case with someone or did any

11  independent research?  And nobody will raise their hands

12  because you will all follow my orders tonight.

13      (Discussion off the record.)

14          THE COURT:  Okay.  So if you would follow the

15  courtroom security officer, he'll give you instructions on how

16  to get back here tomorrow.

17      (Proceedings adjourned to 9:00 a.m., June 17, 2014.)

18              C E R T I F I C A T E

19          I, Patrick J. Mullen, do hereby certify that the
     foregoing is a complete, true, and accurate transcript of the
20   trial proceedings had in the above-entitled case before the
     Honorable MICHAEL J. REAGAN, one of the judges sitting in said
21   court in Chicago, Illinois, on June 16, 2014.

22

                            /s/ Patrick J. Mullen
23                   _____
                            Official Court Reporter
24                          United States District Court
                            Northern District of Illinois
25                          Eastern Division