```
 1                      IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    UNITED STATES OF AMERICA,    )       Docket No. 12 CR 872
                                   )
 4                   Plaintiff,    )       Chicago, Illinois
                                   )       Tuesday, June 17, 2014
 5            v.                   )       9:00 o'clock a.m.
                                   )
 6    CHERRON MARIE PHILLIPS,      )
                                   )
 7                   Defendant.    )

 8                                  VOLUME 2
                             TRANSCRIPT OF TRIAL
 9            BEFORE THE HONORABLE MICHAEL J. REAGAN, and a jury

10    APPEARANCES:

11    For the Government:          MR. NATHAN D. STUMP
                                   Special Assistant U.S. Attorney
12                                 (9 Executive Drive,
                                    Fairview Heights, IL  62208)
13
      For the Defendant:          MS. LAUREN WEIL SOLOMON
14                                 (P.O. Box 2013,
                                    Highland Park, IL  60035)
15
      Court Reporter:             Mary T. Lindbloom
16                                 327 S. Church Street
                                   Rockford, Illinois  61101
17                                 (779) 772-8309

18

19

20

21

22

23

24

25
```

```
 1        (The following proceedings were had in open court, out of

 2        the presence and hearing of the jury:)

 3            THE COURT:  Good morning, all.  Good morning,

 4   Ms. Phillips.  Do you want to make your statement before we

 5   begin?  We're in open court out of the presence of the jury in

 6   this case.  Ordinarily, Ms. Phillips has a statement to make

 7   that I would give her that opportunity now out of the presence

 8   of the jury.

 9            DEFENDANT PHILLIPS:  Okay, Judge.  I have a

10   housekeeping matter.  I've given the court proper notice.  I do

11   not consent to these proceedings.  I have not consented to be

12   the surety in this matter.  I demand a bond to find out who

13   would indemnify me if I am damaged in this matter.

14            Also, stand-by counsel is speaking for the defendant.

15   Therefore, stand-by counsel must have a legal relationship with

16   the defendant and has agreed to assume all liability for all

17   charges against the defendant under whatever contract that the

18   court has presided or put together with the stand-by counsel.

19            THE COURT:  Okay.  You can be seated.

20        (The following proceedings were had in open court, in the

21        presence and hearing of the jury:)

22            THE COURT:  Good morning, all.  As I promised you

23   yesterday, we would start today with me asking is there anyone

24   in the jury who did not follow the court's instructions and

25   either read about the case or did any independent research or
```

Lefkow - Direct

1    discussed it with anyone?

2        (No response.)

3        THE COURT:  Okay.  Seeing no one, I thank you for your

4    cooperation.

5        This chair was broken yesterday.  It's been fixed now.

6    So, you should not fall.  Okay?

7        A JUROR:  Thank you.

8        THE COURT:  Next, you'll see we do have the technology

9    now.  So, I think things will go a little smoother with respect

10   to the evidence.  Those things that were passed around to you

11   yesterday, you're going to get all of that back in the jury room

12   for deliberations.  So, I don't expect you to speed read and

13   have a photographic memory.  It will go much smoother today.

14       We have a new court reporter.  Mary is here.  And a new

15   courtroom deputy.  Carol is here.

16       And then, lastly, one thing I'll alert you to is

17   sometimes you'll get on the elevator or you'll go outside the

18   courtroom, and you'll see the attorneys or the parties or the

19   agents.  They've been instructed by me to avoid you.  So, if

20   they look at you and avert their eyes or act standoffish, that's

21   on my instruction because as you know from what I've said ten

22   times already, I only want you to be influenced by what you see

23   and hear from the witness stand.

24       Having said that, Mr. Stump.

25       MR. STUMP:  Thanks, your Honor.  The United States

Lefkow - Direct

```
1    calls Judge Joan Lefkow.
2         (Brief pause.)
3              THE COURT:  Carol, would you swear the witness, please?
4              THE CLERK:  Please rise and raise your right hand.
5         (Witness duly sworn.)
6              JOAN LEFKOW, GOVERNMENT'S WITNESS, SWORN
7                        DIRECT EXAMINATION
8    BY MR. STUMP:
9    Q.  Good morning.
10   A.  Good morning.
11   Q.  Could you just state your full name for the record and spell
12   your last name?
13   A.  My name is Joan Lefkow, L-e-f, as in Frank, k-o-w.
14   Q.  Ms. Lefkow, what do you do for a living?
15   A.  I'm a United States district judge.
16   Q.  And where is your office located?
17   A.  I'm right below this courtroom in 1952, I think, on the 19th
18   floor.
19   Q.  How long have you been a United States district judge?
20   A.  Since June of 2000, I believe.
21   Q.  Were you appointed by a president?
22   A.  Yes.
23   Q.  Is that how that works?
24   A.  President Clinton.
25   Q.  And is your appointment for life?
```

Lefkow - Direct

```
1    A.  Yes, during good behavior.
2    Q.  As a United States district judge, are you a judicial
3    officer of the United States?
4    A.  Yes.
5    Q.  I'm going to show you what we've previously marked and
6    admitted as Government's Exhibit 13.2.  Do you recognize that?
7    A.  Yes.
8    Q.  When did you first see this document, do you remember, and
9    under what circumstances?
10   A.  I think maybe someone from -- a federal agent brought it to
11   me or the Marshal's Service.  I'm not sure.
12   Q.  What was your reaction when you saw it?
13   A.  Surprise, I suppose, and a little dismayed.
14   Q.  Now, there's a -- it looks like a case number here under the
15   box number two that says unique identifier.  Do you see where it
16   says case number 06 CR 778?
17   A.  Yes.
18   Q.  Do you recognize that case number?
19   A.  Yes, I do.
20   Q.  I want to show you, as well, in box number five there's a
21   name here.  It says Devon Phillips.  Do you see that?
22   A.  Yes.
23   Q.  Do you recognize that name?
24   A.  Yes.
25   Q.  How do you recognize the name and the case number?
```

Lefkow - Direct

1    A.  He was a defendant in a criminal case that was assigned to

2    me.

3    Q.  What was your role then as the district judge in that case?

4    A.  I presided over all the proceedings in that case from the

5    arraignment, I guess, to the sentencing.

6    Q.  What's the difference between a district judge and a

7    magistrate judge?

8    A.  Well, a magistrate judge is appointed for a term by the

9    district court judges, a vote of the district court judges.

10   They serve for eight years, whereas -- and their duties are

11   statutory, whereas district court judges are, as Mr. Stump said,

12   appointed for life, and the duties are more plenary, I should

13   say, or the jurisdiction.

14   Q.  And is there a difference then between the types of matters

15   that a magistrate judge would handle in a criminal case, as

16   opposed to the matters that a district judge would handle?

17   A.  Yes.

18   Q.  What sort of things would a magistrate judge handle and, if

19   you recall, what sort of things did the magistrate judge handle

20   in this particular case against Devon Phillips?

21   A.  Well, magistrate judges in general will typically hear the

22   preliminary proceedings in a criminal case, which could include

23   applications for search warrants.  When a person is arrested,

24   then they're brought in before the court, and the charges are

25   read to them.  That's handled by a magistrate judge.  And

Lefkow - Direct

1   appointment of counsel up to -- well, they can preside over a

2   variety of things, but not the sentencing, not the guilty plea,

3   not the trial, those kinds of things.

4   Q.   This particular case against Devon Phillips, do you remember

5   the kind of case that it was?  It was a criminal case; is that

6   right?

7   A.   Yes, it was.

8   Q.   Do you remember the general nature of the charges?

9   A.   It was possession with intent to distribute narcotics, as I

10  recall.

11  Q.   And do you remember how the case was resolved?  Did it go to

12  trial?

13  A.   No.  It was resolved by guilty plea after many, many court

14  hearings.

15  Q.   Did you preside over the guilty plea?

16  A.   Yes.

17  Q.   At that time do you recall was the defendant, Devon

18  Phillips, was he represented by counsel?

19  A.   Yes, he was.

20  Q.   What about the sentencing?  Was there a sentencing in the

21  case?

22  A.   Yes.

23  Q.   Did you preside over the sentencing, as well?

24  A.   I did, yes.

25  Q.   Do you recall the sentence that you gave him?

Lefkow - Direct

1    A.  I was trying to remember, and I didn't review the notes.

2    It's my recollection it was around seven years.

3    Q.  I have what we've previously marked and admitted as

4    Government's Exhibit 21.  It is an exemplification certificate

5    for the docket sheet in the case against Devon Phillips, and I'd

6    ask you if you could just take a look at this entry here.  It's

7    docket entry number 170.

8    A.  Yes.

9    Q.  Does that tell you anything about the sentence that you gave

10   him?

11   A.  Yes.  It says 78 months on Counts 1, 2, and 3 to run

12   concurrently, for a total term of 78 months.

13   Q.  Thanks.

14         I'm going to put this on the screen.  This is again

15   Government's Exhibit 21, and what I want to show you is docket

16   entry number 136.  Can you read that?

17   A.  Yes.

18   Q.  What does it say in the docket text?

19   A.  Administrative notice and demand from Cherron Phillips dated

20   2-1, 2010.

21   Q.  All right.  This name Cherron Phillips, do you recognize

22   that name?

23   A.  Yes.

24   Q.  How do you know that name?

25   A.  Well, I came to know her through the Devon Phillips case.

Lefkow - Direct

```
 1    She was I understood to be Devon Phillips' sister, and she came
 2    to court a number of times to sit in the pews.
 3    Q.  How do you remember her coming to court?  Was there anything
 4    about her that was memorable?
 5    A.  Well, she had a very, I would say, confident bearing, and I
 6    remember that she wore something on her head, a scarf, kind
 7    of -- looked kind of like a hat.
 8    Q.  Was she a party to the case at all?
 9    A.  No.
10    Q.  Was she an attorney of record in the case?
11    A.  No.
12    Q.  I'm going to show you at the top of the page -- and actually
13    probably what I have to do is start with the page before.  It
14    carries over.  This is docket entry number 126.  You can see
15    it's a minute entry with your name listed.  Do you see that?
16    A.  Yes.
17    Q.  All right.  And it talks about defendant's motion.  It talks
18    about a couple different motions.  Then I'm going to flip the
19    page and show you here at the top it says Cherron Phillips'
20    motion to vacate order of forfeiture and release of personal
21    property is denied.  Do you see that?
22    A.  Yes.
23    Q.  Did she file motions in that case?
24    A.  She did.  She -- you know, it's been a long time, but I
25    recall that she -- I thought that she was writing things for her
```

Lefkow - Direct

1    brother because he was in custody, and I didn't see how he could

2    have prepared these elaborate documents, but that one must have

3    been signed by her and -- I guess that's all.

4    Q.  All right.  I'm going to go back to the lien now.  This is

5    Exhibit 13.2.  Down at the bottom there's a signature here.  Do

6    you recognize the signature?

7    A.  No.

8    Q.  Do you recognize the name River Tali?

9    A.  Well, I've heard about it in connection with her, but not

10   during the litigation.  I didn't know her as River Tali that I

11   can recall.

12   Q.  All right.  Let me show you now what we've marked for

13   identification as Government's Exhibit 23.  It's a one-page

14   document.  Do you recognize that?

15   A.  Yes.

16   Q.  What did I hand to you?

17   A.  It's a letter that's signed by Cherron Marie Phillips dated

18   February 21, 2013.

19   Q.  And who is it addressed to?

20   A.  To me.

21   Q.  Did you receive that letter?

22   A.  Yes.

23   Q.  And is this exhibit a true and accurate copy of the letter

24   that you received?

25   A.  Yes.

Lefkow - Direct

1    Q.  All right.

2            MR. STUMP:  At this time, your Honor, I'd move to admit

3    Government's Exhibit -- what did I say?  24?

4            THE WITNESS:  23.

5            MR. STUMP:  23.

6            MS. SOLOMON:  No objection.

7            THE COURT:  23 admitted, no objection.

8        (Government's Exhibit 23 was offered and received in

9        evidence.)

10           MR. STUMP:  I'm going to publish this to the jury now.

11   And, your Honor, I'm just going to read this into the record,

12   and I'm going to start where it says Dear Madam.

13           "I am writing this request to forgive me because I have

14   come to learn of my tremendous mistake.  I fully understand that

15   listening to people in the public on how to obtain remedy was a

16   huge mistake.  Forgive me for my failure to do the proper study

17   on learning how to come to my brother and properly resolve

18   matters instead of filing liens on persons.

19           "I understand this was a serious mistake.  I had no

20   intentions on causing harm and thought I was following the law.

21   I simply thought at that time I was doing the right thing.  I

22   make no excuse for taking bad advice.

23           "It was a tremendous mistake and ill-advised and

24   completely out of line.  Please be advised I would never do such

25   a thing again.  I understand that public servants must have a

Lefkow - Direct

```
 1   difficult job in dealing with people who don't understand law
 2   and don't understand how to come to harmony.  I now again
 3   reiterate, I fully understand my mistake and how I must have
 4   offended and/or inconvenienced you.  I have but two words.
 5   Forgive me.  Sincerely, Cherron Marie Phillips."
 6   BY MR. STUMP:
 7   Q.  Judge, after you received this, what did you do with it, do
 8   you remember?
 9   A.  I don't really recall, though whenever I receive a letter
10   that's unusual that's not in the ordinary course of my work, I
11   usually -- my assistant does something with it.  Sometimes they
12   go to the Marshal's Service.  And other than that, I don't
13   remember what happened to it.
14   Q.  Back to the lien.  Aside from your role as United States
15   district judge and the presiding judge in the case against Devon
16   Phillips, did you have any other relationship to Devon Phillips?
17   A.  No, none.
18   Q.  How about to Cherron Phillips?
19   A.  None.
20   Q.  Has either Devon Phillips or Cherron Phillips ever performed
21   any sort of services for you?
22   A.  No.
23   Q.  Do you owe either of them a hundred billion dollars?
24   A.  I hope not.  No, I don't.
25   Q.  Do you owe either of them any money whatsoever?
```

254

                              Lefkow - Cross

1      A.  I do not.
2              MR. STUMP:  Your Honor, could I have just one moment,
3      please?
4          (Brief pause.)
5              MR. STUMP:  That's all I've got.  Thanks, Judge.
6              THE COURT:  Thank you.  Ms. Solomon.
7                          CROSS EXAMINATION
8      BY MS. SOLOMON:
9      Q.  Good morning, Judge.
10     A.  Good morning.
11     Q.  My name is Lauren Solomon, and I'm representing Cherron
12     Phillips in this matter.
13             You testified that you were the presiding judge in
14     Devon Phillips' criminal case?
15     A.  Yes.
16     Q.  And that Ms. Phillips appeared to be his sister?
17     A.  Right.
18     Q.  And she came to the courtroom in support of her brother
19     during those proceedings?
20     A.  Yes.
21     Q.  And you also indicated that you thought that he filed
22     filings in that matter on his own?
23     A.  He filed many pro se filings, yes.
24     Q.  At certain points in time during the case, he was
25     representing himself pro se?

Lefkow - Cross

1    A.  Well, he had an attorney, appointed counsel, but he wouldn't
2    cooperate with him.  And so, there were times when I tried to
3    see if he could represent himself, but he wouldn't do that,
4    either.  That is, all he would do is file these nonsensical
5    documents.  And eventually an attorney, John Sullivan, was able,
6    apparently, to communicate with him and gain cooperation.  So,
7    he represented him.  But during that -- it was almost
8    five years -- he filed many, many pro se documents.
9    Q.  And the filing of pro se documents when you represent
10   yourself pro se is acceptable under the law?
11   A.  It is, unless you're represented by counsel, and then you're
12   not allowed to do both.
13   Q.  Okay.  And if somebody helps you with those filings while
14   you were proceeding pro se, that's also acceptable?
15   A.  I suppose so.
16   Q.  As long as it's not an attorney who's actually representing
17   him.
18   A.  Well, someone couldn't hold themselves out as a
19   representative who was not an attorney, but obviously to consult
20   with someone who's not an attorney to make a pro se filing that
21   you sign yourself, I wouldn't even know about that.
22   Q.  And in many cases that's exactly what happens with pro se
23   defendants?
24   A.  I suppose.  I don't know.
25   Q.  Now, this document 13.2, which purports to be a lien, you

Lefkow - Cross

1    said you learned about this through the U.S. Marshal's Service?
2    A.  I don't remember.  It might have been an FBI agent.  I
3    really don't remember how it came to me, but I had seen it when
4    it -- you know, shortly after it happened.  I was notified at
5    some point that there was -- this potential case was being
6    investigated by the U.S. Attorney and federal agents.
7    Q.  Did you actually receive a copy of the document?
8    A.  Yes, I think so.
9    Q.  And that was through the FBI or the U.S. Marshal's Service?
10   A.  Probably.
11   Q.  You didn't receive any other kind of notification of it?
12   A.  I don't think so.
13   Q.  And do you know whether it was actually ever on the title of
14   your property?
15   A.  Well, no, I don't know.  I have no idea.  But I didn't have
16   any property registered at the time, as far as I know.
17   Q.  You did not --
18   A.  I had a car.
19   Q.  Okay.  So, you didn't have real estate or real property that
20   this could have attached to?
21   A.  That's correct.
22   Q.  And as far as you know, it wasn't attached to the title of
23   your car?
24   A.  I don't know.
25   Q.  You didn't try to sell your car at any time?

Lefkow - Cross

1    A.  I did not.

2    Q.  And you've never looked at the title to determine that?

3    A.  Correct.  I didn't.

4    Q.  And you said that when you received the apology letter, you

5    also just turned that over to the U.S. Marshals?

6    A.  I don't know.  It might be just in a file in my office.  I

7    don't know.  I would have to -- I just don't remember.

8    Q.  And it didn't have any impact on the case.  Actually, it was

9    way after?

10   A.  Way after.

11   Q.  It was two years after the case had completed?

12   A.  I guess so.  I think it ended in 2011 sometime, the case,

13   and that's 2013, right.

14   Q.  Right.  The letter is dated 2013.

15          And did you know Ms. Phillips by her name?

16   A.  Yes.

17   Q.  And what name did she go by?

18   A.  Cherron Phillips.

19   Q.  Thank you.

20          THE COURT:  Mr. Stump.

21          MR. STUMP:  Brief, your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. STUMP:

24   Q.  Judge, I want to direct your attention to this box seven

25   here on Exhibit 13.2.

                        Lefkow - Redirect

1    A.  Yes.

2    Q.  It says all property, including but not limited to, and then

3    you see there's a fairly long, extensive list there.  Do you see

4    that?

5    A.  Right.

6    Q.  Including bank accounts, safety deposit boxes, certificates

7    of deposit, retirement funds, 401Ks, stocks, securities, cash,

8    jewelry, houses, lands, motor vehicles, watercraft.  Do you own

9    any of that stuff?

10   A.  I do, yes.  I didn't think about it in those terms, but yes.

11   Bank accounts and other things, yes.  Jewelry a little.

12   Q.  That's all I have.  Thank you.

13   A.  Okay.

14          THE COURT:  Ms. Solomon.

15                      RECROSS EXAMINATION

16   BY MS. SOLOMON:

17   Q.  As far as you know, none of those properties that you

18   have -- I assume you don't have farm supplies or farm equipment,

19   but the ones -- of the assets that you do have, as far as you

20   know, nothing ever attached to them, and no liens were ever

21   placed against them?

22          MR. STUMP:  Judge, I'm going to object to the form of

23   the question in terms of a lien attaching to property.  I think

24   we've established that the lien was recorded already.

25          THE COURT:  Well, this is a sophisticated witness, and

259

                            Lefkow - Recross

1    I think she would know the difference between an attachment and

2    an encumbrance.  So, overruled.

3             THE WITNESS:  I hope so.

4    BY THE WITNESS:

5    A.  I'm not sure.  What was your question again?

6    BY MS. SOLOMON:

7    Q.  As far as you know, this lien did not in any way interfere

8    with your possession of any of these items that are listed in

9    this lien.

10   A.  Yes, that's correct.

11   Q.  There was no impact?

12   A.  Right.

13   Q.  Thank you.

14            MR. STUMP:  Thanks, Judge.  That's all the questions I

15   have.

16            THE COURT:  Okay.  May the witness be released from

17   further testimony?

18            MR. STUMP:  Yes, your Honor.

19            THE COURT:  Ms. Solomon?

20            MS. SOLOMON:  Yes.

21            THE COURT:  Thank you.

22            THE WITNESS:  Thank you.

23        (Witness excused.)

24            MR. STUMP:  Judge, the United States calls Pat

25   Fitzgerald.

Fitzgerald - Direct

1      (Brief pause.)

2      (Witness duly sworn.)

3           PATRICK FITZGERALD, GOVERNMENT'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5   BY MR. STUMP:

6   Q.  Good morning, sir.

7   A.  Good morning.

8   Q.  Could you tell us your full name, please, and spell your

9   last name?

10  A.  Patrick Fitzgerald, F-i-t-z-g-e-r-a-l-d.

11  Q.  Mr. Fitzgerald, what do you do for a living, sir?

12  A.  I'm an attorney.

13  Q.  And where do you work?

14  A.  I work at the law firm of Skadden Arps.

15  Q.  Is that here in Chicago?

16  A.  Yes.

17  Q.  How long have you been with the law firm?

18  A.  About a year and a half.

19  Q.  And what were you doing before that?

20  A.  Before that I was the U.S. Attorney here in Chicago from

21  2001 to 2012.

22  Q.  What does it mean to be the U.S. Attorney?

23  A.  The U.S. Attorney works in the U.S. Attorney's Office.  The

24  U.S. Attorney himself or herself is the chief law enforcement

25  officer for the district, here the Northern District of

Fitzgerald - Direct

1    Illinois.

2    Q.  Does the U.S. Attorney's position basically manage the

3    entire U.S. Attorney's Office?

4    A.  Yes.

5    Q.  What about Assistant U.S. Attorneys?  Who are they?

6    A.  The Assistant U.S. Attorneys are all the folks in the U.S.

7    Attorney's Office who are lawyers other than the U.S. Attorney,

8    and in Chicago there's roughly 160 U.S. Attorneys.

9    Q.  Can you tell us in a criminal case what sort of involvement

10   would a U.S. Attorney have, as opposed to an Assistant U.S.

11   Attorney?

12   A.  It varies by the case.  Almost all the cases that are

13   brought civilly or criminally are handled by Assistant U.S.

14   Attorneys.  On the criminal side, an Assistant U.S. Attorney

15   likely does the investigation, likely does the trial.  The

16   decision to charge a case is initially recommended by an

17   Assistant U.S. Attorney, but it will go up the supervisory chain

18   for people to approve, and depending on the scope or the

19   significance of the case, what the crimes are that are charged,

20   different people are required to approve it.  Most cases that

21   are charged as criminal cases by the U.S. Attorney's Offices are

22   approved by someone below the U.S. Attorney, but certain cases

23   go up to the U.S. Attorney for approval.

24   Q.  As a U.S. Attorney, does your name appear on any documents

25   associated with a criminal case?

Fitzgerald - Direct

1    A.   Yes.   I think the title of the U.S. Attorney and his or her

2    name appears on every indictment brought by the office.   It

3    might be signed by somebody else with the U.S. Attorney's

4    approval, but every case is brought in the name of the

5    U.S. Attorney on behalf of the government.

6    Q.   How do you become a U.S. Attorney?

7    A.   The U.S. Attorney is presidentially appointed.   I was an

8    Assistant United States Attorney in New York for 13 years.   An

9    Assistant U.S. Attorney is hired by the U.S. Attorney, and the

10   U.S. Attorney himself or herself is appointed by the President

11   and confirmed by the Senate.

12   Q.   Which president appointed you?

13   A.   President Bush.   George Bush the II president Bush.   43.

14           THE COURT:   43rd.

15           THE WITNESS:   43rd, yes.   43rd president.

16           THE COURT:   41 just went skydiving at age 90.

17   BY MR. STUMP:

18   Q.   Mr. Fitzgerald, when you are a U.S. Attorney, are you an

19   officer or employee of the United States?

20   A.   Yes.

21   Q.   I want to show you what's already been admitted as

22   Government's Exhibit 13.5.   This is a multi-page document.   I'm

23   just showing on the screen the first page.   Do you recognize

24   that?

25   A.   Yes.

Fitzgerald - Direct

1    Q.   How do you recognize it?

2    A.   I was shown it a couple of times, including last -- I think

3    late last week.

4    Q.   Do you remember the circumstances under which you first saw

5    this document?

6    A.   Vaguely.   Someone in my office brought it to me, I think.

7    It could have been the marshals or the FBI or a prosecutor.   I

8    don't remember.   But someone working for the government came and

9    told me that there was a lien that I think had been filed

10   against -- it might have been Chief Judge Holderman, but I

11   think -- my name was on it, but I think it was brought to me

12   because it was filed against someone else.

13   Q.   Were you the U.S. Attorney when this was brought to your

14   attention?

15   A.   Yes.

16   Q.   And just to be clear, this date here says March 14th, 2011.

17   Were you the U.S. Attorney on that date?

18   A.   Yes.

19   Q.   Now, do you have any recollection of this particular case

20   number here, 06 CR 778?

21   A.   No.

22   Q.   At the time that this was brought to your attention, did you

23   recognize the name Devon Phillips?

24   A.   Yes, I believe so.

25   Q.   How did you recognize that name?

Fitzgerald - Direct

1    A.  I had a vague recollection that there was a case involving

2    him, and I think -- I didn't handle it personally, but my

3    recollection is something happened with his case in the

4    courtroom or outside the courtroom, and I just -- the name was

5    vaguely familiar.

6    Q.  I'm going to flip the page here.  There's a signature there.

7    I'm not sure if you can see that.  Do you recognize that

8    signature at all?

9    A.  I'm having trouble seeing it.  My contacts are fuzzy today.

10   But I don't recognize it from what I can see.

11   Q.  Do you recognize the name River Tali?

12   A.  No.

13   Q.  Aside from your role as the U.S. Attorney at the time, did

14   you have any involvement with Devon Phillips?

15   A.  In a personal capacity?

16   Q.  Yes.

17   A.  No.

18   Q.  What about anyone in his family?

19   A.  No.

20   Q.  To your knowledge, did anyone in his family ever perform any

21   services for you?

22   A.  No.

23   Q.  Do you owe Devon Phillips a hundred billion dollars?

24   A.  I don't owe anyone a hundred billion dollars, and I don't

25   believe I owe Devon Phillips a penny.

265

                          Fitzgerald - Cross

1    Q.   Thanks.

2              MR. STUMP:   Tender the witness.

3              THE COURT:   Ms. Solomon.

4                          CROSS EXAMINATION

5    BY MS. SOLOMON:

6    Q.   Good morning, Mr. Fitzgerald.

7    A.   Good morning.

8    Q.   I'm Lauren Solomon, and I represent Cherron Phillips in this

9    matter.

10   A.   Okay.  Nice to meet you.

11   Q.   Nice to meet you.

12             You said that you didn't have anything directly to do

13   with the Devon Phillips case?

14   A.   I don't -- let me think about this.  I remember the name,

15   and I remember something happening in a courtroom.  So, I would

16   have been briefed on it.  And I don't know what I did in

17   response to it.  As you say that and I think about the name, I

18   just remember the name coming up.  So, I could have been -- I

19   could have been briefed on that case more.

20             I generally got briefed on certain types of cases, but

21   I mean -- let me put it this way.  Sometimes a U.S. Attorney

22   does the case himself or herself.  And so, over the course of my

23   time, sometimes I did a case where actually if it went to trial,

24   I'd go in the courtroom myself, and sometimes I went into the

25   grand jury myself and dealt with witnesses myself.  So, I'd work

Fitzgerald - Cross

```
 1    the case almost as if I was an Assistant U.S. Attorney.  Other
 2    cases I'd be briefed on, and then there were cases I was never
 3    briefed on.
 4              I did not work on the Devon Phillips case myself.  I
 5    didn't go in the grand jury.  I didn't go to trial.  I don't
 6    think I attended the trial.  But at some point I was briefed on
 7    it.  So, it would be in that middle category.  But I got briefed
 8    on lots of cases.  So, it's hard to keep in my mind how much I
 9    was briefed on a particular case.  But I didn't work the Devon
10    Phillips case as if I was working it myself.
11    Q.  How many cases did the U.S. Attorney's Office handle in one
12    year during your tenure?
13    A.  I was afraid you'd ask that.  I should know that.  There are
14    civil cases and criminal cases.  The criminal cases would be in
15    the hundreds.  You know, high hundreds.  But whether it's 800,
16    you know, I couldn't tell you the exact number, but it would be
17    in the hundreds per year.
18    Q.  Well, the case number was 06 CR 778.  So, that would
19    indicate that there were at least 777 cases prior to
20    Mr. Phillips, and unless it was filed the last day of the year,
21    then there were cases that followed his.
22    A.  Yes.  I would think that the 06 number means it was filed in
23    2006.  It was the 778th case.  Maybe there were 900.  Maybe
24    there was a thousand.  But we're in that ball park of high
25    hundreds, maybe a thousand per year.
```

Fitzgerald - Cross

1    Q.  And, obviously, you didn't have hands on interaction in
2    every case that went through your office?
3    A.  Obviously not, no.
4    Q.  And in this case the matter didn't go to trial.  So, clearly
5    you couldn't have been involved in a trial since there wasn't
6    one.  It was resolved by plea.
7    A.  I'll accept that as a fact.  I certainly didn't go to trial
8    with Devon Phillips.
9    Q.  And you indicated at some point you received a copy of
10   either a lien -- you believed it was a lien that was placed on
11   Judge Holderman?
12   A.  As I sit here now, anything involving judges, prosecutors,
13   witnesses, defense counsel that was anything out of the ordinary
14   or anything involving anything that might be involved as a
15   threat, I would be told about.  And so, I just remember someone
16   showing me a piece of paper, and as I sit here now, it could
17   have been -- sometimes the marshals would come down and tell me
18   a judge received something in the mail you should know about.
19   Sometimes it would be reported to the FBI, and they'd bring it
20   to me.  Sometimes a judge might call and say I received
21   something or something happened.  And sometimes an AUSA brought
22   it to me.
23          I have a vague recollection of Tom Shakeshaft once
24   talking to me about this, but when I was asked the question how
25   it first came to me, I just remember whoever brought it to me I

268

Fitzgerald - Cross

1    viewed it -- and this is a very vague memory -- as being in the
2    context of involving someone else.  In other words, I don't know
3    if they came to me and said a lien was filed against you or
4    whether they said a lien was filed against Judge Holderman and
5    you.  But, obviously, when I looked at it, I saw my name.  But I
6    think it was brought to my attention.
7    Q.  And you think it was brought to your attention in the
8    context of Judge Holderman because those kinds of things would
9    come to your attention as U.S. Attorney?
10   A.  Yes.
11   Q.  And this wasn't the only thing that would have been -- time
12   that something would have been brought to your attention
13   involving a case.
14   A.  Not at all.  Right.  I agree.
15   Q.  Many times during -- I don't know if a day, a week, but the
16   year, certainly matters came to your attention because of
17   questions, issues that came up involving criminal or civil cases
18   in this district?
19   A.  Yes.
20   Q.  Now, did this lien impact your -- I'm sorry.  I'll strike
21   that.
22            Were you aware of this lien independently?
23   A.  I'm a little -- independently of?
24   Q.  Someone bringing Judge Holderman's lien to your attention.
25   A.  I think I'll answer the question.  It may have been brought

Fitzgerald - Cross

1      to me more than once.  I mean, it could have been the Marshal

2      telling me that the judge received a lien.  It could have been

3      the Assistant U.S. Attorney telling me about the lien.  So, I

4      may have heard about it more than once within the office, but if

5      you're asking me did a lien show up on my real estate records,

6      that way, no.  I don't think the lien was successfully placed on

7      my property.

8      Q.  As a matter of fact, the pin number didn't correspond to any

9      property that you own?

10     A.  That's correct.

11     Q.  And the pin number is the number that's used for tax

12     purposes?

13     A.  I believe so.

14     Q.  And as far as you know, no lien was ever placed on the pin

15     number attached to your property?

16     A.  That's correct.

17     Q.  And it would have been impossible to do that because your

18     property is not known to the public?

19     A.  I hope not.  It was not listed in my name, and it was

20     designed so people would not know where I lived, and I actually

21     sold the property that I lived in in 2011, and there was no lien

22     there.  So, I can tell you for a fact that the lien was not

23     placed on the property that I owned.

24     Q.  Right.  And it was not ever placed -- it never showed up in

25     the title to your property?

Fitzgerald - Cross

1    A.  That's correct.

2    Q.  And you successfully sold your house and moved on?

3    A.  Correct.

4    Q.  Okay.  And as far as you know, there was never any lien or

5    attachment placed on any other property that you own?

6    A.  To my knowledge, the hundred billion dollar lien was never

7    attached to anything that I owned.

8    Q.  And you were never informed by any entity, whether it be a

9    title company, a bank, auto title company, or anything of that

10   sort, that there was this hundred billion dollar lien pending

11   against your property?

12   A.  No private entity ever told me about the lien.  I only heard

13   about the lien through the government channels.  It never showed

14   up, to my knowledge, on any credit report or things like that.

15   Q.  So, if whoever brought it to your attention had not done so,

16   you would be completely unaware that this ever occurred?

17   A.  If the people in the government, who may have been more than

18   one, hadn't told me about it, I would not have known about it

19   from anything that happened outside the office.

20   Q.  It had no impact on your life?

21   A.  It had no impact on my personal life, that's correct.

22   Q.  That's correct.  Okay.

23        Now, you said that you didn't recognize the name River

24   Tali?

25   A.  The name River Tali doesn't come to mind.

Fitzgerald - Cross

1    Q.  And you also didn't have any personal involvement with Devon

2    Phillips or Cherron Phillips?

3    A.  No involvement with them, as far as I'm aware at all,

4    outside of whatever role I played in the office when the case

5    came to my attention, which I'm vague on.  But I had no outside

6    relationship with either of them.

7    Q.  Okay.  Thank you.

8    A.  Thank you.

9            MR. STUMP:  No further questions, your Honor.

10           THE COURT:  May I release the witness from further

11   testimony?

12           MS. SOLOMON:  Yes, Judge.

13           MR. STUMP:  Yes, your Honor.

14           THE COURT:  Thank you, sir.

15           THE WITNESS:  Thank you, Judge.

16       (Witness excused.)

17           MR. STUMP:  The United States calls Judge Arlander

18   Keys.

19       (Brief pause.)

20           THE CLERK:  Raise your right hand.

21       (Witness duly sworn.)

