```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,     )      Docket No. 12 CR 872
                                   )
 4                  Plaintiff,     )      Chicago, Illinois
                                   )      Wednesday, June 18, 2014
 5             v.                  )      8:30 o'clock a.m.
                                   )
 6   CHERRON MARIE PHILLIPS,       )
                                   )
 7                  Defendant.     )

 8                             VOLUME 3
                           TRANSCRIPT OF TRIAL
 9          BEFORE THE HONORABLE MICHAEL J. REAGAN, and a jury

10   APPEARANCES:

11   For the Government:          MR. NATHAN D. STUMP
                                  Special Assistant U.S. Attorney
12                                (9 Executive Drive,
                                   Fairview Heights, IL  62208)
13
     For the Defendant:           MS. LAUREN WEIL SOLOMON
14                                (P.O. Box 2013,
                                   Highland Park, IL  60035)
15
     Court Reporter:              Mary T. Lindbloom
16                                327 S. Church Street
                                  Rockford, Illinois  61101
17                                (779) 772-8309

18

19

20

21

22

23

24

25
```

1          (The following proceedings were had in open court, out of

2          the presence and hearing of the jury:)

3               THE COURT:  We're in open court.  It is 8:30.  I

4     indicated that we would have the on-the-record jury instruction

5     conference to supplement what we did at the final pretrial.  The

6     defendant is not present, which she was told that we would start

7     at 8:30.  She's been late each day.  I'm going to begin without

8     her.  If she has any objections she wants to raise to these

9     instructions, she can do so later.

10               I think the first one to go over is Government's 20.

11    It's a definition of attempt.  And I'm giving it instead of

12    Defendant's 20.  That's by agreement.  Although, when I say by

13    agreement, the defendant, as I understand it, agrees to the

14    form, but objects to the substance of the instruction itself.

15    Is that correct?

16               MS. SOLOMON:  That's correct.

17               THE COURT:  Okay.  So, I'm going to give Government's

18    20 over objection of the defendant at the final pretrial.  The

19    defendant had tendered a 20, again without waiving her position

20    that attempt ought not be given.

21               I was somewhat reticent to give an instruction

22    regarding attempt and the substantive instruction that talks

23    about attempt in this case when we discussed the matter at the

24    final pretrial.  Frankly, at that point in time, I did not

25    understand the details of the testimony in this case.  I have

1    now heard the majority of it, and I think attempt is

2    particularly appropriate in this case.  The statute talks about

3    attempt.  The jury needs a definition of attempt.  And I think

4    there's been significant testimony by some of the alleged

5    victims that -- for example, Judge Holderman did not own any of

6    the real estate at the time these purported liens were filed.

7    So, I think attempt is particularly appropriate.  Anything you

8    want to add, Mr. Stump?

9           MR. STUMP:  No, your Honor.

10          THE COURT:  I also have now Government's 21 that has

11    been edited.  I understand the defendant does object to this

12    instruction regarding knowingly.  Is there anything you want to

13    add, Ms. Solomon, to your objection regarding the definition of

14    knowingly?

15          MS. SOLOMON:  No, nothing further.

16          THE COURT:  Mr. Stump?

17          MR. STUMP:  I wasn't clear what that objection was.  I

18    thought at the final pretrial conference the issue was that she

19    wanted the ostrich language added, and what I did was when I

20    refiled my proposed jury instructions, I just went ahead and

21    added it because I had no problem with that amendment.  Other

22    than that, I don't know that there is an objection.

23          THE COURT:  Okay.  And I don't recall.  This does

24    include the ostrich.

25          THE LAW CLERK:  That was what your handwritten note had

1    said on the --

2           THE COURT:  Okay.  Let me look at my notes here.

3        (Brief pause.)

4           THE COURT:  Okay.  Right.  My notes say your initial

5    Instruction 21 did not have the last paragraph regarding the

6    ostrich instruction that indicates, quote, you may find the

7    defendant acted knowingly if you find beyond a reasonable doubt

8    that she had strong suspicion that the liens were false and that

9    she deliberately avoided the truth.  You may not find that the

10   defendant acted knowingly if she was merely mistaken or careless

11   in not discovering the truth or if she failed to make an effort

12   to discover the truth.  That language has now been included in

13   Government's 21.

14          But my notes do say that I initially refused the

15   government's.  A new 21 was going to be prepared with the

16   bracketed material, which is what I just read, the ostrich

17   instruction, and then given over objection of the defendant.

18   So, the defendant still has an objection to it, but I don't

19   recall what it was, frankly.

20          MS. SOLOMON:  I don't recall what it is.  I think it

21   was because I had -- because there's modifications to the

22   Seventh Circuit pattern jury instruction.  It says Modified

23   4.10.

24          THE COURT:  You preferred your 21.

25          MS. SOLOMON:  Right.

```
 1          THE COURT:  The defendant had tendered her own

 2    Instruction 21, which is 4.10, which I had indicated I was going

 3    to refuse.

 4          MR. STUMP:  And I think the difference is, Judge, that

 5    my proposed 21 had an added sentence.

 6          MS. SOLOMON:  Ignorance of the law, however, is not a

 7    defense.

 8          MR. STUMP:  Correct.

 9          MS. SOLOMON:  And the government is not required to

10    prove that the defendant knew her actions were unlawful.  That's

11    what I objected to, and that's a continuing objection.

12          THE COURT:  Okay.  And I think that's an appropriate

13    statement of the law.  So, I'm going to include the ignorance of

14    the law is not a defense.

15          So, Defendant's 21 is refused, as I refused at the

16    instruction conference at the final pretrial.  The government's

17    current 21 is given over objection of the defendant, but it does

18    include, I note, the ostrich instruction.  Okay.

19          Okay.  Then the next instruction to discuss on the

20    record is Government's 14.  At the final pretrial conference I

21    was going to give it over objection of the government (sic) with

22    the inclusion of the words filed or attempted to be filed.  And,

23    again, at that point in time, the government felt that the

24    attempted to file was an appropriate inclusion.  I agreed, but

25    wasn't as certain as I am now.  And then the defendant indicated
```

1    that she was going to object to the entire instruction, and I

2    believe it was because of the attempted to be filed portion.

3              MS. SOLOMON:  Yes, that's correct.

4              THE COURT:  Anything further for the record?

5              MS. SOLOMON:  No.

6              THE COURT:  Okay.  And I think that in this case it's

7    particularly appropriate, as I indicated, that the attempt

8    language from the statute be included because there were some

9    purported liens in this case, in my view, attempt to be filed,

10   and by that I mean they clearly didn't attach legally to the

11   property of the defendants -- of the victims, but clearly there

12   was an attempt by the defendant to file them if the jury so

13   concluded beyond a reasonable doubt.

14             So, Government's 14 is given over objection of the

15   defendant.  And I already did 21.

16             THE LAW CLERK:  And you did -- was it 20 and 21?

17   You've done 20, 21, and 14.  Those were the only three edited

18   ones.

19             THE COURT:  Okay.

20             THE LAW CLERK:  Do you need to reiterate your refused

21   and withdrawn, or do they just stand?

22             THE COURT:  I think we covered that at the final

23   pretrial.

24             Then the next thing will be the verdict forms.  We have

25   twelve of them, one for each individual who was allegedly a

1 victim.  The forms don't read that, but we did use the language

2 of the verdict form in such a manner that it includes the names

3 of the individuals in each count so the jury's not confused.

4 So, there are twelve separate ones where the jury can find

5 guilty or not guilty on any combination of those twelve.  Is

6 there any objection to the jury instruction forms by the

7 defendant?

8    MS. SOLOMON:  No objection.

9    THE COURT:  Is there anything else we need to take up

10 on instructions on behalf of the --

11    MS. SOLOMON:  I'm sorry.  The jury verdict form, not

12 the jury instruction form.

13    THE COURT:  The verdict form.

14    MS. SOLOMON:  No objection.

15    THE COURT:  The verdict form.

16    MR. STUMP:  No.  The only thing I would take up now,

17 your Honor, and it may be something that we could do off the

18 record, but I spoke with someone whatever place it was that the

19 defense subpoenaed last night.  I still am a little unsure what

20 that person is going to be here to do or to present.  I haven't

21 seen any evidence yet or any documents, and I have a concern for

22 what I think they're here to do.

23    I think my understanding is that they're here to

24 provide some testimony that would help establish that some of

25 these properties did not belong to -- some of the pin numbers at

1    the bottom of liens did not actually belong to the victims.  I

2    don't know what the purpose of that would be because my

3    understanding, your Honor, is that once the lien is filed,

4    purportedly against the real or personal property of the person

5    named in the lien, that whatever effect it may have had on their

6    financial transactions or that part of this case is really not

7    an element of the offense and is not relevant.  And what I'm

8    concerned about is that the jury is going to be very confused by

9    this testimony and get turned around in knots about whether or

10   not a particular victim may have owned a particular piece of

11   property on a particular date and time, and that's getting into

12   weeds that we really don't need to be getting into.

13            And, furthermore, Ms. Solomon did ask most of the

14   victims who testified if this had affected their finances or if

15   this lien had come up in some other way.  She asked some of the

16   victims point blank if this was their property.  So, I think

17   this is also some ground that's already been covered, and to

18   have a new witness come in with documents in sort of an official

19   capacity is going to be more confusing than probative.

20            THE COURT:  Ms. Solomon.

21            MS. SOLOMON:  I totally disagree.  I don't think that

22   the -- there was no witness that testified about whether -- I

23   didn't show any witness, you didn't show any witness, what the

24   pin number corresponded to or did they -- there was no testimony

25   about the pin attaching to a particular property.

1           What the witness is going to bring is documents that

2   show, one, that these properties were not owned by the witnesses

3   who came into court to testify, but, in addition, they're also

4   going to show that the liens themselves don't even appear on the

5   title.  As a matter of fact, there's no liens.

6           In some instances, actually, there are some maritime

7   liens, and they're totally unrelated to this case.  They're

8   liens that were attached to the 240 South Clark Street.  There's

9   five liens there that have completely different numbers and

10  completely different dates on them.  So, I think it's totally

11  probative of the force and effect of these liens, and even if

12  there is -- and particularly in light of the claim that they

13  were filed or attempted to be filed, I think that's totally

14  relevant for the jury's consideration.

15          And, as a matter of fact, some of the pin numbers

16  aren't even valid pin numbers because there's not enough numbers

17  on their face to even have a property connection to them.

18          THE COURT:  Okay.  I'm going to give the defendant

19  great leeway in presenting the defense she wants to, defense

20  counsel.  She's in a very untoward position.  She has a client

21  who doesn't cooperate with her, who has sat here motionless on

22  the other side of the table, sometimes at the other end of the

23  table, and she's done a yeoman's job in trying to defend a

24  recalcitrant defendant.

25          I can see how this information could be important to

1    the jury.  Clearly an attempt to file a lien is different than

2    actually filing the lien, and clearly there needs to be no harm

3    under the statute, and I think all that's covered by the

4    instruction.  So, I'm going to hear what the testimony is and

5    not prejudge whether or not it ought to be excluded at this

6    juncture.  You can make an objection at the appropriate time.

7           MR. STUMP:  Will we do that in the presence of the

8    jury?

9           THE COURT:  Yes.  Just like an objection relevancy or

10   whatever, and we'll do it on the run, as they say.

11          MR. STUMP:  Yes, sir.

12          THE COURT:  I'm likely to let her go forward with her

13   testimony.

14          MR. STUMP:  I'll just note also as part of my objection

15   then that I have not still received any discovery.  Discovery is

16   a reciprocal obligation.

17          MS. SOLOMON:  I showed it to you, and you said it's

18   basically they're going to do -- I haven't seen it, either.  I

19   have not.  The subpoena is going to arrive here this morning

20   with the documents and with the person.

21          THE COURT:  But all this is information that's

22   available online?  You showed him yesterday?

23          MS. SOLOMON:  Yes, I did.  I showed you the packet.  I

24   can -- I don't know if I brought it with me today.  But it was

25   those documents that I showed you yesterday morning that show

1    the tax assessor documents that were accessed by pin.

2              THE COURT:  One other thing --

3              MS. SOLOMON:  I'm sorry.  We did have a conversation

4    yesterday with Agent Rongitsch about whether or not those pin

5    numbers had been searched, and he indicated that he had already

6    searched them, and he knew essentially that the properties

7    didn't attach to the individuals.

8         (Whereupon, Defendant Phillips entered the courtroom.)

9              THE COURT:  Good morning, Ms. Phillips.

10             So, I'm going to hear testimony and see where we go

11   from there.  I am going to give three instructions that I

12   haven't discussed yet, and probably now is a good time to do it.

13   First of all, I reserved ruling on Government's Instruction 11,

14   which was the 404 instruction.  I'm now going to give that.

15   There's a motion in limine on that, I ruled, and allowed that

16   evidence in.  So, I will give that.

17             The other two instructions are interdependent on

18   whether or not the defendant testifies.  One is Instruction 7 by

19   the government.  The defendant's failure to testify, present

20   evidence.  And then the other is Government's 8, which is

21   credibility of the witnesses.  If the defendant testifies, there

22   is some bracketed material in the instruction that should be

23   included.  If she does not, it can be given in its current form.

24             So, having said that, Ms. Phillips, let me direct my

25   attention to you.  As I indicated to you off the record

1      yesterday, I would be at some point in time addressing you

2      directly regarding your right to testify in this case.  You have

3      an absolute right to testify if you want to, no matter what your

4      attorney or anybody else suggests or recommends to you.  You

5      have an absolute right not to testify.  If you choose not to

6      testify, the jury cannot consider that in any way in arriving at

7      their verdict.  And if you would choose not to testify, I would

8      tell the jury you have an absolute right not to testify or

9      present evidence and that they could not consider that in any

10     way in arriving at their verdict, and they couldn't even discuss

11     that fact in their deliberations.  So, have you decided if you

12     you're going to testify?

13          DEFENDANT PHILLIPS:  I do not consent to surety.  I am

14     here under threat of imprisonment.  I am in fear of loss of

15     liberty through simulated judicial process under threat,

16     coercion, force, and intimidation arising from slavery as stated

17     by the U.S. Supreme Court.  Proceed on your liability.

18          THE COURT:  All right.

19          DEFENDANT PHILLIPS:  On your own liability.

20          THE COURT:  I'm going to interpret that to mean you're

21     electing not to testify.  Am I incorrect in that conclusion?