22            ARLANDER KEYS, GOVERNMENT'S WITNESS, SWORN

23                     DIRECT EXAMINATION

24   BY MR. STUMP:

25   Q.  Good morning, sir.

Keys - Direct

```
 1    A.  Good morning.

 2    Q.  Would you start by telling us your full name, please, and

 3    spell it for the record?

 4    A.  My name is Arlander, A-r-l-a-n-d-e-r, last name is Keys,

 5    K-e-y-s.

 6    Q.  Mr. Keys, what do you do for a living, sir?

 7    A.  Well, now I'm a mediator/arbitrator with JAMS.

 8    Q.  How long have you been a mediator or arbitrator?

 9    A.  For about a week, one week.

10    Q.  And what were you doing before you started that job?

11    A.  I was a United States magistrate judge in the Northern

12    District of Illinois.

13    Q.  Where was your office located in relationship to this

14    courtroom?

15    A.  One floor up, 22nd floor.

16    Q.  How long were you a United States magistrate judge here in

17    the Northern District?

18    A.  For 19 years and three months, from February of 1995 'til

19    May 30th of this year.

20    Q.  How did you get the job as magistrate judge?

21    A.  We went through a merit selection panel of lawyers and state

22    court judges.  We went through -- I think there were about 63

23    individuals and got it down to five, and the district judges

24    selected me as a successful one at that particular time.

25    Q.  And you said you served for 19 years?
```

Keys - Direct

 1    A.  19 years and three months, but who's counting.

 2    Q.  As a United States magistrate judge, are you considered a

 3    judicial officer of the United States?

 4    A.  Yes.

 5    Q.  I want to show you now what's previously been admitted as

 6    Government's Exhibit 21.  This is an exemplification certificate

 7    associated with a case number there.  Do you see the case

 8    number?

 9    A.  Yes.

10    Q.  Do you recognize this case number or the case it's

11    associated with in any way?

12    A.  No, I do not.

13    Q.  Could you open the exhibit?  And let me show you the name of

14    the defendant associated with this exhibit.  It says Devon

15    Phillips.  Do you recognize that name?

16    A.  I recognize it now only because I -- well, I recognize it

17    now.

18    Q.  Do you recognize it now?

19    A.  Yes.

20    Q.  And did you have any association with that case?

21    A.  Yes, I did.

22    Q.  Let me take this back from you.  And what I'd like to do is

23    ask you if I put this on the overhead here and I flip through it

24    and look through the docket, will we see where you had some

25    involvement with the case?

Keys - Direct

1    A.  Yes.

2    Q.  All right.  I'm going to do that, and I'm going to start

3    with the very first entry.  It says docket number one.  Can you

4    read the document text from where you're sitting?

5    A.  Yes.

6    Q.  Could you go ahead and read that out loud in the record?

7    A.  Complaint signed by Judge Arlander Keys as to Devon Phillips

8    1 yap, entered 10-25, 2006.

9    Q.  What does that docket entry represent?

10   A.  It represents that a complaint had been brought to me by an

11   Assistant United States Attorney.  I had read the affidavit

12   attached to the complaint, and I agreed that there was probable

13   cause to have the defendant arrested.

14   Q.  Now, is there a difference between a complaint and an

15   indictment?

16   A.  Yes, it is.

17   Q.  Would you mind explaining to us briefly what the difference

18   is?

19   A.  Well, on a complaint all you're looking at, the magistrate

20   judge is looking at, is the affidavit that's signed by the

21   agent, and the agent swears that the affidavit is complete and

22   that it is true, and the judicial officer, based on that

23   finding, finds that there's probable cause to arrest the

24   defendant.  That's all.

25   Q.  Now, in a case like this that has a complaint in it or that

Keys - Direct

1    begins with a complaint, is there a point in time in which

2    there's typically an indictment returned, as well?

3    A.  Yes.

4    Q.  Can you explain to us what that process is and why it

5    happens?

6    A.  Well, once the defendant is arrested and brought before the

7    magistrate judge on an initial appearance, and at that point the

8    magistrate judge decides whether there is -- or there are

9    conditions on which that individual can be released under

10   certain conditions or whether he needs to be held without bond,

11   and then later the U.S. Attorney presents the evidence to --

12   after a -- there's either going to be a preliminary hearing to

13   determine whether there is enough evidence after hearing

14   testimony to hold that individual for further proceedings, and,

15   if there is, then the individual -- a finding is made by the

16   magistrate judge that there is sufficient evidence to hold an

17   individual to answer to the charges of the complaint, and then

18   the U.S. Government, the attorney, U.S. Attorney, will present

19   that evidence to a grand jury.

20   Q.  And it's the grand jury that returns the indictment; is that

21   right?

22   A.  Yes.

23   Q.  You mentioned that there's an initial appearance that's held

24   after a complaint is filed.  Do you see in the docket entry

25   number two, do you see your name there?

Keys - Direct

 1    A.  Yes.

 2    Q.  And is that entry -- does that reflect an initial appearance

 3    that was held on the complaint?

 4    A.  Yes, it does.

 5    Q.  So, does that mean that you were the magistrate judge then

 6    that presided over that initial appearance?

 7    A.  It does.  And typically in that situation, if they file

 8    within 20 -- the initial appearance was 10-20.  That means that

 9    the complaint was filed and the individual was arrested and

10    brought before me on the same day.

11    Q.  Now, I want to turn the page.  Do you see your name in

12    several other places on this document?  Do you see it here in

13    docket entry number three?

14    A.  Yes.

15    Q.  Okay.  And again in number six?

16    A.  Yes.

17    Q.  And I'm going to show you now number 14 here, as well.  Can

18    you tell us just reading this what happened at this minute entry

19    docket 14?

20    A.  Okay.  Docket 14 was after the grand jury had returned an

21    indictment on Mr. Phillips on December 19th.  I was designated

22    as the magistrate judge.  At the time I must have been off

23    because the next entry was Morton Denlow as to the preliminary

24    bail.  But in any event, an arraignment was held on

25    December 21st, and that was just a notice of arraignment.

Keys - Direct

1    Q.   Okay.

2    A.   The arraignment was held on December 27th.

3    Q.   I see a notation here that says arraignment reset.

4    A.   Reset to January 5th.

5    Q.   All right.  And then here there's an entry there for

6    January 5th.  Was this the minute entry that reflects that you

7    presided over the arraignment on that indictment?

8    A.   Yes.

9    Q.   I want to switch gears, and I want to show you now what's

10   been admitted as Government's Exhibit 13.11.  Oh, that's not the

11   right one.  Sorry.  13.2.  Judge Keys, do you recognize that

12   document?

13   A.   Yes, I do recognize it.

14   Q.   Under what circumstances did you first find out about this

15   document?

16   A.   That document was brought to me either by an FBI agent or

17   the U.S. Marshal, Deputy U.S. Marshal, to inform me that I had

18   been -- a lien had been placed against me.

19   Q.   What was your reaction when you saw the amount there of the

20   lien?

21   A.   Well, my first reaction was that I don't have a hundred

22   billion dollars.  And so, I had no idea what this was all about.

23   I had no idea whatsoever.  Didn't even know who the person was

24   who had -- I didn't recognize who the person was because this

25   was several years later, I believe.

Keys - Direct

1    Q.  Did you recognize then that name, Devon Phillips?

2    A.  I didn't at the time, no.

3    Q.  And the date here that's on the stamp, it says April 19th,

4    2011.  Were you still a United States magistrate judge at that

5    time?

6    A.  Yes, I was.

7    Q.  But it had been you said several years since you had any

8    involvement with the case against Devon Phillips; is that right?

9    A.  Yes.

10   Q.  Aside from your role as the magistrate judge in some of the

11   proceedings in that case, did you have any other interactions or

12   involvement with Devon Phillips?

13   A.  No, I did not.

14   Q.  Do you know the name Cherron Phillips?

15   A.  No.

16   Q.  Did you ever have any interactions with anyone in the family

17   of Devon Phillips?

18   A.  No.

19   Q.  To your knowledge, do you owe anyone in that family, Devon

20   Phillips or anyone else, any money whatsoever?

21   A.  No.

22   Q.  Now, I want to show you what's previously been marked for

23   admission as Government's Exhibit 27.  It's a one-page document.

24   Do you recognize that?

25   A.  Yes.

Keys - Direct

1    Q.  Can you tell us what it is?

2    A.  I received this letter in the mail and -- yes.  And I

3    immediately called the U.S. Marshal and turned it over to him.

4    Q.  And who does the letter purport to have been sent from or

5    by?

6    A.  From Cherron Marie Phillips.

7    Q.  And what's the date of the letter?

8    A.  February 21st, 2013.

9    Q.  And is this document that I handed to you, Exhibit 27, a

10   true and accurate copy of the letter that you received on or

11   about that day?

12   A.  Yes.

13        MR. STUMP:  At this time, your Honor, I'd move for the

14   admission of Government's Exhibit 27.

15        THE COURT:  Any objection?

16        MS. SOLOMON:  No, Judge.

17        THE COURT:  27 admitted, no objection.

18     (Government's Exhibit 27 was offered and received in

19      evidence.)

20        MR. STUMP:  I'm just going to publish this to the jury.

21   BY MR. STUMP:

22   Q.  Judge, after you received this, do you know what you did

23   with it, do you remember?

24   A.  Yes.  I gave it to the Deputy U.S. Marshal.  I believe it

25   was a marshal.  I called him and told him I had received this

Keys - Direct

1    ex parte kind of communication, and I wanted to -- so, they came
2    up and picked it up.
3    Q.  Aside from your involvement in this case in terms of your
4    testimony here today, have you had any other involvement with
5    Devon Phillips or Cherron Phillips or anyone in that family
6    since you received that letter?
7    A.  No.
8    Q.  Thanks.  That's all my questions.
9         THE COURT:  Ms. Solomon, cross examination.
10                       CROSS EXAMINATION
11   BY MS. SOLOMON:
12   Q.  Good morning, Judge Arlander.
13   A.  Good morning.
14   Q.  My name is Lauren Solomon, and I represent Cherron Phillips
15   in this matter.  I just have a few questions for you.
16        As a magistrate judge, you handle many court
17   appearances; is that right?
18   A.  Thousands of them, yes.
19   Q.  Thousands.  And in the course of your duties as a magistrate
20   judge, you have what are called the preliminary proceedings in
21   criminal cases?
22   A.  Yes.
23   Q.  And that includes the filing of the complaint?
24   A.  Yes.
25   Q.  The initial appearance?

Keys - Cross

1    A.  Yes.

2    Q.  Detention or bond hearings?

3    A.  Yes.

4    Q.  And arraignments?

5    A.  Yes.

6    Q.  And for each of those proceedings, they're pretty brief; is

7    that correct?

8    A.  Yes.

9    Q.  Other than a prolonged detention hearing which might go --

10   have witnesses or things of that nature or if there's a

11   preliminary hearing.

12   A.  Yes, those can be longer.  Otherwise, they're pretty brief.

13   Q.  But in the average case, a preliminary hearing in federal

14   cases is often waived?

15   A.  Often they are.

16   Q.  And in many instances detention is not an issue either

17   because an individual will be detained or because someone's

18   released on bond?

19   A.  That's true.

20   Q.  So, with respect to Devon Phillips, the preliminary

21   proceedings before you were essentially brief?

22   A.  Yes.

23   Q.  There was the initial appearance and the arraignment and

24   also --

25   A.  Yes, the waiver.

Keys - Cross

1    Q.  -- the bond hearing or appearance evidently was before a
2    different magistrate?
3    A.  Yes.  According to the docket, it was, yeah.
4    Q.  According to the docket.
5    A.  I don't remember the case.
6    Q.  Okay.  And you have no independent recollection of this
7    case?
8    A.  I do not.
9    Q.  And nor do you have any independent recollection of
10   Ms. Phillips?
11   A.  Ms. Phillips?
12   Q.  Ms. Phillips, who is involved in this case.
13   A.  I still have no recollection of her.
14   Q.  Okay.  Now, you indicated that you handed over the letter to
15   the U.S. Marshals, and you said you turned it over because it
16   was an ex parte communication?
17   A.  Yes.
18   Q.  And an ex parte communication is one that occurs that's
19   given to a judge without the presence of both attorneys in the
20   case?
21   A.  Correct.
22   Q.  And that's a routine matter to be handed over to -- those
23   kinds of communications are prohibited in a case?
24   A.  Correct.
25   Q.  And they're prohibited because you don't want to have the

Keys - Cross

1   appearance of any kind of undue bias?

2   A.  Correct.

3   Q.  Either for or against a defendant?

4   A.  Correct.

5   Q.  As far as you know, Ms. Phillips was never in your

6   courtroom?

7   A.  As far as I know, no, she wasn't.

8   Q.  And as far as you recall, because of the routine nature

9   of -- how many cases do you think you saw during the course

10  of -- in an average year as a magistrate?

11  A.  Criminal or all cases?

12  Q.  Well, we'll start with criminal.

13  A.  I would say three, 400.

14  Q.  And the number of civil cases you see on top of that?

15  A.  Probably seven, 800.

16  Q.  I'm sure you have a good memory, but it would be impossible

17  to remember everything about every case?

18  A.  You're right.

19  Q.  Right.  Now, this lien that was brought to your attention,

20  Government's Exhibit 13.12, aside from when it -- I'm sorry.

21  Aside from whenever someone brought it to your attention, were

22  you aware of it outside of your official duties as a magistrate?

23  A.  No, I was not.

24  Q.  It didn't appear on any kind of property that you may have

25  owned at the time?

Keys - Cross

```
 1   A.  I don't know.  I never checked.

 2   Q.  You never checked.  No one informed you that there was any

 3   kind of lien against a title to any property that you owned?

 4   A.  No.

 5   Q.  Do you own real estate?

 6   A.  Yes, I do.

 7   Q.  And as far as you know, there's no -- have you attempted to

 8   change ownership on that property?

 9   A.  No.

10   Q.  And as far as you know, there's no encumbrance or lien

11   against that property?

12   A.  As far as I know.  I simply haven't checked.

13   Q.  Okay.  And no one's informed you?

14   A.  No what?

15   Q.  No official title company or anyone has informed you?

16   A.  No.

17   Q.  Okay.  And at the bottom of the lien, it indicates other

18   property that this is designed to attach to?

19   A.  Yes.

20   Q.  And as far as you know, what purports to be a lien has not

21   in any way attached to any of your other personal property?

22   A.  As far as I know, you're right.

23   Q.  You've not been informed by any entity that --

24   A.  No, I have not.

25   Q.  Okay.  Nothing further.  Thank you.
```

285

Brown - Direct

1          THE COURT:  Mr. Stump.

2          MR. STUMP:  No further questions.  Thanks, Judge.

3          THE COURT:  May the witness be excused permanently?

4          MR. STUMP:  Yes.

5          THE COURT:  Thank you, sir.

6          THE WITNESS:  Thank you.

7     (Witness excused.)

8          MR. STUMP:  Your Honor, the United States calls Judge

9     Geraldine Soat Brown.

10     (Brief pause.)

11          THE CLERK:  Please raise your right hand.

12     (Witness duly sworn.)

13          GERALDINE BROWN, GOVERNMENT'S WITNESS, SWORN

14                    DIRECT EXAMINATION

15     BY MR. STUMP:

16     Q.  Good morning.

17     A.  Good morning.

18     Q.  Would you start by telling us, please, your full name and

19     how to spell it for the record?

20     A.  My name is Geraldine Soat Brown.  G-e-r-a-l-d-i-n-e S-o-a-t,

21     Brown, B-r-o-w-n.

22     Q.  And do you go by -- both of the last names are Soat Brown?

23     A.  I go by Brown because Soat is my maiden name.

24     Q.  What do you do for a living?

25     A.  I'm the presiding magistrate judge of the United States

Brown - Direct

1    District Court for the Northern District of Illinois.

2    Q.  How long have you held that position?

3    A.  I've been a magistrate judge since the year 2000.  I was

4    appointed the presiding magistrate judge in 2012.

5    Q.  Can you explain to us sort of what the presiding magistrate

6    judge does by comparison to what you would normally have done as

7    a regular United States magistrate judge?

8    A.  Well, I do everything that I did as a magistrate judge, but

9    I also add some additional administrative duties.  I'm liaison

10   between the magistrate judges here in the Northern District of

11   Illinois and the district judges.  We have twelve magistrate

12   judges in the Northern District of Illinois, eleven in Chicago

13   and one in Rockford.

14          My role is to sit on certain court committees and to be

15   the leader of our twelve magistrate judges here.  For example, I

16   organize monthly meetings, I organize the criminal duty

17   schedule, and make other kinds of arrangements for my colleagues

18   to expedite the relationship between the district judges and the

19   magistrate judges.

20   Q.  How do you become a presiding magistrate judge?

21   A.  Well, you are appointed by the chief judge with the consent

22   of the other district judges.  Generally speaking, it's a matter

23   of rising up in seniority, although not every -- it hasn't been

24   automatically a matter of seniority.

25   Q.  And is it a term that you serve, or is it indefinite?

Brown - Direct

1    A.  It is a two-year term that is renewable once.  So, I began

2    to serve as the presiding magistrate judge in January 2012 and

3    was renewed again in January 2014.  So, my term will end in

4    January 2016.

5    Q.  As a United States magistrate judge, are you a judicial

6    officer of the United States?

7    A.  Yes, we are judicial officers.  We are judges.  We are part

8    of the judicial branch of the government, and we are employed by

9    the district court.

10   Q.  I want to show you what we've previously admitted as

11   Government's Exhibit 21.  This is an exemplification certificate

12   for a criminal case number.  Do you recognize the case number or

13   anything about the case in the document that I've just handed to

14   you?

15   A.  I recognize it as a docket for a criminal case.  This

16   criminal case is numbered 06 CR 778.  I recognize that there is

17   one entry that relates to me, which is docket entry number 63.

18   Q.  Thanks, Judge.  I want to put this on the big screen here.

19   You said it was docket entry 63?

20   A.  Yes.

21   Q.  All right.  Can you see that from where you're sitting?

22   A.  Yes, I can.

23   Q.  Could you read into the record what the docket text says

24   there next to number 63?

25   A.  Minute entry before the Honorable Geraldine Soat Brown as to

Brown - Direct

1    Devon Phillips.   Detention order previously issued in 06 CR 778

2    to stand.   And then there's yap, which indicates the initials of

3    the docket clerk that entered the minute order, and then entered

4    5 -- that is May -- 28th, 2008.

5    Q.  Aside from this one docket entry, did you have any other

6    involvement in this particular criminal case?

7    A.  Well, that docket entry reflects the task that I did on that

8    case.

9    Q.  And was it just the one task, though?

10   A.  Yes.

11   Q.  In other words, in preparation for your testimony today, did

12   you check to see if you had done anything else in the case?

13   A.  I did.

14   Q.  And did you, in fact, do anything else besides what is

15   notated here?

16   A.  I did not.

17   Q.  Tell us what your involvement was in this case.   What did

18   you do?

19   A.  Well, let me start by saying that when the magistrate judges

20   are on criminal duty, which is a duty that we take on a rotating

21   basis, we have certain tasks in preliminary felony proceedings.

22   So, for example, a couple weeks ago I had a week of criminal

23   duty, and then another magistrate judge had the next week, and

24   then someone else is on this week.

25           One of the tasks that we do when we're on criminal duty

Brown - Direct

```
 1    is to accept indictments that are returned by the grand jury.

 2    Under the statute the grand jury must return indictments in open

 3    court.  So, when we are on criminal duty, our responsibility is

 4    to accept those indictments.  My courtroom deputy is notified by

 5    the grand jury supervisor that the grand jury wants to return an

 6    indictment, and my courtroom deputy sets up a date and a time

 7    for that to happen.  And then when the foreperson of that grand

 8    jury comes into my courtroom, my courtroom deputy calls the --

 9    opens court and then says, in effect -- now, say, if it was a

10    grand jury sitting today -- in the matter of the special June

11    2014 grand jury, foreperson in open court presents two

12    indictments.

13         I would come on the bench.  I would greet the

14    foreperson of the grand jury.  I would say are you the

15    foreperson of the special June 2014 grand jury?  Yes.  And you

16    are tendering to me two indictments returned by the grand jury?

17    Yes.  I accept the grand jury's tender of two indictments.  And

18    I thank you and your fellow jurors for your faithful service to

19    the court and the people of the Northern District of Illinois.

20    And then court is adjourned.  The grand jury person returns to

21    the grand jury room.

22         My courtroom deputy will have already looked at the

23    papers to make sure that they're in proper order, that the

24    requisite number of signatures have been fixed on it, and then

25    after I've accepted it, my courtroom deputy stamps on it that
```

Brown - Direct

1    this indictment was returned in court on the record before

2    Magistrate Judge Geraldine Soat Brown, and then the docket clerk

3    puts an entry on the docket to reflect that fact.

4    Q.  And that's it?

5    A.  That's it.  In this particular case, this was a superseding

6    indictment, meaning the grand jury had already returned certain

7    charges against Mr. Phillips, and this was the grand jury

8    returning further charges against Mr. Phillips.  He had already

9    had an initial appearance and subsequent to that had a decision

10   about whether he was going to be held in custody or released on

11   bond.  At the time this superseding indictment was returned to

12   him, he was already -- had been ordered to be held in custody.

13   So, the entry that I made, the document that was entered with my

14   signature, reflected that the order of detention was to stand.

15   Q.  That's where it says detention order previously issued in

16   06 CR 778 to stand?

17   A.  Yes.

18   Q.  That's what that means?

19   A.  Yes.

20   Q.  So, just to be clear, was there a detention hearing then

21   held by you or presided over by you?

22   A.  No.

23   Q.  This was just to make sure the docket was clear that the

24   order that was previously in place would continue; is that

25   right?

Brown - Direct

1    A.   Correct.

2    Q.   I want to show you now what we've marked for admission and

3    been admitted as Government's Exhibit 13.11.  It's a one-page

4    document.  Ms. Brown, do you recognize this?

5    A.   I recognize it now.  I have seen it, yes.

6    Q.   Do you remember how this was first brought to your

7    attention?

8    A.   One of the marshals who works in judicial security brought

9    it to my chambers one day.  That was the first time I saw it.

10    Q.   What was your reaction when you saw this?

11    A.   Well, I was shocked.  I had no idea what this was about.  I

12    looked at it.  I looked at all the names there.  Chief Judge

13    Holderman, Patrick Fitzgerald, Judge Lefkow, the Clerk of the

14    Court.  I thought, well, I'm in good company here.  I realized

15    it had to relate to some kind of a court proceeding because

16    that's what I have in common with all those people.

17         But I was also very disturbed by it because I didn't

18    know what this was going to do.  I was disturbed that someone

19    would do this to harm me and harm my credit rating.  I didn't

20    know whether this would have financial impact for me in the

21    future, and I needed to discuss it with my husband because we

22    have -- most of our assets are jointly held and with my two

23    adult sons because if anything happened to me and they had to

24    handle my affairs, I wouldn't want them to be shocked by seeing

25    a one hundred billion dollar lien.

Brown - Direct

1   Q.  Has this document interfered with any transactions that
2   you've tried to do or has it come up in any way in any private
3   financial transactions?
4   A.  Not that I'm aware of.  We have not refinanced a house or
5   bought a house or had any additional lending since this was
6   recorded.
7   Q.  This name, Devon Phillips, when you saw this lien, did you
8   recognize that name?
9   A.  No, I did not.
10  Q.  And what about the case number?
11  A.  Well, I recognized it as likely indicating a criminal case
12  in this court.  So, it was a matter of going on the docket to
13  see what the criminal case was about.
14  Q.  Aside from that docket entry that we saw and what you
15  described to us as the accepting of the return of the
16  superseding indictment from the foreperson of the grand jury,
17  did you have any other involvement with Devon Phillips?
18  A.  No.
19  Q.  What about anyone in his family?
20  A.  No.
21  Q.  Do you owe Devon Phillips any money whatsoever?
22  A.  I do not.
23  Q.  I'm going to show you now what we've marked for
24  identification as Government's Exhibit 26.  This is a one-page
25  document.  Do you recognize that?

Brown - Direct

1    A.  Yes.

2    Q.  Can you tell the ladies and gentlemen of the jury what I

3    handed to you?

4    A.  It is a letter that arrived in my chambers in February 2013.

5    My courtroom deputy brought it in in an envelope that had been

6    addressed to me in my chambers, and that's the first time I saw

7    it.

8    Q.  Who does it appear to be from?

9    A.  It appears to be from Cherron Marie Phillips.

10           MR. STUMP:  Your Honor, at this time I'd move to admit

11   Government's Exhibit 26.

12           MS. SOLOMON:  No objection.

13           THE COURT:  26 admitted, no objection.

14      (Government's Exhibit 26 was offered and received in

15         evidence.)

16   BY MR. STUMP:

17   Q.  Judge Brown, when you got Exhibit 26 in the mail, what was

18   your reaction?

19   A.  Well, it came in through my courtroom deputy bringing it in.

20   Q.  Okay.

21   A.  I was disturbed by it because I knew that by this point

22   Ms. Phillips was the defendant in this case, and it was

23   disturbing to me that she would send this strange letter to me

24   personally in my chambers, that she would approach me

25   individually and get as far as into my chambers with a

Brown - Direct

1    communication from a criminal defendant.

2    Q.  Aside from your knowledge of this particular case in which

3    you're now testifying, did you know the name Cherron Marie

4    Phillips from any other context?

5    A.  No.

6    Q.  Have you ever had any interactions with her in person?

7    A.  No.

8    Q.  What did you do after you received this letter?

9    A.  I called the deputy marshal who is in charge of judicial

10   security, informed him that I had received a letter relevant to

11   this case, and he came down and took it.

12   Q.  Thank you.  That's all my questions.

13          THE COURT:  Ms. Solomon.

14                         CROSS EXAMINATION

15   BY MS. SOLOMON:

16   Q.  Good morning, Judge Brown.

17   A.  Good morning.

18   Q.  My name is Lauren Solomon, and I'm representing Cherron

19   Phillips in this matter, and I have a few questions for you.

20          Let's start with the letter that you received.  And

21   that's dated February 21st, 2013?

22   A.  It is dated that, yes.

23   Q.  Okay.  And that was quite a number of years after you had

24   whatever brief involvement you had with the Devon Phillips case?

25   A.  I believe that's right.

Brown - Cross

1    Q.  And you said that you were shocked by it; is that right?

2    A.  I said -- I think I said I was disturbed by the letter.  I

3    was shocked by the lien.  I was disturbed by the letter.

4    Q.  Okay.  It's not uncommon for judges to receive letters from

5    defendants or their family members; isn't that correct?

6    A.  Well, I wouldn't necessarily agree with that.  For one

7    thing, I don't have this case.

8    Q.  So, what's uncommon about it is that it came from a case

9    that you weren't involved in?

10   A.  What's uncommon about it is the fact that this Ms. Phillips

11   was a defendant in a case in which I was one of the victims

12   named in the charges.  That's what's uncommon, for a -- I've

13   never heard of a situation in which a defendant sent a letter

14   directly to a victim named in the charges.  I've never heard of

15   it.

16   Q.  It's common in criminal cases, for example in sentencing, to

17   receive letters from the defendant?

18   A.  When I am the sentencing judge, you do invite communications

19   from the defendant.  In fact, the sentencing protocols require

20   you to ask the defendant, my understanding, if the defendant has

21   any comment about sentencing.  From time to time when you're

22   doing sentencing, you will get letters from the defendant or the

23   defendant's family or friends asking for some leniency or

24   something like that, but that's in a situation in which there's

25   a context, there's a formal context for that.  I'm the judge

Brown - Cross

1    who's presiding.  I'm going to be making a decision.  People
2    approach me to have their input into the question of sentencing.
3    In that context victims usually have a similar right to do it.
4    This was not at all in that context.
5    Q.  But in that context it is common for judges to receive
6    letters from defendants and their family members?
7    A.  It's not unheard of.  When you're a sentencing judge, that's
8    a very different thing from this situation.
9    Q.  It's part of the normal process of sentencing is family
10   members and defendants are invited to write letters to the
11   judge.  The defendant is invited to make a statement about the
12   defendant's version, for example.
13   A.  It happens, yeah.
14   Q.  And that frequently comes in through a letter to the judge.
15   A.  It can happen that way.  This is not that context.
16   Q.  I understand, but I'm just focusing for the moment on the
17   context of a sentencing proceeding in a criminal case.  Family
18   members also write letters on behalf of the defendant.
19   A.  They do.
20   Q.  And employers, friends also may write letters to a judge in
21   support of that defendant?
22   A.  They do.
23   Q.  And sometimes there's also -- more commonly in a criminal
24   case in front of you as a magistrate judge, there might be
25   letters from family or friends or bosses supporting a bond

Brown - Cross

1    petition or in the context of a detention hearing?

2    A.   Not very often in detention hearings.  Usually, the

3    detention hearing you have a proceeding in which the pretrial

4    service officer presents a recommendation, and the defense

5    attorney and the U.S. Attorney discuss whether that's feasible,

6    or there's pros or cons.  If there is someone who is going to be

7    a custodian or put up some financial security, that person will

8    come forward, but they don't usually make some kind of argument

9    on behalf of the defendant.

10   Q.   But it could be possible in a case that, for example, an

11   individual says I have a job, and here's a letter from my boss

12   that is proof of that job.  So, if you release me, I will have

13   employment.

14   A.   That could happen.

15   Q.   That could happen.  Okay.

16         Now, in this case you indicated that you were not the

17   magistrate judge on duty when this case came into the court?

18   A.   That's right.

19   Q.   And looking at docket entry number 61, you didn't have any

20   independent recollection of that particular proceeding; is that

21   right?

22   A.   I'm not sure I understand the question.

23   Q.   Before you reviewed the docket in preparation for your

24   testimony today, did you have any independent recollection of

25   the Devon Phillips case?

Brown - Cross

1    A.  No.  I mean, I reviewed it when I got the -- I reviewed the
2    docket when I received the lien to see what contact I might
3    possibly have had in this case.  So, it was earlier than just in
4    review of testimony for today.
5    Q.  But prior to that time there was nothing about docket entry
6    number 61, superseding indictment returned, that was in any way
7    memorable or apart from other cases that you do?
8    A.  That's correct.
9    Q.  And you very nicely described the exact proceeding that
10   occurs when there is an indictment that's returned in your
11   courtroom, and it seemed like that whole procedure as you
12   described it took about a minute and a half.  Would that be
13   about accurate?
14   A.  That's probably right.
15   Q.  Right.  Okay.  So, it's a pretty quick procedure.  There's
16   other people involved.  Your courtroom deputy is involved; is
17   that right?
18   A.  She has a function of taking -- literally taking the papers
19   out of the hands of the foreperson and going through them to
20   make sure that all the papers are in the right order and so on
21   and that the requisite number of grand jurors have, in fact,
22   signed the indictment.  Her name is not associated with that
23   case.  My name is.
24   Q.  No, your name is.  Of course.
25   A.  Right.

Brown - Cross

1    Q.  But she actually does the review of it, and she hands it to

2    you, and then you sign it?

3    A.  She hands it -- she hands it back to the foreperson.  The

4    foreperson hands it back to me.

5    Q.  Okay.

6    A.  I usually take a quick look through it myself, and then

7    there's a stamp.  Stamps my name on it.

8    Q.  Okay.  And you said that this was a superseding indictment?

9    A.  Right.

10   Q.  And so, that means that there were some kind of charges

11   brought before this?

12   A.  That's right.

13   Q.  And you said that since it was superseding, it meant that

14   there were further charges?

15   A.  That's generally what superseding means is that there are

16   additional or different charges that are being brought.  It

17   supersedes the indictment that was previously entered.

18   Q.  Which means it replaces it, basically?

19   A.  Right.

20   Q.  Okay.  And you just clarified that it could also just be

21   different charges.  It doesn't necessarily mean there's

22   additional charges.

23   A.  Well, it would be very unusual to have a superseding

24   indictment that didn't carry forward the additional charges in

25   some format.  I mean, what you're doing is you're not starting a

Brown - Cross

1    new case.  What you're doing is taking a case in which certain

2    charges have been brought and adding -- in most cases, adding

3    additional charges to it.  I do not recall -- I didn't look to

4    see exactly what -- you know, before today, didn't look to see

5    exactly what the difference between the initial indictment in

6    Mr. Phillips' case and the one I accepted was.

7    Q.  So, you have no independent knowledge if that was true.

8    A.  I don't know what the difference between the original

9    indictment was and the superseding indictment as I sit here

10   today, but that would be a matter of public record.  You could

11   go and look at the original indictment, then look at the

12   superseding indictment, and compare the two, and you could

13   figure it out.  But I have not done that for today, no.

14   Q.  No.  And then the second entry on the docket sheet is docket

15   entry number 63?

16   A.  Yes.

17   Q.  And that's a minute order entry.  And a minute order entry

18   is just essentially what's written on the entry?

19   A.  Right.

20   Q.  And that indicates that there was no court appearance at

21   that time.

22   A.  Not by Mr. Phillips, no.

23   Q.  No.  It wasn't an arraignment --

24   A.  No, no.  It was not an arraignment.

25   Q.  -- or anything of that nature?

Brown - Cross

1    A.  No.

2    Q.  All it was was your entering a written order saying that the

3    detention order was to stand?

4    A.  Yes.

5    Q.  Okay.  So, as far as you know, you never had any contact

6    with Mr. Phillips whatsoever?

7    A.  That's correct.

8    Q.  And as far as you know, you never had any contact with

9    Ms. Phillips, either?

10   A.  That's correct.

11   Q.  Now, with respect to the purported lien that's Government's

12   Exhibit 13.11, there is an indication next to the amount,

13   there's another box, and it has property that's listed.  And as

14   far as you know, there was never any kind of -- I think you

15   testified to the fact that there was never any impact, or, as

16   far as you know, no lien was ever placed on any real property

17   that you own?

18          MR. STUMP:  I'm going to object to the form of the

19   question whether a lien was placed on the property.

20          THE COURT:  Do you understand the question?

21   BY THE WITNESS:

22   A.  Well, could you rephrase that again?

23          THE COURT:  Sustained.

24   BY MS. SOLOMON:

25   Q.  You were never informed by a title company that a lien was

Brown - Cross

1    recorded against your property?

2    A.  We haven't gotten any affirmative notification, but we

3    haven't done any transactions to take out any additional

4    mortgage or any additional indebtedness, either.

5    Q.  You haven't reviewed your title on your real property?

6    A.  No, I have not.

7    Q.  And there was no notification from any title company that a

8    lien was recorded?