22          DEFENDANT PHILLIPS:  And I will have to reiterate what

23     I just said.

24          THE COURT:  Okay.  I will give you one more opportunity

25     to testify at the close of the evidence, the government's case.

```
 1    I'll ask you again if you want to testify.  If you take the same
 2    position you just did now, I'm going to interpret that to mean
 3    that you're likely not to testify.  Again I reiterate you have
 4    an absolute right to not testify, and you have an absolute right
 5    to testify, and that's solely up to you.
 6             DEFENDANT PHILLIPS:  Judge, may I ask is there a bond
 7    in this case?
 8             THE COURT:  I'm not going to respond to those
 9    questions.
10             Okay.  Anything else for the record?
11             MR. STUMP:  No.
12             MS. SOLOMON:  Just I wanted to put on the record, since
13    Ms. Phillips is here, that I did receive the filing that was
14    filed in the Seventh Circuit.  I brought it to the attention of
15    the government and the judge.
16             THE COURT:  All right.  There's a filing in the Seventh
17    Circuit Court of Appeals, not in my case that's under trial
18    right now, in which she purportedly terminates the legal
19    relationship between her and Ms. Solomon.  That's a Court of
20    Appeals issue.  That's not one for me to address.
21             So, you'll have your fingerprint expert today.
22             MR. STUMP:  Yes.
23             THE COURT:  And anybody else?
24             MR. STUMP:  No.
25             THE COURT:  Okay.  You'll rest.  And then we'll take a
```

1     break.  I'll send the jury out.  We'll hear your motion at the

2     conclusion of the government's case.  I'll rule on that.  And

3     then we'll go into your case if that motion is denied.  Then

4     we'll take another break.  You can reiterate your motion, if you

5     want, and then we'll do jury instructions.  I'll read those.

6     And then go into closing arguments.

7              MR. STUMP:  Your Honor, just logistically, I would ask

8     that the jury be sent out for the motion before I officially

9     announce to the jury that we rest.  That would give me just the

10    extra five minutes to make sure with Meg that all my exhibits

11    are in order, and I would be willing to rest off the record

12    before she makes her motion so that the timing of the motion is

13    appropriate.

14             THE COURT:  We have time to do the exhibits right now

15    if you want to.

16             THE LAW CLERK:  As of last night, our charts matched.

17             MR. STUMP:  Okay.

18             THE LAW CLERK:  Right?

19             MR. STUMP:  Yes.

20             THE LAW CLERK:  We checked at the end of each day, and

21    so far we're --

22             MR. STUMP:  Then that's fine, your Honor.  Probably

23    what I'll ask then is while the jury is still in the box just

24    for a minute confer with my agent, make sure that everything's

25    in order.

```
 1                THE COURT:  Okay.

 2                MR. STUMP:  I just -- when I try a case by myself, I

 3      hesitate to just say very quickly yes, we rest.  I thought about

 4      it.  I think we're going to be fine.  But just -- I may ask for

 5      that extra minute or so to do that.

 6                THE COURT:  Okay.

 7                THE LAW CLERK:  If we can at that point, I guess I

 8      haven't -- you know, since we're not collecting them in this

 9      trial like I can tidy them up in a stack or something.

10                THE COURT:  Okay.  Let's start up at 9:00 o'clock.

11                MS. SOLOMON:  Thank you.

12          (Brief recess.)

13          (The following proceedings were had in open court, in the

14           presence and hearing of the jury:)

15                THE COURT:  Good morning, all.  Please be seated.

16                Okay.  So, my prediction about the soccer game wasn't

17      so good.  I predicted three to one South Korea, and it was one

18      to one.

19                Is there anyone in the jury who did not follow the

20      court's instructions and either read about the case, listened to

21      a news article about it, discussed the matter with someone, or

22      did any independent research regarding it?

23          (No response.)

24                THE COURT:  Hearing no one, thank you.

25                Folks, this morning we have a little more testimony,
```

1    and then there will be some jury instructions, closing argument,

2    and the case will come to you by deliberation.  On the last day

3    there are always some legal requirements that I have to go

4    through with the counsels that require you not to be present.

5    So, there are going be a couple of times when I'm going to ask

6    you to excuse yourself to the jury room for a few moments, and

7    I'll bring you back.  Happens in every case.

8              The other thing I want to mention to you is I tell the

9    jurors that at 4:00 o'clock in the afternoon if you've not yet

10   reached a verdict, I'll call you in and ask if you would like to

11   continue to deliberate until 5:30.  It's not any indication that

12   I'm trying to rush you, anything like that.  It's just I'm

13   trying to plan your time and everything like that for the

14   security personnel and that.  So, I don't even know when you're

15   going to get the case today, but I will at 4:00 o'clock call you

16   back in here if you're deliberating at that time and ask if

17   you'd like to stay until 5:30 if you think you can reach a

18   verdict by then.  If you think that that won't help, we'll leave

19   at 5:00 o'clock as usual.  Okay.

20             All right.  Mr. Stump.

21             MR. STUMP:  Thank you, your Honor.  The United States

22   calls Monte Swank.

23             THE CLERK:  Would you stand and raise your right hand?

24        (Witness duly sworn.)

25

Swank - Direct

1          MONTE SWANK, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3     BY MR. STUMP:

4     Q.  Good morning, sir.

5     A.  Good morning.

6     Q.  Would you tell us your name, please, and spell it?

7     A.  My name is Monte Swank.  My last name is spelled S-w-a-n-k.

8     Q.  How do you spell your first name?

9     A.  M-o-n-t-e.

10    Q.  Mr. Swank, where do you work?

11    A.  At the Federal Bureau of Investigation.

12    Q.  And in what city and state are your offices located?

13    A.  I work at the FBI laboratory located in Quantico, Virginia.

14    Q.  What do you do for the FBI laboratory in Quantico?

15    A.  I'm a latent fingerprint expert or latent fingerprint

16    examiner for the FBI laboratory.

17    Q.  Is that your official title, latent print examiner?

18    A.  No.  My official title is physical scientist forensic

19    examiner.

20    Q.  Would you mind leaning into that microphone just a little

21    bit?  Thanks.

22          What does it mean to be a physical scientist forensic

23    examiner?

24    A.  I receive, handle, and process evidence for the development

25    or detection of latent prints.  I would then get those prints

506

Swank - Direct

1    photographed and compare them against known prints to other

2    latent prints or search them against the FBI's fingerprint

3    database.  I'll then write reports based on my findings.

4    Q.  How long have you been employed in fingerprint work?

5    A.  Approximately six years.

6    Q.  Do you have to have any specialized education or training to

7    do the job that you do?

8    A.  I'm required to have a four-year university degree,

9    including some credits in sciences.

10   Q.  Do you have such a degree?

11   A.  Yes, I do.

12   Q.  Do you have any advanced degrees beyond a Bachelor's degree?

13   A.  Yes.  I received my Master's of Science degree in forensic

14   science from the Marshall University located in Huntington, West

15   Virginia.

16   Q.  In what year did you receive that degree?

17   A.  In 2008.

18   Q.  Now, aside from just your education, what about training?

19   In order to become a person who examines fingerprints for the

20   FBI, do you have to go through a certain amount of training?

21   A.  Yes.  At the FBI laboratory, we complete an approximate

22   18-month training program in the latent print unit of the FBI

23   laboratory, where I learned how to record inked prints and

24   handle and process evidence for the development of latent

25   prints.  I learned about the anatomy, physiology, and embryology

Swank - Direct

1    of friction ridge skin and how to analyze and compare latent

2    prints and known prints.

3            I completed casework under the supervision of a mentor

4    for approximately one year and processed thousands of items of

5    evidence and completed approximately 100,000 comparisons.

6    Throughout my training I was provided with classroom lectures

7    and comparison exercises and also was tested by means of

8    presentations, oral boards, moot courts, and at the completion

9    of my training, I successfully completed a comprehensive

10   qualification examination.

11   Q.  You said that you received this 18-month training through

12   the FBI?

13   A.  That is correct.

14   Q.  Have you had any training outside of the FBI, outside of

15   that 18-month training that you talked about?

16   A.  I continue to have education in the field of latent prints

17   through continuing education.  Sometimes it may be by attending

18   conferences or by our training manager bringing in someone to

19   give training to us.

20   Q.  Have you ever testified in court before?

21   A.  Yes, I have.

22   Q.  What about federal court?

23   A.  Yes, two times.

24   Q.  In what courthouses did you testify?

25   A.  I testified in the United States District Court in the

Swank - Direct

1    Northern District of Georgia, as well as the United States

2    District Court in Washington, D.C.

3    Q.  And in those two cases, did you testify about fingerprint

4    examinations?

5    A.  Yes, I did.

6    Q.  Was your testimony accepted as expert testimony in those two

7    cases?

8    A.  Yes, it was.

9            MR. STUMP:  Your Honor, at this time I'm going to

10   tender Mr. Swank as an expert in the field of fingerprints.

11           THE COURT:  Any objection?

12           MS. SOLOMON:  No objection.

13           THE COURT:  So noted.

14   BY MR. STUMP:

15   Q.  Mr. Swank, you talked about two different kinds of

16   fingerprints, I think, a moment ago.  You mentioned latent

17   prints, and I believe you mentioned known prints; is that right?

18   A.  Yes, I did.

19   Q.  Can you start by explaining to us what is a latent print?

20   A.  On the palm or surface of the hand and the soles of the feet

21   is a specialized skin known as friction ridge skin.  This skin

22   contains raised portions which aid in the gripping of objects,

23   and these are known as ridges.

24           A latent fingerprint, throughout the course of the day

25   this skin can become coated in sweat, oils, or other similar

Swank - Direct

1    substances.  When an object is touched, an impression of this

2    friction ridge arrangement can be left behind, and this would be

3    a latent print.  You might have seen this if you've gone to grab

4    a drinking glass or used a touch screen device.

5              Latent prints are often fragmentary in nature and

6    require the use of lasers, fingerprint powders, or chemicals in

7    order to be visualized.

8    Q.  Do you always have to use some sort of powder or chemical to

9    be able to detect a latent print?

10   A.  No.  Sometimes they can be seen visually.

11   Q.  Now, what is a known fingerprint?

12   A.  On the palm or surface of the hand and the end joint of the

13   finger, a known fingerprint would be a recording of this area of

14   the finger.  This is typically done by taking a finger and

15   rolling it from nail to nail in black printer's ink and then

16   again from nail to nail on a suitable contrasting background,

17   such as a standard fingerprint card.  This can also be

18   accomplished by using a computer or scanning device which does a

19   live scan or JABS, which is the joint automated booking system.

20   Q.  Do that again.  What is JABS you said?

21   A.  JABS is the joint automated booking system.

22   Q.  J-A-B-S?

23   A.  Yes.

24   Q.  And what is that?

25   A.  It's a way to record known fingerprints that will be

Swank - Direct

1   captured without the use of inks.

2   Q.  Is that a system that's used in law enforcement to your

3   knowledge?

4   A.  Yes.  There are many offices for the FBI that do use the

5   JABS.

6   Q.  Is there an advantage in law enforcement to using JABS over

7   ink from your vantage point?

8   A.  From my vantage point, as far as a latent fingerprint

9   examiner, like using -- like having prints used in ink, just

10  because of the clarity of information that is present.  However,

11  with using the electronic system such as JABS, it can be

12  transmitted quicker.

13  Q.  Do you have access then to a database as part of your job

14  where you can see known prints that were taken through the JABS

15  system?

16  A.  Yes, I do.

17  Q.  Now, I want you, if you could, to explain to the jury what

18  the basic factors are that you use to make an identification

19  comparing a known fingerprint to a latent fingerprint.  When you

20  go about that process, what are the basic factors that you look

21  for?

22  A.  I will use a methodology known as ACE, which stands for

23  analysis, comparison, and evaluation.  In the analysis phase, I

24  will look at first the latent print and look for all the

25  information that is present.  I'll be looking for what the

Swank - Direct

1    latent print was left on, what type of matrix or substance it
2    was left in, such as sweat or oils, as well as any determining
3    factors, such as the pressures or movements that may have been
4    present when the print was placed.  I'll be looking for the
5    quantity of information that is present, as well as the quality
6    or clarity of that information.  When I determine that there is
7    enough information present to be of value for identification
8    purposes, I'll then do a similar analysis of the known prints.
9         Next I will move on to the comparison phase, where I'll
10   lay the latent print and the known print side by side and look
11   for similarities and differences.
12        When I am complete by looking at both the information
13   present in the latent and the known print, I'll then move to the
14   evaluation phase where I'll come to one of three conclusions.
15   The first is an identification, where the information present in
16   the latent print and the information present in the known print
17   have been determined to come from the same source; an exclusion,
18   where the information present in a latent print and the
19   information present in the known print has been determined to
20   not come from the same source; or an inconclusive decision,
21   where there's not enough comparable area between the latent
22   print and the known print to come to a determination of
23   identification or exclusion.
24   Q.  So, I just want to make sure I understand.  There's three
25   different results that you can have from an examination; is that

Swank - Direct

1    right?

2    A.  That's correct.

3    Q.  And the first you just said was called identification?

4    A.  Yes.

5    Q.  And what does it mean when you reach an identification?

6    A.  It means that the latent print and the print that was taken

7    on the known card have been determined to come from the same

8    source.

9    Q.  The second one you said I think was an exclusion; is that

10   right?

11   A.  Yes.

12   Q.  And what does it mean if you reach the conclusion of an

13   exclusion?

14   A.  It means that the two prints did not come from the same

15   source.

16   Q.  And the third you said was inconclusive?

17   A.  Yes.

18   Q.  What is that?

19   A.  An inconclusive print, for instance, could be if a latent

20   print happens to be from the tip area of a finger, but in the

21   known rollings or recordings of the known print, that area is

22   not captured.  So, those two areas cannot be compared to see if

23   they came from the same source.  Usually, this would result in

24   getting more known cards in order to try and capture that

25   information to compare.

Swank - Direct

1    Q.  Mr. Swank, I want to show you what we've already admitted as

2    Government's Exhibit 30.  It's an envelope, and then there's

3    some documents inside.  What I want to ask you is as part of

4    your job as a fingerprint examiner, did you see what we've

5    marked for identification as Government's Exhibit 30?

6    A.  Yes, I have.  I know this because my initials appear in the

7    bottom right-hand corner of both the envelope, as well as the

8    documents.

9    Q.  All right.  I'll take that back from you just so I can try

10   to show this on the screen.  Are you referring to this teeny

11   tiny little notation here?

12   A.  Yes, I am.

13   Q.  And how do you recognize that little notation?

14   A.  On each piece of evidence that I receive, I will write the Q

15   number, which is an item identifier that is used at the FBI

16   laboratory, as well as my initials on it, to show that I have

17   examined those items.

18   Q.  Okay.  So, for example, I have on the screen one of the

19   notations on Exhibit 30.  Can you tell us what that is and what

20   it signifies to you?

21   A.  It shows that it is item Q5, and my initials are on it, MJS.

22   Q.  How did you decide what number to assign for Q purposes?  Q

23   whatever?

24   A.  Our evidence control -- evidence control in the laboratory

25   will receive all evidence that is submitted to it and will go

Swank - Direct

1    through an inventory of each piece of evidence and assign it a Q

2    value, a sequential Q value based on those items.