9    A.  I have not received a notification.  That's correct.

10   Q.  The only notification that you received was being shown this

11   Government's Exhibit 13.11 by someone in the courthouse?

12   A.  That's right.

13   Q.  And you've not tried to sell or buy any property?

14   A.  That's correct.

15   Q.  Since the time of 2011?

16   A.  That's correct.

17   Q.  Okay.  And with respect to the other property that is

18   listed, there's a long list of property there.  As far as you

19   know, no lien has ever been attached to any of these other

20   properties that are listed?

21   A.  Well, I don't know what the effect of this lien is.  That's

22   one of my concerns.  I really don't know what the effect of

23   recording something like this has on any of your other

24   interests.  I don't know the answer to that question.

25   Q.  The question is:  As far as you know, have you ever received

Brown - Cross

1   any information from any source whatsoever that a lien or
2   encumbrance has been placed on any property that you own?
3   A.  Have I received an affirmative notification other than this
4   that any property that I have was encumbered by this lien.  I
5   have not gotten any additional notification, no.
6   Q.  And have you had any difficulty with any of the property
7   that you may have that's listed on there related to a lien or
8   encumbrance that might have been attached to it?
9           For example, have you -- you use your bank accounts.
10  Has there been any indication that you can't use your funds
11  because the bank has notified you that you have a hundred
12  billion dollar lien against your bank account?
13  A.  No, that has not happened.
14  Q.  And as far as you know, you have never received any
15  information with respect to any other bank accounts you may
16  have, any other accounts.  I assume you don't have farm
17  equipment, but maybe --
18  A.  No, I don't have any farm equipment.
19  Q.  Okay.  As far as you know, you have not received any
20  notification from any source at all about any potential hundred
21  billion dollar lien?
22  A.  Other than this, I have not received any other affirmative
23  notification from any other source about this lien.
24  Q.  Thank you.
25          THE COURT:  Mr. Stump.

Brown -

```
 1              MR. STUMP:  No further questions, your Honor.
 2              THE COURT:  I just have one to try to clarify things,
 3    and I don't know if you can help, Judge Brown.  It's really a
 4    real property issue.  When someone files a lien involving real
 5    property, the title company doesn't notify you about that until
 6    you go to sell the property; is that correct?
 7              THE WITNESS:  That's my understanding.  It can be on
 8    your title without your ever knowing it until you go to do a
 9    title search pursuant to your effort to try to sell the
10    property.
11              THE COURT:  Okay.
12              THE WITNESS:  And we have not tried to sell any
13    property since this lien was registered.
14              THE COURT:  Okay.  Now, if you wanted to, you could go
15    engage a title company, ask them to do a commitment for title,
16    run the search, but you'd have to pay for that.
17              THE WITNESS:  That's right.
18              THE COURT:  Okay.
19              THE WITNESS:  We have not done that.
20              THE COURT:  Okay.  Follow-up based on the court's
21    questions?
22              MR. STUMP:  Not from the United States, your Honor.
23              THE COURT:  Ms. Solomon?
24              MS. SOLOMON:  I would just have.
25
```

Brown - further cross

```
 1                    FURTHER CROSS EXAMINATION
 2    BY MS. SOLOMON:
 3    Q.  You indicated that you could do a search through the title
 4    company, but you have not.  And is that just because you are not
 5    selling the property or because you don't think that this lien
 6    is really on there?
 7    A.  Well, that's kind of a compound question there, but we
 8    haven't -- I didn't incur the expense of running a title search
 9    because we are not currently interested in selling any real
10    property.
11    Q.  Okay.  Thank you.
12               THE COURT:  May the witness be released permanently?
13               MS. SOLOMON:  Yes.
14               MR. STUMP:  Yes, your Honor.
15               THE COURT:  Thank you, Judge.
16         (Witness excused.)
17               THE COURT:  Why don't we take a 20-minute break, folks.
18    We did 15 yesterday.  We'll do 20 today, in case any of you need
19    to go downstairs.
20         (Brief recess.)
21               THE COURT:  Okay.  Please be seated.  Please swear the
22    next witness.
23               MR. STUMP:  Your Honor, the United States calls Karl
24    Barnes.
25               THE CLERK:  Would you please rise and raise your right
```

Barnes - Direct

1    hand?

2         (Witness duly affirms.)

3              THE COURT:  Thank you.  Please be seated.  Mr. Stump.

4              KARL BARNES, GOVERNMENT'S WITNESS, SWORN

5                        DIRECT EXAMINATION

6    BY MS. SOLOMON:

7    Q.  Sir, could you tell us your full name and spell it, please?

8    A.  Karl with a K, a-r-l.  You want my middle name, too?

9    Q.  It's fine.

10   A.  The middle or just the initial?

11   Q.  Whatever you're comfortable with.

12   A.  Okay.  D and last name is Barnes, B-a-r-n-e-s.

13   Q.  Mr. Barnes, what do you do for a living?

14   A.  I work at Ford Motor Company.

15   Q.  What do you do for Ford?

16   A.  I work in quality control.

17   Q.  How long have you had that job?

18   A.  23 years as of today.

19   Q.  In what city and state do you work?

20   A.  Chicago, Illinois.

21   Q.  Do you live in Chicago, as well?

22   A.  Yes, I do.

23   Q.  I want to show you what's been marked and admitted now as

24   Government's Exhibit 30.

25   A.  Okay.

Barnes - Direct

1   Q.  It's an envelope on the outside, and there's some documents

2   on the inside.  Would you mind opening up what's in there?  And

3   after you've had a chance to look at it, let me know if you

4   recognize what I handed to you.

5   A.  Yes.

6   Q.  What did I hand to you?  What is this?  What did I show you?

7   A.  A packet of envelopes that was mailed.

8   Q.  All right.  And how do you recognize this?  How have you

9   seen it before?

10  A.  Because I signed my name to it.

11  Q.  You see your signature on the document?

12  A.  Correct.

13  Q.  All right.  Let me show you -- you're looking at the first

14  page of the documents; is that right?

15  A.  Correct.

16  Q.  The signature at the bottom of the page, is that your

17  signature?

18  A.  Correct.

19  Q.  And underneath it it says notary public.  Do you see that?

20  A.  Yes, sir.

21  Q.  Are you, in fact, a notary public?

22  A.  I am.

23  Q.  And the date here is February 27th, 2011.  Is that the date

24  you signed it?

25  A.  Yes, sir.

Barnes - Direct

```
1    Q.  And were you at that time a notary public?

2    A.  Correct.  Yes, sir.

3    Q.  This box right here, can you just tell us what this is?

4    A.  That's the seal that a notary public must have, and I sealed

5    the document where it says seal where I notarize.

6    Q.  And here it says seal.  That's what you're referring to?

7    A.  Yes, exactly.

8    Q.  Tell us, if you wouldn't mind, what is a notary public.

9    What do you actually do?

10   A.  A notary public just basically is like a state witness of

11   verifying who a person is.

12   Q.  How do you become a notary?

13   A.  You file filing -- well, you file an application with the

14   county or the -- the state, and then also you pay a fee, and

15   then you get insurance.

16   Q.  You get insurance?

17   A.  Yes.

18   Q.  What kind of insurance?

19   A.  Like a bonding insurance.

20   Q.  What's that for?

21   A.  In case you do something wrong.

22   Q.  And do you have to have any sort of specialized training to

23   become a notary?

24   A.  No.  I know with the recent real estate stuff, they had an

25   additional packet of information that go out to inform us a
```

Barnes - Direct

```
 1   different process on real estate transactions, but that was it.
 2   Q.  And do you serve as a notary public for a certain amount of
 3   time, or is it indefinite?
 4   A.  Yes.
 5   Q.  What's the term?
 6   A.  Maybe three or four years.  I'm not certain.
 7   Q.  All right.
 8   A.  So, it might have been --
 9   Q.  This one says my commission expires May --
10   A.  Yes, sir.  It might have been four years.  Yeah, four years.
11   Q.  All right.  And I see this expiration date is actually just
12   a little more than a month ago?
13   A.  Correct.
14   Q.  Did you renew since then?
15   A.  I'm in the process of renewing.
16   Q.  Now, do you recall who it was that presented this document
17   to you to sign?
18   A.  Yes.
19   Q.  And who brought that to you?
20   A.  River Tali.
21   Q.  Do you know River Tali?
22   A.  Yes, I do.
23   Q.  How do you know her?
24   A.  We grew up together.
25   Q.  And did River Tali present you with everything that's in
```

Barnes - Direct

1    here?

2    A.  Yes.

3    Q.  Do you see her in the courtroom today?

4    A.  Yes, I do.

5    Q.  Could you describe for the ladies and gentlemen of the jury

6    what she's wearing?

7    A.  Yes.  She's wearing a long black dress or skirt, a purple

8    top, and a blue head covering.

9    Q.  All right.

10          MR. STUMP:  I'd ask the court to take notice that the

11   witness has identified the defendant.

12          THE COURT:  So noted.

13   BY MR. STUMP:

14   Q.  Now, you say you've known her since childhood?

15   A.  Yes.

16   Q.  How did you know her when you were kids?

17   A.  I guess before we were born, our families knew each other.

18   So, by them knowing each other, we just grew up knowing each

19   other.

20   Q.  Did you live in close proximity to one another growing up?

21   A.  Yes, about a block and a half away, a block away.

22   Q.  Did you ever know her to go by any other names besides River

23   Tali?

24   A.  Yes.

25   Q.  What other names do you know her to go by?

Barnes - Direct

1    A.   Cherron Phillips.

2    Q.   Did you know people in her family, as well?

3    A.   Yes.

4    Q.   Do you know if she has a brother?

5    A.   Yes.

6    Q.   What's his name?

7    A.   Wayne Phillips.

8    Q.   She has a brother named Wayne Phillips?

9    A.   Yes.

10   Q.   Does she have any other brothers?

11   A.   Yes.

12   Q.   What are their names?

13   A.   Devon Phillips.

14   Q.   Devon Phillips?

15   A.   Yes.

16   Q.   Now, I want to ask you about this packet here.  I'm flipping

17   the pages because what I want to find is the first time here

18   that you've signed underneath the signature of River Tali.  Do

19   you see that?

20   A.   Yes, sir, I do.

21   Q.   And what is the significance of your signature right here?

22   And that is your signature, right?

23   A.   Correct.

24   Q.   What's the significance of that when you signed that?

25   A.   I'm acknowledging that the person who signed before me is

Barnes - Direct

1   the person who signed period.

2   Q.  Do you -- before you sign something like this, do you review

3   the contents of what it is that you're signing?

4   A.  No, they tell us, and it's in the notary book, you're not an

5   attorney.  So, don't try to figure out what's in it.  I mean,

6   you're just supposed to notarize stuff.

7   Q.  Okay.  So, this one, this common law affidavit of 24-hour

8   demand of release, did you read any of this before you signed

9   it?

10  A.  No.  Most of the time when I notarize things, people have

11  one of those memo things that they put where you need to

12  notarize stuff at.

13  Q.  And aside from your signature, what did you do to make it a

14  document officially notarized?

15  A.  I stamped it.

16  Q.  And is that what we see here where it says affix seal?

17  A.  Correct.

18  Q.  And then did you date it, as well, here?

19  A.  Yes, I did.  Sorry about the illegibility.

20  Q.  When we see your signature and the date and this seal

21  throughout this document, did that all come from you?

22  A.  Correct.  It should if that's my signature.  Yeah.

23  Q.  Let me flip through it.

24  A.  Okay.

25  Q.  And for the record, I'm just flipping through some pages

Barnes - Direct

1    here.

2    A.  Yes, that's me.

3    Q.  Okay.  So, around maybe the 12th page in, that's your

4    signature there?

5    A.  Correct.

6    Q.  All right.  And you see the signature here.  It appears to

7    say River Tali.  Do you see that?

8    A.  Yes.

9    Q.  Every time we see that signature --

10   A.  Yes.

11   Q.  -- was it always the same person that was signing in your

12   presence?

13   A.  Yes.

14   Q.  And was it always the defendant here?

15   A.  Correct.

16   Q.  I'm going to flip through just a few more.  This is one

17   right here.  We're about maybe 20, 21 pages in.  Is that your

18   signature there?

19   A.  Yes, sir.

20   Q.  And this signature right here, is that the same person, the

21   defendant, who signed in your presence?

22   A.  Yes.

23   Q.  This POA here, is that a term that you're familiar with?

24   A.  No.

25   Q.  As I'm flipping through, is your testimony the same that for

Barnes - Direct

1    all of these documents as we're flipping through them that you

2    didn't read any of them before you signed them?

3    A.  No.  Only basically where it says notary public or, you

4    know, it's my signature.

5    Q.  Okay.  This is -- we're about 31 pages in.  You see your

6    signature here.  And I'm going to scoot back to say the title of

7    this document.  This appears to be called affidavit of notice of

8    secured party.  Do you see that?

9    A.  Correct.  Yes, I do.

10   Q.  All right.  And at the top of the page appears to be a

11   reference to case number 06 CR 778.  Do you see that?

12   A.  Yes.

13   Q.  And there's some names here at the top, and it says versus,

14   and then it's got a name here and an address.  Did you have any

15   familiarity with the contents of this document when you signed

16   it?

17   A.  No, sir.

18   Q.  Do you personally know any of the people that are listed

19   here at the top part above the BS?  It's Joan Humphrey Lefkow,

20   Thomas Shakeshaft, or Marty Zimmerman?

21   A.  No, I do not.

22   Q.  All right.  The next page after that signature page is a

23   document that's addressed to a Michael W. Dobbins.  Do you see

24   that?

25   A.  Yes, I do.

Barnes - Direct

1   Q.  And the date here, September 7th, 2010, do you see that?

2   A.  Yes.

3   Q.  Now, here what I see is your signature.  Do you see your

4   notary seal anywhere on this page?

5   A.  No, because I didn't see seal to be signed.

6   Q.  All right.

7   A.  I mean, stamped.  Sorry about that.

8   Q.  Is it your practice as a notary to sometimes sign documents

9   without stamping them?

10  A.  Not for stuff that don't need to be notarized.

11  Q.  Well, what about this document then?  Is that your

12  signature?

13  A.  Yeah, that's my signature.

14  Q.  Why did you sign this document or in what capacity?

15  A.  Well, I signed it, but I didn't -- I signed it because one

16  of those label things were there.

17  Q.  Say that -- what is a label thing?

18  A.  Post-It.  A clear Post-It thing that be tabbed on the end of

19  paper.

20  Q.  Does it say something on the Post-It?

21  A.  No.

22  Q.  Okay.

23  A.  Just an indication of where I sign.

24  Q.  Where you're supposed to sign?

25  A.  Exactly.

Barnes - Direct

1    Q.  So, did you read this document then before you signed it?

2    A.  No.  I just -- where my post office box were because I think

3    it was explained at the time something might come to me in my

4    post office box and would I mind.  So, I said no.

5    Q.  Is that your post office box right here?

6    A.  Yes, it is.

7    Q.  For all of these documents that we've looked at that are

8    contained in this one exhibit, were they all presented to you by

9    the defendant?

10   A.  Yes.

11   Q.  When you're a notary, do you require a person to present ID

12   to you?

13   A.  Not -- the law says not if you're personally known to them,

14   that you know them personally.  Sorry about that.

15   Q.  Did you ask the defendant to provide you with ID before you

16   signed these for her?

17   A.  No, because I personally know her.

18   Q.  Now, the very front page here of the exhibit says affidavit

19   of notary presentment, certificate of mailing, and it says that

20   on this 27th day of February 2011 for the purpose of

21   verification, I, the undersigned notary public, etc., etc., do

22   certify that the following documents listed below were presented

23   to me, and I, the below signed notary, personally verified that

24   these documents were placed in an envelope and sealed by me, and

25   then it says sent by registered mail.  Is that all true and

Barnes - Direct

```
1    correct, that you personally verified that the documents here
2    were placed in an envelope and sealed?
3    A.   No.
4    Q.   Okay.  So, did you read this document, this first page,
5    before you signed at the bottom and sealed?
6    A.   No, I didn't.
7    Q.   Do you know anything about how this package was mailed?
8    A.   I mean, other than I see it's through the post office.
9    Q.   I mean, did you have any involvement in the mailing of this
10   package, do you remember?
11   A.   No, sir.  No, sir.  Not that I recall.
12   Q.   That's all the questions I have.  Thanks.
13            THE COURT:  Ms. Solomon.
14                       CROSS EXAMINATION
15   BY MS. SOLOMON:
16   Q.   Good morning, Mr. Barnes.
17   A.   How you doing today.
18   Q.   I'm doing well.  Thank you.
19            My name's Lauren Solomon, and I represent Ms. Phillips
20   in this matter.  So, I'm just going to ask you a few questions,
21   kind of a follow-up to the government.
22   A.   Okay.
23   Q.   So, let's start with the first page.  That's where we ended.
24   A.   Okay.
25   Q.   So, at the top of this document, it says on this 27th day of
```

Barnes - Cross

1    February 2011 for the purpose of verification, I, the

2    undersigned notary public, and it goes on.  The government

3    already read it.  And then at the bottom you signed it?

4    A.  Correct.

5    Q.  Would that be a normal thing for you to do, to be actually

6    mentioned in the document and then not read it and then sign it

7    saying that you notarized it?

8    A.  Like my name printed in the document?

9    Q.  Right.  Because this I would assume ordinarily --

10   A.  Normally, people bring things that have like spaces, like --

11   Q.  They bring documents that are unrelated to you?

12   A.  Exactly.

13   Q.  And then you just serve as a notary?

14   A.  Exactly.

15   Q.  So, this one is --

16   A.  Because normally I can't notarize nothing that's --

17   Q.  That you're named in.

18   A.  Yeah, exactly.  Exactly.

19   Q.  Because it would be like --

20   A.  A conflict of interest.

21        THE REPORTER:  One at a time.

22        MS. SOLOMON:  Sorry.

23        THE WITNESS:  I'm sorry.

24   BY THE WITNESS:

25   A.  It would be a conflict of interest.

Barnes - Cross

1    BY MS. SOLOMON:

2    Q.  Because you can't be a witness --

3    A.  To myself.

4    Q.  -- to yourself.  Okay.  That's part of your job as a notary.

5    A.  Correct.

6    Q.  Okay.

7    A.  It benefits to others, but not myself.

8    Q.  So, this page is unusual --

9    A.  Yes.

10   Q.  -- because it names you as the -- it names you as the

11   undersigned notary, and then your signature appears at the

12   bottom.

13   A.  Yes.

14   Q.  Okay.  And also you indicated that you didn't actually mail

15   that?

16   A.  No, I don't recall.

17   Q.  So, then this document -- this page would be untrue?

18   A.  Correct.

19   Q.  Okay.  Now, in looking through the document, there appears

20   to be other notaries on some of the pages?  So, on this page

21   there's three other notaries?

22   A.  Um-hm.

23   Q.  And none of them are you?

24   A.  No.

25   Q.  And so, you don't recall ever having seen that, since you

Barnes - Cross

1   didn't look through any of the documents?

2   A.  Exactly.

3   Q.  Okay.  It also appears that from the dates on these

4   documents that they were prepared on different dates?

5   A.  Yes.

6   Q.  So, this one's dated February 1st, and this one, for

7   example, is dated February 8th.  Okay.

8   A.  (Nodding.)

9   Q.  So, there were not other notaries who were also there --

10  A.  No.

11  Q.  -- sealing these documents at the same time that you were

12  notarizing?

13  A.  No.  No, ma'am.

14  Q.  Now, you indicated that you have full time employment?

15  A.  Yes, ma'am.

16  Q.  And you work for Ford Motor Company?

17  A.  Yes.

18  Q.  And you are a notary sort of as a side job?

19  A.  No.  It's just I became a notary because black people don't

20  prepare for deaths, and the State of Illinois is a probate

21  state.  And I get tired of my people, black people,

22  African-Americans, whatever you want to call them, not preparing

23  to leave their property to their children.  And so, I became one

24  as a -- kind of not a service, but to be a tool to be used for

25  that purpose.

Barnes - Cross

1    Q.  That's very nice of you.

2    A.  Yeah.

3    Q.  So, you do this mostly for friends?

4    A.  Yeah.  Yeah, I don't advertise.

5    Q.  And people in the neighborhood?

6    A.  Exactly.

7    Q.  And so, when River Tali or Cherron Phillips came to you and

8    asked you to notarize, you did it as a favor to her?

9    A.  Yeah.  No problem, yeah.

10   Q.  Now, at some point when you first knew Ms. Phillips, she

11   went by the name of Cherron Phillips?

12   A.  Correct.

13   Q.  And at some time did she legally change her name?

14   A.  Yes.

15   Q.  And from that time on she was River Tali?

16   A.  Exactly.

17   Q.  Okay.  And you said you grew up with her?

18   A.  Yes.

19   Q.  So, you didn't need to see any identification?

20   A.  No.  I knew who she was.

21   Q.  And that's part of the rules?

22   A.  Yes, exactly.  I mean, if they personally known to you.

23   Q.  Okay.

24   A.  Because the key is you identify who that person is.  If you

25   don't -- like anybody in here, you all would have to show me ID,

Barnes - Cross

1    and they'd show us which ID to use to verify the person.

2    Q.  Okay.  And are there specific -- are they supposed to be

3    state-issued identification?

4    A.  Well, I guess yes, but no, because you could use passports.

5    Q.  As long as it has a photo?

6    A.  Yes.  Exactly.

7    Q.  So, some kind of government issued identification?

8    A.  Exactly.

9    Q.  And you indicated that your current -- you currently don't

10   have a -- your current notary is --

11   A.  Is inactive or -- yeah.  Yeah.

12   Q.  So, you're not doing that at the present time?

13   A.  Not currently.

14   Q.  But when you renew it, then you'll start again?

15   A.  Exactly, yes.

16   Q.  And you said that you're not in the habit of reading

17   documents?

18   A.  They tell us in the book don't -- you're not an attorney.

19   So, I just kind of preface that in my mind, one, to kind of stay

20   out of people's business, and then, two, I'm not an attorney.

21   So, I can't advise them on nothing because I don't have no

22   knowledge of that.

23   Q.  And do people who -- you said you do this for people who

24   don't ordinarily prepare for their deaths.  Do those people

25   generally have an attorney who helps them before they come to

Barnes - Cross

1   you?

2   A.  I don't know.  They just want me to notarize.  I mean, are

3   you saying is the attorney before me?

4   Q.  Yes.

5   A.  No.

6   Q.  So, you're just assuming they know what they're doing?

7   A.  Exactly.

8   Q.  Okay.  And is that what you assumed with Cherron, that she

9   had -- either she or someone else had prepared these documents?

10  A.  Yes.

11  Q.  And you don't know who?

12  A.  No, I don't know who.

13  Q.  That wasn't a question you asked?

14  A.  Yeah.  No.  It's not my -- no.

15  Q.  And you didn't ask her anything about the contents of the

16  documents?

17  A.  No.

18  Q.  And you didn't ask her about who it was being mailed to?

19  A.  No.

20  Q.  And you said it was unusual.  You ordinarily don't mail

21  documents for the people you prepare?

22  A.  No.

23  Q.  Or you notarize something.

24  A.  No.

25  Q.  And you did it in this case as a favor?

Barnes - Cross

1    A.   No, I don't recall.

2    Q.   Oh, you don't recall at all that you even mailed it?

3    A.   Exactly.  Exactly.  I mean, I would, but I don't recall.

4    Q.   You don't recall it?

5    A.   Correct.

6    Q.   Okay.  About how many times do you notarize documents in,

7    say, a given month?

8    A.   One.

9    Q.   So, you don't do it very often?

10   A.   I don't do it very often because I don't advertise or

11   nothing.  You know, even though I get subscriptions to different

12   notary publications and stuff, I just haven't I guess marketed

13   being a notary.

14   Q.   Okay.  And how long have you been a notary?

15   A.   I think since before 2008.  Maybe 2004 was my first

16   expiration.

17   Q.   Okay.

18   A.   So, it might have been like 2001 or something like that.

19   Q.   Okay.  And you were asked about this document by Mr. Stump,

20   and this is a letter to Mr. Dobbins?

21   A.   Yes, I see that.

22   Q.   Okay.  Now, did you read this letter before you signed it?

23   A.   No, I didn't.

24   Q.   But you weren't signing it as a notary?

25   A.   No.  I see, no, because I didn't stamp it.

1325

                              Barnes - Cross

1   Q.  Okay.  So, you didn't know who Mr. Dobbins was?

2   A.  No, I did not.

3   Q.  And Ms. Phillips didn't tell you anything about the

4   document?

5   A.  No.  It just was a thumbtack -- I mean a Post-It note.

6   Q.  A Post-It?

7   A.  Yeah, and I just signed it.  And I didn't see no place for

8   no stamp.  So, I just kept off.

9   Q.  Okay.  Because it didn't have the language on the bottom --

10  A.  Yeah, exactly.

11  Q.  -- that it normally has?

12  A.  The seal.

13  Q.  Right.

14  A.  Exactly.

15  Q.  Okay.  And the CC at the bottom, what is --

16  A.  That's my post office box.

17  Q.  Okay.  Oh, that's the -- I'm sorry.

18  A.  Oh, I'm sorry.

19  Q.  The CC here.

20  A.  Oh, her hand was in the way or is in the way.  Still in the

21  way.  Sorry.

22  Q.  Can you see it now?

23  A.  Yes, I do.

24          THE COURT:  Feel free to stand up if you need to.

25          THE WITNESS:  Oh, okay.  Thank you.

                              Barnes - Cross

 1    BY THE WITNESS:

 2    A.  Yes, I see it.

 3    BY MS. SOLOMON:

 4    Q.  Okay.  So, it says CC, and there's three individuals who are

 5    listed there?

 6    A.  Yes.

 7    Q.  And you don't know who those are, either?

 8    A.  No.

 9    Q.  And Ms. Phillips didn't tell you?

10    A.  No.

11    Q.  And so, you signed your name?

12    A.  Yes.

13    Q.  You didn't prepare the letter?

14    A.  No.

15    Q.  Okay.  But you don't know who prepared it?

16    A.  No.

17    Q.  Okay.

18            MS. SOLOMON:  Nothing further.

19            THE COURT:  Mr. Stump.

20            MR. STUMP:  Brief redirect.

21                         REDIRECT EXAMINATION

22    BY MR. STUMP:

23    Q.  Mr. Barnes, every time in this exhibit in Exhibit 30 that we

24    see the signature River Tali followed by your signature and your

25    seal, was that always this defendant who signed in your

Barnes - Redirect

```
1    presence?
2    A.  Yes.
3    Q.  There's a fingerprint here.  Do you see that?
4    A.  Yes.
5    Q.  Do you know anything about how that fingerprint got there?
6    A.  I'm assuming she did it because I just -- when she signed
7    it, then I signed it.
8    Q.  Did you witness her signing the document?  I mean --
9    A.  Yes.
10   Q.  -- did you ever see her --
11   A.  Yes.
12   Q.  -- signing?  And did you see her place the fingerprint
13   there?
14   A.  No, I don't recall.
15   Q.  You don't recall?
16   A.  No.
17   Q.  Okay.
18   A.  Because I think if it -- well, I ain't going to get into
19   that.  No, but I was going to say if it's stamped or whatever,
20   it would be on the previous page.
21   Q.  What do you mean?
22   A.  Whatever that was, the stamp, because I'm going through
23   documents where those thumb stamps is and signing, stamping,
24   signing, stamping.
25   Q.  So, were you looking specifically for this print?
```

Barnes - Redirect

1   A.  No.  No, no, no.  That's not what I'm saying.

2   Q.  Okay.

3   A.  Forget it.

4   Q.  All right.  Maybe I'm misunderstanding.

5           Let me show you another page.  This is a document

6   called notice of materialman maritime lien.  This is the second

7   page here.  It says affidavit of maritime materialman lien under

8   general maritime law.  Do you see that?

9   A.  Yes.

10  Q.  All right.  I'm going to show you now the last page here,

11  and there's a signature there and a fingerprint and then your

12  name, your signature, and the seal.  Do you see that?

13  A.  Correct.

14  Q.  Okay.  Who is it that signed right there?

15  A.  River Tali.

16  Q.  And that's the defendant?

17  A.  Correct.

18  Q.  And what about this fingerprint?  Did you witness that being

19  placed there?

20  A.  No.

21  Q.  All right.  That's all I have.

22                      RECROSS EXAMINATION

23  BY MS. SOLOMON:

24  Q.  When you notarize documents, it's not a requirement to have

25  a thumbprint on the document, is it?

Barnes - Recross

1    A.  No.

2    Q.  So --

3    A.  I take that back.  Only in real estate transactions now in

4    the State of Illinois, maybe the County of Cook, you have to

5    have a book, and like for quit claim deeds and so many people

6    was doing illegal stuff that when you notarize something, you

7    have to have a print, and I record that in the book.  They

8    have -- I have a thing for an ink stamp, and they thumb, and

9    then they put in my box next to the date and stuff that they

10   have signed.  I keep a recording of that.  That's required.

11   Q.  And is that something that's always been part of the

12   Illinois law?

13   A.  No.  That's just for real estate, only for real estate

14   transactions.

15   Q.  Only for real estate transactions.

16   A.  Correct.

17   Q.  And do you know when that came into effect?

18   A.  2008 after the bubble burst.

19   Q.  But for other documents that are not related to real estate

20   transactions, there's no requirement for a thumb print?

21   A.  There's no requirement.  Exactly.

22   Q.  And that would not be something that you would ordinarily

23   witness?

24   A.  No.  Exactly.  Or required.

25   Q.  Thank you.

```
1              MR. STUMP:  No further questions, your Honor.
2              THE COURT:  Okay.  Mr. Barnes, just for your future
3    information, for a will to be valid, it doesn't have to have a
4    notary.
5              THE WITNESS:  You say what?
6              THE COURT:  For a will to be valid in Illinois,
7    notaries don't work.  You need two signatures.
8              THE WITNESS:  Oh, okay.  Like witnesses.
9              THE COURT:  Right.  A couple of people over 18 who are
10   disinterested.  So, you might not waste your money on your seal
11   anymore.
12             THE WITNESS:  I ain't in it for the money.
13             THE COURT:  Understood.
14             THE WITNESS:  Thank you, though, for the information.
15             THE COURT:  Can I release the witness permanently?
16             MR. STUMP:  Yes.
17             THE COURT:  Thank you, Mr. Barnes.  You can step down.
18             THE WITNESS:  Okay.  Thank you.
19        (Witness excused.)
20             MR. STUMP:  The United States calls Justin Williams.
21        (Brief pause.)
22             THE CLERK:  Raise your right hand.
23        (Witness duly sworn.)
24
25
```

Williams - Direct

 1                 JUSTIN WILLIAMS, GOVERNMENT'S WITNESS, SWORN

 2                              DIRECT EXAMINATION

 3     BY MR. STUMP:

 4     Q.  Good morning.

 5     A.  Good morning.

 6     Q.  Could you tell us your full name, please?

 7     A.  Yes.  Justin Williams.

 8     Q.  And common spelling of Justin and Williams?

 9     A.  J-u-s-t-i-n W-i-l-l-i-a-m-s.

10     Q.  Mr. Williams, what do you do for a living, sir?

11     A.  I'm a special agent with the Drug Enforcement

12     Administration.

13     Q.  Where are you currently assigned?

14     A.  My current assignment is to the Bangkok country office in

15     Bangkok, Thailand.

16     Q.  How long have you been in Bangkok?

17     A.  Approximately three months.

18     Q.  And when did you come back to the States, since you're here

19     now?

20     A.  I just came back last week.

21     Q.  Did you come back just for this trial?

22     A.  I did, yes.

23     Q.  Before you went to Bangkok, where were you assigned?

24     A.  Previously I was assigned to the Chicago field division of

25     the Drug Enforcement Administration.

1332

Williams - Direct

1  Q.  How long have you been with the DEA?

2  A.  Approximately eleven years.

3  Q.  In all that time have you been a special agent?

4  A.  I have, yes, sir.

5  Q.  Can you tell us what, generally speaking, the duties are of

6  a special agent for the DEA?

7  A.  Yes.  Basically, I enforce the laws of the Controlled

8  Substance Act.  I effect warrants and make arrests for people

9  that commit violations against the Controlled Substance Act.

10  Q.  And what sort of violations would that be?  Just give us a

11  few examples.

12  A.  Narcotics violations for illicit drugs.

13  Q.  Do you have any prior law enforcement experience before you

14  became a special agent?

15  A.  I do, yes, sir.

16  Q.  What did you do before you were a special agent?

17  A.  I worked in the City of Chicago as a police officer for five

18  years.

19  Q.  As a special agent with the DEA, are you an employee of the

20  United States or a branch of the United States?

21  A.  I am, yes, sir.

22  Q.  In other words, that's a federal job?

23  A.  That's correct.

24  Q.  Now, you said it was for eleven years.  In 2006 were you

25  still a special agent?

Williams - Direct

1    A.  Yes, sir.

2    Q.  And how about in 2011?

3    A.  Yes, sir.

4    Q.  I want to show you what's been admitted as Government's

5    Exhibit 13.10.  This is a two-page document.  Do you recognize

6    that?

7    A.  I do, yes.

8    Q.  How did you first become aware of this document?

9    A.  I don't know if it was coming over here to go to -- I

10   learned -- through the court system, I learned that there was a

11   lien placed on me by somebody related to one of the defendants

12   that I had worked a case on.

13   Q.  All right.  And when you say through the court system, what

14   do you mean?

15   A.  Meaning through the Northern District of Illinois through

16   the United States Attorney's Office and the Drug Enforcement

17   Administration in Chicago.

18   Q.  Was the notification that you received part of this case?

19   A.  It was, yes, sir.

20   Q.  Before that, did you know this existed?

21   A.  No, I had no idea.

22   Q.  Now, when you found out about it, what was your reaction?

23   A.  I was angry.  I was very pissed off.

24   Q.  Why?

25   A.  Because why is there a lien on me for one hundred billion

Williams - Direct

1    dollars from an individual that I had never had contact with or

2    that I do not know.

3    Q.  Well, let me ask you about that.  There's a name right here

4    in box five.  It says Devon Phillips.  Do you recognize that

5    name?

6    A.  I do recognize that name, yes, sir.

7    Q.  Okay.  You said there was an individual that you had no

8    connection with.  Is that Devon Phillips, or is that someone

9    else?

10   A.  That would be somebody else.

11   Q.  Okay.  Let me show you the signature at the bottom page

12   here.  I don't know if you can even read that, but do you

13   recognize the signature?

14   A.  No, I do not.

15   Q.  Do you know recognize the name River Tali?

16   A.  No, I do not.

17   Q.  Tell us about how you know Devon Phillips.

18   A.  I know Devon Phillips because he was an individual that the

19   Drug Enforcement Administration had locked up for selling

20   narcotics to undercover agents.