3    Q.   So, if we flip through these pages, will we see Q numbers

4    going up in sequential order for every single page in this

5    exhibit?

6    A.   Yes, you will.

7    Q.   Now, what I want to ask you is did you examine these

8    documents as part of your job to determine whether any latent

9    prints were on these documents?

10   A.   Yes, I did.

11   Q.   And did you find any latent prints of value in this case?

12   A.   Yes, I did.

13   Q.   Where should we look to find them?

14   A.   In this particular submission on item Q8, which is a copy of

15   a common law affidavit dated 02-08-11, and item identifier Q44,

16   which is a copy of a notice of lien dated 01-24-11.

17   Q.   I have on the screen Q8; is that right?

18   A.   That's correct.

19   Q.   Okay.  This red fingerprint here, is this the latent print

20   that you found on Q8?

21   A.   Yes, it is.

22   Q.   And there's a little sticky here that says FBI laboratory.

23   How did that get there?

24   A.   In the FBI laboratory when we examine a document or a piece

25   of evidence and either develop or visualize a latent print

Swank - Direct

1    present, we will create a Q tag, which is what that box is that
2    says FBI laboratory on it.  That will include the item
3    identifier, our date, and the process in which we saw it, as
4    well as the laboratory number that was assigned to that
5    submission.  When we see this, we will then prepare and send it
6    to our photography unit, which will then capture the latent
7    prints so that we can then go on and use them later on in our
8    comparisons by using photographs.
9    Q.  What do you mean by using photographs?
10   A.  All the evidence that we receive when we get a latent print,
11   we will always take a photograph of it so that there will always
12   be documentation of the latent prints that are present, as well
13   as additional copies that can be made in case it needs to be
14   further examined by another qualified individual.
15   Q.  And why a photograph, as opposed to the original?
16   A.  We want to try to make sure that the evidence stays as true
17   to form as possible, and that is why we will capture the
18   evidence.  In most cases when we receive evidence, we will
19   examine it visually, as well as with alternate light sources
20   with different wavelengths, and then process it using chemicals.
21   And by processing it using chemicals, it can -- a print that you
22   may see may later on, because of the nature of the chemicals,
23   show up in a different fashion, as far as the quality of it or
24   because the chemicals that are being used are looking for
25   different types of chemicals to interact with.

Swank - Direct

1      So, we want to make sure that we capture every latent
2  print in the best quality as possible.  So, we may capture it
3  using one method and later on capture it using multiple other
4  methods.
5  Q.  You said there was another print on this exhibit that you
6  found to have value; is that right?
7  A.  Yes.  On Q44.
8  Q.  All right.  Is this the print you're referring to?
9  A.  Yes, it is.
10  Q.  And is it this red one that we all see right here?
11  A.  Yes, it is.
12  Q.  What did you have to do to analyze these prints?  You said
13  the first phase of your examination is analysis.  What analysis
14  did you do on Q8 and Q44?
15  A.  When I received the photographs back from when I send this
16  to our photography unit, it will be digitally processed so that
17  the latent print will show up, where the ridges are black
18  instead of red, with a contrasting background such as white.
19  And this is typically done so that when we get to our comparison
20  phase, we can have them be the same, where the known prints are
21  usually with black ridges and white in between.
22      During my analysis, I'll then take this photograph of
23  this latent print that I received and will look at it for
24  different levels of detail.  The first level of detail would be
25  the overall ridge flow, and there are three basic ridge flows or

Swank - Direct

1    patterns that I would be looking for.  There is an arch where
2    ridges will flow in from one side of the print, make a riser
3    wave in the middle, and exit out on the opposite side of the
4    print.  There is a loop where ridges will flow in, recurve, and
5    exit out on the same side that they came in on.  And a whorl,
6    which is a circular pattern type, much like a bull's-eye.
7          The second level of detail that I would be looking for
8    is the individual ridge characteristics.  Along each one of
9    these ridges there may be a characteristic which would be either
10   a dividing ridge, which is a ridge that flows and then splits
11   into two ridges, an ending ridge where the ridge will flow and
12   come to an abrupt stop, or a dot, which is as wide as it is
13   long.  I will be looking at not only these type of
14   characteristics, but also the overall location it is in the
15   print, the direction that it either opens or points, and the
16   spatial relationship between one characteristic and another one.
17         When I'm looking at the second level of detail, I will
18   also be looking for the presence of any third level of detail
19   that may be present, such as sweat pores that may appear along
20   the ridges, as well as the edges and the shapes of the ridges
21   themselves.
22   Q.  And did you do all three of those steps, or did you look for
23   all three of those distinguishing features in Q8 and Q44?
24   A.  Yes, I did.  And when I look at these three levels of
25   detail, I will also come to a determination on whether or not

Swank - Direct

1    the print is of value for identification purposes, and then I

2    will claim the print to be used in the comparison phase.

3    Q.  What does it mean for a print to be of value?

4    A.  When a print is of value for identification purposes, it

5    means that there is enough quantity of information, as well as

6    the quality or clarity of that information present, in order to

7    be used to identify.

8    Q.  What happens if you have a latent print that is not of

9    value?  Then what?

10   A.  I will examine all latent prints on the evidence, and if it

11   is not of value for identification purposes, then I'll move on

12   to look for other ones that are of value for identification

13   purposes.

14   Q.  I want to show you now what we've marked for identification

15   as Government's Exhibit 41, and, actually, I believe this has

16   been admitted, as well.  Sir, do you recognize that?

17   A.  Yes, I do.

18   Q.  What did I hand you?

19   A.  Government's Exhibit 41 is a known card which has a

20   laboratory identifier of K1 that are fingerprints bearing the

21   name Cherron Phillips.

22   Q.  Have you seen that exhibit before?

23   A.  Yes, I have.

24   Q.  How do you know that you've seen it?

25   A.  I know this because my initials appear in the bottom

Swank - Direct

1    right-hand corner again.

2    Q.  All right.  I'm going to put this on the screen.  Did you

3    use this Exhibit 41 in your examination in this case?

4    A.  Yes, I did.

5    Q.  And what was the purpose of this?  What did you do with

6    this?

7    A.  I used this known card to compare against other latent

8    prints in the case in order to reach a conclusion.

9    Q.  And what was your conclusion?

10   A.  In this case there were the two latent prints that were

11   claimed for -- that were of value for identification purposes in

12   Exhibit 30 and were identified with fingerprints that were found

13   on the known card, Exhibit 41, bearing the name Cherron

14   Phillips.

15   Q.  Any specific print that's on this card that they were

16   associated with?  I mean, any one of these?

17   A.  Yes.  Both fingerprints from Government's Exhibit 30 were

18   identified with the number one block or the right thumb block on

19   Government's Exhibit 41.

20   Q.  This one right here?

21   A.  Yes.

22   Q.  Now, as part of preparing for your testimony today, did you

23   provide any sort of illustrative aid that would help explain how

24   you made this comparison?

25   A.  Yes, I did.

Swank - Direct

1    Q.  I'm going to show you what we've marked for identification

2    as Government's Exhibit 43.  Sir, do you recognize this exhibit?

3    A.  Yes, I do.

4    Q.  How do you recognize it?

5    A.  These are chart enlargements that I created to illustrate or

6    demonstrate how I would do a comparison and an identification in

7    this case.

8    Q.  Now, where do the actual prints that are on that

9    illustration come from?

10   A.  The known print that is on this chart comes from

11   Government's Exhibit Number 41, the number one block or the

12   right thumb block from that card.

13   Q.  This is the one that we have right up on the screen?

14   A.  That's correct.

15   Q.  And what else?

16   A.  And the latent print that appears on this comes from item

17   identifier Q8, which was from Government's Exhibit Number 31.

18   Q.  Thirty?

19   A.  Or Number 30.  I'm sorry.

20          MR. STUMP:  Your Honor, at this time I'd move for

21   admission of Government's Exhibit 43.

22          MS. SOLOMON:  No objection.

23          THE COURT:  43 admitted, no objection.

24      (Government's Exhibit 43 was offered and received in

25       evidence.)

Swank - Direct

1          MR. STUMP:  All right.  Your Honor, at this time I
2    would also ask that the witness be permitted to step down.  Or
3    do you need to?
4          THE WITNESS:  Yes.
5          MR. STUMP:  To be able to explain this.
6    BY THE WITNESS:
7    A.  What I'm about to show you are chart enlargements that I
8    created that help to illustrate an identification in this case.
9    The lines, the red lines, as well as the letters that appear,
10   I've put on for demonstrative purposes only.
11         So, on one side there is the latent print, and on the
12   other side is the known print.  When I start my examination, I
13   will start with the latent print and go through the phases of my
14   methodology, the analysis -- the first phase, which is the
15   analysis.  I will start by looking for the three levels of
16   detail that I spoke about, the first one being the overall ridge
17   flow.  And in this case it is a whorl pattern type, which is a
18   circular pattern type.
19         I will next look along these ridges to look for
20   characteristics, such as the dividing ridge, the ending ridge,
21   and the dot.  And then while I'm looking at this level two
22   detail, I'll look for the presence of any pores or ridge edges
23   that are along those ridges.
24         After I'm done looking at the latent print, I will make
25   a determination of whether or not it is of value for

Swank - Direct

1    identification purposes, and then I will do a similar analysis
2    of the known print.
3         Next I will lay the latent print and the known print
4    side by side and then look for similarities and differences.  I
5    will start with the level one detail and notice that the latent
6    print is a whorl type pattern and move over to the known print
7    and notice that it is also a whorl type pattern.
8         Next I'll move over to the level two detail, and
9    starting in the approximate center of the print or the core and
10   going up to the about 11:00 o'clock position, there is a
11   characteristic that I have marked Characteristic A that is a
12   dividing ridge that is opening down and to the left.  I will go
13   down across one intervening ridge to a second ridge, which I've
14   marked Characteristic B, that has an ending ridge pointing up
15   and to the right.  I'll then move across one, two intervening
16   ridges to a third ridge, which I've marked Characteristic C,
17   that is a dividing ridge that is opening to the left.
18        I'll then move over to the known print, and starting at
19   the approximate center or the core, I'll go to the 11:00 o'clock
20   position and find a characteristic that is a dividing ridge
21   opening down and to the left, which I've marked
22   Characteristic A.  I'll go across one intervening ridge to a
23   second ridge down and to the left to a characteristic I've
24   marked Characteristic B, which is an ending ridge pointing up
25   and to the right.

Swank - Direct

```
 1              I'll move down and to the right across one, two
 2      intervening ridges to a third ridge to a characteristic I've
 3      marked Characteristic C, which is a dividing ridge pointing to
 4      the left, opening to the left.
 5              I'll continue in this manner going from latent print to
 6      known print until all the information that is present, not only
 7      the three that I've gone over today, but the other
 8      characteristics that I've marked and have not gone over, as well
 9      as all the other characteristics that are present in this print.
10      I'll go from latent print to known print until they're all
11      exhausted, and then I will move on to the third phase of the
12      methodology phase to the evaluation phase.
13              And in this case I've come to the determination that
14      the latent print found on Government's Exhibit 30, Q8, has been
15      identified with the number one block or the right thumb block
16      found on Government's Exhibit Number 41, the known card bearing
17      the name Cherron Phillips.
18      BY MR. STUMP:
19      Q.  Now, Mr. Swank, you said that you did that comparison there
20      for Q8.  What about Q44?
21      A.  I also did this for Q44, and the latent print that was found
22      on Q44 was also identified with Government's Exhibit Number 41,
23      the known card bearing the name Cherron Phillips.
24      Q.  Now, I want to show you what's previously been admitted as
25      Government's Exhibit 45, and it's a plastic envelope with some
```

Swank - Direct

 1    documents inside.  Do you recognize Government's 45?

 2              I see you're flipping through the pages looking at the

 3    lower right-hand corner.  Are you looking for your same notation

 4    on these documents?

 5    A.  Yes, I am.

 6    Q.  Do you see it there?

 7    A.  Yes.  On all the documents, as well as on the envelope.

 8    Q.  And what does that tell you?

 9    A.  It tells me that I have examined these documents before and

10    have then put my initials on them.

11    Q.  And which documents in the case are these?

12    A.  These are documents --

13    Q.  I mean, what is the title of the document, I guess.

14    A.  Oh.  The title of the first document is a notice of claim of

15    maritime lien.

16    Q.  All right.  And is it your understanding that there are

17    essentially twelve similar type documents in that packet?

18    A.  I believe there --

19    Q.  Or I'm sorry.  Eleven.

20    A.  I believe there are eleven in this packet, yes.

21    Q.  Is that how many you received is eleven?

22    A.  Yes.

23    Q.  And did you do the same examination -- so, analysis,

24    comparison, and evaluation -- with this set of documents as you

25    did for Q8 and Q44?

Swank - Direct

1    A.  Yes, I did.

2    Q.  What was the result that you reached in the evaluation for

3    this exhibit?

4    A.  Nine of the prints that were found on these documents were

5    identified with the fingerprints found on Government's Exhibit

6    Number 41, a known card bearing the name Cherron Phillips, and

7    two of the prints that were designated were not of value for

8    identification purposes.

9    Q.  I just want to put the first one on the screen.  Okay.  Just

10   for the record, the name on the first page of this exhibit is --

11   under name of vessel, it says Thomas E. Shakeshaft.  And I'm

12   going down to the bottom here.  There's what appears to be a

13   fingerprint at the bottom.  Do you see that?

14   A.  Yes, I do.

15   Q.  Is this one of the latent prints that you examined?

16   A.  Yes, it is.

17   Q.  You said that for nine of these your conclusion was an

18   identification that the source of this fingerprint is the same

19   source as the fingerprints on Exhibit 41; is that right?

20   A.  That's correct.

21   Q.  Which two did you not reach that conclusion for?

22   A.  On item identifier Q112, which is a copy of a lien bearing

23   the name Eric Cato, as well as on Q item 118, which is a copy of

24   a lien bearing the name Geraldine Brown.

25   Q.  Now, when you started your testimony, you explained there

Swank - Direct

1    were three different conclusions you can reach.  Identification,

2    exclusion, and inconclusive.  What was your result with regard

3    to those other two?

4    A.  In the other two, I did not get to the comparison phase

5    which would render one of those three conclusions.  During the

6    analysis phase, when I was looking for all the information that

7    was present in those latent prints, there was not enough

8    quantity and clarity of information present to be determined to

9    be of value for identification purposes.

10    Q.  We talked earlier about a print having no value or being of

11    value.  Is that what you're talking about here?