21   Q.  Now, did you have any involvement with the investigation of

22   Devon Phillips?

23   A.  Yes, I did.

24   Q.  What was your involvement?

25   A.  I wasn't involved in the initial investigation.  I came in

Williams - Direct

1    later and conducted a safety proffer, safety valve proffer,

2    basically an interview of Mr. Phillips.

3    Q.  You conducted an interview of him?

4    A.  Yes, sir.

5    Q.  Was that in your capacity as a special agent of the DEA?

6    A.  Yes, it was.

7    Q.  Other than that one interview, did you have any other

8    involvement in the investigation of the case?

9    A.  I did, yes.

10   Q.  What else?

11   A.  Other than the interview, I testified at a sentencing

12   hearing for Mr. Phillips.

13   Q.  I want to direct your attention to this box two here of the

14   document, case number 06 CR 778.  Was that the case number

15   associated with that prosecution?

16   A.  Yes, sir.

17   Q.  And you said you testified at the sentencing hearing?

18   A.  Yes, sir.

19   Q.  Do you remember what you testified about?

20   A.  Yes.  Basic questions about Mr. Phillips' involvement with

21   narcotics and his responses that I had learned during the

22   interview.

23   Q.  Now, do you remember anything else about that sentencing

24   proceeding, like who else was there?

25   A.  Yeah, I do remember that there was a relative of his that

Williams - Direct

1    was in the back of the courtroom.  I believe his sister was

2    present.

3    Q.  Do you recognize her in court?

4    A.  Pardon me.  One second.

5    Q.  I should have asked you before I asked you that.  Would you

6    recognize her if you saw her today?

7    A.  Yes, I do.  Yes, sir.

8    Q.  Okay.  Can you describe what she's wearing for the jury?

9    A.  I believe she's the woman in the purple shirt with the head

10   shawl on right now.

11          MR. STUMP:  I'm going to ask the court to take notice

12   that the witness has identified the defendant.

13          THE COURT:  So noted.

14   BY MR. STUMP:

15   Q.  Do you remember anything else about that sentencing?  Is

16   there anything else about that sentencing hearing that sticks

17   out in your mind?

18   A.  The only thing that sticks out in my mind was that the

19   questions regarding the investigation weren't answered

20   truthfully by Mr. Phillips.  That's all that I really remember.

21   Q.  Aside from your interview of Mr. Phillips and then your

22   testimony at the sentencing hearing, did you have any other

23   involvement in the case against Devon Phillips?

24   A.  None at all.

25   Q.  Aside from your role as a special agent in the DEA, did you

Williams - Direct

1    have any interactions with Mr. Phillips?

2    A.  Never.

3    Q.  What about the defendant in this case?

4    A.  Never.

5    Q.  Has anyone in that family ever performed any services for

6    you?

7    A.  Never.

8    Q.  Do you owe any of them a hundred billion dollars?

9    A.  I don't owe any of them any money, no.

10            MR. STUMP:  Thank you, your Honor.  That's all the

11   questions.

12            THE COURT:  Ms. Solomon.

13                        CROSS EXAMINATION

14   BY MS. SOLOMON:

15   Q.  Good morning, Mr. Williams.

16   A.  Good morning, ma'am.

17   Q.  My name is Lauren Solomon, and I represent Cherron Phillips

18   in this case.  Thank you for coming all the way from Thailand.

19   A.  Thank you for having me.

20   Q.  So, you testified that -- well, first of all, you've been a

21   DEA agent a long time?

22   A.  Yes, ma'am.

23   Q.  And approximately how many cases do you handle or are you

24   involved in in any given year?

25   A.  It depends.  I've been involved in many, though.

Williams - Cross

```
 1   Q.  And over the course of your employment as a DEA agent,
 2   you've been involved in many drug cases?
 3   A.  Yes, ma'am.
 4   Q.  And you said that you worked for the Chicago Police
 5   Department prior to your work with DEA, correct?
 6   A.  Yes, ma'am.
 7   Q.  And were you also a drug agent at the Chicago Police
 8   Department?
 9   A.  I was employed as a patrolman.  I worked narcotics, along
10   with other crimes, violent crimes, property crimes, but I wasn't
11   specifically a narcotics officer, no.
12   Q.  Not until you came to the DEA?
13   A.  Yes, ma'am.
14   Q.  Okay.  And you were not the lead investigator in Devon
15   Phillips' case?
16   A.  No, I was not.
17   Q.  And you actually -- it appears from what you were talking
18   about, you weren't involved in the investigation?
19   A.  No.  What I stated is I was involved with the investigation
20   starting with the safety valve proffer.
21   Q.  And that would have been after the arrest?
22   A.  Yes, ma'am.
23   Q.  During the course of the proceedings in federal court?
24   A.  Yes, ma'am.
25   Q.  And safety valve is related to sentencing; is that correct?
```

                        Williams - Cross

 1    A.  Yes, ma'am.
 2    Q.  Okay.  So, it wasn't part of the underlying facts of the
 3    case in terms of investigating?
 4    A.  I don't really understand your question --
 5    Q.  Okay.  I'll strike it.
 6    A.  -- but my -- okay.
 7    Q.  Do you remember when you first got involved with the case?
 8    Do you remember when that proffer would have been?
 9    A.  A couple years ago, maybe 2011.
10    Q.  Okay.  Was it close to sentencing?
11    A.  I don't recall without looking at the paperwork.
12    Q.  Did you say you testified at the trial?
13    A.  Yes, ma'am, at the sentencing hearing.
14    Q.  At the sentencing hearing.  It was a guilty plea.  So, there
15    was no trial.
16    A.  Yeah, I testified at the sentencing hearing.
17    Q.  Okay.  You don't recall how the case was resolved?
18    A.  No.
19    Q.  Okay.  So, other than the one interview and testifying at
20    sentence -- so, it would have been essentially on two days you
21    had contact with the case?
22    A.  That I recall, yes, ma'am.
23    Q.  Okay.  Now, you said that you were surprised when you saw
24    this lien?
25    A.  Yes, ma'am.  Very.

Williams - Cross

```
 1    Q.  And do you own any real property?
 2    A.  I do.
 3    Q.  And did you own real property at the time?
 4    A.  I do, yes.
 5    Q.  And were you aware of any lien being placed on any real
 6    property that you owned?
 7    A.  No, I wasn't.
 8    Q.  Are you currently aware -- do you still own real property?
 9    A.  Yes, ma'am.
10    Q.  You've never been notified in any way or tried to sell the
11    property and found that there was a lien on your property?
12    A.  No, I have not tried to sell my property, but I'm scared if
13    I did try to sell it what would happen.  But I have not tried to
14    sell it.  I learned of the lien.
15    Q.  Do you get -- do you pay taxes in Cook County?
16    A.  Yes, ma'am.
17    Q.  And do you get your annual tax bill?
18    A.  I do.
19    Q.  Do you go online to pay it?
20    A.  No, I do not.
21    Q.  Did you know that if you go online, it will indicate on your
22    tax bill whether or not there's any liens against your property?
23    A.  No, I do not.
24    Q.  So, you're not aware that -- that doesn't come on your paper
25    bill?
```

Williams - Cross

```
 1   A.  No, ma'am.  My taxes are paid through my escrow account
 2       through the financial institution.  I don't log online for
 3       anything.
 4   Q.  So, you don't -- you never actually see your tax bill?
 5   A.  That's correct.
 6   Q.  Do you see any documents related to your real property?
 7   A.  Yes.
 8   Q.  Okay.  And as far as you know, on any of those documents, no
 9       lien has appeared?
10   A.  I haven't received notification from my financial
11       institution.  Only through what I've learned through my employer
12       and through the government.
13   Q.  And you don't recall how you learned of the lien through the
14       government?
15   A.  I don't remember specifically who, no.
16   Q.  Okay.  And if you look at the box that's next to the amount
17       of the lien, there's a number of different kinds of property
18       that are listed, and have you received any notice or aware of
19       any liens or encumbrances that have been attached to any of that
20       property?
21   A.  Like I said, ma'am, I haven't received any other
22       notification, no.
23   Q.  So, you haven't tried to get money out of your bank account
24       and no one's told you there's a hundred billion dollar lien
25       against your bank account and you can't get any money?
```

42

                            Williams - Cross

1    A.  I haven't received any other notices.  Sorry.

2    Q.  But that has not occurred?

3    A.  No.

4    Q.  No.  Okay.  Nothing further.

5            Oh, one more thing.  You didn't have any personal

6    contact with Cherron Phillips?

7    A.  No, I did not.

8    Q.  And your involvement in the Devon Phillips' case was

9    limited?

10   A.  Yes, ma'am.  Safety valve proffer and sentencing hearing.

11   Q.  Okay.  Thank you.

12   A.  Thank you.

13                        REDIRECT EXAMINATION

14   BY MR. STUMP:

15   Q.  Agent Williams, that safety valve proffer, which you

16   essentially testified is an interview, did that occur before or

17   after the sentencing hearing?

18   A.  Before.

19   Q.  I want to show you what we've marked as an exhibit, and it's

20   been admitted.  This is Government's Exhibit 21.

21           Agent Williams, this is a court docket for a criminal

22   case.  Are you familiar with how to read these?  Have you ever

23   looked through one of these?

24   A.  Yes, sir.

25   Q.  Can you look through this right here, and I'm going to

Williams - Redirect

1    direct you.  We're going to look in 2011.  On February 8th,

2    2011, there's a docket entry there.  It says 167.  Can you read

3    right where my finger is here what it says?

4    A.  Yes, sir.  It states sentencing held on February 8th, 2011,

5    and continued to February 9th, 2011, at 10:00 o'clock a.m.

6    Q.  If the sentencing of Devon Phillips occurred on February 8th

7    and February 9th, 2011, does that mean your interview of Devon

8    Phillips occurred before those dates?

9    A.  Yes, sir.

10   Q.  And does that sound about right to you, that it would have

11   been before that?

12   A.  It does, yes.

13   Q.  Now I want to show you again the lien, Government's

14   Exhibit 13.10, and ask you if you could just read the date

15   that's on there.

16   A.  Yes, sir.  April 13th, 2011.

17   Q.  All right.  So, the interview that you had with Devon

18   Phillips and the sentencing both predated this date; is that

19   right?

20   A.  It did, yes, sir.

21   Q.  Thank you.

22          THE COURT:  Ms. Solomon.

23                          RECROSS EXAMINATION

24   BY MS. SOLOMON:

25   Q.  The interview did not involve Cherron Phillips; is that

Williams - Recross

1    right?

2    A.   Correct.

3    Q.   She had nothing to do with that proceeding?

4    A.   That's correct, ma'am.

5    Q.   Okay.  Thank you.

6         THE COURT:  Okay.  May I release the witness

7    permanently?

8         MS. SOLOMON:  Yes, your Honor.

9         MR. STUMP:  Yes, your Honor.

10        THE COURT:  Thank you, sir.

11        THE WITNESS:  Thank you, your Honor.

12     (Witness excused.)

13        THE COURT:  Folks, if you don't mind, we'll quit a

14   minute early.  We'll come back at 1:00 o'clock.  One hour for

15   lunch.

16     (Whereupon, the within trial was recessed to 1:00 o'clock

17     p.m. of the same day.)

18

19

20

21

22

23

24

25

345

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
   UNITED STATES OF AMERICA,  )  No. 12 CR 872
 4                            )
           vs.                )  Chicago, Illinois
 5                            )
   CHERRON MARIE PHILLIPS,    )
 6                            )  June 17, 2014
                 Defendant.   )  1:00 p.m.
 7

 8                        VOLUME 2B
                    TRANSCRIPT OF PROCEEDINGS
 9        BEFORE THE HONORABLE MICHAEL J. REAGAN AND A JURY

10
   APPEARANCES:
11
   For the Government:      MR. NATHAN D. STUMP
12                          (United States Attorney's Office,
                             9 Executive Drive,
13                           Fairview Heights, Illinois  62208)

14
   For the Defendant:      MS. LAUREN WEIL SOLOMON
15                          (Lauren Weil Solomon,
                             P.O. Box 2013,
16                           Highland Park, Illinois  60035)

17

18

19

20

21

22

23                        PATRICK J. MULLEN
                        Official Court Reporter
24             219 South Dearborn Street, Room 1412,
                    Chicago, Illinois  60604
25                        (312) 435-5565
```

Sanchez - direct by Stump

```
 1      (Proceedings in open court.  Jury out.)
 2              THE MARSHAL:  Ready, Judge?
 3              THE COURT:  Please.
 4      (Jury in.)
 5              THE COURT:  Okay.  Please be seated.
 6              THE CLERK:  Would you raise your right hand?
 7      (Witness duly sworn.)
 8                          NOEL SANCHEZ,
 9                  GOVERNMENT'S WITNESS, DULY SWORN
10                        DIRECT EXAMINATION
11  BY MR. STUMP:
12  Q.  Good afternoon, sir.  Could you tell us your full name,
13  please, and spell it?
14  A.  Noel Sanchez, S-a-n-c-h-e-z.
15  Q.  Mr. Sanchez, where do you work?
16  A.  I'm a captain with the Chicago Police Department.
17  Q.  How long have you been with Chicago PD?
18  A.  Next month will be my 28th year.
19  Q.  And how long have you been a captain?
20  A.  Since October of last year.
21  Q.  What rank did you hold before you were captain?
22  A.  I was a lieutenant in Englewood for three years.
23  Q.  Are you assigned then to a specific division when you work
24  at the Chicago PD?
25  A.  At various ranks, I was assigned to different units within
```

347

Sanchez - direct by Stump

1   the department, yes.

2   Q.   As a captain today, do you also hold another title?

3   A.   I am the commanding officer of the medical services section

4   as an inspector in the medical section.

5   Q.   How long have you held that title?

6   A.   Since December of last year.

7   Q.   In 2006, do you remember what your rank was?

8   A.   I was a sergeant with the Chicago Police Department.

9   Q.   And were you assigned at that time to any specific

10  division?

11  A.   Yes, I was.

12  Q.   Which one?

13  A.   I was assigned to the DEA HIDTA CPD task force.

14  Q.   DEA?

15  A.   Yes.

16  Q.   And what did you say after that?

17  A.   We used to call it the DEA CPD HIDTA task force.

18  Q.   "CPD" stands for what?

19  A.   Chicago Police Department.

20  Q.   And what's the "HIDTA" that you said?

21  A.   "HIDTA" stands for High Intensity Drug Trafficking Area.

22  Q.   Okay.  You said that's a task force.

23  A.   Yes.

24  Q.   Can you explain real briefly what is a task force?

25  A.   This particular group, this is a task force put together,

348

Sanchez - direct by Stump

1  and we were known as Group 47.  It was actually two teams
2  within the task force.  We were combined with Chicago police,
3  DEA, states attorney's investigators, and state police, and
4  basically we were told to go after narcotics traffickers who
5  had a propensity for violence in the city.
6  Q.  As part of that task force, were you associated in any way
7  formally with the DEA?
8  A.  Yes.
9  Q.  What was that?
10  A.  Once we -- once I took that position, we were deputized
11  with the DEA, and we were working with them under the umbrella
12  of the DEA.
13  Q.  What did you understand it to mean that you were deputized?
14  A.  Well, I had credentials that said I was a DEA task force
15  officer.  I carried their badge, their IDs.  We did all their
16  paperwork.  We were agents of the task force.
17  Q.  Are there rules that you have to operate under if you're a
18  Chicago Police Department officer specific to Chicago PD?
19  A.  Yes.
20  Q.  Are there also rules that you have to follow if you are
21  associated with the DEA?
22  A.  Yes.
23  Q.  Are they all the same, or are there different rules there?
24  A.  There are slightly different rules, definitely different
25  paperwork.  The DEA is a little more stricter, more hands-on

349

Sanchez - direct by Stump

1  with the paperwork and the guidelines that they have.  The
2  Chicago Police Department has a different set of guidelines,
3  but we had to merge both them together.  I did, anyway.
4  Q.  Let me show you what we've marked for identification as
5  Government Exhibit 22.  It's a multipage document.  What I want
6  you to do is this.  I'm going to show you the last page of the
7  exhibit.  Do you see your name on the last page of that
8  exhibit?
9  A.  I do.
10  Q.  And do you see your signature anywhere on the page?
11  A.  I do.
12  Q.  What is it that I showed you?  Do you recognize that
13  document?
14  A.  It's a form I signed, "Deputization Request Authorization."
15  I signed this back in December of '06, requesting when I was
16  deputized as an agent.
17  Q.  All right.  Thank you.  How did the opportunity arise to
18  become a deputized federal task force officer?
19  A.  Actually, there was a previous sergeant in that position.
20  He had been promoted to lieutenant, and they were looking for
21  another qualified individual within the narcotics section.  At
22  the time, I was a sergeant in just the regular narcotics
23  section of the Chicago Police Department, and I was asked if I
24  would be interested in working on the task force.  I said sure,
25  and the next thing you know I had to sit through a couple of

350

Sanchez - direct by Stump

1  interviews before I was taken into the task force.  I had to
2  sign documents saying that I was going to go through a
3  background check into things in my background to become
4  deputized, basically.
5  Q.  At some point, did your involvement in the task force end?
6  A.  Yes.
7  Q.  How did that come about?
8  A.  I was promoted to lieutenant in about 2010.
9  Q.  And what did the promotion have to do with you no longer
10  working on the task force?
11  A.  Well, basically I had to leave that task force.  I had to
12  go to the academy to be a lieutenant, and then I was going to
13  get assigned back into patrol in the Chicago Police Department.
14  So I couldn't carry my credentials anymore.  I had to turn my
15  credentials in, and I wasn't going to be working with the DEA
16  anymore.
17  Q.  Do you recall when that was?
18  A.  I got promoted in October of 2010.
19  Q.  And were you deputized as a federal task force officer
20  between December of 2006 and that date in 2010?
21  A.  Yes.
22  Q.  I'm going to show you, while it's warming up, what was
23  already admitted as Government Exhibit 13.9.  It's a two-page
24  document.  Do you recognize it?
25  A.  I do.

351

Sanchez - direct by Stump

1  Q.  What did I hand to you?

2  A.  This is a notice of a claim of maritime lien against me.

3  Q.  And have you seen this before?

4  A.  I have.

5  Q.  When was the first time you saw this document, and what

6  were the circumstances under which you saw it?

7  A.  I was told that someone had put a lien on me while working

8  as an agent with the Government for $100 billion.

9  Q.  Let me see if this is ready.  Okay.  I have on the screen

10  13.9.  If you look in box number 5, there's a name there,

11  "Devon Phillips."  Do you see that?

12  A.  I do.

13  Q.  Do you recognize that name?

14  A.  I do.

15  Q.  How do you know the name "Devon Phillips"?

16  A.  He was a subject that was arrested while I was on the task

17  force for narcotics.

18  Q.  Did you have any involvement in the investigation?

19  A.  I was the supervisor of the undercover officer when the

20  controlled purchase was done --

21  Q.  Who was the --

22  A.  -- and I was --

23  Q.  I'm sorry.  Finish your answer.

24  A.  I was on the scene when he was arrested.

25  Q.  When Devon Phillips was arrested.

Sanchez - direct by Stump

1 A.  When Devon Phillips was arrested, correct.

2 Q.  Who was the undercover officer that you supervised?

3 A.  Eric Cato.

4 Q.  I want to show you this.  At the top here where it says

5 "Name of Vessel, N. Sanchez" have you seen your name written

6 like that before?

7 A.  I have.

8 Q.  And I also want to show you this right here (indicating).

9 Next to the case number, 06 CR 778, it says "Officer Number

10 1202."  Do you see that?

11 A.  I do, sir.

12 Q.  Does that mean anything to you?

13 A.  That was my sergeant's star number.

14 Q.  What is that, the sergeant's star number?

15 A.  Well, every Chicago policeman has a star.  Now this star is

16 an inspector's star, so this is not numbered.  But if you're a

17 patrolman, sergeant, lieutenant, or captain, they're numbered.

18 So if I may, my captain's star has a number on it.  It says

19 "12" on it.  So that identifies me as a captain.  When I sign

20 my name and say "N. Sanchez 12," they know it's me.  That was

21 my sergeant's star.

22 Q.  Now, through your involvement supervising Eric Cato and

23 being present at the arrest, would your name like this and your

24 badge number or your star number, would that have appeared on

25 any documents associated with the investigation?

353

Sanchez - direct by Stump

1  A.  Probably.

2  Q.  And how would that happen?

3  A.  Any case report that's generated, any report that was

4  generated in that arrest, Eric Cato would have submitted me the

5  reports, and I would have signed as the approving sergeant that

6  I approved his report, that I read his report.

7  Q.  And when you did that, would you put your name and your

8  star number there on the report?

9  A.  I usually do.  Sometimes I put my whole name, Noel, and

10 sometimes I just do the initial.  But if it's identified by

11 1202, everyone knows it's me.

12 Q.  You said there were two groups that were part of this task

13 force.

14 A.  Yes.

15 Q.  Did both groups work on the investigation of Devon

16 Phillips?

17 A.  In this particular case, Group 47, which was the two teams,

18 worked on it.  There was a Group 41 that initially started the

19 investigation, and that was a totally different group.

20 Q.  I want to take you back again to Government Exhibit 22.

21 You had looked at the last page.  I want you to look at the

22 second to last page.  There's a name there.  Do you see that

23 name?

24 A.  Yes, I do.

25 Q.  The name is "Gilberto Calderon."  Do you see that?

354

Sanchez - direct by Stump

1  A.  Yes.

2  Q.  Do you recognize that name?

3  A.  Yes.

4  Q.  Do you know that person?

5  A.  I do.

6  Q.  Who is he?

7  A.  He is the sergeant that was on the other team within Group

8  47.  As I said, Group 47 had two sergeants, and there were two

9  individual groups of CPD, DEA, state police, and state

10  investigators.  Two teams, one group, Group 47.

11  Q.  And he was on the other team.

12  A.  Yeah.  His side of the floor handled long-term cases,

13  wires, things of that nature.  My side of the floor handled

14  sort of the short-term cases, quick buy busts, things of that

15  nature.

16  Q.  Was that team also involved in the investigation of Devon

17  Phillips?

18  A.  It was.

19  Q.  Officer Calderon, do you know what his rank is today?

20  A.  He is a sergeant of police still.

21  Q.  Is he a friend of yours?  Do you know him?

22  A.  I do know him.  We worked together.  We were teammates for

23  several years.

24  Q.  Is he on active duty right now?

25  A.  He is still with the Chicago Police Department.  He is

Sanchez - cross by Solomon

1   currently on medical for issues that he had.

2   Q.  Okay.  I want to go back to this lien, 13.9.  Other than

3   your role as supervisor, part of the task force supervising

4   Officer Cato, did you have any other interactions or

5   involvement with the case against Devon Phillips?

6   A.  I did not.

7   Q.  Outside of your job as a deputized federal task force

8   officer, did you have any sort of contact or relationship with

9   Devon Phillips at all?

10  A.  No.

11  Q.  How about anyone in his family?

12  A.  No.

13  Q.  Has anyone in his family ever performed any sort of

14  services for you?

15  A.  No.

16  Q.  And do you owe Devon Phillips $100 billion?

17  A.  I do not.

18  Q.  Do you owe him any money at all?

19  A.  No.

20          MR. STUMP:  Okay.  Thank you.

21          THE COURT:  Ms. Solomon?

22                  CROSS-EXAMINATION

23  BY MS. SOLOMON:

24  Q.  Good afternoon, Officer Sanchez.

25  A.  Good afternoon.

356

Sanchez - cross by Solomon

1   Q.   My name is Lauren Solomon, and I represent Cherron Phillips
2   in this matter.  I just have a few questions for you.  Your
3   involvement with the task force was for approximately three
4   years?
5   A.   I was assigned approximately from 2005, the end of 2005,
6   beginning of 2006, somewhere in there, through when I got
7   promoted in 2010.
8   Q.   Okay.  So it was approximately five years then?
9   A.   Approximately.
10  Q.   During that time, you were always employed as a Chicago
11  police officer as well?
12  A.   Yes.
13  Q.   So your employer remained the Chicago Police Department?
14  A.   Yes.
15  Q.   And your task force duties and responsibilities were
16  essentially in addition to your Chicago Police Department
17  actions, or were they all a part of it and you were just
18  working in a group with other people?
19  A.   No, they were a part of it.
20  Q.   Okay.  So you continued in the same capacity as you were
21  when you were a police officer, a Chicago police officer?
22  A.   Well, I still was a Chicago police officer, but I was -- in
23  addition to that, I was also working with the DEA in their
24  operations.
25  Q.   And in order to work with the DEA in their operations, you

357

Sanchez - cross by Solomon

1 had to be deputized for the joint task force.

2 A.  Yes.

3 Q.  And as part of your investigation with the joint task

4 force, you learned of the case of Devon Phillips -- involving

5 Devon Phillips?

6 A.  Yes.

7 Q.  But you weren't directly involved with that case.

8 A.  Can you explain?

9 Q.  You were not one of the officers that was in direct contact

10 with Devon Phillips.

11 A.  No, I was not.

12 Q.  That was Officer Cato?

13 A.  Officer Cato, yes.

14 Q.  Okay.  But you just said you were present at the time of

15 Mr. Phillips' arrest?

16 A.  Yes.

17 Q.  As a supervising officer at the time of the arrest?

18 A.  Yes.

19 Q.  Now, Mr. Stump showed you Government Exhibit 13.9, and it's

20 called "Notice of Claim of Maritime Lien"?

21 A.  Yes.

22 Q.  And you are named as a "vessel"?

23 A.  That's what it says.

24 Q.  When we talk about "maritime," that means that you must be

25 a boat?

358

Sanchez - cross by Solomon

1   A.  I think there are different definitions but, yeah, usually

2   that's the general definition.  People assume it with some type

3   of boat or vessel.

4   Q.  So that's rather unusual on its face.

5   A.  I would have thought so.  I wasn't familiar with that at

6   all.

7   Q.  Okay.  So to begin with, at the top it's an unusual

8   document.  Then as we go through it, it says in box 4 that the

9   owner and address of the vessel is the United States Government

10  in San Juan, Puerto Rico?

11  A.  Yes, it does say that.

12  Q.  So that would also be another unusual aspect of that

13  document, wouldn't it?

14  A.  Yes, in my opinion, yes.

15  Q.  We wouldn't ordinarily think of the U.S. Treasury as being

16  located in Puerto Rico.

17  A.  I wouldn't, no.

18  Q.  And then, of course, at the bottom, box number 6 is also

19  very unusual in that it's for $100 billion.

20  A.  Correct.

21  Q.  I don't know about you, but I don't really see that figure

22  much in my life.

23  A.  I don't, either.

24  Q.  Okay.  Then next to box 6, in box 7 there are a number of

25  properties that are listed?

359

Sanchez - cross by Solomon

 1   A.   Correct.

 2   Q.   And I would assume that you do not have all of those

 3   properties listed.  You might have some of those.  I assume you

 4   don't have farm equipment?

 5   A.   I don't have any farm equipment.

 6   Q.   Okay.  Have you been notified or have you been aware of any

 7   kind of problems that you've had with a bank account or any

 8   property that you own as a result of Government Exhibit 13.9?

 9   A.   No.

10   Q.   Do you own real property?

11   A.   I do.

12   Q.   And have you tried to buy or sell any real property since

13   you received notice of this, Government Exhibit 13.9?

14   A.   No, I haven't.

15   Q.   Are you aware of any -- that this lien has attached in any

16   way to any real property that you own?

17   A.   I haven't become aware of any, no.

18   Q.   Okay.  So aside from the initial -- well, you learned of

19   this through some personnel in the Federal Government?

20   A.   I did.

21   Q.   And that was while you were in the joint task force?

22   A.   This was after.

23   Q.   It was after that.

24   A.   Yes.

25   Q.   And it was also after that that you became aware of this

360

Sanchez - redirect by Stump

1  case?

2  A.  Do you mean this prosecution?

3  Q.  This prosecution.

4  A.  Yes.

5  Q.  And during the time that Devon Phillips' case was in

6  federal court, were you involved in any way in that

7  prosecution?

8  A.  I was not.

9  Q.  You did not have to come over here and testify or be

10  present at any time.

11  A.  I did not.

12  Q.  And have you ever met or had any contact with Ms. Cherron

13  Phillips?

14  A.  No.

15  Q.  So other than receiving the notice, did you actually ever

16  look at the copy of the lien?

17  A.  I was presented with a copy.

18  Q.  And was that in preparation for this trial or at a prior

19  time?

20  A.  Before, prepping for this trial.

21  Q.  Okay.  Other than that, you have not received any notice of

22  any impact that the lien has had.

23  A.  Not that I'm aware of.

24        MS. SOLOMON:  Okay.  Thank you.

25        THE COURT:  Mr. Stump?

361

Sanchez - redirect by Stump

1                    REDIRECT EXAMINATION

2  BY MR. STUMP:

3  Q.  Captain Sanchez, you said that you were not called to

4  testify at any court proceeding associated with this case

5  against Devon Phillips, is that right?

6  A.  Correct.

7  Q.  Would you have been willing, able, and ready to testify if

8  you had been called?

9  A.  Absolutely.

10 Q.  You know, let me ask you one other question about this box

11 here, box number 7.  Do you, in fact, own some property that

12 would fit the description here, bank accounts, retirement

13 funds, cash on hand, jewelry, that kind of thing?

14 A.  Yes, I do.

15          MR. STUMP:  Thank you.

16          MS. SOLOMON:  Nothing further, Your Honor.

17          THE COURT:  May I release the witness permanently?

18          MR. STUMP:  Yes.

19          MS. SOLOMON:  Yes.

20          THE COURT:  Thank you, sir.

21          THE WITNESS:  Thank you, Your Honor.

22      (Witness excused.)

23          MR. STUMP:  The United States calls Eric Cato.

24      (Brief pause.)

25          THE CLERK:  Would you raise your right hand?

362

Cato - direct by Stump


1       (Witness duly sworn.)

2               THE COURT:  Please have a seat, sir.

3               THE WITNESS:  Okay.

4                       ERIC D. CATO,

5               GOVERNMENT'S WITNESS, DULY SWORN

6                     DIRECT EXAMINATION

7  BY MR. STUMP:

8  Q.  Good afternoon.

9  A.  Good afternoon.

10  Q.  Could you tell us your full name, please, and spell your

11  last name?

12  A.  Eric D. Cato, C-a-t-o.

13  Q.  Mr. Cato, what do you do for a living?

14  A.  I'm a sergeant in the Chicago Police Department.

15  Q.  How long have you been with the Chicago PD?

16  A.  Twenty-two years.

17  Q.  How long have you been a sergeant?

18  A.  Seven years.

19  Q.  Have you ever been deputized as a federal task force

20  officer?

21  A.  Yes.

22  Q.  With which agency?

23  A.  DEA.

24  Q.  I want to show you what we've marked for identification as

25  Government Exhibit 22.  It's a multipage document, and I'm

363

Cato - direct by Stump

1   showing you the fourth page of the document.  Do you see your

2   name there?

3   A.   Yes.

4   Q.   And do you see your signature anywhere on the document?

5   A.   Yes, I do.

6   Q.   What did I hand you?  What is that?

7   A.   A deputization authorization form.

8   Q.   Is that a form that you signed?

9   A.   Yes, it is.

10  Q.   And what was your understanding of the form when you signed

11  it?  What were you doing?

12  A.   I was being federally deputized.

13  Q.   Do you know what date did you sign there?

14  A.   12/13/06.

15  Q.   That's 2006?

16  A.   Yes.

17  Q.   I want to show you now what's been admitted as Government

18  Exhibit 13.7.  You'll see it up there.  It's a one-page

19  document.  Do you recognize that?

20  A.   Yes, I do.

21  Q.   How did you first find out about this document?

22  A.   I think I received a phone call.

23  Q.   Do you remember anything about that phone call?

24  A.   Yes, that I was being -- a lien was being put against me.

25  Q.   Do you remember who called you or what agency?

364

Cato - direct by Stump

1  A.  DEA.

2  Q.  Okay.  Do you know approximately when that phone call

3  happened?

4  A.  No, I don't.

5  Q.  I want to show you this box right here, box number 2.  It

6  says "Unique Identifier."  There's a case number here, and then

7  next to that it says "Officer Number 14274."  Do you see that?

8  A.  Yes, I do.

9  Q.  Does that mean anything to you?

10  A.  Yes, it does.

11  Q.  What is that?

12  A.  That was my badge number when I was a patrolman.

13  Q.  I also want to ask you about this name right here, "Devon

14  Phillips," in box number 5.  Do you see that?

15  A.  Yes, I do.

16  Q.  Do you know someone named Devon Phillips?

17  A.  Yes, I do.

18  Q.  Who is Devon Phillips to you?

19  A.  Devon Phillips was a gentleman who was selling narcotics.

20  Q.  And how do you know that?

21  A.  I worked undercover, and Devon Phillips sold me narcotics

22  on two occasions.

23  Q.  He sold the drugs directly to you.

24  A.  Yes.

25  Q.  In what year did that investigation occur, do you know?

Cato - direct by Stump

1   A.   I believe the investigation started in 2006.

2   Q.   As a result of your investigation, was there a prosecution?

3   A.   Yes.

4   Q.   Were you involved in any way in the prosecution?

5   A.   Yes, I was.

6   Q.   And what was your involvement?

7   A.   Testifying in court.

8   Q.   Did you testify in court?

9   A.   Yes, I did.

10  Q.   Do you recall what type of hearing it was?

11  A.   Sentencing hearing.

12  Q.   Aside from your involvement in the investigation and your

13  testimony in court, did you have any other involvement in the

14  case against Devon Phillips that you can remember?

15  A.   No.

16  Q.   Aside from your role as a Chicago PD officer and a

17  federally deputized task force officer, did you have any

18  connection to Devon Phillips?

19  A.   No.

20  Q.   How about anyone in his family?

21  A.   No.

22  Q.   Has anyone in his family ever performed any services for

23  you?

24  A.   No.

25  Q.   Do you owe him or anyone in his family any money at all?

366

Cato - cross by Solomon

1   A.   Not at all.

2   Q.   What was your reaction when you saw this?

3   A.   I was shocked and taken back.  You know, it made me upset.

4   Q.   Has this document come up in any private transactions,

5   financial transactions that you've tried to engage in?

6   A.   No.

7   Q.   All right.  I want to point you to this box right here, box

8   number 7.  It says "all property, including but not limited

9   to," and then it lists a bunch of different kinds of property.

10  Do you see that?

11  A.   Yes.

12  Q.   Just glancing through that paragraph, do you own any types

13  of property that would fit any of those descriptors?

14  A.   Yes.

15            MR. STUMP:   Thanks.  That's all I have.

16            THE COURT:   Ms. Solomon?

17                         CROSS-EXAMINATION

18  BY MS. SOLOMON:

19  Q.   Good afternoon, Officer Cato.

20  A.   Sergeant Cato.

21  Q.   I'm sorry, Sergeant Cato.

22  A.   Yes.

23  Q.   My name is Lauren Solomon, and I represent Cherron Phillips

24  in this matter.

25  A.   Yes, ma'am.

Cato - cross by Solomon

1   Q.  I'm just going to ask you a few follow-up questions.  You

2   said that you were deputized to be involved in the federal task

3   force.

4   A.  Yes, ma'am.

5   Q.  And your deputization ended in August of 2011?

6   A.  Yes, ma'am.

7   Q.  And you're currently a full-time Chicago police officer?

8   A.  Yes, ma'am.

9   Q.  And at the time that you were part of the task force, you

10  were also employed by the Chicago Police Department?

11  A.  Yes, ma'am.

12  Q.  And your employment continued with the Chicago Police

13  Department through your deputization, isn't that right?

14  A.  Yes, ma'am.

15  Q.  And you were an undercover officer with respect to Devon

16  Phillips.

17  A.  Yes.

18  Q.  And he was the sole target of that investigation?

19  A.  Yes.

20  Q.  He was the only defendant in that case?

21  A.  I believe so, yes.

22  Q.  Okay.  You weren't involved in the case at all until the

23  sentencing once the case was brought to federal court?

24  A.  I don't understand the question.

25  Q.  Following the indictment, you weren't involved in the case

368

Cato - cross by Solomon

1   in federal court until the sentencing?

2   A.   Yes.

3   Q.   That's when you testified?

4   A.   Yes, ma'am.

5   Q.   Okay.  You indicated that someone from the DEA contacted

6   you by telephone?

7   A.   Yeah, it was either DEA or FBI.

8   Q.   And did you ever receive a copy of the lien?

9   A.   Yes.

10  Q.   And do you recall when you received a copy?

11  A.   From the FBI.

12  Q.   At around the same time as the phone call?

13  A.   No.

14  Q.   Subsequent to the phone call?

15  A.   Yes.

16  Q.   And you received that by mail?

17  A.   No, by hand.

18  Q.   By hand, okay.  When you looked at Government Exhibit 13-7,

19  had you ever seen anything called a maritime lien before?

20  A.   No.

21  Q.   Did you know what that was?

22  A.   Not at all.

23  Q.   Okay.  Were you surprised that you were listed in the box

24  called "vessel"?

25  A.   Where is that at?

369

Cato - cross by Solomon

1  Q.  Where it says "Eric Cato" for "name of vessel," box number
2  1 at the top.
3  A.  Oh, okay.  I see it now.  Was I surprised?
4  Q.  Yes.
5  A.  Yes.
6  Q.  Okay.  Did you own real property at the time that you
7  received this lien?
8  A.  Yes.
9  Q.  And do you continue to own that property?
10  A.  Yes.
11  Q.  Have you made any attempts to sell the property since the
12  lien was handed to you?
13  A.  No.
14  Q.  Have you received any kind of notice of any kind, or have
15  you become aware that this lien is against any real property
16  that you own?
17  A.  I don't understand the question.
18  Q.  Have you become aware of this lien being against your
19  property?
20  A.  No.
21  Q.  Have you become aware that a lien was placed against any
22  other property you may own, whether real or personal?
23  A.  No.
24  Q.  Has there been any impact from the receipt of this piece of
25  paper since you received it?

370

Cato - cross by Solomon

1  A.  I haven't tried to do any transactions as far as any of my

2  property, so no.

3  Q.  Well, you use your bank account, I would assume?

4  A.  Oh, yes.

5  Q.  And you haven't been notified by the bank that there's a

6  $100 billion lien against your bank account and it's frozen?

7  A.  No, no.

8  Q.  So in any practical day-to-day way, you haven't had any

9  impact from this piece of paper that is Government Exhibit

10  13-7.

11  A.  No.

12  Q.  Okay.  You indicated that you've never had any contact with

13  Devon Phillips' family members?

14  A.  I have not.

15  Q.  And that would include Cherron Phillips.

16  A.  I have not.

17        MS. SOLOMON:  Okay.  Thank you.

18     (Discussion off the record.)

19        MR. STUMP:  No further questions, Your Honor.

20        THE COURT:  May I release the witness permanently?

21        MS. SOLOMON:  Yes, Your Honor.

22        MR. STUMP:  Yes, Your Honor.

23        THE COURT:  Thank you, sergeant.

24        THE WITNESS:  Thank you.

25     (Witness excused.)

371

Thompson - direct by Stump

1          MR. STUMP:  The United States calls Andre Thompson.

2     (Brief pause.)

3          THE CLERK:  Raise your right hand, please.

4     (Witness duly sworn.)

5                    ANDRE M. THOMPSON,

6               GOVERNMENT'S WITNESS, DULY SWORN

7                    DIRECT EXAMINATION

8  BY MR. STUMP:

9  Q.  Good afternoon, sir.

10 A.  Good afternoon.

11 Q.  Could you tell us your full name, please?

12 A.  Andre M. Thompson, T-h-o-m-p-s-o-n.

13 Q.  Mr. Thompson, where do you work?

14 A.  I'm a sergeant with the Chicago Police Department.

15 Q.  How long have you been with the Chicago Police Department?

16 A.  Twenty-four years.

17 Q.  And how long have you been a sergeant?

18 A.  Approximately two years.

19 Q.  Are you assigned to any particular kinds of cases with

20 Chicago PD?

21 A.  Excuse me?

22 Q.  Is there a particular kind of case that you investigate

23 with the Chicago Police Department, or do you investigate all

24 crimes?

25 A.  I investigate all crimes.

372

Thompson - direct by Stump

1 Q.  I want to ask you about the DEA.  Have you ever worked with

2 the DEA?

3 A.  Yes, I have.

4 Q.  And have you ever been deputized as a federal task force

5 officer?

6 A.  Yes, I have.

7 Q.  I want to show you what we've marked for identification as

8 Government Exhibit 22.  What I want to show you is the second

9 page and the third page of that exhibit.  Do you see your name

10 on those two pieces of paper?

11 A.  Yes, I do.

12 Q.  And with regard to the second page, do you see your

13 signature?

14 A.  That is correct.

15 Q.  Do you know what these documents are that I handed to you?

16 A.  These are deputization papers.  When you're assigned to a

17 task force, you have to be deputized.

18 Q.  All right.  These are papers that you signed in connection

19 with that deputization?

20 A.  That is correct.

21 Q.  If you don't mind me asking, what is the date that you

22 signed the second page there?

23 A.  September 3rd, 2008.

24 Q.  Okay.  Sergeant Thompson, I want to ask you about a

25 document that's already been admitted in evidence.  It's

373

Thompson - direct by Stump

1  Government Exhibit 13.6.  Do you see that on the screen?

2  A.  Yes, sir.

3  Q.  It's a one-page document.  Have you seen it before?

4  A.  Yes, I have.

5  Q.  How did it come to your attention?

6  A.  I was working in the organized crime division, and I was

7  informed that some agents were looking for me.  Once they

8  caught up with me in the building, I was presented with one of

9  those liens.

10  Q.  And what was your reaction when you saw this?

11  A.  I'm worth $100 billion, wow.

12  Q.  I want to show you a couple of things on this document.

13  One is up here in box number 2.  Do you see next to this case

14  number that there's an officer number that says "10154"?

15  A.  Yes, I do.

16  Q.  Does that mean anything to you?

17  A.  Yes.  That's my old star number.

18  Q.  "Old star number" meaning what?  What does that mean?

19  A.  Before I got promoted, that was my star number for my first

20  22 years, 10154.

21  Q.  So that was before you were promoted to sergeant?

22  A.  That is correct.

23  Q.  And you say you were promoted to sergeant just two years

24  ago?

25  A.  Yes, December 16th, 2012.

374

Thompson - direct by Stump

1  Q.  Okay.  So for 20-some years before that, that star number

2  was associated with you, is that right?

3  A.  That is correct.

4  Q.  Now I'm going to go down to box number 5 where it says

5  "Devon Phillips."  Do you see that?

6  A.  Yes, sir.

7  Q.  Do you know that name?

8  A.  Yes, I do.

9  Q.  How do you know the name "'Devon Phillips."

10  A.  I purchased narcotics from Devon Phillips.

11  Q.  Can you say that again just a little closer to the

12  microphone?

13  A.  I'm sorry.  While I was a task force officer, I purchased

14  narcotics from Devon Phillips.

15  Q.  Do you recall what year that was?

16  A.  I believe it was maybe '04 or '05.  I'm not sure.

17  Q.  All right.  It's been a while, though, huh?

18  A.  Yes.

19  Q.  And you say you purchased narcotics from him.  Was that

20  part of an investigation that you were involved in?

21  A.  That is correct.  During that investigation, I was the

22  undercover officer.

23  Q.  At that time, were you deputized federally with the DEA?

24  A.  That is correct.

25  Q.  Did you have any involvement in the investigation other

Thompson - direct by Stump

1  than being the undercover and purchasing drugs from him?

2  A.  Through my investigation, I basically initiated the actual

3  case.

4  Q.  All right.  You were the officer that initially got the

5  case started, is that right?

6  A.  That is correct.

7  Q.  How about the prosecution?  Was there a prosecution that

8  came out of that investigation?

9  A.  Yes, there was.

10  Q.  And were you part of that prosecution at all?

11  A.  Yes, I was.

12  Q.  What role did you play in the prosecution?

13  A.  When you say "prosecution," are you referring to the

14  takedown, or are you referring to the sentencing?

15  Q.  Let me ask you about both things you're referring to.  When

16  you say "takedown," were you present when Devon Phillips was

17  arrested?

18  A.  Yes, I was.

19  Q.  And what was your role at that time?

20  A.  During the takedown that particular day, myself and another

21  undercover officer, we were posing as brothers from Wisconsin.

22  Okay?  The other undercover set up the actual multi-kilo deal,

23  and I sat in an undisclosed location with the flash money,

24  which was approximately $50,000.

25  Q.  And was there an exchange of money and drugs at some point

376

Thompson - direct by Stump

1    in there?

2    A.   No, the money never made it to the location because the

3    other undercover observed the narcotics on the seat.  So the

4    money never showed up.  He gave the takedown signal, and he was

5    taken down.  He was placed under arrest.

6    Q.   Now I'm going to take you to the other thing that you

7    mentioned which was a sentencing hearing.  Were you present

8    when Devon Phillips was sentenced in federal court?

9    A.   I testified during the sentencing hearing.  I don't believe

10   I was present for his -- when he was sentenced.

11   Q.   Okay.  So it's two different things.  You're saying you

12   were present at the sentencing hearing and you testified.

13   A.   Yes.

14   Q.   But were you there when the sentence was imposed?

15   A.   No, I was not.

16   Q.   As to your testimony at the sentencing hearing, do you

17   remember anything about that hearing today?

18   A.   As pertaining to the case?  As to what transpired?

19   Q.   Anything about the hearing at all.

20   A.   Oh, yes.  During the hearing, Mr. Phillips was representing

21   himself during the trial, and there were several times when the

22   judge or the prosecution would ask him a question and he

23   basically did not have an answer.  What he would then do is

24   look over to a female, who I later found out to be his sister,

25   for advice.  She would step up and whisper something to him, or

377

Thompson - direct by Stump

1  she would write something on a legal pad.  Then he would read
2  off that legal pad as to what she had written down or something
3  of that nature.
4  Q.  Do you remember what the sister looked like?
5  A.  Vaguely.  I mean, this was about eight, nine years ago.  I
6  know she was a tall female, black, approximately maybe six-one.
7  Q.  Okay.
8  A.  Six-two, maybe.
9  Q.  Okay.  Aside from your role as the undercover and aside
10  from your role in testifying at the sentencing hearing, did you
11  have any other involvement in the investigation or the
12  prosecution that we haven't already discussed that you can
13  remember today?
14  A.  What I do remember is that during that investigation, when
15  the name "Cherron Phillips" appeared, the first time I was
16  aware of Cherron Phillips was when we did -- it's called a --
17  we went to the dealership, and we pulled the jacket of a
18  Mercedes Benz that Devon was driving.  From that jacket, we
19  learned that the Mercedes Benz was in the name of Cherron
20  Phillips.  We also learned that during this transaction, within
21  the same day Cherron had visited the dealership, and on these
22  visits, for example --
23          MS. SOLOMON:  Objection, Judge.  Can we have a
24  sidebar?
25          THE COURT:  Yes, let's go to sidebar.

378

Thompson - direct by Stump

1      (Discussion at sidebar on the record.)

2           THE COURT:  I'm really worried about what he's going

3 to say.  Is he going to implicate her in any way?

4           MS. SOLOMON:  Yeah, I think he is.

5           MR. STUMP:  I suspect the answer is going to be no.

6 Now that he's answering the question, I'm fine withdrawing my

7 question.

8           THE COURT:  Okay.  Otherwise, I want you to lead him

9 because I'm afraid of where this could go.

10          MS. SOLOMON:  Yeah, I'm very afraid of where it's

11 going.

12          MR. STUMP:  Okay.

13          THE COURT:  So you'll withdraw the question?

14          MR. STUMP:  I'll withdraw the question.

15          MS. SOLOMON:  Okay.

16          THE COURT:  Okay.

17      (Discussion at sidebar concluded.)

18          MR. STUMP:  Your Honor, I'm going to withdraw that

19 last question.

20          THE COURT:  Okay.

21 BY MR. STUMP:

22 Q.  Sergeant Thompson, aside from your role as a federal task

23 force officer, did you have any personal interactions with

24 Devon Phillips?

25 A.  No.

379

Thompson - cross by Solomon


1   Q.  How about Cherron Phillips?

2   A.  No.

3   Q.  Anyone else in their family?

4   A.  No.

5   Q.  All right.  Do you owe anyone in their family any money at

6   all?

7   A.  Absolutely not.

8               MR. STUMP:  Thank you.

9               THE COURT:  Ms. Solomon?

10                        CROSS-EXAMINATION

11  BY MS. SOLOMON:

12  Q.  Good afternoon, Sergeant Cato.  My name is Lauren Solomon,

13  and I represent Cherron Phillips in this case.  I just have a

14  few questions for you.  Can you hear me okay?

15  A.  Yes, I can hear you.  I'm Sergeant Thompson.

16  Q.  I'm sorry, Sergeant Thompson.  I just have a question.

17  Were you deputized twice on two different occasions?

18  A.  That is correct.

19  Q.  Okay.  The first one or the first time was in 2004?

20  A.  That is correct.

21  Q.  And then your deputization ended sometime thereafter?

22  A.  Yes, ma'am, it did.

23  Q.  And did you then return to your Chicago Police Department

24  duties at that time?

25  A.  Yes, I did.

380

Thompson - cross by Solomon

1   Q.   Then at a later date, you were once again deputized?

2   A.   That is correct.

3   Q.   Okay.  That second deputization started in 2008?

4   A.   I believe it was 2008, and that also ended in 2009.

5   Q.   Okay.  Is there a set period of time that that takes place,

6   or does it vary?

7   A.   I don't understand.

8   Q.   Do you have to be renewed for a deputization after a

9   certain period of time?

10  A.   No.  In cases where you are assigned to a task force, some

11  guys have the opportunity to stay five, seven, eight years.

12  During my deputization with the DEA as well as with money

13  laundering -- well, the money laundering team that I was on was

14  disbanded.  That's why it shows that short period of '08 and

15  '09.

16  Q.   So that was your second period of deputization.

17  A.   That was the second period.

18  Q.   Okay.

19  A.   The first period when I was assigned with the DEA task

20  force, I was there from 2004 to 2007.  The only reason why I

21  went back was because I guess my time span had expired with the

22  DEA and I was returned back to the organized crime division.

23  Q.   Okay.  So the Chicago Police Department didn't have a

24  termination time, but the DEA did?

25  A.   No, ma'am.

381

Thompson - cross by Solomon

1  Q.  Well, you just said that your termination time had ended.

2  A.  You have a certain amount of time.  Some people's time with

3  the task force are longer than others.

4  Q.  Okay.

5  A.  My time was up in '07.

6  Q.  Okay.

7  A.  For some odd reason, they wanted me back in narcotics.

8  Q.  The Government showed you Government Exhibit 13.6, and you

9  said you became aware of that when you were notified by someone

10  in the Federal Government?

11  A.  Yes, I do believe so.

12  Q.  Okay.  You don't remember who that was?

13  A.  No, ma'am, I do not.

14  Q.  And do you recall when that was?

15  A.  The exact date?  No, I do not.

16  Q.  And you were notified by telephone or in person?

17  A.  They talked to me in person.  They met me at 3340 West

18  Fillmore.

19  Q.  Okay.  You were given a copy of the document that's called

20  "Notice of Claim of Maritime Lien"?

21  A.  Yes.

22  Q.  And had you ever heard of a maritime lien before that?

23  A.  Absolutely not.

24  Q.  Do you know what "maritime" applies to?

25  A.  I know it has something to do with water or boats or

Thompson - cross by Solomon

1  something.

2  Q.  Water or boats.  So it didn't seem to apply to you, did it?

3  A.  When I saw the number and I saw "lien" on it, then it

4  became very serious to me.

5  Q.  Okay.

6  A.  Yes, it applied to me.

7  Q.  Okay.  But you didn't think of yourself as a vessel in the

8  sense of a maritime boat.

9  A.  Not at the present time, no.

10  Q.  Okay.  Now, did you own real property at the time that you

11  received this lien?

12  A.  Yes.

13  Q.  And have you tried to sell the property since you received

14  the lien?

15  A.  No, I haven't.

16  Q.  Are you aware of whether or not there's any kind of lien or

17  encumbrance on your title to that real property?

18  A.  No, I'm not aware if there's a lien on my property.

19  Q.  And are you aware of any liens or attachments to any other,

20  whether real or personal property that you own?

21  A.  No, I'm not aware of that.

22  Q.  You've not had any problems accessing any real or personal

23  property since you had this lien or you received a copy of the

24  purported lien?

25  A.  Since I've received it, I haven't went out and purchased a

383

Thompson - cross by Solomon

1  home or a new car or anything like that, so no.

2  Q.  Right.  But it also lists as possible property bank

3  accounts, retirement accounts.  You haven't had any notice from

4  any bank or other holder of an account that you may have that

5  you can't access your money because there's a lien on it?

6  A.  No, I haven't.

7  Q.  Okay.  You said you were the officer that initiated the

8  case against Devon Phillips?

9  A.  Yes.

10  Q.  And was he the sole target of that investigation?

11  A.  Yes, he was.

12  Q.  And your involvement in the federal case was to testify at

13  the sentencing hearing?

14  A.  Could you repeat that?

15  Q.  When the case actually came over to court after he was

16  indicted, your involvement in that case was to testify at the

17  sentencing hearing?

18  A.  Yes, my testimony was needed for it.

19  Q.  But you were not there at the time that he was actually

20  sentenced?

21  A.  I do believe that I was either out of the courtroom or I

22  didn't come to the actual sentencing date.  That was set at a

23  later date.  After the plea bargain or he pled guilty or

24  whatever, then they later set a sentencing date.  On that

25  particular date, I was not in the courtroom.

384

Thompson - cross by Solomon

1    Q.   So the sentencing date was separate from the sentencing

2    hearing?

3    A.   Yes.

4    Q.   Okay.   You said that Mr. Phillips was representing himself

5    at the time that you testified?

6    A.   Throughout the trial, he started out representing himself.

7    He was instructed that he should seek an attorney.   He later

8    changed his mind and sought out an attorney.   That attorney

9    later withdrew himself from the case.   Then there was another

10   attorney involved.   It was just a roller coaster.

11   Q.   But you said that the case ended in a plea agreement.

12   A.   Yes.   At that point, he had sought a legal attorney.   He

13   was instructed to by the judge, if I'm not mistaken.

14   Q.   So I guess I'm not clear.   He was represented by an

15   attorney or not at the sentencing hearing?

16          MR. STUMP:   Your Honor, we'll stipulate.

17          MS. SOLOMON:   But I want an answer.

18          THE COURT:   That's okay.   She wants to examine the

19   witness.

20          MS. SOLOMON:   Yeah, I want to hear it from the

21   witness.

22          MR. STUMP:   Fair enough.

23   BY THE WITNESS:

24   A.   Repeat the question, please.

25   BY MS. SOLOMON:

Thompson - cross by Solomon

1  Q.  I just wanted to know:  Was he represented by counsel at
2  the sentencing hearing?
3  A.  To be totally honest with you, yes, he was.  There was a
4  counsel who questioned me at the sentencing hearing.  I was
5  cross-examined by a lawyer.  Yes, he did have a lawyer.
6  Q.  Okay.  You said that you saw that he was -- Mr. Phillips,
7  you indicated that Mr. Phillips was being questioned at the
8  sentencing hearing as well?
9  A.  If Mr. Phillips was questioned at the sentencing hearing, I
10  don't -- repeat that.
11  Q.  On direct, you said that Mr. Phillips was asked questions
12  and that he consulted with somebody else in the courtroom while
13  he was being questioned.
14  A.  No.  If it came across like that, that's not what happened.
15  Mr. Phillips was asking the questions.  He was going back and
16  forth with the judge.  When the judge actually said something
17  to him that I guess he didn't understand, then he looked over
18  his shoulder and he'd seek, I guess, advice from his sister.
19  Q.  From the woman who you believe was his sister.
20  A.  No, at that time I knew it was his sister.
21  Q.  Oh, you knew at that time.
22  A.  Uh-huh.
23       MS. SOLOMON:  Okay.  Thank you.  Nothing further.
24       THE COURT:  Anything further?
25       MR. STUMP:  No.  Thank you, Your Honor.

Powers - direct by Stump