12    A.  Yes.  Those two prints were of no value.

13    Q.  Thank you.  That's all the questions I have.

14         THE COURT:  Ms. Solomon.

15                  CROSS EXAMINATION

16    BY MS. SOLOMON:

17    Q.  Good morning, Mr. Swank.

18    A.  Good morning.

19    Q.  My name is Lauren Solomon, and I represent Cherron Phillips

20    in this matter.  I thank you for traveling to Chicago to testify

21    today.

22         Now, you were given documents at different times in

23    this case?

24    A.  That is correct.

25    Q.  And the first number of documents that you received are the

Swank - Cross

1    larger group of documents?

2    A.  That's correct.  There were many pages that were sent to me

3    in a submission, and only specific pages were asked to be

4    examined for latent prints.

5    Q.  So, of the first set of documents numbered Q1 through Q57,

6    how many of those were you asked to examine?

7    A.  I was asked to examine any of the latent prints that were

8    found over the name River Tali, and there were two of those

9    present.

10   Q.  So, of those 57 documents, you only examined two of them?

11   A.  I examined all of them to see if there were latent prints on

12   the other pages with the name River Tali, but only two of them

13   did have them.

14   Q.  Only two of the documents fit that description?

15   A.  Yes.

16   Q.  Okay.  So, and those documents had the visible thumbprint on

17   them or a visible print on them?

18   A.  Yes, that's correct.

19   Q.  And was it necessary to conduct any -- what chemical test,

20   if any, did you conduct on those prints?

21   A.  There was no chemical processing involved in the examination

22   of these documents.  It was asked only to compare the inked

23   prints or the prints that were visible on the names.

24   Q.  So, you photographed them and then did your comparisons from

25   the photographs?

Swank - Cross

1    A.  That's correct.

2    Q.  And you compared known prints by Ms. Phillips to the latent

3    prints?

4    A.  That's correct.

5    Q.  And those were the prints that were on the fingerprint card?

6    A.  Yes, they were.

7    Q.  And that was Exhibit 41, Government's Exhibit 41, that was

8    up on the screen?

9    A.  Government's Exhibit 41 is a known card that was sent to me

10   later on in another submission, and there was a card that was

11   used previously that I used for a comparison, and then the known

12   card was sent to me to compare later on to make sure that the

13   known prints that I had were the known prints -- were from the

14   same source as the known prints that were sent in to me.

15   Q.  And so, the initial source for the known prints was computer

16   generated?

17   A.  It was a known card that was stored digitally in a computer,

18   yes.

19   Q.  And the fingerprint card is one that used the rolled ink

20   method?

21   A.  I'm not sure how the original known print card was taken.

22   Q.  So, if it was -- there was two methods, the rolled ink, and

23   the other one was -- what was that method as you described it?

24   A.  There was the rolled method using ink, and there's also a

25   scanning method by using it on what would end up being a flatbed

Swank - Cross

1    scanner that would be used as a live scan method.

2            There is also a third method that can be used, which is

3    a chemical method, and that would use what appears to be like a

4    clear ink that would be used so that it's not as messy as a

5    regular printer's ink, and it would be used with heat to

6    chemically have them show up.

7    Q.  And by looking at this card, you can't tell which method was

8    used for these prints?

9    A.  Not necessarily, no.

10   Q.  And in this instance you only used the photographic method

11   for examining the latent print?

12   A.  When I start my examinations for the analysis phase, I will

13   start with the evidence itself to see how much information is

14   present and if I should send it to our photography unit, and

15   then when I get any latent prints that were present

16   photographed, I will then conduct a complete analysis on that,

17   on those photographs, later on.

18   Q.  So, your examination in this case was based solely on what

19   you could see visually?

20   A.  Yes, it was.

21   Q.  You didn't need to use any chemicals to extract a print that

22   was not visible?

23   A.  That's correct.  I did not use any chemicals.

24   Q.  And so, as far as you know, you don't know whether there

25   were any latent prints on the other documents because you didn't

Swank - Cross

1    perform those kinds of tests on the documents that would only

2    have latent prints?

3    A.  I examined the other documents for inked prints, which are

4    the ones that I explained that were on top of the name that was

5    present, but I did not do any chemical processing to look for

6    any additional latent prints.

7    Q.  No.  I'm asking about the other documents that did not have

8    the inked prints on them.  You conducted no examination of

9    those.

10   A.  I did conduct an examination on those documents to see if

11   there were latent prints that were put over the name River Tali.

12   Q.  So, you looked to see if there was visual latent prints?

13   A.  Yes.

14   Q.  You conducted no further examination?

15   A.  That is correct.

16   Q.  The field of latent print evaluation is a science?

17   A.  Yes, it is.

18   Q.  And it's part of a forensic science?

19   A.  Yes.

20   Q.  And the fingerprints section that you worked with uses

21   digital images for the prints?

22   A.  For the most part, yes, it does.  I should clarify.  Now it

23   does always use digital, digital images.

24   Q.  It always does, or it does not?

25   A.  It does now, yes.

Swank - Cross

1    Q.  It does.

2         Okay.  In your second mailing, you also examined

3    another group of documents?

4    A.  That is correct.

5    Q.  And those were labeled Q -- those are labeled Q109 through

6    actually 150.  Did you examine all of those or just the initial

7    documents that were entitled notice of claim of maritime lien?

8    A.  I examined all the documents to see if there were latent

9    prints placed over the name or near the name of River Tali.

10   Q.  And the latent prints were only on the first eleven

11   documents?

12   A.  They were among the first sets of documents.  Some of the

13   documents were multiple pages.  So, they may appear on the first

14   page of one, and a couple pages later might be the next one.

15   Q.  Again, you were doing a visual scan with your eye, your

16   naked eye, to look for the visual thumbprint that was on the

17   documents?

18   A.  Yes, I did.

19   Q.  And you didn't perform any kind of chemical analysis on the

20   other pages where the thumbprint was not visible to the naked

21   eye?

22   A.  That is correct.

23   Q.  And in your initial examination, you found that there was

24   two fingerprints that were a match, the latent print that

25   matched the known print, one on Q8 and the other on Q44?

Swank - Cross

1   A.   That is correct.

2   Q.   And you found that there were how many points of similarity?

3   A.   We don't count points to make a determination.

4   Q.   Well, in that case you did have nine points of similarity

5   between the two prints?

6   A.   Are you referring to the illustration that I had?

7   Q.   Yes.  In the illustration there was nine points of

8   similarity?

9   A.   There were only nine prints that I marked out for

10  demonstrative purposes, but there were in excess of 20 in that

11  latent print.

12  Q.   Excess of -- I'm sorry.  I didn't hear.

13  A.   Of 20.

14  Q.   Of 20?  And is there any standard in the industry for the

15  number of similarities that are required to make a comparison --

16  come to a conclusion that it's the same print?

17  A.   No.  The quantity and the quality of information that is

18  present have a symbiotic relationship where if there are more

19  characteristics that are present and the quality is not as good

20  versus having a very high quality and fewer characteristics,

21  there's a lot that goes into trying to determine whether or not

22  there's enough information present to be of value for

23  identification purposes.

24  Q.   And in the second set of documents, you found that there

25  were nine documents that contained a comparison that was

Swank - Cross

1   meaningful?

2   A.   In the second set of documents, there were nine that were

3   claimed as being of value for identification purposes.

4   Q.   And the additional two did not have any meaningful

5   comparison?

6   A.   Yes.

7            MS. SOLOMON:  Nothing further.

8            THE COURT:  Any redirect?

9            MR. STUMP:  No.  Thank you, your Honor.

10           THE COURT:  May the witness be permanently excused?

11           MS. SOLOMON:  Yes.

12           MR. STUMP:  Yes.

13           THE COURT:  Okay.  You can be excused, sir.  Thank you.

14       (Witness excused.)

15           THE COURT:  Mr. Stump?

16           MR. STUMP:  Your Honor, could I have one moment,

17   please?

18           THE COURT:  Sure.

19       (Brief pause.)

20           MR. STUMP:  Your Honor, at this time the United States

21   rests.

22           THE COURT:  Okay, folks.  At this time I'm going to ask

23   that you retire back to your jury room for a few minutes,

24   probably less than 15, and we'll bring you back out.  Thank you.

25

534

1      (The following proceedings were had in open court, out of

2      the presence and hearing of the jury:)

3           THE COURT:  We're in open court out of the presence of

4      the jury.  The government has rested.  Ms. Solomon.

5           MS. SOLOMON:  I would -- at this time I would move --

6      at this time I would move for judgment of acquittal at the close

7      of the government's case.

8           THE COURT:  Any argument?

9           MS. SOLOMON:  No, I'll just leave it at that.

10          THE COURT:  Okay.  Mr. Stump, any response?

11          MR. STUMP:  Your Honor, we believe that the evidence is

12     more than sufficient for the case to go back to the jury.  As to

13     the five elements, we feel that we've presented testimony and

14     exhibits that satisfy each and every one of them.

15          THE COURT:  Okay.  Under Rule 29, before submission to

16     the jury, after the government closes its evidence or after the

17     close of all the evidence, the court on the defendant's motion

18     must enter a judgment of acquittal for any offense for which the

19     evidence is insufficient to sustain a conviction.  After

20     reviewing the evidence in this case as to all twelve counts, the

21     court believes the government has made a submissible case.  So,

22     the defendant's motion under Rule 29 at the conclusion of the

23     government's case is denied.

24          Do you have any witnesses, Ms. Solomon?

25          MS. SOLOMON:  I believe my witness is in the cloak

```
 1    room, but I would like a moment to speak.
 2              THE COURT:  Okay.  And before you do that,
 3    Ms. Phillips, this is the time at which I need to know if you're
 4    going to testify or not.  I know when we had the jury
 5    instruction conference, the second portion of it on the record
 6    today at 8:45, you indicated that you did not consent to the
 7    proceedings and read your standard statement to me.  I need to
 8    know now if you're going to testify or not, recognizing you have
 9    an absolute right to testify or not testify.  Are you going to
10    testify in the case?
11              DEFENDANT PHILLIPS:  Personal jurisdiction is not on
12    the record.  There is no bond for this particular claim.  I am
13    not the surety for this action, and I have not consented to this
14    legal process.
15              THE COURT:  And you understand, as I told you this
16    morning, that if you reiterated that statement, I was going to
17    interpret it to mean that you elect not to testify.  So, I'm
18    interpreting that to mean that you are waiving your right to
19    testify in this case.  If that is incorrect, let me know.
20              DEFENDANT PHILLIPS:  (No response.)
21              THE COURT:  Hearing nothing, I'm going to assume that
22    you are not going to testify then.
23              Ms. Solomon, why don't you take a few minutes to talk
24    to your witness.  We'll start up at 10:00 o'clock, in about
25    six minutes.  Okay?
```

```
 1              MS. SOLOMON:  Thank you.

 2         (Brief recess.)

 3              THE COURT:  Okay.  Would you bring the jury in, please?

 4    Okay?

 5              MS. SOLOMON:  I have no witnesses.

 6              THE COURT:  Oh, no witnesses?  Okay.

 7              MS. SOLOMON:  No.

 8              THE COURT:  Okay.  Let me hold off the jury a minute.

 9         (Brief pause.)

10              THE COURT:  Okay.  We're present in court out of the

11    presence of the jury.  Ms. Solomon, do you have a defense that

12    you want to present?

13              MS. SOLOMON:  At this time we rest, your Honor.

14              THE COURT:  Okay.  Ms. Phillips, again, if you would

15    like to testify, it's your sole decision.  You can testify or

16    not testify.  The decision is completely up to you.  If you'd

17    like to testify, please come forward.

18         (No response.)

19              THE COURT:  Okay.  You're not coming forward.  I'm

20    going to consider that and your statement as an indication that

21    you waive your right to testify in this case.

22              So, we can move on to me reading instructions and

23    closing argument.  How much time does the government request for

24    closing argument?

25              MR. STUMP:  Your Honor, I would ask for 30 minutes.
```

```
 1                THE COURT:  Okay.  How would you like to -- and is that
 2    sufficient for you, Ms. Solomon?
 3                MS. SOLOMON:  That would be more than sufficient for
 4    me.
 5                THE COURT:  Okay.  How would you like to split it up?
 6                MR. STUMP:  Your Honor, I'd like to use as much as I
 7    used in the first time and then whatever --
 8                THE COURT:  There's no carry-over.
 9                MR. STUMP:  I can't reserve --
10                THE COURT:  No, because then you take one minute and
11    you reserve 29, and then she doesn't get to rebut.
12                MR. STUMP:  Fair enough.
13                THE COURT:  I've been around the block before.
14                MR. STUMP:  Fair enough.  I'll take 20 and ten then,
15    Judge.
16                THE COURT:  Okay.  And what kind of warning would you
17    like on the 20?
18                MR. STUMP:  How about a two-minute warning?
19                THE COURT:  And I'll make sure you acknowledge me so
20    I'll make sure you've heard it.
21                MR. STUMP:  Okay.
22                THE COURT:  And on the ten minute?
23                MR. STUMP:  Same.
24                THE COURT:  Two-minute warning.  Okay.
25                And you have 30 minutes, Ms. Solomon.  How much time
```

Charge

1    would you like for a warning?

2           MS. SOLOMON:  I think I'll be done way before 30

3    minutes.  Five minutes is fine.

4           THE COURT:  Okay.  Five-minute warning.

5           Okay.  Would you bring the jury in, please?

6    (The following proceedings were had in open court, in the

7        presence and hearing of the jury:)

8           THE COURT:  Okay, folks.  Please be seated.  You have

9    heard all the evidence in the case.  And so, I'm now going to

10   instruct you on the law.  I've already instructed you at the

11   beginning, but I did tell you there would be additional

12   instructions at the end, and that's what I'm going to do now.

13          Remember to consider all the court's instructions as a

14   whole, not singling out any one over the other.  You'll receive

15   these instructions in writing.  They'll be in a folder, and the

16   instructions will be stapled.  In that folder also will be the

17   verdict forms.  The verdict forms are loose.

18          You'll have to make twelve decisions in the case.

19   There are twelve counts to the indictment in this case.  The

20   government alleges Ms. Phillips committed twelve separate

21   crimes.  And so, you'll have to decide guilt or innocence on

22   each of those.  So, you're each going to have to sign your name

23   twelve times.

24          When you return those into court, I will review them to

25   make certain that the form is correct.  Then when we file those

Charge

1    electronically, the signatures will be available only to the

2    Clerk's Office and the court.  The general public will be able

3    to see the verdict forms, but your signatures will be redacted,

4    again preserving your personal identities.

5           So, these are the balance of the instructions.  Do not

6    make any decisions simply by counting the number of witnesses

7    who testified about a certain point.  What is important is how

8    truthful and accurate the witnesses were and how much weight you

9    think their testimony deserves.