```
 1        THE COURT:  May the witness be permanently released?

 2        MS. SOLOMON:  Yes, Your Honor.

 3        MR. STUMP:  Yes.

 4        THE COURT:  Thank you, sergeant.

 5        THE WITNESS:  Thank you.

 6   (Witness excused.)

 7        MR. STUMP:  The United States calls Kevin Powers.

 8        THE CLERK:  Raise your right hand.

 9   (Witness duly sworn.)

10                      KEVIN POWERS,

11              GOVERNMENT'S WITNESS, DULY SWORN

12                    DIRECT EXAMINATION

13 BY MR. STUMP:

14 Q.  Sir, can you tell us your name, please?

15 A.  Sure.  Kevin Powers.  The last name is spelled P-o-w-e-r-s.

16 Q.  Mr. Powers, where do you work?

17 A.  I work for the Drug Enforcement Administration, DEA, here

18 in Chicago.

19 Q.  What do you do for the DEA?

20 A.  I am division counsel for DEA, which basically means

21 in-house counsel.  I provide legal advice to all the agents,

22 task force officers, reporting directly to the chief counsel of

23 DEA in Washington.  But in reality my boss here in Chicago is

24 the special agent in charge.

25 Q.  How long have you been in that role with DEA?
```

Powers - direct by Stump

1   A.   I started with DEA in February of 2005.

2   Q.   And you said your title is division counsel?

3   A.   That's correct, division counsel for the Chicago Field

4   Division.

5   Q.   And have you been in that exact position since 2005?

6   A.   Yes, sir.

7   Q.   As part of your job, are you familiar with the process by

8   which a law enforcement officer can become federally deputized

9   with the DEA?

10  A.   Yes, a state and local officer, that task force process,

11  yes.

12  Q.   Could you explain that process just briefly to the jury?

13  A.   Sure.  Basically, DEA and all the federal agencies tend to

14  be small in size.  We only have like currently 4800 agents

15  worldwide.  We're in all 50 states and 67 countries.  So in

16  order to multiply our forces, basically, we have task force

17  officers.

18           What we do, state and local partners will offer up

19  manpower, men and women who are law enforcement officers either

20  in that city, town, or state.  They'll go through a background

21  check, and we'll deputize them.  They're actually sworn.  They

22  take the same oath that agents take, and then they have all of

23  the powers and duties of federal agents.  They are the

24  functional equivalent of a federal agent at that point.

25  Q.   How are they paid after they're deputized?

Powers - direct by Stump

1  A.  They remain on the payroll of their state and local

2  agencies.  For instance, if the City of Chicago sent a task

3  force officer, CPD would pay the task force officer/police

4  officer their regular pay.  If they're working on certain types

5  of cases and overtime is incurred, the Federal Government will

6  pay their overtime.

7  Q.  You said that there's a process.  You mentioned a

8  background check and all that.  Can you just walk us through,

9  if someone was going to become federally deputized with the

10 DEA, the different steps that would have to occur before that

11 could be accomplished?

12 A.  Sure.  Initially what would happen is a police chief or a

13 commander would reach out to the special agent in charge in

14 Chicago and would say:  Listen, we're interested in giving you

15 a task force officer and becoming federal partners.

16        It benefits them as well as DEA.  The process is,

17 basically, the special agent in charge will say:  Okay.

18 Congress has funded a task force position.  In other words,

19 there's now an opening.

20        The police chief will then nominate usually between

21 three and five officers per position.  Then one of the special

22 agent in charge's assistants, an assistant special agent in

23 charge will interview those few people and decide which one

24 would be a good fit, the best fit for DEA.

25        Once the decision is made that it's mutually

389

Powers - direct by Stump

1  agreeable that this particular officer will be a task force
2  officer, a background check is run on the officer, basically,
3  his criminal history.  Usually, there isn't one.  But it's
4  basically just, you know, the computer database background
5  check to make sure that they would be appropriate as a federal
6  task force officer.
7          Once they clear that process, then we would send the
8  -- basically, it's a one-page contract.  We would send it to
9  headquarters.  That's DEA Headquarters, which is in Arlington,
10 Virginia.  The division is called security programs.  They
11 would just check and make sure that all the I's are dotted, T's
12 are crossed, and it's an appropriate task force officer.
13         Then that form would be sent back to DEA Chicago, and
14 we would literally bring the candidate in and give him his
15 oath.  Then he gets a DEA badge and DEA credentials, and as and
16 as I said before, he is now the functional equivalent of a DEA
17 agent.
18 Q.  Those forms that you've described that are filled out and
19 sent back and forth, are those maintained by the DEA?
20 A.  Yes, sir, they are.
21 Q.  How are they maintained?
22 A.  They're maintained -- the originals are maintained at DEA
23 Headquarters in Arlington, Virginia, and copies are maintained
24 in the field division.  So in this case we keep a copy in the
25 Chicago Field Division.

390

Powers - direct by Stump

1  Q.  I want to show you what we've marked for identification as
2  Government Exhibit 22.  It's a multipage document.  Do you
3  recognize what I've handed to you?
4  A.  Yes, sir, I do.
5  Q.  What is Exhibit 22?
6  A.  Exhibit 22, the first page is a cover letter from my boss,
7  the special agent in charge of DEA Chicago, John J. Riley, to
8  the special agent in charge -- the former special agent in
9  charge of the Federal Bureau of Investigation here in Chicago.
10 It's a cover letter that answers the FBI's inquiry as to
11 whether four particular individuals were ever task force
12 officers.
13 Q.  And who are those four individuals?
14 A.  The four individuals are Eric Cato, Noel Sanchez, Andre
15 Thompson, and Gilberto Calderon.
16 Q.  All right.  Now, what is the rest of the exhibit?
17 A.  The rest of the exhibit are the copies of the forms.  It's
18 called the DEA-481, and that is the form that I spoke of
19 earlier where it's broken into four parts.  That's the task
20 force request and authorization, basically, the contract.
21 Q.  And who are the people who are the subjects of those
22 various forms?
23 A.  Page 2 is Andre Thompson.  Page 3 is also Andre Thompson
24 because he had two stints as a DEA task force officer.  Page 4
25 is Eric Cato.  Page 5 is Gilberto Calderon.  Page 6 is Noel

391

Powers - direct by Stump

1  Sanchez.

2  Q.  Now, are these forms forms that are filled out as part of

3  DEA's ordinary course of business when deputizing someone to

4  become a federal task force officer?

5  A.  Yes, sir, they are.

6  Q.  And have they been maintained in the ordinary course of

7  business by DEA since they were filled out?

8  A.  Yes, that's correct.

9  Q.  And are the forms that I've handed to you in Exhibit 22,

10  are they true and accurate copies of the forms that were filled

11  out and maintained in the ordinary course of business by DEA?

12  A.  Yes, they are.

13      MR. STUMP:  Your Honor, at this time I'm going to

14  move for the admission of Government Exhibit 22.

15      MS. SOLOMON:  No objection.

16      THE COURT:  22 is admitted, no objection.

17      (Government Exhibit 22 received in evidence.)

18  BY MR. STUMP:

19  Q.  Can you tell us, Mr. Powers, in fact, were the following

20  people federally deputized with the DEA:  Eric Cato?

21  A.  Yes.

22  Q.  Noel Sanchez?

23  A.  Yes.

24  Q.  Andre Thompson?

25  A.  Yes, twice.

392

Powers - direct by Stump

1  Q.  And Gilberto Calderon?

2  A.  Yes.

3  Q.  And can you tell me, do you happen to know the dates for,

4  say, Andre Thompson?  Do you happen to know roughly the dates?

5  A.  The first time he was a task force officer was 2004 to

6  2007, and the second time was 2008 to 2009.

7  Q.  Okay.  I'm going to show page 1 of the exhibit, Exhibit 22.

8  Their names are listed here, and then there's some dates listed

9  next to them.  Do you see that?

10  A.  Yes, I do.

11  Q.  So next to Andre Thompson there's dates from 2008 to 2009.

12  A.  Yes.

13  Q.  Can you explain that?

14  A.  Yes.  That's the second tour of him as a task force

15  officer.  When we produced that to the FBI, the bureau called

16  back to DEA and said:  Can you check again on Thompson to make

17  sure?  We think he may have been a task force officer another

18  time.

19        Basically, we just hadn't gone deep enough into the

20  file.  We flipped another couple of pages in his task force

21  officer file and found the original deputization form which was

22  dated 2004.

23  Q.  And that's the second page of this exhibit, is that right?

24  A.  That's correct.

25  Q.  And the date here appears to be August 18th, 2004?

393

Powers - direct by Stump

1   A.   That was the date that Deputy Chief Risley, who is

2   deceased, that he sent the form to the special agent in charge

3   at DEA nominating Andre Thompson.

4   Q.   Okay.   These other dates that are here on the front of

5   Exhibit 22, are these accurate for the time periods that these

6   officers were deputized with DEA?

7   A.   Yes.   The formal deputization is those dates.   In practical

8   reality, sometimes they're attached to the task force and are

9   working cases prior.   But in terms of, you know, strictly the

10  contract and DEA having responsibilities to them, those are the

11  exact dates.

12  Q.   Okay.   So to make sure I understand, these are the official

13  deputization dates?

14  A.   Correct.

15  Q.   And what you're saying is a person could be working under

16  the umbrella of DEA unofficially before or after these dates,

17  is that right?

18  A.   Before, yes, usually not after, though.   When they go, they

19  go, and that's how we get that date.   A lot of times task force

20  officers will be formally attached to the task force group and

21  working sometimes up to a year, just because it's a paperwork

22  drill.

23          MR. STUMP:   Okay.   Thanks.   That's all the questions

24  I have.

25          THE COURT:   Ms. Solomon?

394

Powers - cross by Solomon