10          Part of your job as jurors is to decide how believable

11   each witness was and how much weight to give each witness'

12   testimony.  You may accept all of what a witness says, a part of

13   it, or none of it.  Some factors you may consider include the

14   intelligence of the witness, the witness' ability and

15   opportunity to see, hear, or know the things he or she testified

16   about, the witness' memory, the witness' demeanor, whether the

17   witness had any bias, prejudice, or reason to lie or slant the

18   testimony, the truthfulness and accuracy of the witness'

19   testimony in light of the other evidence presented, and any

20   inconsistent statements or conduct by the witnesses.

21          A defendant has an absolute right not to testify or

22   present evidence.  You may not consider in any way the fact that

23   the defendant did not testify or present evidence.  You should

24   not even discuss it in your deliberations.

25          You have heard evidence that the defendant committed

Charge

1    acts other than the ones charged in the indictment.  Before

2    using this evidence, you must decide whether it is more likely

3    or not that the defendant did the acts that are not charged in

4    the indictment.  If you decide that she did, then you may

5    consider this evidence to help you decide the defendant's

6    motive, knowledge, intent, or identity.  You may not consider it

7    for any other purpose.  Keep in mind that the defendant is on

8    trial here for the conduct charged in the indictment, not for

9    the other acts.

10          Counts 1 through 12 of the indictment charge the

11   defendant with retaliating against a federal official by false

12   claim.  In order for you to find the defendant guilty of this

13   charge, the government must prove each of the following five

14   elements beyond a reasonable doubt.

15          Number one, the defendant filed or attempted to file a

16   lien or encumbrance in a public record.  And, number two, the

17   lien or encumbrance was false or it contained a materially

18   false, fictitious, or fraudulent statement or representation.

19   And, number three, the defendant knew or had reason to know that

20   such lien or encumbrance was false or that it contained a

21   materially false, fictitious, or fraudulent statement or

22   representation.  And, number four, the lien or encumbrance was

23   filed or attempted to be filed against the property of an

24   officer or employee of the United States Government.  And,

25   number five, the defendant filed or attempted to file the false

Charge

1   lien or encumbrance on account of the officer or employee's

2   performance of official duties.

3        If you find from your consideration of all the evidence

4   that the government has proved each of these elements beyond a

5   reasonable doubt as to the charge you are considering, then you

6   should find the defendant guilty of that charge.  If, on the

7   other hand, you find from your consideration of all the evidence

8   that the government has failed to prove any one of these

9   elements beyond a reasonable doubt as to the charge you are

10  considering, then you should find the defendant not guilty of

11  that charge.

12       A person acts knowingly if she realizes what she is

13  doing and is aware of the nature of her conduct and does not act

14  through ignorance, mistake, or accident.  Ignorance of the law,

15  however, is not a defense, and the government is not required to

16  prove that the defendant knew her actions were unlawful.

17      In deciding whether the defendant acted knowingly, you

18  may consider all of the evidence, including what the defendant

19  did or said.  You may find that the defendant acted knowingly if

20  you find beyond a reasonable doubt that she had a strong

21  suspicion that the liens were false and that she deliberately

22  avoided the truth.  You may not find that the defendant acted

23  knowingly if she was merely mistaken or careless in not

24  discovering the truth or she failed to make an effort to

25  discover the truth.

Charge

1          A person attempts to commit the offense of retaliating

2     against a federal official by filing a false lien if she, number

3     one, knowingly takes a substantial step toward committing the

4     offense; number two, does so with intent to commit the offense.

5     The substantial step must be an act that strongly corroborates

6     that the defendant intended to carry out the offense.

7          A statement or representation is material if it has a

8     natural tendency to influence someone's decision.

9          Once you are all in the jury room, the first thing you

10    should do is choose a foreperson.  The foreperson should see to

11    it that your discussions are carried out in an organized way and

12    that everyone has a chance to be heard.  You may discuss the

13    case only when all jurors are present.  So, it will take all

14    twelve of you.

15         I might add at this point -- and this is off the

16    instruction -- that when I bring back these instructions and the

17    verdict form and the evidence, I will put it in the middle of

18    the table, and I do that because I have found that if I put it

19    towards one end or another, that person thinks I want them to be

20    the foreperson.  That's not correct.  You all choose who the

21    foreperson is going to be.

22         Back to the instruction.  Once you start deliberating,

23    do not communicate about the case or your deliberations with

24    anyone except other members of your jury.  You may not

25    communicate with others about the case or your deliberations by

Charge

1  any means.  This includes oral or written communications, as

2  well as any electronic method of communication, such as

3  telephone, cell phone, smart phone, iPhone, BlackBerry,

4  computer, text messaging, instant messaging, the Internet, chat

5  rooms, blogs, websites, or services like Facebook, MySpace,

6  LinkedIn, YouTube, Twitter, or any other method of

7  communication.

8       As an aside, in my district we collect cell phones, and

9  the courtroom security officer holds onto them, and I'm told we

10  do that, too.  So, they'll collect your cell phones and just

11  hold them for you.

12       Back to the instruction.  If you need to communicate

13  with me while you are deliberating, send a note through the

14  courtroom security officer.  He or she'll be right outside the

15  door.  Just knock on it hard.  The note should be signed by the

16  foreperson or by one or more members of the jury.

17       To have a complete record of this trial, it is

18  important that you do not communicate with me except by written

19  note.  I may have to talk to the lawyers about your message.

20  So, it may take me some time to get back to you.  You may

21  continue your deliberations while you wait for my answer.

22       If you do send me a message, do not include the

23  breakdown of any votes you may have conducted.  In other words,

24  do not tell me that you are split six to six or eight to four or

25  eleven to one or whatever your vote happens to be.

Charge

1        Please be advised that transcripts of trial testimony

2   are not available to you.  You must rely on your collective

3   memory of the testimony.

4        So, back off the instructions, if you do happen to send

5   a note out, what I will do is put the date and time it was

6   received.  I will make copies for counsel.  I'll come out in

7   open court on the record with the court reporter.  You're still

8   in the back.  I will read the question.  I will ask them for

9   proposed responses.  I will then formulate a response.  I'll

10  bring you back in and tell you what the response is.

11  Oftentimes, unfortunately, my response to you is going to be you

12  have all the information necessary to conclude a verdict in this

13  case, meaning sorry, I can't answer your question.  You might

14  ask for a dictionary.  Makes a lot of sense.  I can't give you

15  one.  It's just one of the rules.

16       The verdict must represent the considered judgment of

17  each juror.  Your verdict, whether it is guilty or not guilty,

18  must be unanimous.  You should make every reasonable effort to

19  reach a verdict.  In doing so, you should consult with each

20  other, express your own views, and listen to your fellow jurors'

21  opinions.  Discuss your differences with an open mind.  Do not

22  hesitate to reexamine your own view and change your opinion if

23  you come to believe it is wrong, but you should not surrender

24  your honest beliefs about the weight or effect of evidence just

25  because of the opinions of your fellow jurors or just so that

1    there can be a unanimous verdict.

2         The twelve of you should give fair and equal

3    consideration to all the evidence.  You should deliberate with a

4    goal of reaching an agreement that is consistent with the

5    individual judgment of each juror.  You are impartial judges of

6    the facts.  Your sole interest is to determine whether the

7    government has proved its case beyond a reasonable doubt.

8         Verdict forms have been prepared for you.  You will

9    take them with you to the jury room.  I'll actually bring them

10   in for you.  When you've reached unanimous agreement, the

11   foreperson will fill in, date, and sign the verdict form.  You

12   actually don't have to date it.  Advise the court security

13   officer once you've reached a verdict.  When you come back into

14   the courtroom, I'll read the verdicts aloud.

15        So, there are twelve verdicts because there are twelve

16   claims by the government in this case, and I want to go over

17   them with you.  First of all, if you look at the top of each

18   verdict form, it has what we call the style.  That's the name of

19   the case.  And in this case it's in the United States District

20   Court -- actually, it says the Southern District of Illinois.  I

21   don't know how that got there.  We're in the Northern District

22   of Illinois.  That's probably just a form error.  So, I will

23   have that changed.  I'm just going to change that by

24   hand-writing it.  My home is the Southern District of Illinois.

25   So, when these were prepared, we apparently did a cut and paste.

Charge

1          United States of America, plaintiff, v. Cherron Marie

2     Phillips, also known as Cherron Phillips El, River Tali El Bey,

3     River Tali Bey, River Tali, and River, defendant, and then it

4     has a case number, 12 CR 872.  Each verdict form then also at

5     the bottom has a signature line for the foreperson at the top,

6     and then the other eleven jurors would sign below.

7          Then the actual content of each jury verdict form reads

8     as follows, but each one's different because each claim involves

9     a different individual, as you know.  So, Count 1 reads -- the

10     verdict form for Count 1 reads as follows:  As to Count 1

11     involving James Holderman, we, the jury, find the defendant,

12     Cherron Marie Phillips, blank, and you would write in there

13     guilty or not guilty, depending on what your verdict would be.

14          Count 2.  As to Count 2 involving Joan Lefkow, we, the

15     jury, find the defendant, Cherron Marie Phillips, blank.  Again,

16     you would fill that out guilty or not guilty.

17          And once you've completed one verdict form, that

18     decision in no way controls your decision in another -- you

19     could find her guilty of all twelve counts, you could find her

20     not guilty of all twelve counts, or any combination in between.

21     That's why we have separate forms for you.

22          Count 3.  As to Count 3 involving Patrick Fitzgerald,

23     we, the jury, find the defendant, Cherron Marie Phillips, blank.

24     You would fill in guilty or not guilty.

25          Count 4.  As to Count 4 involving Thomas Shakeshaft,

Charge

```
 1    we, the jury, find the defendant, Cherron Marie Phillips, blank.
 2    You would fill in guilty or not guilty.
 3          Count 5.  As to Count 5 five involving Michael Dobbins,
 4    we, the jury, find the defendant, Cherron Marie Phillips, blank.
 5     You would fill in the words guilty or not guilty.
 6          Count 6.  As to Count 6 involving Andre Thompson, we,
 7    the jury, find the defendant, Cherron Marie Phillips, and you
 8    would fill in guilty or not guilty.
 9          Count 7.  As to Count 7 involving Eric Cato, we, the
10    jury, find the defendant, Cherron Marie Phillips, guilty or not
11    guilty.
12          Count 8.  As to Count 8 involving Gilberto Calderon,
13    we, the jury, find the defendant, Cherron Marie Phillips, and
14    you'd fill in guilty or not guilty in the blank.
15          Count 9.  As to Count 9 involving Noel Sanchez, we, the
16    jury, find the defendant, Cherron Marie Phillips, blank, and you
17    would fill in guilty or not guilty as to Count 9.
18          Count 10.  As to Count 10 involving Justin Williams,
19    we, the jury, find the defendant, Cherron Marie Phillips, blank,
20    and you would fill in guilty or not guilty as to Count 10.
21          Count 11.  As to Count 11 involving Geraldine Soat
22    Brown, we, the jury, find the defendant, Cherron Marie Phillips,
23    blank, and you'd fill in guilty or not guilty.
24          And, finally, Count 12.  As to Count 12 involving
25    Arlander Keys, we, the jury, find the defendant, Cherron Marie
```

1    Phillips, blank, and you'd fill in guilty or not guilty.

2          You don't have to take them in this order, either.  If

3    you want to start with Count 6, you can do that.  It's totally

4    up to you.  You eventually, however, will have to sign your name

5    on each form.  So, we need your signature on all twelve counts.

6          So, I'm going to just change that Southern.  I'm just

7    going to hand-write in Northern so I don't keep you any longer

8    than I need to.

9          In terms of whether we need you again in the future,

10   we're checking on that.  I know you want to know if you have to

11   call in again, and I will have that answer for you.

12         I also indicated to you that the twelve -- the verdict

13   must be unanimous as to the twelve of you, and there are 14 of

14   you.  We have what we call alternates in criminal cases, and

15   there's a very good reason for that.  I have in the past -- in

16   fact, when I was a private practitioner, I was trying a civil

17   case, and during the lunch hour one of our jurors slipped on

18   some ice and broke her hip, and it had taken us about

19   three weeks to try the case.  And so, the judge brought in an

20   alternate juror to deliberate in place of that initial juror who

21   became injured.  And so, we didn't have to retry the case for

22   three weeks.

23         And so, the two alternates in this case will be asked

24   to stay here in the courthouse in case we need you to substitute

25   for one of the original twelve.  It's rare that we need you, but

Stump - Opening Argument

1    we might.  So, I'll let you know who the alternates are at the
2    end.  Okay?
3            All right.  At this time then, the court recognizes
4    Mr. Stump for your closing argument.
5            MR. STUMP:  Thank you, your Honor.
6             OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT
7            MR. STUMP:  May it please the court, counsel.
8            THE COURT:  Mr. Stump.
9            MR. STUMP:  Ladies and gentlemen of the jury.  When we
10   began the week, I stood in front of you, and I counted out the
11   victims.  I said two federal prosecutors, four federal judges,
12   four federal task force officers, a federal agent, and, of
13   course, the Clerk of the U.S. District Court.  They were just
14   titles.  That's all they were.  They were just titles.  And
15   maybe that's all they were to her is just titles.  But now
16   you've seen them, and you've heard their testimony, and you know
17   they're not just titles.  They're people.  They're real people,
18   and they have real reactions to these liens.
19           You heard Judge Brown.  She said she was shocked when
20   she saw the lien.  You heard Agent Williams say he was pissed
21   off.  You heard Sergeant Thompson kind of chuckle to himself and
22   say, "I'm worth a hundred billion dollars," you know.  And these
23   liens are a joke.  They're a joke.  People as ships, a hundred
24   billion dollars.
25           But it's not a laughing matter, and this is serious

Stump - Opening Argument

1    stuff.  These are people who work every day and who have devoted
2    their careers to the administration of justice, and this was not
3    justice.  This was vengeance.  It was petty.  It was sneaky.  It
4    was a cheap shot.  And more than that, the reason that you're
5    all here today sitting as the jury, it was a crime.  Not just
6    one crime, but twelve crimes.  And what I've done here, this is
7    the table that's in the indictment.  I want to make sure that
8    you understand it, and I've modified it slightly so that you can
9    better understand how it works.

10            So, for one thing, where it says person, I've added the
11   names.  Because they're people.  They're not just titles.  And
12   when you go back to deliberate and you're looking at these
13   verdict forms and you're trying to match this stuff up, I want
14   to be able to remind you who's who here.

15            In addition, I've added these black lines.  What the
16   black lines do is they separate the counts by date.  As you can
17   see, they're grouped.  So, there's a group here, the first five.
18   The date there is all March 14th, 2011.  The second group here,
19   March 17th, 2011.  Agent Williams here off by himself,
20   April 13th, 2011.  And the two federal magistrate judges here at
21   the bottom, April 19th, 2011.