```
 1                    CROSS-EXAMINATION
 2  BY MS. SOLOMON:
 3  Q.  Good afternoon, Mr. Powers.
 4  A.  Good afternoon, ma'am.
 5  Q.  My name is Lauren Solomon, and I represent Cherron Phillips
 6  in this case.
 7  A.  Yes, ma'am.
 8  Q.  Okay.  I have just a couple questions for you.
 9  A.  Of course.
10  Q.  Do you have a background in law enforcement that you are
11  counsel at DEA?
12  A.  No, a legal background, ma'am.  I was a -- I'm a lawyer.
13  Q.  Okay.  Mr. Stump showed you this letter, and for Andre
14  Thompson you said that that was incorrect, that the 2008 to
15  2009 dates are not the only dates that he served?
16  A.  That's correct.  He also served a previous tour as a task
17  force officer.
18  Q.  Okay.  You said someone could work with the task force
19  unofficially before they're actually deputized?
20  A.  Yes.
21  Q.  But if it was unofficial, then they would still be
22  completely under the umbrella of their home or originating
23  employer?
24  A.  That's correct.
25  Q.  Okay.  It would be rare that -- you said that once their
```

395

Powers - cross by Solomon

1  deputization is completed, they're no longer under the DEA task

2  force rubric?

3  A.  That's correct.

4  Q.  Okay.  From this letter, it appears that Eric Cato is no

5  longer a member of the DEA task force?

6  A.  That is correct.

7  Q.  And his term ended August of 2011?

8  A.  Yes, ma'am.

9  Q.  And Noel Sanchez's term ended September of 2010?

10  A.  That's correct.

11  Q.  And Andre Thompson's ended March of 2009.

12  A.  That's correct.

13  Q.  So according to this letter and according to your records

14  or the records of DEA, the only person who's presently a member

15  of the DEA task force is Mr. Calderon.

16  A.  Well, if you move the letter down a little bit, ma'am,

17  you'll see that letter is dated in 2012.

18  Q.  Okay.

19  A.  So actually even Gil Calderon is now back with the Chicago

20  police as well.

21  Q.  Okay.  So as of February of 2012 he was still a member of

22  the task force, but currently he is not.

23  A.  That's exactly right.

24  Q.  And do you recall when his term ended?

25  A.  I believe it was in 2013.

396

Simmons - direct by Stump

1          MS. SOLOMON:  Okay.  Thank you.  Nothing further.

2          MR. STUMP:  No further questions, Your Honor.

3          THE COURT:  May I release the witness permanently?

4          MR. STUMP:  Yes.

5          MS. SOLOMON:  Yes.

6          THE COURT:  Thank you, sir.

7          THE WITNESS:  Thank you, Your Honor.

8      (Witness excused.)

9          MR. STUMP:  The United States calls Rob Simmons.

10     (Brief pause.)

11         THE COURT:  Would you raise your right hand?

12     (Witness duly sworn.)

13                    ROBERT DONALD SIMMONS,

14               GOVERNMENT'S WITNESS, DULY SWORN

15                    DIRECT EXAMINATION

16  BY MR. STUMP:

17  Q.  Good afternoon, sir.

18  A.  Hello.

19  Q.  Could you tell us your full name and please spell your last

20  name?

21  A.  Robert Donald Simmons, S-i-m-m-o-n-s.

22  Q.  Mr. Simmons, what do you do for a living?

23  A.  I'm a special agent with the Federal Bureau of

24  Investigation.

25  Q.  In what city and state do you work?

397

Simmons - direct by Stump

1 A.  Chicago, Illinois.

2 Q.  How long have you been with the FBI in Chicago?

3 A.  I've been assigned to Chicago for approximately four years.

4 Q.  Were you with the FBI in another location before that?

5 A.  Yes.

6 Q.  Where?

7 A.  Sacramento.

8 Q.  How long were you in Sacramento?

9 A.  Again, approximately three and a half, four years.

10 Q.  Throughout that time, so seven or eight years, have you

11 always been a special agent?

12 A.  Yes.

13 Q.  Do you have any prior law enforcement experience before you

14 got to the bureau?

15 A.  I do not.

16 Q.  Can you tell us, generally speaking, what does a special

17 agent with the FBI do?

18 A.  We conduct investigations of federal violations.

19 Q.  Those are violations of federal law?

20 A.  Yes.

21 Q.  Criminal?

22 A.  Yes.

23 Q.  I want to ask you about a case.  It's a case for the name

24 Devon Phillips.  Are you aware that there was an investigation

25 and prosecution of a person by that name in this building a

398

Simmons - direct by Stump

1  number of years ago?

2  A.  Yes.

3  Q.  Were you involved in any way in either the investigation or

4  the prosecution?

5  A.  No.

6  Q.  Have you had any involvement in this case --

7  A.  Yes.

8  Q.  -- for which you're testifying here today?

9  A.  Yes.

10  Q.  What was your role in the investigation and prosecution

11  here?

12  A.  I assisted with the search warrant that was conducted in

13  March of 2012.

14  Q.  And what was your role in connection with the search

15  warrant?

16  A.  I was initially a member of the entry team, and then I was

17  assigned to search a portion of the residence.

18  Q.  You said it's a residence.  Whose residence was it?

19  A.  Cherron Phillips.

20  Q.  Was there a specific -- tell us, do you remember the exact

21  day that you searched the house?

22  A.  March 9th, 2012.

23  Q.  Do you remember approximately what time of day it was when

24  you all arrived?

25  A.  I believe we started the search -- the entry at

399

Simmons - direct by Stump

1 approximately 6:10 a.m.

2 Q.  And you were one of a number of agents that were there that

3 day, is that right?

4 A.  Yes.

5 Q.  What specifically were you looking for when you went to

6 search that house?

7 A.  Based on the search warrant, we were authorized to look for

8 documentation, non-privileged documentation related to the case

9 you referenced earlier, I believe, another federal case,

10 documentation pertaining to maritime liens with the names of

11 certain federal officials or federal employees, world passports

12 or other identification documents pertaining to Cherron

13 Phillips or River Tali, and documentation showing who lived or

14 owned that residence, i.e., phone bills, utility bills.

15 Q.  I'm going to show you what's marked for identification as

16 Government Exhibits 33.1 through 33.3.  Each one is one page.

17 They're photographs.  What I want to ask you is if you

18 recognize what's in the photographs.

19 A.  Yes, I do.

20 Q.  All right.  What did I show you there?  What are those

21 exhibits?

22 A.  A picture of the residence that we searched on March 9th,

23 2012, a picture of the room that I searched inside that same

24 residence, and a picture of a safe that has been opened that I

25 found inside the room inside the residence that I searched on

400

Simmons - direct by Stump

1  that date.

2  Q.  And those photographs that you're holding in your hand, do

3  they truly and fairly depict the scene as you recall it on

4  March 9th, 2012?

5  A.  Yes.

6        MR. STUMP:  At this time, we'd move for admission of

7  Government Exhibits 33.1 through 33.3.

8        MS. SOLOMON:  No objection.

9        THE COURT:  33.1 through 33.3 admitted, no objection.

10     (Government Exhibits 33.1, 33.2, and 33.3 received in

11      evidence.)

12  BY MR. STUMP:

13  Q.  Okay.  I'm going to put 33.1 on the screen.  What are we

14  looking at here, Agent Simmons?

15  A.  That's the residence we searched on March 9th, 2012.

16  Q.  Was there a specific plan for where you were supposed to go

17  when you got in the house?

18  A.  Based on where I was standing when we entered, I was

19  assigned to go upstairs to participate in the protective search

20  initially.

21  Q.  And what was that?  What's the protective search?

22  A.  Just going in and seeing who's in the residence, securing

23  everybody in a place to kind of get it under control and make

24  sure it's safe for everyone involved before we begin the

25  search.

401

Simmons - direct by Stump

1   Q.   Was there anyone home when you went to search the house?

2   A.   Yes.

3   Q.   Who was there, do you remember?

4   A.   Cherron Phillips, two other females, and I believe two

5   children.

6   Q.   Do you recognize Cherron Phillips in the courtroom?

7   A.   Yes.

8   Q.   Can you describe her for the record?

9   A.   She's standing directly behind you with the blue head

10  scarf.

11  Q.   Is she standing or sitting?

12  A.   Sitting -- standing -- sitting.  Excuse me.

13  Q.   Okay.  To make it clear, you're referring to this woman

14  right here (indicating)?

15  A.   Yes.

16        MR. STUMP:  I'm going to ask the Court to take notice

17  that the witness has identified the defendant.

18        THE COURT:  So noted.

19  BY MR. STUMP:

20  Q.   Agent Simmons, what room or rooms did you end up searching

21  in the house?

22  A.   I searched a large bedroom on the second floor.

23  Q.   Were you able to determine if it was the master bedroom or

24  some other bedroom?

25  A.   I believed it to be the master bedroom based on the size

402

Simmons - direct by Stump

1  and the items that we found in there.

2  Q.  I'm going to show you the second page of the exhibit.  Let

3  me back it up.  What do we see in this picture?

4  A.  That's a photograph of the upstairs bedroom that I

5  searched.

6  Q.  Okay.  What I want to ask you about is what's this right

7  here in the picture (indicating)?  Can you see it?

8  A.  Yes.

9  Q.  What am I pointing to?

10  A.  That's a small safe.

11  Q.  And where was the safe located in that room?

12  A.  It was located, initially located in that closet right

13  behind it.

14  Q.  Now, in the picture, is the safe open or shut?

15  A.  The safe is open.

16  Q.  And was it that way when you found it?

17  A.  No, it was shut.

18  Q.  Was the safe locked?

19  A.  Yes.

20  Q.  At some point, was the safe unlocked?

21  A.  Yes.

22  Q.  Do you know how that happened?

23  A.  Yes.

24  Q.  How did that happen?

25  A.  Cherron Phillips opened the safe for us.

403

Simmons - direct by Stump

1  Q.  And did you find anything inside the safe that was

2  responsive to the warrant?

3  A.  Yes.

4  Q.  I'm going to put 33.3 on the screen.  This is the inside of

5  the safe.  What did you find inside the safe that you felt was

6  responsive to the warrant?

7  A.  The maritime liens with the names of certain federal

8  officials and federal employees.

9  Q.  I'm going to show you what we've marked for identification

10  as Government Exhibits 1 through 12.  Could you take a look at

11  those exhibits and let me know after you've looked at them if

12  you recognize them?

13  A.  Okay.

14  Q.  Do you recognize these exhibits?

15  A.  Yes.

16  Q.  All 12 of them?

17  A.  Yes.

18  Q.  And what are they?

19  A.  Those are the maritime liens that I located inside that

20  safe.

21           MR. STUMP:  At this time, I'd move for the admission

22  of Government Exhibits 1 through 12.

23           MS. SOLOMON:  No objection.

24           THE COURT:  1 through 12 are admitted, no objection.

25       (Government Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

404

Simmons - direct by Stump

1    and 12 received in evidence.)

2        MR. STUMP:  Your Honor, I'm going to revert back to

3  yesterday, if it's okay with you, and publish these by passing

4  them out.

5        THE COURT:  Okay.

6  BY MR. STUMP:

7  Q.  While they're going around, Agent Simmons, can you tell us

8  or describe in your own memory what happened involving the

9  opening of the safe and the finding of these liens?

10  A.  Well, in the course of searching the room, I found a safe

11  in the closet locked.  So I let the search team leader know and

12  some of the other search team members.  Someone else, not

13  myself, asked Cherron Phillips if she would open the safe.  The

14  safe required a key and a numeric code on a keypad to be

15  opened.  Ms. Phillips got the key.  The battery to the keypad

16  was dead, so we collectively located some batteries, and then

17  Ms. Phillips opened the safe.

18  Q.  Do you remember anything about her demeanor when she opened

19  the safe?  Were you there, and can you describe that part of

20  it?

21  A.  Yes, because I was present.  I don't necessarily recall

22  anything about her demeanor.  When she opened it, she was moved

23  away from the safe.  We didn't know what was in the safe, and

24  so we didn't want her to put her hands in there in the event

25  that there was something of concern in there.  So she was moved

Simmons - cross by Solomon

1  out of the room pretty quickly after the safe was opened.

2  Q.  Other than your role in helping to assist with that search

3  warrant, did you have any other role in the investigation in

4  this case?

5  A.  No.

6          MR. STUMP:  Thank you.  That's all the questions that

7  I have.

8          THE COURT:  Ms. Solomon?

9                   CROSS-EXAMINATION

10 BY MS. SOLOMON:

11 Q.  Good afternoon, Mr. Simmons.

12 A.  Hello.

13 Q.  My name is Lauren Solomon, and I represent Ms. Phillips.

14 You said you were part of the search team that entered

15 Ms. Phillips' residence, and that was in March of 2012?

16 A.  Yes.

17 Q.  And approximately how many -- there were approximately 18

18 officers who participated in the search?

19 A.  I believe there were 19, and then there were some Chicago

20 police officers that supported us on the outside that did not

21 come in initially.  So I don't know how many CPD officers there

22 were, but I'd say there were 19.

23 Q.  From the FBI.

24 A.  The FBI and other federal agencies.

25 Q.  And the 19 federal officers entered the home?

406

Simmons - cross by Solomon

1   A.  Correct.

2   Q.  And you -- well, perhaps not you, but some officers forced

3   entry into the home?

4   A.  That's correct.

5   Q.  At the residence, you didn't knock on the door and wait for

6   someone to answer.

7   A.  No.  I was in this line.  I could hear what was going on,

8   but I could not see.  So I can describe to you what I heard,

9   but I didn't see it.

10  Q.  No, that's okay.  When you went in the door, the door had

11  been pushed in?

12  A.  Yes, I heard them knock.

13  Q.  Okay.

14  A.  And then --

15  Q.  The door was pushed in?

16  A.  Correct.

17  Q.  And when you -- so you were not the first officer to go

18  into the house.

19  A.  No.

20  Q.  And when you arrived in the house, there were three

21  females?  You indicated three adult females?

22  A.  Yes, I believe so.

23  Q.  And do you know approximately their ages?  One was

24  Ms. Phillips, and a second was?

25  A.  I would be estimating.  I believe her mother was present,

407

Simmons - cross by Solomon

1    so she was older.

2    Q.  Her mother?

3    A.  I believe so.

4    Q.  Okay.

5    A.  Then there was another female probably close to

6    Ms. Phillips' age.

7    Q.  Okay.  Did you know the identity of the second female?

8    A.  I do not, no.

9    Q.  Okay.  But you think the other -- there was Ms. Phillips,

10   perhaps her mother, and then a third female.  Then you also

11   indicated there was two young children?

12   A.  Yes.

13   Q.  And about how old were the young children?

14   A.  The only thing I recall is the one that -- she had to carry

15   one of the children, so he was of an age where he still needed

16   to be carried, a toddler.  I don't -- so anything would be an

17   estimate, three to four years of age.

18   Q.  So when you saw the child, you first saw him -- it was a

19   he, I believe?

20   A.  Yes.

21   Q.  A boy was in Ms. Cherron's arms?

22   A.  Yes.

23   Q.  She was carrying him.

24   A.  Yes.

25   Q.  And did she continue to carry him while the officers were

408

Simmons - cross by Solomon

1   in the house?

2   A.  Well, I can only speak about the times that I saw her.

3   When I saw her up in that bedroom, I believe she had the child

4   with her.

5   Q.  And was the child upset?

6   A.  Not at that time, I don't believe.

7   Q.  But you didn't see them the whole time you were there.

8   A.  Correct.

9   Q.  And you were assigned to the upstairs?

10  A.  Correct.

11  Q.  And there were other officers who were also assigned to the

12  upstairs area?

13  A.  Yes.

14  Q.  And you went into this room that you told Mr. Stump you

15  assumed was Ms. Phillips' bedroom?

16  A.  Yes.

17  Q.  Okay.  Ms. Phillips was cooperative in opening the safe?

18  A.  Yes, from what --

19  Q.  When asked, she opened it?

20  A.  From what I saw of that interaction, yes.

21  Q.  Okay.  Then you found the 12 maritime liens.

22  A.  Yes, they were located in there.

23  Q.  And did you find -- were any other documents taken from the

24  safe?

25  A.  The liens were in a folder.  I believe there was some other

409

Simmons - redirect by Stump

1  paperwork with them.

2  Q.  Okay.

3  A.  I don't recall.  I don't recall exactly what it was.

4  Q.  And your participation in the search was your only

5  involvement in this case.

6  A.  Correct.

7  Q.  And you are a full-time member of the FBI in the Chicago

8  Field Office.

9  A.  Yes.

10  Q.  Okay.  Thank you.

11  A.  Thank you.

12          THE COURT:  Redirect?

13          MR. STUMP:  Short.

14                  REDIRECT EXAMINATION

15  BY MR. STUMP:

16  Q.  Agent Simmons, why so many agents at the search scene?

17  A.  I wasn't involved in the decision-making.  Based on, A, it

18  was a large residence, probably larger than it looks in the

19  photo, it was a large residence, and other than that I can't

20  say.

21  Q.  Did you feel like you had enough agents to be able to do

22  the job that you needed to do there?

23  A.  Yes, yes.

24  Q.  And with regard to the way that you all made entry into the

25  house, you said you didn't see it, but you heard something.

Simmons - recross by Solomon

1  A.  Yes.

2  Q.  What did you hear?

3  A.  I heard the agents up front.  There's two doors to enter

4  the residence.  They went to the first door, saw someone

5  moving, was giving voice commands for that person to open the

6  door, and for a period of time it wasn't.  I mean, it was at

7  least 30 seconds in which they were instructing somebody to

8  open the door, which doesn't sound like a lot, but when you're

9  standing there it's a lot.  So then the first door was

10  breached.  Then there was a second door, and one of the lead

11  agents was having a conversation with Ms. Phillips through the

12  door.  She refused to open the door, so the second door was

13  breached at that point.

14  Q.  And did you understand it to be your authority under the

15  search warrant to take that action when she refused to open the

16  door?

17  A.  Yes.

18        MR. STUMP:  That's all the questions I have.

19                  RECROSS-EXAMINATION

20  BY MS. SOLOMON:

21  Q.  You indicated that you appeared at the house at 6:10 a.m.

22  to execute the search warrant?

23  A.  Yes.

24  Q.  And you also indicated that this was a multistory house?

25  A.  Correct.

411

Simmons - recross by Solomon

1   Q.   And you indicated that the bedroom was on the second floor?

2   A.   Correct.

3   Q.   And that Ms. Phillips was the owner of the house?

4   A.   I don't know that I --

5   Q.   Well, it appeared to be her residence, is that correct?

6   A.   Yes, yes.

7   Q.   And you said today that you thought that 30 seconds was an

8   extreme amount of time for someone to get out of bed, kind of

9   wake up, grab the child, walk down the stairs, and get to the

10  door?  At 6:10 a.m., you would expect someone to get there

11  quicker than that?

12          MR. STUMP:  I'm just going to object because I think

13  she's mischaracterizing his previous testimony.

14          THE COURT:  Overruled.  You can answer.

15  BY THE WITNESS:

16  A.   Let me try to clarify.  My understanding, again, from

17  hearing was that the agents who were knocking on the door saw

18  someone at or near the door.  So they waited 30 seconds from

19  the time that they had seen that individual at the door to

20  breach the door.  So somebody was behind the door and was being

21  non-compliant.  So they didn't come down.  They were there at

22  the door.

23  BY MS. SOLOMON:

24  Q.   You don't know whether -- you did not see that person.

25  A.   Correct.

412

Simmons - recross by Solomon

1  Q.  You do know who that person at the door was.

2  A.  Correct, no.

3  Q.  And do you think it would be unusual for someone who's been

4  woken up at 6:00 in the morning to be reluctant to let someone

5  into their house?

6  A.  Maybe, sure.

7  Q.  Would you automatically let somebody into your house at

8  6:00 in the morning if you didn't know who they were?

9  A.  I mean, they were announcing who they were.

10 Q.  But it would be surprising, at the very least.

11 A.  Sure.

12 Q.  Did you -- were you aware of the amount of damage that had

13 been caused to the house as a result of the search?

14        MR. STUMP:  I would object on relevance grounds.

15        THE COURT:  What's the relevancy?

16        MS. SOLOMON:  He said that very little was done to

17 the house.  I just wanted to ask if he was aware of the

18 destruction that occurred when they rammed the door.

19        THE COURT:  It's marginally relevant.  Overruled.

20        MS. SOLOMON:  Okay.  Nothing further.

21        THE COURT:  I overruled the objection.

22        MS. SOLOMON:  Oh, I'm sorry.

23        THE COURT:  You win, barely.

24 BY MS. SOLOMON:

25 Q.  Were you aware that there was considerable damage to the

413

Simmons - recross by Solomon

1  house as a result of the search?

2  A.  I was aware that there was damage to the two doors entering

3  the house.

4          MS. SOLOMON:  Nothing further.

5          MR. STUMP:  Thank you, Your Honor.  That's all I

6  have.

7          THE COURT:  May the witness be permanently released?

8          MS. SOLOMON:  Yes.

9          MR. STUMP:  Yes, Your Honor.

10          THE COURT:  Thank you, agent.

11          THE WITNESS:  Thank you.

12      (Witness excused.)

13          THE COURT:  Do you want to take a break now?

14          MR. STUMP:  Yes.

15          THE COURT:  Okay.  Let's take 20 minutes, folks.  I

16  can tell it's just in time.  Some of you are ready to stretch.

17      (Jury out.)

18          THE COURT:  Okay.  Are we ready?

19          MR. STUMP:  Yes.

20          THE COURT:  Okay.  Bring them in.

21      (Jury in.)

22          THE COURT:  Please be seated.

23          Mr. Stump?

24          MR. STUMP:  Thank you, Your Honor.  The United States

25  calls Josh Rongitsch.

414

Rongitsch - direct by Stump

1    (Witness duly sworn.)

2                          JOSH RONGITSCH,

3                   GOVERNMENT'S WITNESS, DULY SWORN

4                       DIRECT EXAMINATION

5    BY MR. STUMP:

6    Q.  Sir, could you say your full name and spell your last name

7    for the record?

8    A.  It's Josh Rongitsch, R-o-n-g-i-t-s-c-h.

9    Q.  Mr. Rongitsch, what do you do, sir?

10   A.  I'm a special agent for the Federal Bureau of

11   Investigation.

12   Q.  Is that here in Chicago?

13   A.  That is.

14   Q.  How long have you been a special agent with the FBI?

15   A.  Just under five years.

16   Q.  Let me ask you this.  As we've been sitting here going

17   through the trial, have you been sitting with me at counsel

18   table pretty much the entire time?

19   A.  Yes.

20   Q.  We talked a lot about the case against Devon Phillips, an

21   investigation and then a prosecution.  Were you involved in any

22   way in either of those?

23   A.  No, I was not.

24   Q.  All right.  Were you involved in the investigation of

25   Cherron Marie Phillips, the defendant?

415

Rongitsch - direct by Stump

1   A.  Yes, I was.

2   Q.  What was your role in the investigation?

3   A.  I was the case agent for the investigation.

4   Q.  What does it mean to be the case agent?

5   A.  As the case agent, basically you handle all aspects of the

6   case, so in this case from inception through trial.

7   Q.  How did you first get involved in the investigation?

8   A.  In March of 2011, I was notified by the United States

9   Marshal's Service of a mailing received by then Chief Judge

10  Holderman and Pat Fitzgerald.

11  Q.  You say it was a mailing to Chief Judge Holderman and to

12  Pat Fitzgerald?

13  A.  Yes, two independent mailings.

14  Q.  And the one to Judge Holderman, I'm going to show you

15  Government Exhibit 30.  All right?  It's admitted.  Is this the

16  mailing that you're referring to?

17  A.  This is the mailing.

18  Q.  All right.  You said there was also a mailing to former

19  U.S. Attorney Pat Fitzgerald?

20  A.  That is correct.

21  Q.  How did that mailing compare to what's been marked as

22  Exhibit 30?

23  A.  Very similar in nature.

24  Q.  All right.  How did this mailing come to your attention,

25  Agent Rongitsch?

416

Rongitsch - direct by Stump

1  A.  Like I said, the United States Marshal's Service contacted
2  me and told me that Judge Holderman and Pat Fitzgerald received
3  a mailing and wanted me to take a look at it.
4  Q.  And what was your initial impression of it when you saw it?
5  A.  My initial impression of it, I didn't know what to expect
6  from reading the contents.  From what was contained within the
7  mailing, it was clear there was a potential threat of arrest to
8  Judge Holderman.
9  Q.  I'm going to direct your attention here to the common law
10 bill of indictment.  Did you read that when you first saw this?
11 A.  I did.
12 Q.  And this paragraph right here where it says "it is
13 ordered," can you read that into the record?
14 A.  I sure can.
15         "It is ordered under common law to arrest Chief
16 Justice James F. Holderman and bring him forthwith to the
17 nearest judge for failure to appear in common law court, motion
18 ordered, summons, no bail."
19 Q.  What did you make of that when you read it?
20 A.  That someone or a group of people were threatening the
21 arrest of Judge Holderman, Chief Judge Holderman.
22 Q.  Had you seen documents like these that are in this mailing
23 before you saw this one?
24 A.  I have.
25 Q.  In what other context?

417

Rongitsch - direct by Stump

1   A.  Working within the FBI, there was another investigation
2   that I was also part of with very similar mailings or very
3   similar documents as contained within this mailing.
4   Q.  I want to ask you, sir, what was your first thought when
5   you saw these about what might be going on?
6   A.  Because of my involvement with another investigation, I
7   thought that there may be some liens filed against unknown
8   parties, in particular Judge Holderman and Pat Fitzgerald,
9   since they received the communication.
10  Q.  All right.  Still on Exhibit 30, I want to turn to another
11  page in this document.  It's about 15 or 16 pages in.  At the
12  top, it says in blue letters "Commercial Affidavit."  Do you
13  see that?
14  A.  I do.
15  Q.  And the date here is January 4th, 2010, and there's a stamp
16  here that says "received January 7, 2011, Michael W. Dobbins,
17  Clerk U.S. District Court."  Do you see that?
18  A.  I do.
19  Q.  I want to turn the page here.  Do you see on this page of
20  the exhibit the reference to "liens"?
21  A.  I do.
22  Q.  And I want to turn the page again.  Let's see.  Let me show
23  you paragraph 13 here.  Do you see here a reference to
24  "commercial liens"?
25  A.  I do.

418

Rongitsch - direct by Stump

1   Q.   Can you read into the record that paragraph?

2   A.   Starting at 13?

3   Q.   You know, if you wouldn't mind, just start it here

4   (indicating).

5   A.   "It shall be considered a willful disregard for this notice

6   and warning, and such shall engender the immediate filing of

7   criminal complaints, affidavit of information and commercial

8   liens, affidavit of obligation against all parties involved."

9   Q.   Okay.  One more time, I'm going to go back to the page

10  before, and we're here in this little paragraph that says

11  Paragraph B.  I want to point out this language there.  Can you

12  read Paragraph B all the way to "properties" over here

13  (indicating)?

14  A.   "All parties who proceed to act or assist in said action

15  against this affiant, Devon Dramaine Phillips El, without

16  verifiable point-by-point rebuttal of each and every point set

17  forth within this affidavit, shall be immediately charged with

18  the criminal fraud, theft, conspiracy of extortion, kidnapping,

19  and commercial liens shall be placed against all their real and

20  personal properties."

21  Q.   Okay.  Thanks.  With the concern that you had, what did you

22  actually do to investigate this issue?

23  A.   I went to the Cook County Recorder of Deeds office located

24  here in Downtown Chicago and attempted to locate liens.

25  Q.   At the time that you did that, did you have any idea who

419

Rongitsch - direct by Stump

1   might be behind this mailing, who might have been involved in

2   it being sent?

3   A.   Yes.

4   Q.   And who did you suspect at that time?

5   A.   Cherron Phillips, also known as River Tali.

6   Q.   Why did you suspect her?

7   A.   Well, first, there was an executive committee order that

8   was also received the same day I received those mailings which

9   identified Cherron Phillips, also known as River Tali, as

10  someone who caused a disturbance in a case, 06 CR 778, with the

11  defendant being Devon Dramaine Phillips.

12  Q.   Let me show you and show the jury this.  This is Government

13  Exhibit 29.  This has already been admitted.  Is this the order

14  that you were just referencing?

15  A.   It is.

16  Q.   Okay.  Why else did you suspect that it was Ms. Phillips?

17  A.   Because at the time that the mailing was received

18  Mr. Phillips, Devon, was in federal custody and more than

19  likely would not have access to public notaries and/or the

20  registered mail system.

21  Q.   All right.  There you're referencing this part of the

22  envelope on Exhibit 30 that says "Registered Mail"?

23  A.   That is correct.

24  Q.   All right.  What did you do when you got to the Cook County

25  Recorder of Deeds the first time?

420

Rongitsch - direct by Stump

1  A.  I went down to the Cook County Recorder of Deeds.  It's not
2  -- I went to a public terminal in the basement where the public
3  terminals are located.  It's not as simple as just a Google
4  search where I can type in "River Tali" or "Cherron Phillips"
5  and have stuff pull up and it's easy to read.  I went down
6  there and conducted a variety of searches on names, "River
7  Tali, Cherron Phillips, Devon Phillips," case numbers and such.
8  I got some results, very limited, though.  I think it was only
9  like two or three items that I actually got a return and was
10  able to see was associated with a lien document.
11  Q.  Now, the certified copies of the liens that were marked as
12  13.1 through 13.12, at some point did you become aware of
13  these?
14  A.  I did.
15  Q.  How did you first become aware of any of them?
16  A.  I first became aware of them in August of 2011.  I was
17  notified by the marshals once again that Mr. Dobbins, then at
18  the time the clerk of court, was going through some sort of
19  real estate transaction and found through his attorney that
20  there was a lien that was causing a hiccup in his transaction.
21  Q.  And what did you do once you found out about that lien?
22  A.  I received that lien via e-mail from the marshals and
23  printed it out, and I had basically now a cheat sheet, I guess
24  that's the best way to sum it up, but something to go by so
25  that I could narrow my search.  Instead of when I first went to

Rongitsch - direct by Stump

1   search and it was very broad-based, now I had a very

2   narrow-based search criteria because I basically could use the

3   document number on there, and also it identified some other

4   potential victims.

5   Q.   I'm putting on the screen now what's already been admitted

6   as 13.4.  What specifically did you rely on in this to conduct

7   your searches?

8   A.   The box labeled number 3, "instrument type," it had names

9   of a series of people that were identified later as victims in

10   this investigation.

11  Q.   And you said also something about the document number?

12  A.   Yeah, yes.  In the upper right-hand corner, each document

13  is given a unique document number.  As we started to search, I

14  was able to see that basically a series of them were all filed

15  at the same time.  So with a document number I could search a

16  document higher and a document lower to see, you know, what is

17  that document.  In essence, they're recorded in clumps.

18  Q.   Now, did you find all 12 at once?

19  A.   I did not.

20  Q.   How many did you find in the first go-around?

21  A.   The first go-around, I found nine liens.

22  Q.   Which nine out of the ones that we've marked as exhibits,

23  do you know?

24  A.   Yes, we identified -- do you want me to name the victim, or

25  do you want me --

422

Rongitsch - direct by Stump

1  Q.  Do you know the numbers?

2  A.  Yes, it was 1 through 9.

3  Q.  Okay, so 13.1 through 13.9.

4  A.  I'd have to look to verify them.

5  Q.  Okay.  Let me show you them here, just to refresh your

6  recollection.

7  A.  We're missing one here, 8.

8  Q.  13.8?  What's the name listed on 13.8?

9  A.  "G. Calderon."

10  Q.  Okay.

11  A.  That is correct.

12  Q.  Okay.  So it was 13.1 through 13.9?

13  A.  That is correct.

14  Q.  That's the first nine.  Would it help your testimony if we

15  had a chart that would show the various liens, the date that

16  they were filed, and the title of the person that they're

17  associated with?

18  A.  It would.

19  Q.  Let me show you what we've marked for identification as

20  Government Exhibit 42.  Do you recognize that?  It's just one

21  page.

22  A.  I do.

23  Q.  What is that?

24  A.  It appears to be a blown-up section from the indictment.

25  Q.  Okay.

Rongitsch - direct by Stump

1   A.   Like a table that was put into the indictment.

2   Q.   And what sort of information is reflected on that exhibit?

3   A.   The counts from the indictment, the date of the recording,

4   the victim, and the official title for the victim.

5   Q.   All right.  Is the victim identified by name or in some

6   other way?

7   A.   Other way.

8   Q.   What's the other way?

9   A.   Well, I guess V1 through V12 in this case.

10  Q.   All right.  Is the information in that table that's on that

11  exhibit true and accurate?

12  A.   It is.

13       MR. STUMP:  At this time, Your Honor, I'd move for

14  the admission of Government Exhibit 42 as an illustrative aid

15  to his testimony.

16       THE COURT:  Well, if it's for demonstrative purposes,

17  that's one thing.  Are you intending it to go to the jury or

18  just used to explain the testimony?

19       MR. STUMP:  Just used to explain the testimony.

20       THE COURT:  Okay.  So, folks, there's a difference

21  between an exhibit that is admitted substantively which you

22  will get to take back with you and something that is just used

23  to assist you in understanding the testimony.  This is

24  something to assist you, so you will not get this back in the

25  jury room.  The other documents so far you will, but I wanted

424

Rongitsch - direct by Stump

1   to explain to you now why when you get in the jury room you

2   won't see this.

3           MR. STUMP:  Thank you, Your Honor.  I'm going to

4   publish it now to the jury.

5   BY MR. STUMP:

6   Q.  Okay.  So real quick, just to be able to explain this, can

7   you tell us what each column signifies?

8   A.  Yeah.  Like I said, it goes back to the indictment, Counts

9   1 through 12.  It's a 12-count indictment in this case.  The

10  date represents the date that the lien was filed within the

11  Cook County Recorder of Deeds.  The person identifies the

12  victim, not by name but by a number, and the official title of

13  the victim.

14  Q.  All right.  So what your testimony is -- just correct me if

15  I'm wrong -- is that you found 1 through 9 here all in that

16  first go-around at the CCRD.

17  A.  That is correct.

18  Q.  All right.  What did you do after you found those nine

19  liens?

20  A.  When I found those liens, basically what I did is I took

21  the document numbers associated with those liens, brought them

22  back to the FBI because I couldn't just go into the Cook County

23  Recorder of Deeds and say that I need these documents and

24  they'd instantly give them to me.  I had to go through a

25  process at our office and make a request, and there's an

425

Rongitsch - direct by Stump

1   administrative specialist that made the request for me so that

2   I could ultimately receive copies of those liens.

3   Q.  And what did you do actually after you had the copies?

4   A.  The same day, I think, I believe the same day that I

5   received those liens, I went out and attempted to speak with

6   Ms. Phillips.

7   Q.  How did that go?  First of all, had you had any contact at

8   all with Ms. Phillips before you reached out to her to try to

9   interview her?

10  A.  I had not.

11  Q.  Had she had any contact with the FBI?

12  A.  She had.

13  Q.  Can you tell us what that was?

14  A.  Ms. Phillips came into the FBI.  I don't know if she

15  physically came in or telephoned in or how, but our complaint

16  unit ended up receiving information from Ms. Phillips as being

17  a victim of potential mortgage fraud.

18  Q.  And when you reached out to her, how did you do it?

19  A.  I went to her residence and attempted to knock on the door.

20  No one answered.  I think I may have even done it several times

21  over the course of that day in trying to get ahold of her.  I

22  saw her vehicle in her driveway, a black Cadillac Escalade, and

23  then I placed a business card in the driver's window area.  It

24  just said, you know, it had my name and number and something to

25  the effect:  I need to speak to you about mortgage fraud -- or

426

Rongitsch - direct by Stump

1   something to that effect.

2   Q.  So you referenced the complaint that she or someone else

3   had brought to the attention of the FBI.

4   A.  That is correct.

5   Q.  All right.  At some point, did you and Ms. Phillips make

6   arrangements to speak?

7   A.  We did.

8   Q.  And can you tell us approximately when that all happened?