22            Now, if you go to the receipts, you will see this.  So,
23   this is Exhibit 14.  Here we have first where it says issued to
24   River, P.O. Box 8053, and here are, if you look at these numbers
25   ending in one, two, three, four, and five, you will find that

1    those document numbers listed on this receipt match up, as Wendy

2    Holderman testified they did, with the first five liens in the

3    packet, and those are the first five liens charged in the

4    indictment.  And if you go down, you will see where that date in

5    the indictment comes from.  March 14th, 2011.  You can do the

6    same thing with the other three receipts, and you'll see the

7    same groupings.

8         Now, what's interesting when you do this little

9    exercise of grouping them by date is you do notice something.

10   Right away you notice that they're in many ways grouped by

11   title, as well.  So, here we are, the first five we've got the

12   chief judge, Judge Holderman.  You've got District Judge Lefkow.

13   You know their roles in this case.  You've got the

14   U.S. Attorney, the Assistant United States Attorney.  They're

15   involved.  They're the prosecutors.  And then you've got the

16   court Clerk.  So, those are all people that are going to be

17   directly stamped on documents and associated with that

18   prosecution.

19        Then, boom, there's the four federal task force

20   officers at one time, one shot.  You don't think they were

21   targeted because of their jobs, because of their titles?  Agent

22   Williams is off by himself.  I'll leave you to guess why, but,

23   you know, he testified that he was there for one interview, and

24   he did testify at the sentencing.  This was the only lien that

25   was filed at a separate location, that Markham location.  So, I

1    don't know.  Maybe he was an afterthought.

2          And then here, two magistrate judges who come at the

3    very end, April 19th, 2011.  You heard Judge Brown say her

4    entire involvement in that prosecution of Devon Phillips lasted

5    about a minute and a half.  So, talk about an afterthought.

6          But what I want to do right now for you is, as the

7    judge has explained, for every crime there are elements, certain

8    things that we have to prove to you, certain facts that have to

9    be demonstrated to you beyond a reasonable doubt for you to find

10   someone guilty, just an easier way of breaking down a crime and

11   looking at it piece by piece.  This is what juries do in

12   deliberation rooms, and I want to do it with you together right

13   now.  So, what I have on the screen is the instruction the judge

14   just read, and it will be available to you when you're in your

15   deliberation room.  These are the five elements of the offense,

16   and what I want to do is I want to walk through them with you

17   one at a time.

18         The first is that the defendant filed or attempted to

19   file a lien or encumbrance in a public record.  Well, let's

20   attack that piece by piece.  Let's start with public record.

21   That's easy.  That was the testimony of Wendy Holderman.  The

22   Cook County Recorder of Deeds is a public record and that all

23   twelve liens that were certified copies that she brought into

24   court, 13.1 through 13.12, these were all recorded in that

25   public record.  So, we have twelve liens, a recording, and a

1   public record.  That takes care of everything but the defendant.

2   So, how do we know it was her.  Well, in this case I would

3   submit to you we had a lot of evidence that it was her.  This

4   was not a stream of evidence, it was not a river of evidence,

5   this was a mountain of evidence that it was her.

6           Let's start with the liens themselves.  Let's get an

7   example.  This is Exhibit 1.  We have here a signature, River

8   Tali, and a fingerprint.  Well, you just heard from Mr. Swank.

9   We know the fingerprint's hers.  You heard from Karl Barnes, the

10  notary public, who said he's known her since they were kids,

11  and, yes, she goes by the name River Tali, and she used to go by

12  the name Cherron Phillips.  So, we've got one and the same

13  person.

14          We also had a lot of the evidence that came out of the

15  house that it was her.  First of all, of course, at that search

16  scene was Government's Exhibit 34, the birth certificate with

17  her name on it.  We had Government's Exhibit 35 come out of the

18  house.  This is that world passport.  Agent Rongitsch testified

19  it came out of the master bedroom.  There's a photograph, and

20  you can compare it yourself, and there's the name River Tali

21  Bey.

22          So, the evidence goes on.  Exhibit 37, this was also

23  taken from the house.  There's her picture, there's the name

24  River Tali El Bey, and this post office box, 8503, the same one

25  that appears on the receipt in Exhibit 14.  There's also a

Stump - Opening Argument

1    signature there.  You don't have to be experts.  You guys can
2    look at signatures and compare them.  So, that was 37.
3           Now, this mailing to Judge Holderman -- and I'm going
4    to talk about it some more -- the key to that were a couple
5    different things.  One is, of course, it sets up why this all
6    happened.  But the other thing is there are some things in that
7    particular mailing that track back to her.  This was the
8    administrative notice and demand, this Exhibit 38, just showing
9    that she had sent that to Judge Holderman at the courthouse, and
10   the receipt says Cherron Phillips El.  That comes out of her
11   house.
12          This Exhibit 39, handwritten notes referencing maritime
13   liens, came out of her house.  It says to print them out.  And
14   then, of course, there was Exhibit 40, the article on maritime
15   liens.  It's almost like something out of an Austin Powers
16   movie.  You know, the amount of evidence that was collected in
17   this one search and that we have in these documents that say
18   this woman is Cherron Marie Phillips.  This woman is River Tali.
19   This woman is the person who signed and filed these liens.  Now,
20   that's not all we have.  There was, of course, the judgment
21   order for the name change showing where she legally changed her
22   name from Cherron Marie Phillips to River Tali El Marie Bey.
23          Well, how about the receipts.  Exhibit 14 that we just
24   looked at, it says that the receipt was issued to someone named
25   River.  Exhibit 17 was the liens associated with the two federal

Stump - Opening Argument

1    magistrate judges, if you just look at it.  Sixteen, the lien
2    associated with Justin Williams issued to Cherron.

3           Now, the number one piece of evidence that you have
4    that it was her is the original liens.  So, remember what Wendy
5    Holderman said.  When someone goes down to the CCRD and they
6    record a document, the CCRD doesn't keep it.  They scan it, they
7    keep a hard copy of what they scanned, but they give the
8    original back to the customer with a stamp, with a sticker on
9    it.  So, a big thing in this whole case was where are the
10   originals.  You find the originals, you find who done it.  Where
11   were these?  They're in a safe in her house.  Remember the
12   testimony of the agents how they get in the safe.  They needed a
13   key and needed a combination.  Who had the key and the
14   combination.  She did.  She told the agent she had sent them off
15   to someone at the Department of Justice.  That's what Agent
16   Rongitsch testified to.  No.  They were safe and sound in a safe
17   in her house.  So, she filed them.

18          Let's go back to our elements.  Number two, the lien or
19   the encumbrance was false or it contained a materially false,
20   fictitious, or fraudulent statement or representation.  Well,
21   this one shouldn't take any time at all.  These are clearly
22   false.  I mean, they're so clearly false that they're laughable.
23   If they weren't so clearly false, they would have caused even
24   more headaches, no doubt.  If it was $3,000, maybe it would have
25   been that much more difficult for somebody.  I don't know.

Stump - Opening Argument

1   Because as soon as you said a hundred billion dollars you know
2   okay, this is not right.
3        There's a few things about this document that also show
4   that it was false.  One, of course, is the simple fact that it's
5   a maritime lien.  Well, a maritime lien, this is about boats.
6   Remember what Wendy Holderman said.  We don't handle boats.
7   Well, Thomas D. Shakeshaft is not a boat.  So, that's false.
8   How about if we go to the bottom of the lien.  This is something
9   that didn't come out.  We didn't do it with testimony, something
10  that you wouldn't really notice or maybe even pay much attention
11  to.  But if you look above the signature of River Tali, this box
12  is a certification and attestation.  So, when she is signing
13  that, what is she saying?  Well, look at it.  I hereby certify
14  that the facts recited herein are true and correct.  We know
15  they're not.
16       I understand that the U.S. Coast Guard will rely on
17  those recitations in indexing the attached instruments.  The
18  owner and all recorded maritime lienholders have been notified
19  by U.S. Mail.  If you don't have anything else to say that she
20  knew that these are false, anything else, know this.  She was a
21  master at mailing stuff.  Every single one of the victims that
22  testified said that they found out through some other means.
23  There was no mailing sent to them with these liens inside saying
24  here.  Here's your notice.  I filed these liens on you.  No.
25  That's why this was sneaky.  That's why it was underhanded.

Stump - Opening Argument

1    Because she did this behind their backs and just waited for the

2    results, just sat back and waited to see what would happen.  So,

3    the liens were false.

4           I'd also direct you to the jury instructions.  The

5    judge didn't read it this time.  At the beginning of the trial,

6    he did.  You'll have a copy of it.  He talks -- the instruction

7    specifically address a lien, what a lien is, and when a lien is

8    false.  You can look at that, as well.

9           Now, back to our elements.  That takes care of number

10   two.  Number three.  The defendant knew or had reason to believe

11   that the lien was false.  That's number three.  Well, aside from

12   the evidence that we've already described and the fact that

13   they're just plainly false on their face, you don't get much

14   better evidence than an apology letter to say that somebody knew

15   what they did was wrong, and in this case we have five of them,

16   five letters acknowledging that she did wrong.

17          More than that -- don't forget now -- Exhibits 18 and

18   19, federal notice of revocation of maritime lien.  These are

19   testified to by Wendy Holderman.  These were also recorded at

20   the CCRD.  These documents purport to revoke the liens that were

21   filed.  Remember when these revocations were filed.  This is

22   in -- let's get the exact date here.  February 1st, 2013.  So,

23   February 1st, 2013, these come across the CCRD.  Remember the

24   evidence of when she was arrested.  November of 2012.  So, this

25   is after she's arrested in this case.  She does this trying to

Stump - Opening Argument

1    undo what she did, and she sent apology letters.  That's

2    knowledge that she did this.  Fortunately, as Wendy Holderman

3    testified, these don't really do anything.

4              THE COURT:  Two minutes left.

5              MR. STUMP:  Thanks.

6              THE COURT:  I didn't know it was going to be loud.

7    Sorry.

8              MR. STUMP:  So, I'm going to cross off number three,

9    and I'm going to rip through four and five.  Are these officers

10   and employees of the United States?  You bet they are.  They all

11   came up here and testified to it.  The task force officers were

12   all federally deputized.  You got that testimony from them and

13   from Kevin Powers.  The judges are all judicial officers of the

14   court, a federal agent, a Clerk of Court, and two federal

15   prosecutors.  That one is easy.

16             And the last one.  Was this on account of the

17   performance of their official duties?  What on earth else was it

18   for?  It was because they were involved in the investigation and

19   prosecution of her brother.

20             You know, she lashed out.  She wanted to go after

21   somebody for what happened to her brother, and this was the

22   avenue that she chose, and it's unfortunate.  Remember when

23   Michael Rees testified about when she was arrested?  They're

24   going to put handcuffs on her, and she's asking for names.

25   She's asking for names of all the arresting officers and

Solomon - closing argument

1   threatening to put liens on them.  That's how she responds to

2   authority of the law.

3          You guys, this was an injustice what happened, these

4   liens.  It's injustice.  It would be even worse of an injustice

5   to let her walk on any one of the counts.  So, I'm asking you to

6   go fill those forms out today, write guilty on every single one

7   of them, and render that verdict in this case.  Thank you.

8          THE COURT:  Thank you, Mr. Stump.

9          Ms. Solomon on behalf of the defendant.

10          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

11          MS. SOLOMON:  May it please the court, Mr. Stump.

12          THE COURT:  Ms. Solomon.

13          MS. SOLOMON:  Ladies and gentlemen of the jury.  Thank

14   you very much for listening.  It's been only three days, but

15   perhaps it feels like a long three days.  You've heard a lot of

16   evidence, and, as the judge has instructed, all the witnesses

17   are equal.

18          This is an unusual case, a peculiar case, because in

19   this case all the parties have been kind of changed.  So, it's

20   very unusual to have judges testifying.  It's unusual to have

21   prosecutors testify.  And it's not so unusual to have agents

22   testify.

23          So, all of those witnesses are all equal.  No one is

24   more important than the other when they get on the witness

25   stand, and that's the important and probably the beautiful thing

Solomon - closing argument

1    about the American justice system is that when we come into a
2    courtroom, we're all equal.  Ms. Phillips is equal to everyone
3    else in this room.  She's presumed innocent.  And the case is
4    decided based on what you heard from the witnesses on the
5    witness stand.
6         So, this case began, we have to remember, with her
7    brother's case, and he was involved in a criminal matter, and
8    she was not.  And had her brother not been brought into this
9    building, Ms. Phillips would not be here today.  And that's sort
10   of the beginning -- it's the beginning of the story.  But it's
11   one of the most peculiar aspects of this case.  Why -- and I
12   know you don't know why, but it's really a question that I have.
13   How can a woman end up here.
14         And, yes, as Mr. Stump pointed out and as Andre
15   Thompson pointed out and we can all see from the evidence, this
16   is absurd, these maritime -- I don't know about you, but I have
17   never heard of a maritime lien in my life.  I have never
18   considered a person as a boat.  That is something that, as
19   Mr. Stump pointed out from the article on maritime liens, did
20   not come from Ms. Phillips' head.  It is, as she said in her
21   apology letter, she relied on a group of people who somehow are
22   disseminating this information, probably through the Internet.
23   That's a wonderful part of the web.  It allows us to access lots
24   of information.  And so, she came up with these ridiculous
25   documents.

Solomon - closing argument

1      And they didn't impact any of the witnesses.  They all
2  testified -- indeed, James Holderman testified that these liens
3  were not even on property that was related to him.  One of them
4  or one or more, I'm not sure, is actually on a commercial
5  building that's right downtown right down the street.  He also
6  said that another one was on the MCC, which is the Metropolitan
7  Correctional Center, which is the federal prison for -- the
8  holding prison for inmates who are in custody and are tried in
9  this building.
10      Others, with the exception of one witness, Mr. Dobbins,
11  no one was even aware that these liens were placed on any
12  property.  As a matter of fact, they don't even know if they're
13  on their property at all.  Not one of them had any impact.  No
14  one did a search.  I know that Judge Soat Brown was very
15  concerned about this.  However, these liens were recorded in or
16  attempted to be recorded, however they were recorded, in the
17  public library section of the Recorder's -- Cook County,
18  Recorder of Deeds Office.  In all of that time, she had never
19  even made any kind of attempt to find out if these liens were
20  actually impacting her property.
21      I'm not saying she had to, but we have to think about
22  the things that were really concerns about.  If we really think
23  that they're going to impact our lives, we do check.  We at
24  least make a phone call.  We at least follow through to find out
25  will this impact me.  No one did that because on their face, a

Solomon - closing argument

1    hundred billion dollars, we know that no one would take that --

2    would consider that legitimate.

3         As a matter of fact, Mr. Dobbins told us that when his

4    attorney discovered -- when the title company discovered when he

5    was trying to sell his parking space that there was a lien on

6    it, and it was quickly discovered that it was bogus, and it did

7    not impact or impair his ability to sell his property.