9   A.  It was September 2nd, 2011.  I believe after I left my card

10  there, I think it was the same day that she ended up calling me

11  back and said:  Yeah, I'm willing to talk to you.

12          I do recall that she did not want to come to the FBI

13  office.  However, she agreed to meet at a location near the FBI

14  office.

15  Q.  Where, in fact, did you meet?

16  A.  We first tried to meet at a location that she chose, and I

17  think it may have been a coffee shop or something.  We both

18  arrived at approximately the same time, and the place was no

19  longer in business or there was nothing there.  So I suggested

20  a Starbucks off of Taylor Street near our office to meet, which

21  she agreed to.

22  Q.  Was there anybody with you when you went to go interview

23  Ms. Phillips?

24  A.  There was.

25  Q.  Who went with you?

427

Rongitsch - direct by Stump

1   A.   Special Agent Ken Wheeler.

2   Q.   Why did Agent Wheeler come with?

3   A.   Typically, we have another agent at all of our interviews.

4   Q.   And did he have any special experience with the kinds of

5   documents that you had seen or anything else that might be

6   involved?

7   A.   He did.  He was the case agent in that other case that I

8   referenced which was very similar to this case.

9   Q.   Now, when you met with Ms. Phillips on that occasion in

10  September of 2011, was there anyone with her?

11  A.   There was.

12  Q.   Who was that?

13  A.   Her name was or she identified herself as Klona El.

14  Q.   Klona El?

15  A.   I believe the spelling is something similar to K-l-o-n-a,

16  El, E-l.

17  Q.   Did you take any steps to try to figure out who she was?

18  A.   Later in the investigation, we did determine who she was.

19  Q.   And who is she?

20  A.   Her true name was Sharon Patrice Jamieson.

21  Q.   Have you seen that name, "Sharon Patrice Jamieson," in

22  association with any of the documents that are involved in this

23  case?

24  A.   Yes.

25  Q.   In particular, which one?

428

Rongitsch - direct by Stump

1  A.  She was the notary public on the last lien that I ended up
2  finding, the lien that was placed against Justin Williams.
3  Q.  All right.  Do you have that in front of you?
4  A.  I do.
5  Q.  I'm going to take that back, and I'm going to show you
6  what's been admitted as Government Exhibit 13.10.  This is the
7  first page, and I'm going to flip to the top of the second
8  page.  This is the name that you're referring to right here in
9  the seal portion (indicating)?
10  A.  That is correct.
11  Q.  Tell us about the interview at Starbucks.  How did you
12  begin?
13  A.  We began the interview talking about the allegations that
14  Ms. Phillips made to our complaint unit, that she believes she
15  was the victim of a mortgage fraud crime.
16  Q.  And so how did that go?  Did you follow up with her about
17  her own complaint?
18  A.  Yeah.  From talking with her, I learned that -- I believe
19  she had four properties in question, and she started explaining
20  to me that she paid this bank, Shore Bank, where she felt that
21  she satisfied the loans with Shore Bank.  However, Shore Bank
22  eventually went under, and a new bank or financial institution
23  took over these loans, Pangea, if I remember correctly, and
24  that Pangea is now going after her, trying to collect because
25  they said that the loans weren't satisfied.

429

Rongitsch - direct by Stump

1  Q.  Did you look into that at all?

2  A.  I did not.  Ms. Phillips, basically what she relayed to me

3  was that she was actually -- the parties that she was claiming,

4  it appeared that she was the wrongdoer.

5          MS. SOLOMON:  Judge, objection, relevance.

6          THE COURT:  What's the relevancy?

7          MR. STUMP:  Judge, basically I'm just trying to

8  explain that he didn't just ignore her complaint, that he

9  responded to her complaint before he began to start the next

10  part of the interview.

11          THE COURT:  Okay.  Why don't you just ask him if he

12  just ignored her complaint.  He can say no, and then we don't

13  have to get into this.

14          MR. STUMP:  I just -- okay.

15  BY MR. STUMP:

16  Q.  Did you ignore her complaint?

17  A.  After hearing the entirety of it, yes.

18  Q.  And why did you do that?

19  A.  Because it didn't have any grounds of criminal activity

20  from the bank.

21  Q.  At some point, did the conversation then turn to the

22  substance of this case?

23  A.  It did.

24  Q.  What did you ask her specifically about this case?

25  A.  I showed her a photocopy of the mailing that was originally

430

Rongitsch - direct by Stump

1  received by Judge Holderman.

2  Q.  And what did she say about that?

3  A.  She acknowledged that she was aware of the document, or the

4  mailing and also the contents there within.

5  Q.  Did she make any admissions about anything having to do

6  with it?

7  A.  Yes.  She said that she read it, she understood it, and

8  that she had a notary public send it to Judge Holderman.

9  Q.  What did she say about her name?

10  A.  Basically during that transition portion of the interview

11  from when she was talking about the banks to talking about the

12  mailing, I asked her, you know:  Have you every changed your

13  name?

14        Then she responded:  Yes, my name is River, just

15  River.

16  Q.  But she said to you that she had changed her name.

17  A.  Yes.

18  Q.  I guess I should ask you this.  Do you recognize her in

19  court?

20  A.  I do.

21  Q.  And would you describe her for the record?

22  A.  Ms. Phillips is wearing a purple top, a black dress, seated

23  at the defendant's table, and she's also wearing a blue scarf

24  or headdress.

25  Q.  And she's the person that you interviewed on that day in

431

Rongitsch - direct by Stump

1    September of 2011.

2    A.   That's correct.

3              MR. STUMP:   I'd ask the Court to take notice that the

4    witness has identified the defendant.

5              THE COURT:   So noted.

6    BY MR. STUMP:

7    Q.   This language that we just looked at in the common law bill

8    of indictment, Exhibit 30, "it is ordered to arrest Chief

9    Justice James F. Holderman," did you show her that language?

10   A.   I did.

11   Q.   What was her reaction to that?

12   A.   Well, I asked her if she could read it.  At one point in

13   the interview, I asked her to read it aloud, and she refused

14   to.  I read it aloud to her verbatim, and at that time I asked

15   her, you know:  What did you mean by this?  What was meant by

16   this?

17             Then she told me that she expected Judge Holderman to

18   be arrested by the United States Marshal's Service.

19   Q.   Did you ask her about the liens?

20   A.   I attempted to.  However, basically, as soon as I pulled

21   the liens out, she instantly was like:  I'm done with this

22   interview -- and wanted to end the interview.

23   Q.   Was that the end, or did anything else happen in the

24   interview?

25   A.   Prior to her leaving, I told her I also had a federal grand

432

Rongitsch - direct by Stump

1  jury subpoena for her fingerprints and attempted to serve it on

2  Ms. Phillips.  However, she refused to take it and also told

3  me:  My fingerprints are my private property.

4            She implied that she's not going to comply with the

5  federal grand jury subpoena.

6  Q.  Did you end up leaving a copy of the subpoena with her?

7  A.  She was already gone.  I mean, she was walking out the door

8  as we were trying to have this conversation, and I couldn't,

9  you know, keep her from leaving.

10  Q.  Did she ever comply with the subpoena?

11  A.  She did not.

12  Q.  I want to show you Exhibits 13.11 and 13.12, and let me

13  just go back to Exhibit 42.  These last two here, Agent

14  Rongitsch, involving the magistrate judges, how did you find

15  those?

16  A.  After I attempted to interview Ms. Phillips and received

17  those initial nine, I didn't know much about the recording

18  process at the Cook County Recorder of Deeds.  So my

19  investigation basically led me there to interview various

20  people at the Cook County Recorder of Deeds.  Also, you know,

21  from those interviews, I learned that a receipt is issued and

22  how things are paid for and how it's filed or recorded.  So

23  with that being said, I ended up talking to an IT specialist

24  within the Cook County Recorder of Deeds.

25  Q.  What was his name?

433

Rongitsch - direct by Stump

1   A.   Joe Ruiz.

2   Q.   And what did Mr. Ruiz do for you?

3   A.   Mr. Ruiz initially was getting me the receipts that

4   corresponded to those initial nine liens.  While he was

5   conducting a search -- and he's extremely good at what he was

6   doing there -- he was able to say:  Hey, I think these may be

7   associated to your case, also.

8            Then he printed those off and also the corresponding

9   receipt with them.

10  Q.   What did you do after you had those 11 total liens?

11  A.   I sent them to the FBI Laboratory for examination,

12  fingerprint examination.

13  Q.   Where is that laboratory located?

14  A.   Quantico, Virginia.

15  Q.   I'm going to show you what we've marked for identification

16  as Government Exhibit 45.  Do you recognize what I've handed to

17  you?

18  A.   Let me take them out here real quick.  I do.

19  Q.   What's Exhibit 45?

20  A.   These are the liens that I sent to the FBI Laboratory for

21  fingerprint examination.

22  Q.   These are the exact 11 liens that you sent?

23  A.   That is correct.

24            MR. STUMP:  Your Honor, at this time I'd move for

25  admission of Government Exhibit 45.

434

Rongitsch - direct by Stump

1        THE COURT:  Any objection to 45?

2        MS. SOLOMON:  No objection.

3        THE COURT:  45 is admitted, no objection.

4    (Government Exhibit 45 received in evidence.)

5  BY MR. STUMP:

6  Q.  And what did you ask the lab to do with these 11 liens?

7  A.  I asked them to compare the fingerprint that was visible on

8  the paper against the fingerprints of Cherron Marie Phillips.

9  Q.  There's one other lien, and we just referenced it in

10 relation to Ms. Jamieson.  That was the lien against Justin

11 Williams.  That's 13.10, and it's number 10, I believe, right

12 here on Exhibit 42, is that right?

13 A.  That is correct.

14 Q.  How did you find that lien?

15 A.  I can't recall exactly, but it was either late 2011 or

16 early 2012 that I was -- I can't recall if I was working on

17 this investigation or the other investigation that I referenced

18 a couple times.  At that time, Joe Ruiz notified me:  Hey, this

19 one may be in relation to that other case that I helped you out

20 on in the past.

21 Q.  So it was Mr. Ruiz again to the rescue.  Was there any

22 explanation for how come that lien hadn't been filed -- hadn't

23 been found before?

24 A.  Yeah.  That was the only lien that was recorded in Markham,

25 a satellite office of the Cook County Recorder of Deeds.

435

Rongitsch - direct by Stump

1  Q.  At some point, did you obtain a federal search warrant for

2  Ms. Phillips' house?

3  A.  I did.

4  Q.  And do you remember the date that the search warrant was

5  executed?

6  A.  March 9th, 2012.

7  Q.  Did you do other things in your investigation between the

8  time that you found out about the mailing and March 9th, 2012,

9  that we haven't discussed?

10  A.  A bunch.

11  Q.  Okay.  I want to skip ahead to the search warrant.  What

12  was your role in executing that search warrant?

13  A.  I was the case agent, first and foremost.  But in addition,

14  I was part of the entry team.  I guess I assigned myself, as

15  the case agent, if Ms. Phillips was willing to speak to us,

16  speak to the FBI, that I would conduct the interview of

17  Ms. Phillips.

18  Q.  Do you remember about how many people you had out there?

19  A.  Approximately 18 to 19 federal officers.

20  Q.  You were present in court when Agent Simmons testified

21  about the warrant, is that right?

22  A.  I was.

23  Q.  Do you remember me asking him how come so many agents?

24  A.  I do.

25  Q.  I'm going to ask you the same question.  How come so many

436

Rongitsch - direct by Stump

1   agents?

2   A.  The house from the outside appears to be only two stories.

3   However, it also contains a fully finished basement.

4   Furthermore, the condition of the house inside was not neat and

5   orderly.  It was very -- the picture doesn't really do it

6   justice.  It's a large home and, furthermore, with the mess, I

7   guess, it wasn't an easy task to search.

8   Q.  So what do those things have to do with the number of

9   agents?

10  A.  The more agents are needed to conduct a search or searches

11  of a larger residence, and depending on the condition and what

12  you're looking for, typically document searches take more

13  people because you're sorting through a lot of stuff.

14  Q.  Did you know exactly what you were going to find when you

15  got there?

16  A.  We had a good indication of what we would find, but

17  ultimately you never know going into a house what you may find.

18  Q.  Now, do you remember Agent Simmons testifying about how you

19  guys entered the home?

20  A.  I do.

21  Q.  Can you explain that to us?  How did that happen?

22  A.  Yeah.  I was actually the individual that knocked and

23  announced.  If you look at the picture there, the porch, I was

24  the one who knocked on and announced on the outside the

25  presence of the FBI and, secondly, that opened the door with

437

Rongitsch - direct by Stump

1  the search warrant.  I did that several times from the outside
2  of the residence, I think approximately two to three times.
3  Q.  What was the response?
4  A.  I think on the second time I knocked and announced, an
5  entry team member behind me basically yelled out about movement
6  in the house, ground floor, you know, that there's some sort of
7  movement.  We knocked and announced again and waited, you know,
8  another 20 seconds or so approximately.  After we saw movement,
9  we had no idea what's going on.  We know that someone is on the
10 first floor but they're not opening the door, and this is after
11 approximately, you know, two or three previous notifications.
12 Q.  So then what did you do?
13 A.  We made entry, breached the front door.  Upon entry, there
14 was another full glass pane door that was locked.  Then off to
15 your left as you entered was a stairwell leading or going up to
16 a second floor.
17 Q.  Within that glass door, could you see in?
18 A.  We could.
19 Q.  And did you see anyone inside?
20 A.  I did.
21 Q.  Who did you see?
22 A.  Ms. Phillips.
23 Q.  Okay.  Did you try to communicate with her at that time?
24 A.  I did.
25 Q.  And how did that go?

438

Rongitsch - direct by Stump

1   A.   She wasn't happy to see me.

2   Q.   Did you exchange words?

3   A.   Yes.   I advised that we were here for a search warrant.

4   You know, I was wearing my body armor, clearly identified as

5   FBI, and told her that she needed to open up the door,

6   otherwise we'd be entering through the door.   Ms. Phillips

7   requested to see a copy of the search warrant.   I told her:

8   I'm happy to, but we've got to get inside first so we can do

9   that.

10         She refused to comply.   Then after exchanging words

11  for a period of time, Ms. Phillips started to exit our viewable

12  area, and we didn't know what she was doing or why she was

13  walking off.   So we made entry through that door, the second

14  door on the first floor.

15  Q.   All right.   Do you remember who was present at the house

16  besides Ms. Phillips when you executed the warrant?

17  A.   I do.

18  Q.   Who else was there?

19  A.   I learned that her mother, her sister, and who Ms. Phillips

20  identified as her son and another young child, and I'm not sure

21  what the child's association was.

22  Q.   Did you take the children into account when you were

23  executing the warrant?

24  A.   Yes.

25  Q.   How?

439

Rongitsch - direct by Stump

1  A.  Upon us breaching that second door, I actually turned my

2  attention to Ms. Phillips because I didn't know where she was

3  going in the house or anything like that.  Ms. Phillips

4  basically refused to comply, however, and immediately started

5  requesting that she needs to grab her son located in the second

6  floor bedroom.

7          I tried to tell her we need to check the house first,

8  you know, because we have no idea when we're going into a house

9  what to expect.  However, Ms. Phillips was very insistent that

10  she get her son, so I actually went through an uncleared

11  portion of the house so that she could grab her child and bring

12  him downstairs.

13  Q.  What do you mean "an uncleared portion"?

14  A.  To my knowledge, no law enforcement personnel from our

15  operation already cleared that area.  So, you know, I was kind

16  of by myself with Ms. Phillips, and I think I may have had

17  another agent walking with me then.

18  Q.  At some point, you said that your goal was, if it all one

19  went well, that you would assign yourself the task of

20  interviewing Ms. Phillips again, is that right?

21  A.  Yes, that is correct.

22  Q.  And did you, in fact, interview her?

23  A.  I did.

24  Q.  Was she under arrest when you interviewed her?

25  A.  She was not.

440

Rongitsch - direct by Stump

1   Q.   Did you make that clear to her?

2   A.   I did.

3   Q.   And what did you tell her about that?

4   A.   After she grabbed her child, she came downstairs with us

5   and once again demanded to see the search warrant.  At that

6   time, we were in an area that, you know, had already been

7   cleared, so we sat down and I showed her a copy of the search

8   warrant and kind of showed her, per her request, the items that

9   we were there to seize.

10   Q.   And what was her reaction?

11   A.   She told me that with the exception of the world passport,

12   which was on our search warrant for items to be seized, that

13   only copies were maintained in the residence.

14   Q.   Only copies of what?

15   A.   Of the documents that we were there to search for.

16   Q.   Now, you mentioned this world passport, and I think another

17   witness mentioned it.  What was the world passport?

18   A.   The world passport was a -- per an interview of another

19   public notary of actually 11 of the liens, she told the FBI

20   that Ms. Phillips presented the world passport to her before

21   she notarized the documents, the lien documents.

22   Q.   So when you went into the hospital, were you looking

23   specifically for that world passport?

24   A.   That was one of the items we were looking for.

25   Q.   And did the warrant give you authority to search for the

441

Rongitsch - direct by Stump

1    world passport?

2    A.  It did.

3    Q.  And what did Ms. Phillips say about the world passport?

4    A.  She advised that it was at an undislosed location at the

5    residence.  You know, with any search warrant, we're trying to

6    be as minimally disruptive as possible.  We asked her:  Okay.

7    Can you just tell us where it is so that we can get out of

8    here?  You know, you have a family, and we don't want to be

9    here any longer.

10              Then she refused to comply.

11   Q.  Before you left the house that day, did you find the world

12   passport?

13   A.  We did.

14   Q.  I'm going to show you what we've marked for identification

15   as Government Exhibit 35.  Do you recognize that?

16   A.  Its cover, yes, I do recognize it.

17   Q.  And what did I just hand you?

18   A.  This is the world passport with the name "River Tali" and a

19   picture of Cherron Phillips in it.

20   Q.  And where was that found?

21   A.  That was found on the second floor master bedroom of the

22   residence.

23              MR. STUMP:  Your Honor, at this time I'd move for

24   admission of Government Exhibit 35.

25              MS. SOLOMON:  No objection.

442

Rongitsch - direct by Stump

1          THE COURT:  35 is admitted, no objection.

2      (Government Exhibit 35 received in evidence.)

3          MR. STUMP:  I'm going to take it out of its plastic

4   and publish it the old-fashioned way by passing it around to

5   the jury.

6   BY MR. STUMP:

7   Q.  Agent Rongitsch, you said the first time you interviewed

8   Ms. Phillips that she didn't want to talk about the liens or

9   she ended interview at least when you started to ask about the

10  liens.  Did you ask her again in the second interview?

11  A.  I did.

12  Q.  What did you ask her, and what did she say?

13  A.  I brought photocopies of all the lien materials and, I

14  think, the corresponding receipts along with some other items

15  that I discussed with Ms. Phillips.  In regards to the liens, I

16  asked her, you know, what was the purpose of these liens, and

17  she advised that it was her right to remedy in her brother

18  Devon Phillips case.

19  Q.  Her right to remedy?

20  A.  Yeah.  Furthermore, under Title 18, under the authority of

21  Congress, she had the right to have these liens filed or

22  recorded.

23  Q.  Did she say anything about how she felt about her brother's

24  case when you interviewed her?

25  A.  Yeah, she advised that there was injustice done in her

443

Rongitsch - direct by Stump

1  brother's case, and basically the liens were filed to rectify
2  the wrongdoings of federal officials or officials involved with
3  her brother's case.
4  Q.  Did she go so far as to say that she is the person that
5  filed the liens?
6  A.  She did not.
7  Q.  Did you present her with anything else?  You said you
8  presented her the liens.  Did you show her anything else that
9  day?
10  A.  Yes, the receipts that correspond to the liens.
11  Q.  And were those substantially the same as the ones that
12  we've marked for admission as Government Exhibits 14 through
13  17, I think?
14  A.  I don't have the exhibits memorized.  Sorry.
15  Q.  That's all right.  Let me show you Exhibit 14.  I have it
16  right here.  It's admitted, so I'll just put it on the
17  overhead.
18  A.  Yes.
19  Q.  Did you show her a copy of this receipt?
20  A.  I did.
21  Q.  And what did she say about that?
22  A.  She advised that -- first of all, the "issued to" portion,
23  she wouldn't make a comment to the lien where it says "River,
24  P.O. Box 8503, Chicago, Illinois 60680."  When I asked her who
25  may have this been recorded by or this receipt issued to, she

444

Rongitsch - direct by Stump

1   implied that a group of individuals may have filed it on her

2   behalf.

3   Q.  Did she elaborate any more about who that group was?

4   A.  I believe it was like a common law, I think just common

5   law.

6   Q.  Nothing beyond that?

7   A.  Nothing beyond that.

8   Q.  What about this safe that was testified to?  Agent Simmons

9   testified about documents coming out of that safe.  When you

10  were interviewing her, had that happened already?

11  A.  No.

12  Q.  When did the issue with the safe come up in relation to

13  your interview of Ms. Phillips?

14  A.  At some point during the interview of Ms. Phillips, I can't

15  -- it was later in the interview because I remember we were

16  almost concluded.  An agent came down and said:  There's a safe

17  upstairs that we found, you know.  Can Ms. Phillips open it up?

18          I basically asked Ms. Phillips:  Are you willing to

19  open it up?

20          She agreed, and I believe two agents escorted her

21  upstairs.  At that time, I stayed downstairs with the second

22  interviewee -- or interviewer that was with me to basically,

23  you know, kind of go over what's going on and what she's

24  telling us.

25  Q.  And were you there when the safe was opened?

445

Rongitsch - direct by Stump

1   A.   I was.

2   Q.   Did you witness the defendant's demeanor when the safe was

3   opened?

4   A.   I did.

5   Q.   Can you describe for us what you saw?

6   A.   Yes.   Basically, Ms. Phillips -- well, can I back up for a

7   quick second?

8   Q.   Please.

9   A.   So Ms. Phillips returned back down, and I was notified by

10  an agent that the batteries were dead within the safe.   So we

11  continued our interview of Ms. Phillips.   Afterwards, they

12  said:   Hey, we've got some batteries.   Let's see if

13  Ms. Phillips is willing to open it up.

14          I actually went up with Ms. Phillips along with a

15  couple other agents to that master bedroom, and at that time

16  Ms. Phillips got in like a crouching position, because as you

17  can see the safe is pretty low on the floor, you know, replaced

18  the batteries.   Then I was like, you know:   Can you open up the

19  safe?

20          A, I didn't have the key and, B, you know, it took a

21  pass code and no one knew the pass code.   At that point, before

22  Ms. Phillips opened it, she kind of, you know, slouched and

23  just seemed defeated, I guess.

24  Q.   Then did she, in fact, open the safe?

25  A.   She did.

446

Rongitsch - direct by Stump

1  Q.  I want to go back to the items that were taken that day.

2  In addition to the liens that we've already seen and the world

3  passport, did anything else come out of that house that you

4  found to be of evidentiary value to you in your case?

5  A.  Yes.

6  Q.  I'm going to hand you what we've previously marked for

7  identification as Government Exhibits 34, 36, 37, 38, 39, and

8  40.  Do you recognize all those exhibits, Agent Rongitsch?

9  A.  I do.

10  Q.  And those exhibits, did they all come out of the

11  defendant's home on the date that you executed the search

12  warrant?

13  A.  These are all the documents that were seized from

14  Ms. Phillips' home on that day.

15  Q.  Are they all of the documents that were seized, or are they

16  all documents that were seized?

17  A.  Thank you.  Yeah, this was not the entirety of the

18  documents that were seized.  This is a portion thereof.

19  Q.  All right.  Let me walk you through the different ones.

20  What is Exhibit 34?

21  A.  34 is a copy of a birth certificate naming Cherron Marie

22  Phillips.

23  Q.  What is Exhibit 36?

24  A.  A document entitled "Judgment Order for Name Change," and

25  it lists as the petitioner name from "Cherron Marie Phillips"

447

Rongitsch - direct by Stump

1   to "River Tali El Marie Bey."

2   Q.  What is Exhibit 37?

3   A.  It's titled "Application for Moorish Great Seal, Tax ID,

4   Nationality and Right to Travel Card," and it lists the name

5   "River Tali" under the first name, the last name "El Bey," and

6   it contains a photo of Cherron Phillips.

7   Q.  Okay.  What about Exhibit 38?

8   A.  It is a PS Form 3811, which I understand is a Postal

9   Service form used for registered mailing.  Basically, it's

10  similar to that of a receipt.

11  Q.  And is there anything on that receipt that ties it to this

12  case?

13  A.  There's a couple things.  The sender information is listed

14  as "Cherron Phillips El."

15  Q.  And who is it addressed to?

16  A.  It's addressed to "U.S. District Court ND, James F.

17  Holderman, Chief Judge."

18  Q.  All right.  What about Exhibit 39?

19  A.  Some handwritten notes which contain maritime liens, notice

20  of affidavit for demand, and various other notes.

21  Q.  And the last one, Exhibit 40, what is that?

22  A.  A document entitled "Maritime Liens and Mortgages," and

23  within the document it contains some underlining.  It looks

24  like someone was doing some research potentially off of it.

25  Q.  Is it a typewritten document or a handwritten document?

Rongitsch - direct by Stump

1  A.  A typewritten document.

2  Q.  So all of these exhibits, 34 and then 36 through 40, were

3  all of these taken from Ms. Phillips' home on the day of the

4  search warrant?

5  A.  That is correct.

6  Q.  And are they all in their original form exactly as you

7  seized them?

8  A.  That is correct.

9          MR. STUMP:  Your Honor, at this time I'd move for

10 admission of Government Exhibits 34, 36 --

11         THE COURT:  One at a time.  One at a time.  34, any

12 objection?

13         MS. SOLOMON:  No objection.

14         THE COURT:  34 admitted, no objection.

15  (Government Exhibit 34 received in evidence.)

16         MR. STUMP:  36, Your Honor.

17         THE COURT:  36?

18         MS. SOLOMON:  No objection.

19         THE COURT:  Admitted, no objection.

20  (Government Exhibit 36 received in evidence.)

21         MR. STUMP:  37.

22         THE COURT:  37?

23         MS. SOLOMON:  No objection.

24         THE COURT:  Admitted, no objection.

25  (Government Exhibit 37 received in evidence.)

Rongitsch - direct by Stump

1          MR. STUMP:  38.

2          MS. SOLOMON:  No objection.

3          THE COURT:  38 is admitted, no objection.

4     (Government Exhibit 38 received in evidence.)

5          MR. STUMP:  39.

6          MS. SOLOMON:  No objection.

7          THE COURT:  39 is admitted, no objection.

8     (Government Exhibit 39 received in evidence.)

9          MR. STUMP:  40.

10          MS. SOLOMON:  No objection.

11          THE COURT:  40 is admitted, no objection.

12     (Government Exhibit 40 received in evidence.)

13          MR. STUMP:  Okay.  I'm going to publish Government

14    Exhibit 40 to the jury.

15    BY MR. STUMP:

16    Q.  All right.  What was it about this exhibit that was of

17    evidentiary value to you in your case, Agent Rongitsch?

18    A.  The initial name, "Cherron Marie Phillips."

19    Q.  All right.  Anything else?

20    A.  Well, I guess also the date of birth on there, because from

21    our earlier investigation there was a driver's license taken in

22    the past of Cherron Marie Phillips with the same date of birth,

23    verification of identification.

24    Q.  Okay.  I show you Exhibit 36, and it says:

25          "Judgment Order in the Matter of the Petition of

450

Rongitsch - direct by Stump

1  Cherron Marie Phillips for Change of Name."

2          Do you see that?

3  A.  I do.

4  Q.  All right.  What was the evidentiary significance of this

5  document to you?

6  A.  It's showing that Cherron Marie Phillips changed her name

7  to River Tali El Marie Bey.

8  Q.  All right.  What's the date associated with this document?

9  A.  January 27, 2010.

10  Q.  Let me show you Exhibit 37.  Can you see that?

11  A.  I can.

12  Q.  What is that?  What is this document?

13  A.  Going off the title, "Application for Moorish Great Seal,

14  Tax ID, Nationality and Right to Travel Card."

15  Q.  And what was it about this document that was of evidentiary

16  value to you?

17  A.  It has the name "River Tali El Bey" and a picture of

18  Ms. Phillips along with her date of birth.

19  Q.  All right.  That's right here (indicating)?

20  A.  Uh-huh.

21  Q.  And does that date of birth match what's on the birth

22  certificate we saw a minute ago?

23  A.  Yes.

24  Q.  What about this street address here where it says "CO Post

25  Office Box 8503"?  Was that any significance to you?

451

Rongitsch - direct by Stump

1   A.  It is.

2   Q.  In what way?

3   A.  During the investigation, I came to learn that Ms. Phillips

4   had a P.O. Box 8503 registered to her.

5   Q.  And let me show you Exhibit 14, the receipt from the Cook

6   County Recorder of Deeds.  Can you read the P.O. Box here under

7   the "issued to" portion?

8   A.  I can.

9   Q.  What does it say?

10  A.  "P.O. Box 8503."

11  Q.  All right.  So it's the same as what's on Exhibit 37.

12  A.  That is correct.

13  Q.  All right.  Let me show you Exhibit 38.  This is the PS

14  Form 3811 you referenced?

15  A.  Yes, it is.

16  Q.  Do you know -- let me show you this first.  It's addressed

17  to James F. Holderman, Chief Judge.  This address here, do you

18  recognize that as the address of this courthouse?

19  A.  It is.

20  Q.  Then on the other side, there's a name and a post office

21  box.  Can you just read them?

22  A.  "Cherron Phillips El, Post Office Box 8503."

23  Q.  All right.  Do you know what document or documents this

24  particular receipt is related to?

25  A.  I do.

452

Rongitsch - direct by Stump

1   Q.   Which ones?

2   A.   That mailing to Chief Judge Holderman.

3   Q.   Let me show you -- take a look, if you would, at this

4   number right here that starts with "7001."  Do you see that?

5   A.   Uh-huh.

6   Q.   Okay.  What I'm going to do is put on the screen what is

7   the top portion of Government Exhibit 28, which has already

8   been admitted.  Can you compare this number here, the certified

9   mail number, to the number that appears on this form

10  (indicating)?

11  A.   I can.

12  Q.   And are they the same?

13  A.   They are.

14  Q.   What's the significance of that to you?

15  A.   That it was in the possession of Ms. Phillips' residence,

16  so she obviously had some knowledge or dealings with having

17  that receipt along with that mailing and knowledge of that

18  mailing.

19  Q.   Let me show you Government Exhibit 39, a handwritten note,

20  and I'm sort of zooming in on the middle of the page.  Can you

21  tell me what it says here (indicating)?

22  A.   "Www.marlegal.com."

23  Q.   And underneath that, can you read that?

24  A.   "Mllie.html."

25  Q.   And underneath that?

453

Rongitsch - direct by Stump

1   A.  "Maritime liens."

2   Q.  And this right here (indicating)?

3   A.  "Printout."

4   Q.  Okay.  You referenced some other things here.  What else

5   was of interest to you in this document?

6   A.  "Notice of Affidavit for Demand."

7   Q.  And why was that of interest to you?

8   A.  Because if my memory serves me correctly, that same title

9   is also referenced in a mailing.

10  Q.  All right.  Then the last document is Government Exhibit

11  40.  What was of value to you in this document?

12  A.  Well, basically the title and the contents there within.

13  Q.  And you see that there's some underlining in the document?

14  A.  That is correct.

15  Q.  Now I want to skip ahead.  After that warrant was executed,

16  did you take Ms. Phillips into custody?

17  A.  Not at the time of the search warrant.

18  Q.  Why not?

19  A.  We did not have an arrest warrant for her.

20  Q.  At some point, did you obtain an arrest warrant for her?

21  A.  Following a grand jury indictment of Ms. Phillips, yes.

22  Q.  And did you, in fact, arrest Ms. Phillips?

23  A.  I did.

24  Q.  And were you present when she was arrested?

25  A.  I was present.

454

Rongitsch - direct by Stump

1  Q.  Can you tell us what day that happened?

2  A.  November 9th or 11th.  You're going to have to help me on

3  that one.  It was in November of 2012.

4  Q.  Okay.  Were you alone when you arrested her?

5  A.  No, I was not.

6  Q.  Who else was with you?

7  A.  A series of agents, federal agents.

8  Q.  Okay.  Now, was she arrested in -- where was she arrested?

9  A.  She was arrested after she dropped her child off at a day

10 care facility.

11 Q.  So where physically was she in the world?  Was she inside

12 or outside?

13 A.  She was outside.

14 Q.  And was it in a public place?

15 A.  It was on a sidewalk.

16 Q.  There's sort of a booking procedure that you have to follow

17 when you arrest someone, is that right?

18 A.  That is correct.

19 Q.  Was Ms. Phillips put through that procedure after she was

20 arrested?

21 A.  She was.

22 Q.  What are some of the things that you do when you arrest

23 someone in a federal case like this?

24 A.  A Buccal swabbing, fingerprinting, and photographs.

25 Q.  I want to ask you about the fingerprinting.  Was

Rongitsch - direct by Stump

1  Ms. Phillips fingerprinted when she was arrested?

2  A.  She was.

3  Q.  Were you present for that fingerprinting?

4  A.  I was.

5  Q.  Did you witness her being fingerprinted?

6  A.  I did.

7  Q.  I'm going to show you now what's been marked for

8  identification as Government Exhibit 41.  Do you recognize that

9  exhibit, sir?

10  A.  I do.

11  Q.  What is it?

12  A.  The fingerprints of Ms. Phillips.

13  Q.  Are those the fingerprints that were taken from

14  Ms. Phillips on the date of her arrest in November of 2012?

15  A.  They are.

16        MR. STUMP:  Your Honor, at this time I'd move for

17  admission of Government Exhibit 41.

18        MS. SOLOMON:  No objection.

19        THE COURT:  Admitted with no objection, 41.

20    (Government Exhibit 41 received in evidence.)

21  BY MR. STUMP:

22  Q.  Agent Rongitsch, what did you do, if anything, with Exhibit

23  41 after you got it?

24  A.  It was sent to the FBI Laboratory for fingerprint

25  comparison.

456

Rongitsch - direct by Stump

1   Q.  And did they, in fact, do a comparison?

2   A.  They did.

3   Q.  I want to show you one other document, and this is what

4   we've marked for identification as Government Exhibit 25.  It's

5   one page.  Do you recognize that document?

6   A.  I do.

7   Q.  What is that?

8   A.  It's a letter addressed to Michael Dobbins titled "Forgive

9   Me."

10  Q.  And how did you see that document?

11  A.  I received this document from the United States Marshal's

12  Service after they collected five of these letters from

13  judicial officials.

14  Q.  Did you receive all five of those letters at the same time?

15  A.  I did.

16  Q.  And is that Exhibit No. 25 a true and correct copy of the

17  letter that was purported to be sent to Mr. Dobbins on or about

18  that date?

19  A.  It is.

20  Q.  And is it in the same condition as it was when you

21  received?

22  A.  It is.

23          MR. STUMP:  At this time, I'd move for the admission

24  of Government Exhibit 25.

25          MS. SOLOMON:  No objection.

457

Rongitsch - cross by Solomon

1        THE COURT:  25 is admitted, no objection.

2     (Government Exhibit 25 received in evidence.)

3        MR. STUMP:  That's all the questions I have, Your

4  Honor.

5        THE COURT:  Ms. Solomon?

6                    CROSS-EXAMINATION

7  BY MS. SOLOMON:

8  Q.  Good afternoon, Mr. Rongitsch.  Is that how you pronounce

9  it?

10  A.  Close enough.

11  Q.  Okay.  You can correct me.

12  A.  Most people just call me Josh.  It's a lot easier.

13  Q.  I don't know if that would be permitted, but if you're

14  okay, then I will call you Josh.