8         Yes.  Shock, anger, laughable, sad.  I have to wonder

9    what kind of empathy, connection, loyalty that Ms. Phillips had

10    to her brother that would lead her to this spot.  Maybe she had

11    a feeling of powerlessness against the federal system and the

12    federal prosecution system.  As one judge in this building has

13    stated, it's the only train that works.  It goes forward.  And

14    she felt powerless against it and unable to help her brother.

15    However misguided she chose to take that, it I think came from a

16    sense of empathy and connection and powerlessness.

17         Now, with respect to the records, Wendy Holderman told

18    us that there were two different sections of the Recorder's

19    Office, and there was the section for the real estate, and those

20    documents were reviewed for requirements before they were filed,

21    and then they were scanned and filed, and there was the other

22    section where these liens went, and that was basically the

23    public library section, and that was for documents that are

24    unrecognizable and they don't know what to do.  That's where you

25    go if you want to record your poetry, for example, is the

Solomon - closing argument

1    example she gave.  I guess you could record a photo of your dog
2    if you chose to do that.  The county is happy for you to do that
3    because they just charge you money.  So, it's a money-making
4    operation for them.  It just goes in there, and then she says
5    that she doesn't know what happens to it.  It stays there.  But
6    we don't know if it ever actually attached to any property, and
7    she couldn't tell us that.  And as far as we know, these liens
8    never attached to any property.  There's no evidence to show,
9    other than the one parking spot that they did.
10          The other interesting thing about the documents is that
11   attached to some of the liens there were the liens that have the
12   pin, the documents that have descriptions of property with the
13   pins on them.  If you'll notice, there is the number that's
14   connected to the document number that's put in the box of the
15   liens.  There's another number on top of some of them, and it's
16   also a document number, and it is clear from that, those two
17   sets, that these were actually the very same documents filed in
18   more than one case unrelated to Ms. Phillips.
19          So, that goes to show that these documents are -- I
20   don't know how people communicate, but there might be some, you
21   know, personal communication where somebody's just passing out
22   these documents randomly and other people are also using these
23   to file in other cases.  So, I'd like you to look for those
24   other numbers at the top, and they do not match any of the
25   document numbers in this case.

Solomon - closing argument

1    The other thing that is interesting about the documents
2    themselves is that many of the liens do not have any property
3    descriptions attached to them.  There is -- I believe it's 13.5
4    and 13.3 have documents attached to them.  But 13.5 has a stack
5    of documents.  That's not one person's property.  Even if you
6    had multiple pieces, there's 24 of them all together, and that
7    clearly is not connected to one person's -- that person's
8    property.  That was for Assistant U.S. Attorney Shakeshaft.

9        So, the thing that strikes me about the liens here is
10   that it would be like trying to pass monopoly money and being
11   charged with counterfeiting.  They're patently absurd on their
12   face, and there's no evidence, aside from Mr. Dobbins, that they
13   actually attached to real property.  There was no evidence from
14   anyone that they attached to any personal property.

15       And so, when you go back and you deliberate, I want you
16   to remember the presumption of innocence that Ms. Phillips has.
17   I want you to remember carefully and to consider all the
18   evidence equally, and I would like you at the end of that
19   deliberation to make a finding of not guilty.

20       Now, Mr. Stump made several points in his opening, and
21   he gets to talk again, and I don't.  He said that Ms. Phillips
22   was sneaky when she filed these because she was an expert at
23   mailings.  That was based on one mailing to Judge Holderman.
24   Maybe it seemed like a lot of mailings because he brought it up
25   many times, but it was one mailing that was sent to Judge

Stump - Final Argument

1    Holderman.  There were filings that she made in the case against
2    her brother, but those were done in person.  So, I'm not sure
3    what that relates to or how that's important.
4         And I also want you to remember that just because the
5    counts are grouped by category, that doesn't mean that any one
6    of those counts or any group of counts is given more
7    consideration or is more important than any others.  They all
8    are to be given equal consideration.
9         So, I thank you for your time.  I thank you for your
10   deliberations.  I want you to remember the presumption of
11   innocence, and it's the government's burden to prove beyond a
12   reasonable doubt that Ms. Phillips is guilty of any or all or
13   any one of the charges alleged in the indictment.  Thank you.
14            THE COURT:  Thank you, Ms. Solomon.
15            Mr. Stump, your final ten minutes.
16            MR. STUMP:  Thank you, your Honor.
17             FINAL ARGUMENT ON BEHALF OF THE GOVERNMENT
18            MR. STUMP:  Ladies and gentlemen, the rules allow me
19   one more chance to come up and speak to you.  I don't think I
20   need it, but I don't want you to have any lingering questions
21   when you're in the deliberation room.  So, I do want to address
22   a few points that Ms. Solomon made.
23         First of all, let's start with the mailing part that
24   she just raised.  This is not important.  It is not important.
25   But there was more than just this one mailing.  So, if you look

Stump - Final Argument

 1    at Exhibit 30, first of all, you had the testimony from Agent

 2    Rongitsch that this almost exact same packet was sent to

 3    U.S. Attorney Fitzgerald.

 4            But remember it begins with this affidavit from

 5    Mr. Barnes listing all these documents that are associated with

 6    this packet.  Well, if you turn the page, a page that we often

 7    flip past, what you'll see is a long list of people that this

 8    package was ostensibly sent to, a long list of names and

 9    addresses.  So, when she wonders where we're getting this idea

10    that she was good at mailing documents, there's just one example

11    that you have right there in the record.  It doesn't matter.

12    Okay?

13            I wrote down three things that Ms. Solomon said in her

14    closing.  These ideas didn't come from her head, from the

15    defendant's head.  They came from somewhere else, an article she

16    read or someone else.  That doesn't matter.  She said that these

17    liens didn't really have any impact on the victims.  That

18    doesn't matter.  The last one she said, she said she had empathy

19    for her brother, she had a feeling of powerlessness, and this

20    was the outlet for that, perhaps.  That does not matter.  These

21    are not defenses because they do not go to any of the elements

22    of the offense.  These are excuses.

23            Excuses are different.  You may, like all of us, want

24    to understand why she did it and what she was thinking.  That's

25    fine.  But the important question, the question that you have to

Stump - Final Argument

1   decide, is guilt or innocence.  That's it.  And those do not

2   have a bearing on either one.

3          Now, she did say -- Ms. Solomon talked about liens

4   attaching or not attaching.  And go back and look at those

5   elements.  That is not one of the elements of the offense.  It

6   just isn't.  I don't have to show you that these folks got hung

7   up because of these liens.  Of course, Mr. Dobbins had a little

8   hiccup with his transaction.  That's fine.  But that's not part

9   of the offense.  Do not get confused by that.

10         You have the testimony of Wendy Holderman that these

11  documents were recorded at the CCRD.  They are still there.  She

12  testified they are still there.

13         Now, Ms. Solomon talked about the pin numbers.  I'm

14  going to use Exhibit 3 as an example.  This is the lien against

15  Judge Holderman.  It's Count Number 1.  So, here we see this box

16  seven, which is the property that the lien is addressed to.  And

17  as we went through this with some of the victims, there's a lot

18  more than just pin numbers.  There's a lot more than just homes

19  and real estate involved here.  It does not matter whether these

20  pin numbers go to anybody's actual home.  Not one of the

21  elements of the offense.  It doesn't matter.

22         I'll also tell you this.  If any one of you is having a

23  hard time with that and you get in the deliberation room and

24  this is something that could possibly hang you up or get in the

25  way of you returning a guilty verdict, I want you to remember

Stump - Final Argument

1    this.  This indictment charges her with not only filing these

2    liens, but attempting to file these liens.  If there is any

3    confusion or any hang-up with this, you have attempt.  That's

4    one of the elements of the offense, that she filed or she

5    attempted to file.  That's in the indictment, and that can be a

6    basis for your verdict.

7         There is no reason with all of this evidence and the

8    testimony that you could find any verdict in this case other

9    than guilty on all twelve counts, and that's the verdict we're

10   asking for today.  Thank you.

11        THE COURT:  Okay.  I will have the jury instructions

12   for you in the red folder.  Don't write on any of those.  I have

13   the verdict forms, and I have changed Southern to Northern on

14   each of them so it has the appropriate style.

15        Jurors number -- original numbers.  Let's go back to

16   memory lane to Monday.  Original jurors number 28 and 29, you

17   are the alternates in the case.  So, when we go back into the

18   jury room, I will ask the courtroom security officer where you

19   should go so that you're segregated from the rest of the group,

20   but we will need you to stay in the courthouse in case we do

21   need you, and we'll keep you informed as things go on, and I

22   will have an answer for all of you as to what we need to do

23   after you've returned your verdict.

24        So, at this time give me a few minutes to get all the

25   exhibits together that I'll bring back, but if you'll all go

1    back to the jury room, I'll be back in a moment.

2         I forgot one thing.  We have to swear the courtroom

3    security offer.  You're done taking oaths, but we have to swear

4    the courtroom -- back in Medieval times, he used to take an oath

5    that he wouldn't give you any fire or food until you came up

6    with a verdict.  We're going to give you both.

7         Please swear the courtroom security officer.

8         THE CLERK:  Raise your right hand.

9    (Court security officer duly sworn.)

10        THE COURT:  Okay.  Please follow him.  Counsel, can I

11   see you?

12   (Off-the-record discussion.)

13        THE COURT:  Ms. Phillips has been instructed to remain

14   inside the federal courthouse pending the outcome of the jury

15   trial.

16   (Whereupon, jury deliberations commenced.)

17

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3     UNITED STATES OF AMERICA,    )     Docket No. 12 CR 872
                                    )
 4                  Plaintiff,      )     Chicago, Illinois
                                    )     Wednesday, June 18, 2014
 5            v.                    )     12:45 o'clock p.m.
                                    )
 6     CHERRON MARIE PHILLIPS,      )
                                    )
 7                  Defendant.      )

 8                              VOLUME 3
                           TRANSCRIPT OF TRIAL
 9          BEFORE THE HONORABLE MICHAEL J. REAGAN, and a jury

10     APPEARANCES:

11     For the Government:        MR. NATHAN D. STUMP
                                  Special Assistant U.S. Attorney
12                                (9 Executive Drive,
                                   Fairview Heights, IL  62208) by
13
       For the Defendant:        MS. LAUREN WEIL SOLOMON
14                               (P.O. Box 2013,
                                  Highland Park, IL  60035)
15
       Court Reporter:           Mary T. Lindbloom
16                               327 S. Church Street
                                 Rockford, Illinois  61101
17                               (779) 772-8309

18

19

20

21

22

23

24

25
```

 1          (The following proceedings were had in open court, out of

 2          the presence and hearing of the jury:)

 3          THE COURT:  We're in open court out of the presence of

 4   the jury.  And at 12:45 today, the jurors sent out the following

 5   note:  Do the federal task force officers that were deputies who

 6   were no longer deputies when the liens were filed, are they

 7   considered federal officers after their federal term is over,

 8   question mark.

 9          And I'm prepared to hear arguments from counsel.  We

10   discussed this at length off the record.  Ms. Phillips is not

11   here.  We're trying to find her.  I instructed her not to leave

12   the courthouse.  I'm sure she's here somewhere, but we can't

13   wait any longer for her.

14          What is the government's position as to how I should

15   respond to this note from the jurors?

16          MR. STUMP:  Your Honor, as I read this note, it appears

17   to be ambiguous whether the question is asking if the officers

18   are considered federal officers under the statute for purposes

19   of criminal liability under Section 1521 or whether they are

20   asking a factual question as to whether the officers are still

21   considered to be federal in the eyes of the agency that

22   deputized them after their deputization ends.

23          Because the question is ambiguous, I'm persuaded by the

24   reasoning that was discussed off of the record that it would be

25   inappropriate to ask for clarification or to respond in any

1    other way but to instruct them that they have the evidence that

2    they need to reach a conclusion on their own.

3           THE COURT:  Ms. Solomon.

4           MS. SOLOMON:  It's my position that the note is clear

5    on its face that what they're talking about is the actual state

6    of the officers' duties once the federal task force deputization

7    ends.  And so, the answer to the question is within the

8    testimony that was given at trial.  Therefore, it would be

9    appropriate for the court to instruct them that they have all

10    the information that they need to answer the question.

11           THE COURT:  Okay.  Both counsel agree as to why.  So,

12    that's what I'm going to do.  I'll bring them out and tell them

13    that.  I've already alerted them as part of my instructions that

14    if I tell them that, that means I can't answer your question.

15    So, this should come as no surprise to them.

16           MS. SOLOMON:  Okay.

17           THE COURT:  Can we get the jurors, please?

18      (The following proceedings were had in open court, in the

19      presence and hearing of the jury:)

20           THE COURT:  Good afternoon, folks.  Please be seated.

21    I apologize for the delay.

22           At 12:45 we received a written question from the jury

23    in this case as follows: Do the federal task force officers that

24    were deputies who were no longer deputies when the liens were

25    filed, are they considered federal officers after their fed term

1    is over, question mark.  My response is as follows:  You have

2    all the information necessary to reach a verdict in this case.

3              I'm sorry.  I can tell by the look on your faces you

4    were hoping for a different response.  I'm afraid that's the

5    response I have to give you.  Please return back to your

6    deliberation room.

7              Oh, I have good news.  I have good news.  You're done

8    after this.  You don't have to go back.

9              A JUROR:  I want that in writing first.

10             THE COURT:  I'm going to put it in the order of the

11   court.

12        (Deliberations resumed, after which the following further

13         proceedings were had in open court, out of the presence and

14         hearing of the jury:)

15             THE COURT:  Okay.  I'll get the jury in.

16        (The following proceedings were had in open court, in the

17         presence and hearing of the jury:)

18             THE COURT:  Okay.  Good afternoon, folks.  Please be

19   seated.  Juror number 18, am I correct that you are the

20   foreperson?

21             THE FOREPERSON:  Correct.

22             THE COURT:  And I presumed that because you have the

23   red folder.

24             THE FOREPERSON:  Correct.

25             THE COURT:  Has the jury reached unanimous verdicts as

1    to all counts consistent with the court's instructions?

2                THE FOREPERSON:  We have.

3                THE COURT:  Would you please hand them to the court

4    security officer?

5         (Said documents were tendered to the court.)

6                THE COURT:  The verdict as to Count 1 is guilty.  It is

7    signed by the foreperson and the balance of the jurors.  The

8    guilty as to Count 2 -- the verdict as to Count 2 is guilty,

9    signed by the foreperson and all the balance of the jurors.  The

10   verdict as to Count 3 is guilty, signed by the foreperson and

11   the balance of the jurors.  The verdict as to Count 4 is guilty,

12   signed by the foreperson and the balance of the jurors.  The

13   verdict as to Count 5 is guilty, signed by the foreperson and

14   the balance of the jurors.

15        The verdict as to Count 6 is not guilty, signed by the

16   foreperson and balance of the jurors.  The verdict as to

17   Count 7 is guilty, signed by the foreperson and the balance of

18   the jurors.  The verdict as to Count 8 is guilty, signed by the

19   foreperson and the balance of the jurors.  The verdict as to

20   Count 9 is not guilty, signed by the foreperson and the balance

21   of the jurors.  The verdict as to Count 10 is guilty, signed by

22   the foreperson and the balance of the jurors.  The verdict as to

23   Count 11 is guilty, signed by the foreperson and the balance of

24   the jurors.  And the verdict as to Count 12 is guilty, signed by

25   the foreperson and the balance of the jurors.

1    Ladies and gentlemen, I have a question for you now

2    that I'm going to ask you, and I'm going to use the plural, the

3    word verdicts, and by that I mean all twelve of the verdicts.

4    And I will start in the case with jurors in the box, and I'm

5    going to go by the numbers you were originally assigned when you

6    came to the court.  Remember I asked you to remember your

7    numbers.

8    So, juror number one, are these your verdicts now and

9    were they when you signed them?

10   A JUROR:  They are.

11   THE COURT:  Juror number seven, are these your verdicts

12   now and were they when you signed them?

13   A JUROR:  Yes.

14   THE COURT:  Juror number eight, are these your verdicts

15   now and were they when you signed them?

16   A JUROR:  Yes.

17   THE COURT:  Juror number eleven, are these your

18   verdicts now and were they when you signed them?

19   A JUROR:  Yes.

20   THE COURT:  Juror number 14, are these your verdicts

21   now and were they when you signed them?

22   A JUROR:  Yes.

23   THE COURT:  Juror number 18, are these your verdicts

24   now and were they when you signed them?

25   A JUROR:  Yes.