15  A.  I'm perfectly fine with that.  It is.

16  Q.  Okay.  You said that you're the case agent on this case.

17  A.  That is correct.

18  Q.  So you're the one who sort of headed up the investigation.

19  A.  Yep.

20  Q.  Okay.  But you weren't involved in any way with the Devon

21  Phillips case?

22  A.  That is correct.

23  Q.  Okay.  You were asked about what the practical effect of a

24  lien is before the grand jury and I believe again today?

25  A.  I don't recall today.

458

Rongitsch - cross by Solomon

1  Q.  Then it was before the grand jury.

2  A.  Potentially.

3  Q.  Potentially.  You indicated that the effect would be that

4  it would impair or would attach to real property, is that

5  correct?

6  A.  Without having my transcripts in front of me from the grand

7  jury, from the best of my recollection, a lien effectively --

8  in this case when a lien is placed, it could potentially

9  encumber someone's property.

10  Q.  Okay.  But in this case, actually, the liens with one

11  exception did not encumber any property.

12  A.  With the exception of one, that is correct.

13  Q.  And that exception is Mr. Dobbins' parking spot.

14  A.  That is correct.

15  Q.  And it's also my understanding that you checked all the PIN

16  numbers that were attached to the lien documents?

17  A.  I don't recall checking every single PIN number associated

18  with the lien documents.

19  Q.  You checked some of the PIN numbers.

20  A.  Yes.

21  Q.  And none of those PIN numbers corresponded to any property

22  related to any of the 1 through 12?

23  A.  Not that I'm aware of.

24  Q.  Okay.  That is because with respect to some, but not all,

25  of these people who have come in to testify about these liens,

459

Rongitsch - cross by Solomon

1  most of them have information that is not available to the

2  public.

3  A.  You're going to have to repeat that question.

4  Q.  The judges, for example, where they live is not known to

5  the public or available to the public.

6  A.  I don't know what judges do in regards to protecting their

7  personal property.

8  Q.  In any event, the PIN numbers were not for their property,

9  any of the judges' property?

10  A.  Previously held property, yes.

11  Q.  In one instance.

12  A.  Two instances.

13  Q.  Related to one of the witnesses.

14  A.  That is correct.

15  Q.  None of the other witnesses, none of the other -- well,

16  actually none of the documents that were attached to the liens

17  that are in the exhibits today in court were connected to any

18  property related to this case.

19  A.  I need some clarification.  I'm sorry.

20  Q.  Okay.  So the liens, Exhibits 13.1 to 13.12, have

21  documents.  I'll put this on the screen.  No, I'll hand it to

22  you.

23  A.  Okay.

24  Q.  (Handing exhibit to the witness.)

25  A.  Thanks.

Rongitsch - cross by Solomon

1  Q.  You have the package of documents that is 13.1 to 13.6, is

2  that correct?

3  A.  No, I just have the lien, 13.5.

4  Q.  Okay.  13.5, that's fine.  Okay.  So the first two pages

5  are the lien?

6  A.  Uh-huh.

7  Q.  Correct?

8  A.  Yes.

9  Q.  And then the next page is a document that is entitled what?

10  A.  "Office of Cook County Clerk Map Department, Legal

11  Description Records," and then it has a PIN number.

12  Q.  Okay.  That PIN number essentially looks like this document

13  (indicating)?  It has the PIN number here, and the PIN number

14  identifies a parcel of property, is that correct?

15  A.  From my understanding, yes.

16  Q.  Okay.  None of the PIN numbers from the Office of the Cook

17  County Clerk Map Department attached to document 13.1 --

18  Government Exhibit 13.5, I'm sorry -- 13.5 relate to property

19  involved that is connected to any of the victims in this case?

20  A.  Yeah.  From talking with or interviewing Patrick

21  Fitzgerald, yes, he did not have or he wasn't aware of any of

22  these PINs being associated with his personal property.

23  Q.  That's correct.  Okay.  Thank you.

24  A.  (Handing exhibit to counsel.)

25  Q.  So when you went to the recorder of deeds, the Cook County

461

Rongitsch - cross by Solomon

1  Recorder of Deeds office, you went to the real estate side of
2  the recorder's office or the public library side to find these
3  liens?
4  A.  I went to the public records located in the basement.  I'm
5  not sure which side it is.
6  Q.  Well, it was public records.
7  A.  It's where the public terminals were.
8  Q.  Okay.  That is the area, as we learned from Ms. Holderman
9  who came in to testify, that is the area for
10  non-real-estate-related liens.
11  A.  I can't recall.  I'm sorry.
12  Q.  Okay.  Okay.  There is a real estate section with liens
13  that attach to the real estate -- real property transactions.
14  A.  Okay.
15  Q.  At the Cook County Recorder's office?
16  A.  Okay.
17  Q.  Do you recall?  You don't recall?
18  A.  I'm vaguely familiar with her stating something like that,
19  but I don't have in-depth knowledge to say that I'm positive of
20  that.
21  Q.  Okay.
22  A.  But, yeah, from her referencing that the other day, I'm
23  familiar with those terms, yes.
24  Q.  And you did some investigation at the Cook County Recorder
25  of Deeds?

462

Rongitsch - cross by Solomon

1  A.  I did.

2  Q.  And you spoke with some people about the operating system

3  at the Cook County Recorder of Deeds?

4  A.  The majority of the information was learned from several

5  cashiers that we interviewed so that I could understand the

6  process of recording, and then also, you know, the individual,

7  Joe Ruiz, who I referenced earlier, he really helped me very

8  specifically to these liens and the receipts corresponding.

9  Q.  And were you aware if the liens are mortgages or documents

10  that come in in the normal course of business that they are

11  reviewed for content?

12  A.  No.

13  Q.  You were not aware of that.

14  A.  They are not reviewed for content.  From my understanding

15  of conducting the investigation and interviewing employees of

16  the Cook County Recorder of Deeds, the cashiers or the intake

17  staff at the Cook County Recorder of Deeds does not review the

18  content within any document presented to them.

19  Q.  Well, Ms. Holderman again testified that there was someone

20  who reviewed the document initially, it then went to the

21  cashier who took the money, and then it was scanned.

22  A.  I think you're referencing the initial review to ensure

23  that it meets very basic minimal legal requirements.  For

24  example, if you have a lien, I could -- I remember this

25  specifically from an interview of a cashier because I asked,

463

Rongitsch - cross by Solomon

1  you know, what is initial review, and they indicated that this
2  upper left-hand portion, or the right as you look at the
3  document, is blank because that's where a cashier would affix a
4  sticker, the recording document sticker.
5          There's other requirements, but that one specifically
6  sticks out in my mind.  That's what the initial review is being
7  done for.
8  Q.  There were also other requirements that were required by
9  state law.
10  A.  Yes.
11  Q.  Okay.  But in the general recording section where you were,
12  there's no review of the documents at all.
13  A.  Well, what I was reviewing is documents that were already
14  recorded.
15  Q.  Right, I understand that.  But in the general section, the
16  documents are not reviewed.  Ms. Holderman said it could be
17  poetry that was coming in to be recorded.  So if there was no
18  familiarity with the documents, then they weren't reviewed at
19  all.
20  A.  I didn't search for poetry.  I'm sorry.  I was very focused
21  on this.
22  Q.  Right, but you searched in the area, the general recording
23  area, not the real estate recording area.
24  A.  Potentially.
25  Q.  Okay.  Well, you were in the basement.

464

Rongitsch - cross by Solomon

1  A.  I was.

2  Q.  Okay.

3  A.  It's very warm down there.

4  Q.  Very warm.  Well, that would have been good in the summer

5  -- I mean, in the winter, but perhaps not now.  Now, there are

6  some recorder's offices that notify property owners when a lien

7  is placed on their property?

8          MR. STUMP:  Your Honor, I'm going to object because I

9  don't think she's laid a foundation that this witness would

10  have personal knowledge about that.

11         MS. SOLOMON:  He testified at the grand jury.  I can

12  get his grand jury testimony and have him review it.

13         THE COURT:  If he's capable of answering it, he may.

14  The objection is overruled.

15  BY THE WITNESS:

16  A.  I did become aware that -- I don't remember when it was

17  implemented with the Cook County Recorder of Deeds; however,

18  they do now have a program in which a person may sign up to be

19  notified if some encumbrance or something is placed on or

20  recorded with a PIN number associated with it.  I don't know

21  all the specifics; however, I'm aware that that has started

22  recently.

23  BY MS. SOLOMON:

24  Q.  But it wasn't in effect at the time that these liens were

25  implemented?

465

Rongitsch - cross by Solomon

 1  A.  I don't think so.

 2  Q.  Okay.  Oh, recorded.  Now, you indicated that Ms. Phillips

 3  had contacted the FBI office and wanted to speak with you about

 4  a matter that she was concerned about.

 5  A.  Not me in particular.

 6  Q.  The FBI office.

 7  A.  Exactly.

 8  Q.  Okay.  You made contact with her and had a meeting with

 9  her, is that correct?

10  A.  Yes.

11  Q.  At some point, you turned the conversation to discussing

12  liens.

13  A.  The mailing.

14  Q.  The mailing, okay.

15  A.  Eventually I tried to get to the liens.  However, the

16  interview, she ended it.

17  Q.  Now, she was not in any way required when she was speaking

18  with you to talk about anything connected to this case?

19  A.  Absolutely not.

20  Q.  It was her choice whether or not she chose to speak with

21  you?

22  A.  That is correct.

23  Q.  And so her leaving without discussing this matter was not a

24  violation of the law?

25  A.  None whatsoever.

466

Rongitsch - cross by Solomon

1  Q.  It was her exercising her right, the right of the Fifth

2  Amendment privilege against self-incrimination?

3  A.  If that's the words, yes.

4  Q.  She could have perceived it as that, and she was entitled

5  to believe that that was true?

6  A.  She's entitled to believe whatever she would like.

7  Q.  Well, the Constitution guarantees it?

8  A.  That is correct.

9  Q.  Okay.  Now, prior to her arrest, the FBI had conducted

10  surveillance of Ms. Phillips?

11  A.  Yes.

12  Q.  And you were aware of what her daily routine was?

13  A.  We tried to develop a pattern of life.

14  Q.  Okay.  You had set up your surveillance early in the

15  morning primarily?

16  A.  We did a couple different surveillances and also spot

17  checks.

18  Q.  And the spot checks were just to determine what vehicles

19  were in front of her house?

20  A.  Vehicles or various things, yes.

21  Q.  Okay.  So in the times that you conducted the surveillance

22  before her arrest, you knew that she took her young child to

23  day care every morning.

24  A.  Yes.  We knew that the indictment was coming, and we knew

25  that, you know, subsequently an arrest warrant would be issued

467

Rongitsch - cross by Solomon

1   as long as we got a grand jury return of the indictment.  So in

2   preparation of that, we had her under surveillance for a long

3   period of time.  So like anything, you know, we're not just

4   going to go out the day of and get an arrest warrant and try to

5   find the person.  So in preparation of the potential upcoming

6   arrest, yes, we did have surveillance out to locate her.

7   Q.  And you chose to arrest her in front of the day care

8   center?

9   A.  We did.

10  Q.  And she was -- she had just dropped her son off?

11  A.  She did.

12  Q.  And then the arrest was effectuated?

13  A.  It was.

14  Q.  Okay.  You could have chosen to arrest her somewhere else?

15  She could have been arrested at home?

16  A.  We didn't have a good pattern of life at that time for her.

17  Furthermore, there was an officer safety concern due to when we

18  executed the search warrant Ms. Phillips' -- well, I want to

19  say "resistance", however, her failure to comply with law

20  enforcement orders.

21  Q.  When you say "failure to comply," she opened the safe when

22  you asked her to?

23  A.  She did, yes.

24  Q.  She talked to you, but then refused to answer certain

25  questions?

468

Rongitsch - cross by Solomon

1  A.  Yes.

2  Q.  And it was her right to do so?

3  A.  Absolutely.

4  Q.  She was concerned about her young children in the home at

5  the time that the search was being executed?

6  A.  She was.

7  Q.  That was her overriding concern?

8  A.  Yes.

9  Q.  And you accompanied her upstairs so that she could get her

10  young son during the search so that she could protect him?

11  A.  I don't know if "protect" is --

12  Q.  Well, there were strangers in the house at 6:00 in the

13  morning.  I would think that her reaction would be to protect

14  her child, if for no other reason that he would be scared.

15  A.  Yeah, in that context, yes.

16  Q.  And there was another young child?

17  A.  There was.

18  Q.  And he was also present with Ms. Phillips, or was he also

19  upstairs?

20  A.  The other child was not with Ms. Phillips.

21           MR. STUMP:  Your Honor, I have another objection to

22  this line of questioning at this point.  I'm failing to see the

23  relevance.

24           MS. SOLOMON:  I'm trying to establish that on direct

25  he made it appear as if Ms. Phillips was uncooperative because

469

Rongitsch - cross by Solomon

1 of various -- for negative reasons, and I'm trying to
2 rehabilitate that view because he was in her home with her
3 young children.  She was arrested after dropping off her young
4 child.  I'm trying to establish that she was exercising, one,
5 her constitutional rights and, two, that it was in her home and
6 she was complying as best she could.
7          THE COURT:  Okay.  Let's bear in mind that the
8 offense here that is alleged is filing false liens against a
9 federal official, and that's pretty far afield from where we
10 are.
11          MS. SOLOMON:  I understand.  Okay.
12 BY MS. SOLOMON:
13 Q.  Now, Ms. Phillips opened the safe?
14 A.  She did.
15 Q.  And she was cooperative about opening the safe?
16 A.  She was.
17 Q.  And you indicated that she seemed defeated?
18 A.  I don't know if that was the best way to describe it, but
19 her demeanor kind of changed when I recall very vividly asking
20 her, you know:  Can you open up the safe now?
21          She kind of, you know, looked back at me and, you
22 know, slumped to some pose.
23 Q.  You were in -- it seems like it could also be because she
24 was just overwhelmed by the situation?
25 A.  I guess she could have been.

470

Rongitsch - cross by Solomon

1  Q.  Right.  It was a pretty overwhelming situation to have the
2  FBI combing through your belongings while looking through
3  documents.  Approximately how long was the FBI in the home?
4  A.  I don't recall.  Several hours.
5  Q.  And were they all present during the whole course of the
6  search?
7  A.  I wasn't really privy to kind of what was going on.  A
8  search team leader was kind of coordinating people moving and
9  searching in various rooms.  Like I said, it was a very large
10  house, lots of rooms.  So my portion, the majority of the time
11  I was in the kitchen and dining room area or sitting area with
12  Ms. Phillips.
13  Q.  And during a large part of the search, she was speaking
14  with you?
15  A.  She was.
16  Q.  And she was cooperative during that period of time?  She
17  was sitting there peaceably?
18  A.  Yes, she was sitting there peaceably.
19  Q.  Perhaps she didn't answer the questions, all the questions
20  you would have liked, but she was sitting there peaceably with
21  you?
22  A.  Well, like I said earlier, she originally told me that, you
23  know, only copies -- that the world passport was there but at
24  an undisclosed location.  Then I was asking her:  Hey, listen.
25  I understand.  Let's try to get this done as quickly as

471

Rongitsch - cross by Solomon

1    possible so that we can get out of here.

2            Then she still, you know, throughout the interview

3    process wouldn't say:  Okay.  The world passport is here.

4            Furthermore, she told us about only copies of the

5    documents; whereas, in fact, we found the original liens in the

6    safe, locked in the safe.

7    Q.  But you did find them.

8    A.  We did.

9    Q.  Now, you said you also found other documents.  Document

10   number 34, that's her birth certificate?

11   A.  Yes.

12   Q.  And her name on her birth certificate is "Cherron Marie

13   Phillips"?

14   A.  That is correct.

15   Q.  And that is a name she goes by or has gone by in the past?

16   A.  Yes.

17   Q.  Okay.  This is an original copy of a birth certificate?

18   A.  It appears to be a photocopy.

19   Q.  Okay.

20   A.  But it was the original document taken from the --

21   Q.  But it's a valid document.

22   A.  I believe so.

23   Q.  It was not seized because it was in any way tampered with

24   or an illegal document?

25   A.  No.

472

Rongitsch - cross by Solomon

1   Q.   Government Exhibit 36 is a document from the Circuit Court

2   of Cook County.   It's a legal document, is that correct?

3   A.   It appears to be a legal document.

4   Q.   And it's a judgment order that's changing Cherron Marie

5   Phillips' name.   It's a petition on behalf of Cherron Marie

6   Phillips, is that right?

7   A.   It appears to be, yeah.

8   Q.   And it's legally changing "Cherron Marie Phillips" to

9   "River Tali El Marie Bey"?

10  A.   It appears to be doing that.

11  Q.   And that's a legal procedure and process?

12  A.   As far as I know.   I've never changed my name.

13  Q.   But many people --

14  A.   But I believe that this document appears to be legitimate.

15  Q.   Many people change their names?

16  A.   Sure.

17  Q.   And it's perfectly legal?

18  A.   That it is.

19  Q.   As a matter of fact, you don't even need to go through an

20  official court proceeding to do that?

21  A.   I don't know.   I'm sorry.

22  Q.   Mr. Stump showed you Government Exhibit 37.   There's

23  nothing illegal about that document, is there?

24  A.   Not on its face, no.

25  Q.   You also said that Ms. Phillips requested to see the copy

473

Rongitsch - cross by Solomon

1   of the search warrant before she would let -- wanted to let the

2   FBI agents in?

3   A.  She did.

4   Q.  She's entitled to see a copy of the search warrant?  Isn't

5   that why you get it?

6   A.  We typically leave a copy at a residence.  However, in this

7   instance, absolutely, I was happy to show her a copy.  I just

8   wanted to make sure that everyone was going to be safe before

9   we could do that process, because if I'm focused on showing

10  someone a document, I don't really have a good idea on what's

11  going on around me if I'm going line by line through a

12  document.

13  Q.  Did you know who the other women in the house were?

14  A.  I did.

15  Q.  And that was her mother?

16  A.  Yes.

17  Q.  And her sister?

18  A.  Yes.  I believe that's who they were.

19  Q.  Okay.  Then there was no one else in the home aside from

20  the two children?

21  A.  Not -- no.

22          MS. SOLOMON:  Nothing further.

23          THE COURT:  Any redirect?

24          MR. STUMP:  Very brief.

25          THE COURT:  All right.

474

Rongitsch - redirect by Stump

1                    REDIRECT EXAMINATION

2  BY MR. STUMP:

3  Q.  Agent Rongitsch, you testified when you asked her initially

4  about the world passport that she said it was at an undisclosed

5  location, is that right?

6  A.  Yes.

7  Q.  Did you ask her about the location of the liens?

8  A.  I did.

9  Q.  What did she say about those?

10  A.  That she mailed them to a Department of Justice employee by

11  the name of Christine in June of 2011.

12  Q.  And based on your investigation, do you believe that to

13  have been a true statement?

14  A.  No.

15  Q.  Why not?

16  A.  Because the original liens that we were there to seize were

17  found in the safe.

18  Q.  Did you also present her with copies of the receipts in

19  that second interview?

20  A.  At the time of the search?  Yes.

21  Q.  Just hold on for just one second.

22  A.  Sure.

23      (Brief pause.)

24  BY MR. STUMP:

25  Q.  This is Government Exhibit 15.  Did you ask her

475

Rongitsch - redirect by Stump

1  specifically about this "issued to" part of the receipt?

2  A.  I did.

3          MS. SOLOMON:  Beyond the scope, Your Honor,

4  objection.

5          MR. STUMP:  She asked if she was cooperative during

6  the interview, and I'm just trying to clean that up.

7          THE COURT:  Okay.  It's technically beyond the scope,

8  but you can recall him.  So as long as you ask non-leading

9  questions, proceed.

10          MR. STUMP:  Thank you, Your Honor.

11  BY MR. STUMP:

12  Q.  Did you ask her specifically about that portion?

13  A.  I did.

14  Q.  What did she say?

15  A.  Well, to back up just very briefly, during the

16  investigation I came to learn that her mother, Betty Phillips,

17  potentially had some sort of name change to Samara or some

18  variation of Samara.  When we initially received that receipt,

19  I had a -- it was implied that there's potentially a

20  misspelling or typo in that receipt.

21          So when I presented this to Ms. Phillips and asked

22  her about it, she responded.  I said, you know, something to

23  the effect of, you know:  Do you see -- do you know who this

24  receipt was given to?  Was it possibly your mother?

25          Then she responded something to the effect:  My

476

Rongitsch - redirect by Stump

1  mother wouldn't be involved with my business or my personal
2  affairs.
3  Q.  All right.  Similarly with regard to Government Exhibit 17
4  here, it says "Wayne" under "issued to."  Did you ask her about
5  that?
6  A.  I did.  Again, as kind of a very similar back story, her
7  father's name is Wayne Phillips.  When I asked her about this
8  receipt being issued, again, she had a very similar statement:
9  Except my father wouldn't be in my -- or something to the
10 effect of:  He wouldn't be involved with my personal affairs or
11 in my personal business.
12         MR. STUMP:  All right.  Thank you, Your Honor.
13         THE COURT:  Any further cross?
14         MS. SOLOMON:  Nothing further.
15         THE COURT:  Okay.  Thank you, sir.  You can step
16 down.
17     (Witness excused.)
18         THE COURT:  Let's go to sidebar off the record.
19     (Discussion at sidebar off the record.)
20         THE COURT:  We're just working on the logistics,
21 trying to be good stewards of your time.
22         MR. STUMP:  Your Honor, the United States calls
23 Michael Rees.
24         THE COURT:  We have a short witness.  Are you okay?
25         A JUROR:  Yeah.

477

Rees - direct by Stump

1           THE COURT:  You're getting paid.

2           A JUROR:  Oh, thank you.

3    (Laughter.)

4           THE CLERK:  Raise your right hand, please.

5    (Witness duly sworn.)

6                      MICHAEL REES,

7            GOVERNMENT'S WITNESS, DULY SWORN

8                  DIRECT EXAMINATION

9  BY MR. STUMP:

10  Q.  Good afternoon, sir.

11  A.  Good afternoon.

12  Q.  Would you tell us your name and spell your last name for

13  the record?

14  A.  Michael Rees, R-e-e-s.

15  Q.  Mr. Rees, what do you do for a living?

16  A.  I'm a special agent with the FBI.

17  Q.  And how long have you been a special agent with the FBI?

18  A.  Oh, about four and a half years.

19  Q.  I want to ask you about the case that we're here about

20  today.  Did you have any involvement in this case?

21  A.  Yes, sir.

22  Q.  And what was your involvement?

23  A.  I was out on the arrest when Ms. Phillips was taken into

24  custody.

25  Q.  Do you remember what day that was?

478

Rees - direct by Stump

1   A.   No, sir.

2   Q.   Do you remember about what time of day it was?

3   A.   It was in the morning.

4   Q.   And where was the arrest effectuated?

5   A.   I couldn't tell you the actual address.  It was on the

6   south side.

7   Q.   The south side of Chicago?

8   A.   Yes, sir.

9   Q.   Outside or inside?

10  A.   Outside.

11  Q.   How did the defendant react?  Well, before I get that far,

12  can you just tell us how you guys arrested her?  How many folks

13  were there, and what did you do?

14  A.   Well, basically the plan was this.  Ms. Phillips had a

15  small child, and we didn't want to arrest her in front of the

16  small child.  We knew that the child attended a day care

17  facility on the south side, so the plan was to wait until

18  Ms. Phillips actually dropped the child off.  As she exited the

19  building, then we would go ahead and place her in custody.  So

20  in order to do that, we had several agents and a task force

21  officer sit in a vehicle on the street in front of the day

22  care.  Then when she exited, we exited the vehicle and took her

23  into custody at that point.

24  Q.   And how did she respond to being arrested?

25  A.   She was non-compliant, not necessarily fighting, but she

479

Rees - cross by Solomon

1   wasn't following commands.  She wasn't placing her hands behind

2   her back.  She wasn't -- she didn't try to run off.  We had

3   obtained actual physical control of her fairly quickly, but she

4   was verbally combative at times.

5   Q.  Now, did she make any statements while she was being

6   arrested?

7   A.  The one that I remember is she asked what our names were,

8   the agents that were with me.  She asked what our names were so

9   that she could file liens against us.

10  Q.  What did she actually say that you remember?

11  A.  I'm sorry.  I don't remember verbatim, but I remember that

12  she did ask for all of our names, the four or five of us that

13  were standing near the vehicle, and she said that she was going

14  to file liens against all of us, too.

15  Q.  To your knowledge, have any liens been filed against your

16  property?

17  A.  Not that I know of.

18          MR. STUMP:  Thanks.  That's all the questions I have.

19          THE COURT:  Ms. Solomon?

20                    CROSS-EXAMINATION

21  BY MS. SOLOMON:

22  Q.  Good afternoon, Mr. Rees.

23  A.  Good afternoon.

24  Q.  My name is Lauren Solomon, and I represent Cherron

25  Phillips.

480

Rees - cross by Solomon

1   A.   Okay.

2   Q.   You said that you were with agents who were waiting outside

3   the day care center?

4   A.   Yes, ma'am.

5   Q.   And you knew that Ms. Phillips would arrive there early in

6   the morning?

7   A.   Yes, ma'am.

8   Q.   And you watched -- the agents watched her go into the day

9   care center?

10  A.   Yes, ma'am.

11  Q.   And she had her son with her?

12  A.   Yes.

13  Q.   A few minutes later, she left the day care center without

14  her son?

15  A.   That's correct.

16  Q.   And she was walking back towards her car?

17  A.   Yes, I believe that's correct.

18  Q.   And were the agents parked near her vehicle at that point?

19  A.   If I recall correctly, I was actually in the vehicle that

20  was parked outside of the door of the day care center, and I

21  believe her vehicle was several car lengths behind us, so

22  further down the street to the south.

23  Q.   So when she was walking towards her car, the agents then

24  walked towards her, or did you --

25              MS. SOLOMON:  I'm sorry.  Strike that.

481

Rees - cross by Solomon

1  BY MS. SOLOMON:

2  Q.  Did you walk toward her?

3  A.  Yes, ma'am.

4  Q.  And then you stopped her somewhere between your car and her

5  car?

6  A.  Correct.

7  Q.  And it was more or less directly across the street.

8  A.  Across the street?

9  Q.  Across the street from the day care center.

10  A.  It was actually on the sidewalk outside.

11  Q.  Right in front of it.

12  A.  I think it probably was -- I would be guessing, I imagine,

13  but I think it would be the next building.  It's not a very

14  wide building, so it would probably have been the next

15  storefront.

16  Q.  Oh, so it was on the same side of the street.

17  A.  Yes, ma'am.

18  Q.  Okay.  Were there other people on the sidewalk or walking

19  into the center?

20  A.  I don't recall.

21  Q.  So it was just the agents and Ms. Phillips?

22  A.  I believe so, ma'am.

23  Q.  And you said you had physically stopped her, so she was

24  stopped.

25  A.  Yes, ma'am.

482

Rees - redirect by Stump

1  Q.  But she was talking to the agents.

2  A.  We identified ourselves as FBI agents and that she was

3  under arrest.

4  Q.  And it was necessary to call DCFS later in the day?

5  A.  I'm not aware of that, ma'am.

6  Q.  Were you aware of anyone else who ever picked up her child

7  at the day care center?

8  A.  That was not part of my duties that day.

9  Q.  Okay.  So was it surprising that someone who had just left

10  her child at day care was upset when she walked out and was

11  arrested?

12  A.  I don't understand the question.

13  Q.  Is it surprising to you that someone who walks into a day

14  care center with a child and walks out and gets arrested would

15  not be upset?

16  A.  I don't know, ma'am.

17          MS. SOLOMON:  Okay.  Nothing further.

18          THE COURT:  Mr. Stump?

19      (Discussion off the record.)

20                      REDIRECT EXAMINATION

21  BY MR. STUMP:

22  Q.  Do you happen to know, Agent Rees, if the day care is on

23  the first floor of that building or on some other floor?

24  A.  Yeah, it was actually on the second floor.  The door to the

25  day care, as soon as it opened up, there was a very short

Rees - redirect by Stump

1 landing and the stairs that went directly up.  So I've never
2 been actually in the building, obviously, but it seems that it
3 could not be on the first floor.
4 Q.  In effectuating the arrest, did you take into account the
5 welfare of the child before you effectuated it?
6 A.  That's why we did it the way we did it, so that the child
7 wouldn't have to be traumatized by seeing the mother arrested.
8          MR. STUMP:  Thank you.
9     (Discussion off the record.)
10          MS. SOLOMON:  Nothing further.
11          THE COURT:  Okay.  May I release the witness
12 permanently?
13          MR. STUMP:  Yes, Your Honor.
14          THE COURT:  Thank you.  You're excused.
15          THE WITNESS:  Thank you.
16     (Witness excused.)
17          THE COURT:  Okay, folks.  That concludes the
18 testimony for today.  Let me give you a preview of what's going
19 to happen tomorrow.  We are on schedule and, in fact, might get
20 the case to you as early as noon for deliberations.  Don't hold
21 me to that, but right now it looks like that could happen.  If
22 that does happen, my understanding is that we will be able to
23 feed the jury lunch while you deliberate.
24          THE CLERK:  Right.
25          THE COURT:  If I get the case to you before lunch,

484

1   we'll supply lunch.  If it's after lunch, you'll have to have

2   your own lunch.  So if you intend to bring your own lunch,

3   bring it.  You might not need it.  So that's the first thing.

4            Then the second thing is that we'll start at 9:00

5   o'clock.  So again, be here a few minutes early if you would.

6            Then the last thing is this.  I've tried to keep you

7   informed as much as I could as to what's going on within the

8   limitations I have to make certain both sides get a fair trial.

9   So when we tell secrets, I tell you we're telling secrets.

10  Okay?

11           I want to tell you that this case is receiving a lot

12  of media attention.  There have been sketch artists here in the

13  courtroom.  This case has been reported in the print media.

14  It's been reported on television.  It's all over the Internet.

15  I tell you that because I will, please, please, please, ask you

16  try not to even look at TV tonight.

17           You have seen the resources that are put into a case

18  like this.  There's a lot of emotions on both sides, as I

19  indicated.  If I have to declare a mistrial because of jury

20  misconduct, that could mean that an innocent person has to be

21  retried or a guilty person goes free because of

22  double-jeopardy.  I'm not saying whether Ms. Phillips is guilty

23  or innocent, but I'm telling you that that potentially could

24  happen in a case where a jury does not follow the court's

25  instructions.

1           So I'm telling you it's all over the Internet.  I'm

2   telling you it's out there, so that's why I'm asking you in

3   this case to please be particularly cautious.  You could hear

4   something on the news just because, you know, it comes up like

5   that, so I'd ask you just not to watch the news.

6           There's a lousy soccer game on tonight.  It's Russia

7   and South Korea.  My resident expert law clerk tells me Russia

8   is going to lose three to one and don't bother watching, but

9   it's something for you to do.  So I offer that to you as my

10  secondary job as your social director.

11          I'm going to reread this direction to you again

12  because it's so critical.  I apologize, but it's that

13  important.

14          Before we begin the trial, I want to discuss several

15  rules of conduct you must follow as jurors.  First, you should

16  keep an open mind throughout the trial.  Do not make up your

17  mind about what your verdict should be until after the trial is

18  over.

19          You have received my final instructions on the law,

20  and you and your fellow jurors have discussed the evidence.

21  Your verdict in this case must be based exclusively on the law

22  as I give it to you and the evidence that is presented during

23  the trial.

24          For this reason and to ensure fairness to both sides

25  in this case, you must obey the following rules.  These rules

486

1    apply both when you are here in court and when you are not in

2    court.  They apply until after you have returned your verdict

3    in the case.

4            Number one, you must not discuss the case, including

5    anyone who's involved in the case, among yourselves until you

6    go to the jury room to deliberate after the trial is completed.

7    You must not communicate with anyone else about this case,

8    including anyone who is involved in this case, until after you

9    have returned your verdict.

10           When you are not in the courtroom, you must not allow

11    anyone to communicate with you about the case or give you any

12    information about the case or about anyone who's involved in

13    the case.  If someone tries to communicate with you about the

14    case or someone who's involved in the case, or if you overhear

15    or learn any information about the case or someone involved in

16    the case when you're not in the courtroom, you must report this

17    to me promptly.

18           You may tell your family and your employer that you

19    are serving on a jury so that you can explain that you have to

20    be here in court.  However, you must not communicate with them

21    about the case or anyone who's involved in the case until after

22    you've returned your verdict.

23           All of the information that you need to decide this

24    case will be presented here in court.  You may not look up,

25    obtain, or consider information from any outside source.

1           There are two reasons for these rules.  First, it
2    would not be fair to the parties in the case for you to
3    consider outside information or communicate information about
4    the case to others.  Second, outside information may be
5    incorrect or misleading.
6           When I say that you may not obtain or consider any
7    information from outside sources and that you may not
8    communicate with anyone about the case, I'm referring to any
9    and all means by which people communicate or obtain
10   information.  This includes, for example, face-to-face
11   conversations, looking up things, doing research, reading,
12   watching or listening to reports in the news media, any
13   communication using any electronic device or media, such as a
14   telephone, cell phone, smartphone, iPhone, Android, BlackBerry,
15   or similar device, PDA, computer, the Internet, text messaging,
16   chat rooms, blogs, social networking, websites like Facebook,
17   YouTube, Twitter, Google Plus, Linkedin, the Chicago Tribune,
18   the Chicago Sun-Times, or any other form of communication at
19   all.  If you see or hear or receive any information about the
20   case by these or any other means, you must report that to me
21   immediately.
22          Just as to my personal experience this morning at the
23   gym regarding this one section I read to you that sometimes you
24   might receive incorrect or misleading information, I forgot my
25   headphones, and as I was on the elliptical there were two

1  fellows who apparently meet every morning at 5:00 o'clock to

2  exercise.  They were talking about this case, and they talked

3  about Ms. Phillips as if she were a he.  So people just don't

4  understand.  They haven't seen or heard what you have.

5         Okay.  I've lectured you enough.  We'll see you

6  tomorrow morning.  It's 9:00 o'clock tomorrow morning, so 8:55

7  in the morning for coffee and doughnuts, nothing healthy.

8     (Proceedings adjourned to 9:00 a.m., June 18, 2014.)

9            C E R T I F I C A T E

10     I, Patrick J. Mullen, do hereby certify that the
foregoing is a complete, true, and accurate transcript of the
11  trial proceedings had in the above-entitled case before the
Honorable MICHAEL J. REAGAN, one of the judges of sitting in
12  said court in Chicago, Illinois, on June 17, 2014.

13

                        /s/ Patrick J. Mullen
14                    _____
                      Official Court Reporter
15                United States District Court
               Northern District of Illinois
16                    Eastern Division

17

18

19

20

21

22

23

24

25