```
 1              THE COURT:  Juror number 19, are these your verdicts
 2    now and were they when you signed them?
 3              A JUROR:  Yes, your Honor.
 4              THE COURT:  Juror number 21, are these your verdicts
 5    now and were they when you signed them?
 6              A JUROR:  Yes, your Honor.
 7              THE COURT:  Juror number 23, are these your verdicts
 8    now and were they when you signed them?
 9              A JUROR:  Yes.
10              THE COURT:  Juror number 25, are these your verdicts
11    now and were they when you signed them?
12              A JUROR:  Yes.
13              THE COURT:  Juror number 26, are these your verdicts
14    now and were they when you signed them?
15              A JUROR:  Yes.
16              THE COURT:  And juror number 27, are these your
17    verdicts now and were they when you signed them?
18              A JUROR:  Yes.
19              THE COURT:  Folks, on behalf of the Northern District
20    of Illinois and the federal judiciary and your country, thank
21    you so much for your time.  We couldn't have done this without
22    you.  We bring you in here from your fields, your factories,
23    your offices.  You don't know anybody else.  Like me, you might
24    not have known where Dearborn Street was.  But we thank you for
25    your service.  You're released.  You will be released from
```

```
 1    further jury service.  If you were in my district, we'd give you
 2    a coffee cup now.  We don't have them.
 3              Thank you.  Please follow the court security officer.
 4    Counsel and the defendant, can I see you at sidebar?
 5        (Off-the-record discussion.)
 6              THE COURT:  Okay.  I'm going to show you the verdict
 7    forms without the jurors' names visible.  These will be uploaded
 8    in a redacted form.  They will be uploaded in confidential form
 9    so that nobody can see them.
10        (Off-the-record discussion.)
11        (The following proceedings were had in open court, out of
12         the presence and hearing of the jury.)
13              THE COURT:  Okay.  Please be seated, folks.
14              So the record's clear, the not guilty verdict that was
15    as to Count 6, that involved Andre Thompson, and Count 9 not
16    guilty involved Noel Sanchez.  These verdict forms will be
17    uploaded to the CM/ECF system with the jurors' signatures on
18    them, but they will be visible only by court personnel.  They'll
19    be sealed.  Redacted versions will be uploaded for the public to
20    see.
21              Sentencing in this case will occur Tuesday,
22    October 14th -- Monday is a court holiday -- at 10:30 in the
23    morning.  We'll notify everybody electronically.
24              As is my habit, in the next week or so, I will be
25    filing proposed terms and conditions of supervised release.
```

1    Ms. Solomon, I do that to give you a heads up as to what I'm

2    thinking in terms of terms and conditions of supervised release.

3    As you know, there are mandatory conditions that are mandated by

4    statute, there are conditions suggested by the criminal law

5    section of the judicial conference, and then there are special

6    conditions.  What I do, based upon what I know about the case

7    and based upon the pretrial services report, is come up with

8    what I think will be reasonable conditions with the

9    understanding that I'm just placing you on potential notice of

10   them.  If you disagree with any of them, you can object to them

11   within the same time frame that you object to the presentence

12   report, and that is within two weeks of disclosure.

13          Ms. Phillips, the next thing that will happen in your

14   case is probation will meet with you to prepare a very detailed

15   presentence investigation report.  I sentence under the law or

16   statute known as 18 United States Code, Section 3553, and

17   Ms. Solomon will go over that with you.  The guidelines under

18   the United States Sentencing Commission are the starting point

19   for sentencing in federal court, however, and your presentence

20   report will include guideline calculations.  It will tell me

21   everything I need to know about you from when you were born

22   until the date of the report.  It will have details regarding

23   this offense, information regarding your health, your family,

24   occupation, finances, that type of thing.  It's very important

25   that we get an accurate report.  So, make sure that you're

1    completely honest and candid and truthful with probation.  If

2    you lie to them, you lie to me, and that would be a gross error

3    in judgment.

4         Once the report has been concluded, your attorney will

5    go over it with you.  If anything in it needs to be changed,

6    she'll ask probation to voluntarily make the changes.  If they

7    refuse, she might ask me to require the changes to be made.  And

8    the government enjoys those same rights.

9         At this time what's the government's position with

10   respect to detention?

11        MR. STUMP:  Your Honor, the United States asks that the

12   court detain the defendant at this time under Section

13   3143(a)(1).  Your Honor, as you know, the standard changes now

14   that there's been a guilty verdict rendered by the jury.  The

15   court shall order that a person who has been found guilty of the

16   offense be detained unless the judicial officer finds by clear

17   and convincing evidence that the person is not likely to flee or

18   pose a danger to the safety of any other person or the community

19   if released, and at this time, your Honor, we think that

20   Ms. Phillips cannot demonstrate by clear and convincing evidence

21   either of those two things.  She has repeatedly objected to and

22   fought the jurisdiction of this court.

23        At this point the game has now changed.  She said in

24   open court, although not on the record, to your Honor and has

25   said to me privately on other occasions that she cannot go to

1     prison.  I have a concern that she will not appear for

2     sentencing.  I also have a concern that between now and

3     sentencing she will pose a danger to other people through

4     filings similar to the ones we've had in this court today.

5                 THE COURT:  Ms. Solomon?

6                 MS. SOLOMON:  Judge, with respect to this count,

7     detention post-conviction is not mandatory, and we think that

8     with respect to danger and flight, those are two different

9     issues, and certainly with respect to risk of flight, there has

10    been nothing throughout these proceedings that indicates that

11    Ms. Phillips would not return to court for sentencing.  She has

12    appeared at every required court appearance.  She has been

13    orderly.  She has voiced objections to proceedings, but she has

14    never in any way been disruptive or disrespectful to this court,

15    to Mr. Stump, to me, or to any other court personnel.  She has

16    not posed any difficulties with her pretrial services officer.

17    She has complied with all directions of the U.S. Marshal's

18    Service.  And, yes, it's clear she's exercised or she's voiced

19    her opposition to the proceedings, but she's always been here.

20    She's generally been timely.  Any kind of tardiness has been due

21    to the escort requirement.  So, I think, one, she's not a risk

22    of flight and, two, that there are -- she's already on

23    electronic monitoring.  She has an OR bond, and that has been

24    sufficient to guarantee her return to court.

25                 With respect to a concern that she might flee because

1    she can't go to prison, I think she states that in the context

2    of she has two young children at home, and that is the

3    difficulty, as it is for anyone who has young children who faces

4    the prospects of going to prison.  And I have heard that -- I

5    can't imagine -- it would be hard for me to think of a case

6    where I have not had a client who's told me they can't go to

7    prison because of X, Y, or Z, whether it is family, business,

8    whatever it is, ties to this community.  And as we know from

9    statistics, it is highly unusual, rare, a very, very low

10   probability that people flee once they're indicted, once they're

11   convicted.  And it's always to my amazement, I have to say, that

12   clients, defendants, who are facing very long sentences walk

13   into this courthouse and stand in front of the judge in their

14   case, and they stand for sentencing, and they are sentenced to

15   prison.

16           In addition, if the court believes that based on the

17   current conditions of bond that there should be more stringent

18   conditions, I think that those can be devised so that there

19   would be either an increase in the bond amount, a cosignator.

20   Ms. Phillips does have relatives in the courtroom.  I have

21   discussed it with them.  Unfortunately, I didn't have enough

22   time to go through all the details for them, but I believe there

23   would be a willingness by family members to be third-party

24   custodians, cosignatories on a bond to assist me and the court

25   in any way they can to ensure that Ms. Phillips returns to

1    court.  Clearly, they are concerned about the transition between

2    Ms. Phillips' family responsibilities to them in the event that

3    she is absent for any length of time and are concerned about her

4    putting her affairs into order so that she will be prepared to

5    serve a prison sentence, if that is what the court orders.

6         With respect to the danger, the danger that

7    Ms. Phillips poses is related to her filings and her insistence

8    on filing documents both in this court and in the Court of

9    Appeals, and I've discussed this matter with her.  I think that

10   the court could impose a condition of her release that she not

11   file anything of any sort that is not -- either has a date or

12   that does not first come through me as her attorney, and she has

13   tentatively agreed to that if that was a condition that was

14   imposed by the court.  She did point out that she does have a

15   filing that is due in the Seventh Circuit on June 23rd.  That

16   could be an exception in the conditions of her release.

17        She does have the electronic monitor, and there has not

18   been any violations, as far as I know, with respect to the

19   electronic monitoring.  I know there was one instance at some

20   point where she claimed that she had gone to a school, and that

21   hadn't occurred, but I do not believe there's been -- I have not

22   been involved in the case the whole time.  There's been no

23   reports from pretrial services of any kind indicating that

24   there's been violations of the conditions of her electronic

25   monitoring.

1          So, I would argue that there are conditions and

2     combination of conditions that can ensure both the safety of the

3     community and Ms. Phillips' return to court for sentencing.

4          THE COURT:  Okay.  Thank you.

5          I'm guided by 18 U.S.C. 3143, which indicates that upon

6     conviction the court shall order an individual detained unless I

7     can conclude by clear and convincing evidence that she is not

8     likely to flee, in addition she does not pose a danger to the

9     community.

10         First of all, I agree with defense counsel that

11    Ms. Phillips has been orderly in this court.  She's been

12    respectful.  She's appeared when told.  She has children.  She

13    has ties and roots in the community.  So, I can conclude by

14    clear and convincing evidence that she's not likely to flee.

15         As to whether or not she poses a danger to the

16    community or not, I cannot conclude by clear and convincing

17    evidence that she does not pose a danger to the community for

18    the following reasons.  First of all, she has repeatedly refused

19    to acknowledge the authority of the court or the laws of the

20    United States.  She refuses to stand upon the clerk ordering all

21    to rise when the court enters the courtroom or the jurors do.

22    That's certainly not determinative, but it's an indication for a

23    lack of respect for the law and her willingness to comport her

24    conduct within its confines.

25         She continues to file in my view frivolous and

1     misguided documents, including multiple interlocutory appeals.

2     Moreover, although defense counsel indicates she is willing to

3     agree to a filing bar, I would note that when we had the final

4     pretrial conference, after we went off the record and I spoke to

5     her, I told her that based upon her cooperation that I was

6     considering relieving her from the obligation of having an

7     escort here in the federal courthouse.  I said but you can't do

8     anything untoward, you can't file any inappropriate documents,

9     and she said fine.  And so, I was fully ready to release her

10    from those restrictions, when I find out that very afternoon

11    after we left she filed a lawsuit against me and against the

12    United States Attorney in this case, Mr. Stump, in federal court

13    in the District of Columbia.  And I don't know if that's

14    actually been filed or not, but I've been served with it.

15         So, we have an individual who continues to file

16    frivolous and misguided documents, and I cannot conclude she's

17    not a danger to the community as a result of that.  I think she

18    would continue to do that unless she is disabled from doing so

19    by detention.

20         There's an ABA article in May of this year describing

21    what she has done as paper terrorism, and it even describes her

22    case, and I think that's what she has been in this case.  She is

23    a paper terrorist.  And I'm afraid that absent detention she's

24    going to continue on that misguided bent.

25         This decision is not written in stone.  If defense

1    counsel thinks you can come up with a combination of conditions

2    that will ensure the safety of the community, I'm happy to

3    consider those.  We can have a teleconference, we can have a

4    video conference regarding that.  But based upon the information

5    I have in front of me, I cannot conclude by clear and convincing

6    evidence that she does not pose a danger to the community.  So,

7    I order her detained pending sentencing.

8              Mr. Stump, your motion to withdraw exhibits at this

9    juncture?

10             MR. STUMP:  No, your Honor, I don't believe so.

11             THE COURT:  You need to withdraw all the exhibits and

12   hold them?

13             MR. STUMP:  Oh, yes, your Honor.  I'm sorry.

14             THE COURT:  Yes.

15             MR. STUMP:  Yes, your Honor.  At this time based on the

16   court's practice, we would ask that we be allowed to maintain

17   custody, and by we I mean the United States Attorney's Office in

18   the Southern District of Illinois, custody of the exhibits that

19   were admitted in court today pending further proceedings.

20             THE COURT:  Okay.  We'll have a receipt for you to

21   sign, and you must maintain them in the same condition that they

22   were received by the jury.

23             MR. STUMP:  Yes.

24             THE COURT:  I don't think defense counsel had any

25   exhibits.

586

```
 1              MS. SOLOMON:  No, your Honor.

 2              THE COURT:  Okay.  Anything else on behalf of the

 3   United States?

 4              MR. STUMP:  No, your Honor.

 5              THE COURT:  Anything else on behalf of the defendant?

 6              MS. SOLOMON:  Nothing, Judge.

 7              THE COURT:  Okay.  Court's in recess in this case.

 8         (Which were all the proceedings had in the above-entitled

 9          trial on the days and dates aforesaid.)

10         We certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13         _____

14   Mary T. Lindbloom
     Official Court Reporter
15

16

17         _____
     Patrick Mullen
18   Official Court Reporter

19

20

21

22

23

24

25
```