```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      ) Docket No. 12 CR 872
                                    )
 4          Government,             )
                                    ) Chicago, Illinois
 5            vs.                   ) October 14, 2014
                                    ) 10:30 o'clock a.m.
 6   CHERRON MARIE PHILLIPS, also   )
     known as Cherron Phillips El,  )
 7   also known as River Tali El Bey,)
     also known as River Tali Bey,  )
 8   also known as River Tali,      )
     also known as River,           )
 9                                  )
             Defendant.             )
10

11            TRANSCRIPT OF PROCEEDINGS - Sentencing
              BEFORE THE HONORABLE MICHAEL J. REAGAN
12

13   APPEARANCES:
     For the Government:       UNITED STATES ATTORNEY'S OFFICE
14                             SOUTHERN DISTRICT OF ILLINOIS
                               BY:  MR. NATHAN D. STUMP
15                             9 Executive Drive
                               Fairview Heights, Illinois  62208
16
     For the Defendant:        ATTORNEY AT LAW
17                             BY:  MS. LAUREN WEIL SOLOMON
                               P.O. Box 2013
18                             Highland Park, Illinois  60035

19   Also Present:             U.S. PROBATION OFFICE
                               BY:  MS. KATHY KIRIKLAKIS
20                             55 East Monroe Street
                               Suite 1500
21                             Chicago, Illinois  60603

22   Also Present:             Mr. Joshua Rongitsch

23
                   Laura LaCien, CSR, RMR, CRR
24                    Official Court Reporter
              219 South Dearborn Street, Suite 1902
25                   Chicago, Illinois  60604
                        (312) 408-5032
```

1      (The following proceedings were had in open court:)

2           COURTROOM DEPUTY:  12 CR 872, USA versus Phillips

3  for sentencing.

4           THE COURT:  Good morning, all.  I'm Judge Michael

5  Reagan from the Southern District of Illinois sitting on

6  intra-circuit assignment by order of Chief Judge Wood in this

7  case.  This matter is set for sentencing this morning.  It's

8  United States of America against Cherron Marie Phillips.

9  Case 12 CR 872.  The United States is represented by

10  Mr. Stump.  Mr. Stump, good morning.

11           MR. STUMP:  Yes.  Good morning, your Honor.

12           THE COURT:  Ms. Solomon for the defendant.  Good

13  morning, Ms. Solomon.

14           MS. SOLOMON:  Good morning, Judge.

15           THE COURT:  And, Ms. Phillips, good morning.

16           THE DEFENDANT:  Good morning.

17           MS. KIRIKLAKIS:  Good morning, your Honor.  Kathy

18  Kiriklakis, U.S. Probation.

19           THE COURT:  Okay.  Good morning.  Let's start by

20  going over the documents in play for today.  There had been

21  some last-minute filings.  I want to make sure everybody has

22  the current filings and are aware of them.

23           First of all, at Document 201, I filed a document

24  entitled Notice Regarding Potential Terms and Conditions of

25  Supervised Release.  As is my habit, I ordinarily file this

1  document well in advance to place the parties on notice of

2  potential terms and conditions of supervised release.  And as

3  I indicated in that document, it is preliminary.  There may

4  be additional terms and conditions the Court will be

5  considering and there might be some that I'm going to

6  exclude.

7           The next is at Document 202.  I filed a sentencing

8  memorandum which basically gives some of the history of the

9  Sovereign Citizen movement.  It is not uncommon for me to

10 write sentencing memorandums in cases where I'm really

11 somewhat unfamiliar with the particular crime.  This

12 particular offense is one with which I had no exposure in the

13 past, although I have had citizen -- sovereign citizen cases

14 in the past.

15          As I indicated in that filing, it is not meant to be

16 something to which should be attributed directly to

17 Ms. Phillips but does give a little history to Sovereign

18 Citizen movement.  And then at Roman numeral four of that

19 document, I did delineate some potential issues for us to

20 consider with respect to the actual sentencing in the

21 guidelines.

22          At Document 203, defense counsel filed a sentencing

23 memorandum.  At Document 204, defendant through counsel filed

24 an objection to the Court's sentencing memorandum.  At

25 Document 205, the government filed an order -- a motion for

1   an order expunging the fraudulent liens filed by the

2   defendant.  Document 206 is a new filing.  It is a victim

3   impact letter from Judge Brown.

4          Have you all seen that?

5          MR. STUMP:  Yes, your Honor.

6          THE COURT:  Have you seen it, Ms. Solomon?

7          MS. SOLOMON:  Yes, Judge.

8          THE COURT:  Okay.  And then just this morning, a

9   character letter was sent from the defendant's aunt.  I don't

10  know if you've all seen that.  That was sent by PDF to me

11  from my staff this morning.

12         MR. STUMP:  I believe I have seen that, your

13  Honor.

14         THE COURT:  Okay.

15         MS. SOLOMON:  I have.  Yes, your Honor.

16         THE COURT:  Okay.  So I do have that.  All right.

17         Okay.  Then the Presentence Report that is operative

18  in this case was disclosed September 5th, 2014, is a total of

19  24 pages and 169 paragraphs and was cobbled coupled together

20  in a very impressive fashion by Probation from various

21  sources in this case.  The defendant twice refused to meet

22  with Probation which of course is her right so Probation was

23  able to put together a very detailed report despite the lack

24  of input from the defendant.

25         In this case, Ms. Phillips was charged with 12

1  counts of violating 18 U.S.C. Section 1521, retaliating

2  against a federal officer by filing false claims.  After a

3  three-day jury trial ending on June 18th, she was found

4  guilty of ten of 12 of those counts.

5       I think the point of beginning this case then is the

6  Presentence Investigation Report.  Ms. Phillips, I want to

7  address you directly.  Have you reviewed the Presentence

8  Investigation Report in your case?

9       THE DEFENDANT:  No.

10      THE COURT:  Okay.  Is there a reason you've not

11  reviewed it?  Has it been presented to you?

12      THE DEFENDANT:  It was refused.

13      THE COURT:  Okay.  So you've refused to read it; is

14  that a fair statement?

15      THE DEFENDANT:  No.  Based on what you just said, I

16  haven't seen anything because it sounds like you've -- you're

17  suggesting that there's been some new information that's been

18  presented that I haven't seen.

19      THE COURT:  Okay.  Let's first talk about the

20  Presentence Report of September 5th, 2014.  Have you reviewed

21  that?

22      THE DEFENDANT:  I objected to the September 5th

23  document presentencing report; yes.

24      THE COURT:  Okay.  Have you read it?

25      THE DEFENDANT:  I objected to it.

1          THE COURT:  Okay.  Ms. Solomon, have you forwarded a

2     copy of that report to your client?

3          MS. SOLOMON:  A report of the -- a copy of the

4     report was forwarded by the U.S. Probation Office.

5          THE COURT:  Okay.  Did you receive a copy of the

6     report dated September 5th, 2014?  It's the Presentence

7     Investigation Report in your case, Ms. Phillips.

8          THE DEFENDANT:  And I objected to it; yes.

9          THE COURT:  Okay.  You can confirm that you did

10    receive it, however?

11         THE DEFENDANT:  I objected to it; yes.

12         THE COURT:  Tell me how you objected it because I

13    haven't seen any objections.  I've seen the responses from

14    your attorney on your behalf.

15         THE DEFENDANT:  Okay.  I refused the document.

16         THE COURT:  All right.

17         MS. KIRIKLAKIS:  Your Honor, I have the envelope.

18    She wrote refused for cause and sent her PSI report back to

19    me.

20         THE COURT:  Understood.  Is that what you mean when

21    you say you objected to it, that you wrote for refused for

22    cause on it?

23         THE DEFENDANT:  I refused it; yes.

24         THE COURT:  Okay.  All right.  Let's now turn then

25    to the defendant's response to the Presentence Report and the

 1   defendant's sentencing memorandum.

 2        Ms. Solomon, you have filed a very well thought out

 3   sentencing memorandum at Document 203.  It, however, contains

 4   many factual assertions that are unsupported by anything that

 5   Probation could confirm or corroborate.  When Probation

 6   prepares a Presentence Report, it has an indicia of

 7   reliability because it can be confirmed by them and because

 8   individuals who speak to Probation do so with 18 U.S.C.

 9   Section 1001 sanctions in mind.  In other words, when an

10   individual speaks to a federal officer, they have the

11   obligation, if they choose to speak, to do so truthfully.  If

12   they fail to do that, there's a potential for them being

13   charged with a crime.

14        None of the information that you supplied in your

15   sentencing memorandum in Document 203 in my view has a

16   separate indicia of reliability; it's hearsay.  Obviously,

17   hearsay is admissible in these proceedings but I have to find

18   there's a sufficient indicia of reliability in order to

19   consider it.

20        Do you have any intention of supplying any testimony

21   to support your sentencing memorandum and the factual

22   allegations in there?

23        MS. SOLOMON:  Your Honor, many of -- much of the

24   information came from Ms. Phillips herself or from her aunt

25   or relatives, Ms. Shirley Hiner, who also spoke with the

1  Probation Office and confirmed much of the information that

2  was in the Presentence Report.  I anticipated that Ms. Hiner

3  would be here in court.  I did not anticipate that she would

4  be called as a witness.  She has not yet arrived.

5      THE COURT:  Okay.  Mr. Stump, your position as to

6  whether I can consider the factual allegations in the

7  defendant's sentencing memorandum that are not consistent or

8  are in addition to the Presentence Report?

9      MR. STUMP:  Your Honor, I think that the Court --

10  there is no limitation on the information that the Court can

11  consider in sentencing.  I do agree that there has to be some

12  sufficient indicia of reliability.

13      In this situation, your Honor, I think most of the

14  facts in the sentencing memorandum have to do with

15  Ms. Phillips' background, how she was raised, her

16  relationships, that sort of thing.  I think honestly, your

17  Honor, rather than reject these quote/unquote facts, the

18  Court can simply attribute less weight to them than it

19  otherwise would if they appeared in a Presentence Report.

20      THE COURT:  Okay.  The closest case I could find

21  regarding this issue is *United States versus Purchess*, 107

22  F.3d. 1261, a Seventh Circuit 1997 case.  In that case, the

23  defendant remained silent on relevant conduct but counsel

24  made unsubstantiated factual assertions regarding relative

25  conduct.  In a rhetorical question, the Court of Appeals

1    said, quote, so what is the District Court to do when faced

2    with an attorney who appears to be manipulating the

3    guidelines to the client's advantage in this way; and I'm not

4    suggesting, Ms. Solomon, that you're manipulating the

5    guidelines but we have a situation where your client refuses

6    to cooperate with Probation which of course is her right, she

7    has a Fifth Amendment right to not speak at sentencing.  That

8    is clear from *Mitchell versus United States*, 526 U.S. 314, a

9    1999 Supreme Court case.  However, the Seventh Circuit

10   indicated in *Purchess* that when an attorney challenged the

11   facts set out in the PSR during argument, we think the Court

12   should put counsel to his or her proof.  The Court should ask

13   whether the attorney intends to present evidence in support

14   of these factual challenges.  If so, the argument can go

15   forward.  If not, the argument is really baseless and the

16   Court need not allow an attorney to waste the Court's time

17   with a baseless argument when there is no evidence supporting

18   the factual challenges.  After all, an attorney's statements

19   denying particular facts in the PSR are not evidence and a

20   defendant who wishes to challenge a factual finding in the

21   PSR must do so with evidence and not with simple denials.

22   This case is somewhat analogous because we have factual

23   assertions that amend or supplement the PSR that have not

24   been subject to any review or corroboration or verification

25   by Probation.

1          The case goes on to say that whether or not the

2     attorney accepts the Court's invitation to put on evidence,

3     the Court can alternatively question the otherwise silent

4     defendant to determine if the defendant understands and

5     adopts the attorney's statements challenging facts underlying

6     possible relevant conduct.  In the instant case, the Court

7     asked the defendant generally at the beginning of a

8     sentencing hearing whether he had read and understood the

9     attorney's objections to the PSR.

10          So I think consistent with *Purchess,* I'm going to

11     ask you, Ms. Solomon, do you intend to put on any evidence to

12     support the facts that you allege in your sentencing

13     memorandum that are in addition to the Presentence Report?

14          MS. SOLOMON:  Judge, I'd like a clarification.

15          THE COURT:  Sure.

16          MS. SOLOMON:  It seems to me that there's two

17     different kinds of facts that are related to the Presentence

18     Report and there are facts that are related to the counts of

19     conviction and the conduct related to the counts of

20     conviction and there's nowhere in any of the objections,

21     sentencing memoranda that I filed that in any way relate to a

22     denial of the facts related to the counts of conviction.

23     That was not part of the sentencing memoranda at all so I

24     guess --

25          THE COURT:  Well, except to the extent that they

1  could be mitigation.  I think there's a mitigating factor you

2  claim where she apologized to five of ten of the

3  individuals.

4       MS. SOLOMON:  I did not refer to that letter; your

5  Honor referred to that letter.  And that letter was

6  presented, as I recall, as evidence at trial with -- those

7  were exhibits at trial --

8       THE COURT:  Right.

9       MS. SOLOMON:  -- and I did not rely in my sentencing

10  memorandum on that apology letter because the Court had

11  indicated that it did not give much weight to those apology

12  letters and those were nothing that were produced by me or by

13  anyone connected to me on behalf of Ms. Phillips.  Those were

14  statements from -- basically statements against interest that

15  were introduced at trial by the government.

16       THE COURT:  The majority of your memorandum, if not

17  all of it, is in mitigation.

18       MS. SOLOMON:  That's correct.  And under Section

19  3553(a) factors, it's incumbent upon the Court to hear all

20  factors in mitigation relating to the defendant in the course

21  of sentencing and that includes all of the background and

22  characteristics of the defendant aside from the conduct

23  because obviously the conduct, offense conduct is also part

24  of that consideration but the Court -- there is no

25  limitations on the 3553(a) factors that the Court can take

1   into consideration in imposing sentence.  As a matter of

2   fact, it's required to consider those factors so that the

3   factors in mitigation that were submitted in the sentencing

4   memoranda were either directly addressed the offense conduct

5   that the Court considered as aggravation of sentencing -- and

6   those were legal arguments that I presented with respect to

7   obstruction of justice, the enhancement, under the advisory

8   sentencing guidelines -- and whether an upward departure as

9   the Court indicated or an upward variance would be

10  appropriate on the facts of this case.

11      And so the Court indicated in its sentencing

12  memoranda that it believed the only mitigating factors in

13  this case were the not very powerful apology letters and the

14  fact that she had a minor child and it was incumbent upon me

15  under Section 3553(a) to provide the Court with as much

16  information about her background that was necessary to let

17  the Court know as much information in mitigation so that it

18  had a full record before it in imposing sentence.

19      THE COURT:  And I agree with all that.  I guess my

20  question -- and it was highlighted by counsel for the

21  government -- is how much credence do I give it when it isn't

22  verifiable when it didn't come from anyone but you -- and I'm

23  not suggesting you did anything wrong, your work has been

24  stellar, but there's no verifiable source.  There's no

25  corroboration.  It's hearsay.  What's --

1   MS. SOLOMON:  Hearsay is accepted by the courts in

2 sentencings on a regular basis.

3   THE COURT:  If there's a sufficient indicia of

4 reliability.

5   MS. SOLOMON:  I've never had -- yes, in some cases

6 that becomes an issue with respect to conduct related to the

7 offense of conviction or information about -- that directly

8 relates to enhancements under the guidelines.

9   If there was something in there that appeared to be

10 an outright lie, it seems like if -- if it says in the

11 memoranda that she was educated and a good mother, I don't

12 think that that's the kind of thing that we have to have a

13 hearing in sentencing to determine what the source of that

14 statement that she's a good mother.  This was observations

15 life-long by a maternal aunt who has known Ms. Phillips her

16 entire life and it doesn't seem like that's the kind of

17 information that the Court needs a witness on the stand to

18 verify the authenticity and the reliability of that

19 statement.  It certainly is one person's impression,

20 life-long impression of her niece that counteracts the --

21 this case is from 2012.  It counteracts whatever publicity,

22 whatever information has occurred inside the courtroom

23 whatever occurred during the course of the trial to give a

24 full picture of the human being, not the defendant, but the

25 human being who is before the Court for sentencing.

1    THE COURT:  Okay.  Ms. Phillips, have you reviewed

2 the document entitled Defendant's Response to the Presentence

3 Report and the Court's Sentencing Memorandum?

4    THE DEFENDANT:  No.

5    THE COURT:  Okay.  Has that been supplied to her?

6    MS. SOLOMON:  It has not been supplied to her.

7    THE COURT:  Okay.  All right.  I'm going to consider

8 your sentencing memorandum in mitigation as you indicated and

9 I'll consider all the background information in this case and

10 the government does not object to me doing that.

11    Sentencing in Federal Court occurs under a law or

12 statute referred to by its position in the law books.  It's

13 called 18 U.S.C. Section 3553.  I am obligated to impose a

14 sentence that is sufficient but no greater than necessary to

15 meet the four purposes of sentencing in Federal Court.

16 There, the need for the sentence imposed, number one, to

17 reflect the seriousness of the offense, to promote respect

18 for the law and provide just punishment for it.  Second, to

19 afford adequate deterrence to criminal conduct.  Third, to

20 protect the public from further crimes of the defendant.  And

21 lastly, to provide the defendant with needed educational,

22 vocational training, medical care or other correctional

23 treatment in the most effective manner.

24    In doing that, I consider the kinds of sentences

25 available.  I endeavor to avoid unwarranted sentencing

1   disparities among defendants guilty of similar conduct with

2   similar backgrounds.  In doing all that, I consider the

3   nature and circumstances of the offense and the history and

4   characteristics of the defendant.

5          The starting point for sentencing in Federal Court

6   is the Federal Sentencing Guidelines so let us start with the

7   Presentence Report in this case which is the September 5th,

8   2014, iteration that I've referred to earlier.  We have

9   various positions with respect to the guidelines in this

10  case.  I have placed the parties on notice of my potential

11  position.  The government has filed its own position.  Let's

12  start with the Presentence Report itself.

13         Mr. Stump, do you have any objections to the

14  Presentence Report or the conclusions other than your belief

15  that it doesn't adequately consider the number of liens

16  involved?

17         MR. STUMP:  No, your Honor.

18         THE COURT:  Okay.  And, Ms. Solomon, do you have any

19  objection to the Presentence Report other than objecting to

20  the government's position for the two-level increase and the

21  increases that I have suggested?

22         MS. SOLOMON:  And no, your Honor.

23         THE COURT:  Okay.  And, Ms. Phillips, do you have

24  any objection to the Presentence Report?

25         THE DEFENDANT:  Well, I haven't reviewed the new

1    version so I'd have to say yes, I haven't reviewed it.

2           THE COURT:  Okay.  You haven't reviewed it because

3    you refused it?

4           THE DEFENDANT:  No.  It sounds like there's been

5    some new information that I wasn't privy to.

6           THE COURT:  Okay.  Probation, the report that you

7    have forwarded to her is the September 5th, 2014, report.  Is

8    that correct?

9           MS. KIRIKLAKIS:  Your Honor, the only thing that we

10   sent to her was the Presentence Report and today we have the

11   victim impact letter which --

12          THE COURT:  Okay.

13          MS. KIRIKLAKIS:  The Presentence Report is the one

14   she refused.

15          THE COURT:  Okay.  So the current iteration is the

16   one that you refused.  Would you like to review it?

17          THE DEFENDANT:  There's current information you're

18   saying?

19          THE COURT:  What is in front of you now is the same

20   report that you wrote refused on the envelope and sent it

21   back to Probation.

22          MS. KIRIKLAKIS:  This is just a victim letter from

23   today.

24          MS. SOLOMON:  Your Honor, she has not received the

25   sentencing memoranda that I wrote so I would like to tender

1   those to her at this time.

2          THE COURT:  Sure.  Go ahead and give them to her.

3          While she's reviewing that, let's move on to the

4   government's position with respect to the guideline

5   calculations.  In this case, Probation believes the base

6   offense level is a 12 that under -- and that's under 2A6.1,

7   that the official victim status has a six-level increase at

8   3A1.2(b), that there's a combined offense level of a

9   five-level addition under 3D1.4.  This is not a case where

10  the counts are grouped.  Probation concludes a total Offense

11  Level 23, Criminal History Category I calling for an advisory

12  range of 46 to 57 months.  The United States agrees with that

13  but believes that there ought to be a two-level increase at

14  2A6.1(b)(2)(B) because there are more than two liens.

15         Mr. Stump, would you present that argument,

16  please?

17         MR. STUMP:  Your Honor, at this time, I will

18  withdraw that argument.  I'm prepared to say that the Court

19  is correct and Probation is correct in this case because each

20  count had only one lien, that there's a better way to address

21  the number of liens and that would be in the form of an

22  upward departure.

23         THE COURT:  Okay.  And I think defense counsel

24  pointed out the infirmity of a two-level increase under

25  2A6.1(b)(2)(B) and that there has to be more than two liens

1    per victim for that to apply.  I think to do otherwise would

2    be double counting when we add the combined offense level

3    under 3D1.4.

4         I think the next thing to address then is that I

5    alerted you of a possible obstruction increase of two or four

6    levels at 3C1.1 based upon the false lawsuits filed against

7    myself and Mr. Stump.  I know I alerted you to those in

8    previous filings.  I'm going to file at this time Court's

9    Exhibit 1 which is a copy of the envelope, certified mail,

10   that was served upon me, a copy of the complaint that was

11   certified upon me, and a copy of the summons in the civil

12   action that was served upon me.  If you look at the date on

13   which the notary acknowledged the signature of the defendant

14   in this case, River Tali Bey, this was penned two days after

15   the final pretrial occurred in this case.

16        What is the government's position about a two-level

17   increase or a four-level increase for obstructing justice

18   based upon the filing of these lawsuits?  Actually, they were

19   never filed, by the way.  They were served.

20        MR. STUMP:  Your Honor, the government's position is

21   that while the conduct may fall under 3C1.1, it's not

22   entirely clear, it's a close call, and that's because the

23   guidelines themselves don't specifically list this conduct as

24   falling under that section.  It does list threatening or

25   attempting to threaten a witness or a juror or some other

1    participant in the litigation.  It doesn't address a mailing

2    to a judge and prosecutor and I'll point out also in this

3    case, your Honor, the case agent.

4         Because it's a close call, your Honor, we'd ask that

5    rather than apply this enhancement under the guidelines, this

6    is just a factor that the Court can consider in determining

7    an appropriate sentence under Section 3553(a).

8         THE COURT:  Ms. Solomon?

9         MS. SOLOMON:  Your Honor, I agree with the

10   government that this conduct is not specifically included in

11   the obstruction guideline and, in addition, that -- first,

12   that there is no case that I'm aware of that I found during

13   the course of my research that would indicate that an

14   obstruction enhancement under 3C1.1 would exceed two points.

15   And secondly, that this is not the kind of conduct that is

16   covered; and if it was the kind of conduct that was

17   specifically covered by the guideline, it is not to the

18   degree of conduct that was involved in cases such as *U.S.*

19   *versus James*.  All the cases that I found during the course

20   of my research involved specifically included conduct to a

21   far greater degree of harassment or obstruction than was

22   involved by the mailings in this case particularly in light

23   of the fact that no lawsuit was ever filed.

24        THE COURT:  Okay.  Of course you understand the fact

25   that no lawsuit was ever filed means that there has to be a

1    continuing monitoring in the D.C. Circuit to see if, in fact,

2    it is getting filed.

3        MS. SOLOMON:  Well, Ms. Phillips has been in custody

4    since that end of the trial in this matter so there certainly

5    is -- Ms. Phillips has no access to that process at this time

6    and certainly not to the documents that the Court has in its

7    possession.

8        THE COURT:  Ms. Solomon, 50 percent of my docket is

9    prisoners filing lawsuits from inside the walls, literally 50

10   percent.

11       I'm going to decline my own invitation to increase

12   the defendant's total offense level by two points.  Clearly,

13   she intended to harass, annoy, obstruct, or intimidate the

14   Court or the prosecutor in this case by filing this false

15   lawsuit within two days of the -- and when I say filing, I

16   mean serving this false lawsuit within two days of the final

17   pretrial.  The fact is, I wasn't harassed or intimidated.  It

18   was somewhat annoying but certainly not to the point that she

19   should receive a two-level increase under the guidelines.  I

20   will consider it as a factor in aggravation, however.

21       The next point of discussion is I suggest under

22   5K2.0(a)(3) a potential three-level increase because the

23   combined offense level of 3D1.4 only covers five units.  In

24   this case under that particular section, there was one unit

25   attributed to each victim up to five but for victims five

1    through ten, there is no increase under the guidelines; and I

2    believe that the guidelines therefore inadequately consider

3    the number of victims in this case.  Mr. Stump?

4         MR. STUMP:  Your Honor, we agree with the Court's

5    calculation of a three-level upward departure under 5K2.0 and

6    I'll just say the argument that the defendant advanced which

7    is that under Section 2A6.1, such an upward departure would

8    be contemplated only if there were more than one lien to the

9    same victim, ignores the second part of that same guideline

10   section -- and this is Comment 4B -- which contemplates that

11   if the offense involved multiple victims, an upward departure

12   may be warranted.

13        In this case, we had 12 distinct victims.  And if we

14   do not apply any sort of upward departure, essentially half

15   of them have no effect whatsoever on the sentence under the

16   guidelines.  That seems to me unreasonable.  And this is a

17   situation in which the guidelines contemplate that if there

18   are more victims, an upward departure may be warranted.  And

19   so for that reason, your Honor, we believe a three-level

20   increase is reasonable.

21        THE COURT:  Ms. Solomon?

22        MS. SOLOMON:  We would object to the three-level

23   enhancement because as the Court stated when it began, a

24   sentence imposed under the sentencing guidelines -- under the

25   advisory sentencing guidelines is to be sufficient but not

1    greater than necessary to meet the goals of sentencing.  And

2    in this case, the victims are taken into consideration under

3    the six-point enhancement for official victims and there

4    is -- the grouping enhancement is five levels and that was

5    the intent of the guidelines.

6         Obviously, the Commission was aware that in some

7    cases that there could be additional counts that were not

8    completely taken into account under the grouping guidelines

9    but it chose to have the cutoff at five.  Obviously, it also

10   indicated that there could be circumstances in which an

11   upward variance would be appropriate.

12        It's somewhat ironic in this case that if you look

13   at the guideline that would be applicable with the

14   enhancement, I believe that 63 to 78 months and the 78 months

15   is exactly the same sentence that Devon got for possession

16   with intent to distribute three kilos of cocaine.  And so we

17   have to also consider the -- you were talking about

18   harassment or victimization and what the harm is that was

19   caused by Ms. Phillips' conduct and her conduct was very

20   serious and it was -- it is troublesome but the question is,

21   is it adequately faced or addressed by sentencing -- a

22   sentence within the advisory guidelines that's proposed by

23   the Probation Department or something less than that proposed

24   by the Probation Department or is something greater than that

25   required.  And as I pointed out in the sentencing memoranda,

1   as the Court is well aware, there was no actual harm,

2   monetary harm to any of the officials that were named in the

3   liens.

4            THE COURT:  I think you're getting into more of the

5   3553 factors.  What I'm trying now is to accurately calculate

6   the guidelines.

7            MS. SOLOMON:  And I would argue that the guidelines

8   themselves without the upward variance meet the goals of

9   sentencing.  They're sufficient but not greater than

10  necessary to meet those goals; and with the upward variance,

11  they tip that balance into greater than necessary to meet the

12  goals of sentencing.

13           THE COURT:  Okay.  I'm going to include a

14  three-level increase under 5K2.0(a)(3) because I don't think

15  that the five-level increase at 3D1.4 adequately addresses

16  the number of victims in this case.  The guidelines provide

17  for a five-unit increase for up to the five liens in this

18  case.

19           If I don't increase that level, that means liens six

20  through ten are free, go without punishment, and indeed liens

21  11 and 12 -- which I think are appropriate to be considered

22  in this case by a preponderance of the evidence -- are also

23  not subject of any incremental punishment so I don't think

24  the guidelines adequately cover the facts of this case by

25  including a maximum of a five-unit increase at 3D1.4.

 1          In summary then, we have a 12-level base offense

 2   level.  We have a six-level increase for official victim

 3   under 3A1.2(b).  We have a five-level increase at 3D1.4 and

 4   over objection of defense counsel a three-level increase

 5   under 5K2.0 because the Court believes that the five levels

 6   under 3D1.4 are inadequate.

 7          That leaves us with a final total Offense Level 26,

 8   a Criminal History Category I which calls for an advisory

 9   range of 63 to 78 months without the Court considering any

10   factors in aggravation or in mitigation.  The potential fine

11   under the guidelines at that particular level is $12,500 to

12   $125,000.

13          Does the government have any objection to those

14   conclusions?

15          MR. STUMP:  No, your Honor.

16          THE COURT:  Okay.  And, Ms. Solomon, your objection

17   is to the three-level increase at 5K2.0(a)(3).  Is that

18   correct?

19          MS. SOLOMON:  That is correct, your Honor.

20          THE COURT:  Okay.

21          Ms. Phillips, do you have any objections to the

22   Presentence Report in your case?  Again, it's a document that

23   was -- looks like it was prepared September 5th, 2014.

24          THE DEFENDANT:  Yes.  I do.

25          THE COURT:  What objections do you have?

```
 1            THE DEFENDANT:  I have objections to the entire
 2   document here.
 3            THE COURT:  All right.  Is that a general objection?
 4   Do you have any specific objections?  I can't consider a
 5   general objection.  You have to make specific objections.
 6            THE DEFENDANT:  Yes.  The document is not accurate
 7   and the information -- I object to the -- I'm sorry.  The
 8   information is incorrect.
 9            THE COURT:  All right.  You'll have to tell me
10   specifically what is incorrect.
11            THE DEFENDANT:  Well, I didn't get a chance to mark
12   anything but can I have a pen or pencil?
13            THE COURT:  Certainly.  We'll go through the
14   objections one at a time.
15        (Brief pause.)
16            THE COURT:  What is your first objection to the
17   Presentence Report, what page?
18            THE DEFENDANT:  Give me just a second, please.
19        (Brief pause.)
20            THE COURT:  Your first objection?
21            THE DEFENDANT:  Again, I'm going to go -- well, for
22   the sake of time, I'm going to object to the whole document.
23   The investigation done by presentence probation is -- I'm
24   objecting to the entire document.
25            THE COURT:  Do you have any details to support your
```

1    objection?

2            THE DEFENDANT:  Yes.  Investigation by the Probation

3    Office is an Executive Branch -- is a violation of separation

4    of powers.  I'm sorry.

5            THE COURT:  Mr. Stump, any response?

6            MR. STUMP:  Your Honor, Congress specifically

7    provided statute that it would be the duty of the Probation

8    Office to prepare a Presentence Report based on an

9    investigation that they conduct.

10           And at this time, your Honor, we'd also say that the

11   defendant's objection is untimely and that she's waived any

12   objection by not participating in the process up until this

13   point.

14           THE COURT:  Okay.  There's no separation of powers

15   issue here.  Probation is part of the Judicial arm, the Third

16   Branch.  They don't work under the Executive Branch.  The

17   objection is overruled.

18           Any other objections?

19           THE DEFENDANT:  No.

20           THE COURT:  Okay.  Counts 1 through 5, 7 through 8

21   and 10 through 12 have a potential penalty of anywhere from

22   probation to ten years of incarceration per count.

23   Supervised release on each count, up to three years.

24   Probation is available on each count from one to five years.

25           As I indicated, the potential fine is $12,500 to

1    $125,000 based upon the total Offense Level 26, Criminal

2    History Category I.  There's a mandatory $100 special

3    assessment per count for a total of $1,000.  Under the

4    advisory United States Sentencing Guidelines, given a total

5    Offense Level 26, Criminal History Category I, the guidelines

6    call for a 63 to 78-month advisory range, supervised release

7    of one to three years per count, no eligibility for probation

8    under the guidelines and I indicated the potential fine is

9    $12,500 to $125,000 under the guidelines.  Additionally,

10   there is a mandatory $100 special assessment.

11           Mr. Stump, any objection to those conclusions?

12           MR. STUMP:  No, sir, your Honor.

13           THE COURT:  And, Ms. Solomon, your objection to

14   those conclusion, please.  This is just the guideline

15   conclusions.

16           MS. SOLOMON:  The guideline conclusions, only -- the

17   legal arguments or the --

18           THE COURT:  I was merely reciting the potential

19   statutory penalties and the guideline penalties based upon my

20   conclusions that this is a total Offense Level 26, Criminal

21   History Category I.

22           MS. SOLOMON:  Just a standing objection to the

23   three-level enhancement.

24           THE COURT:  Okay.  All right.  The next thing I'd

25   like to discuss before hearing arguments of counsel is my

1 filing which I incorporate by reference at Document 202 the

2 sentencing memorandum and that is the potentially aggravating

3 factors for consideration.  That is, the status of the

4 victims in the case, acquitted conduct, collateral damage and

5 now the potential obstruction of justice which I decided is

6 not appropriate for a two-level guideline increase but may be

7 appropriate as an aggravating factor.  So let's take those

8 one at a time, the status of the victims, Mr. Stump.

9           MR. STUMP:  Your Honor, I understand the Court's

10 argument in this regard and I do believe it is an aggravating

11 factor.  There are ways in which this crime can be committed

12 that would -- you can envision would not be so disruptive to

13 the judicial function.  For instance, if she had merely filed

14 liens against the investigating officers, that might be

15 different; and I don't think this is about the status of a

16 victim in terms of who is more important.  But certainly when

17 you file a lien against the Presiding Judge, the Chief Judge,

18 the prosecutor, the U.S. Attorney at the time, those are

19 liens that are going to have a greater impact in terms of

20 disrupting judicial proceedings in the courthouse and I'm the

21 Exhibit A for that and you are too, your Honor, because of

22 course we're not from this district.  So the fact that these

23 victims retain that status I do think is an aggravating

24 factor for the Court to consider.

25           THE COURT:  Ms. Solomon?

1          MS. SOLOMON:  As discussed in the sentencing

2    memoranda, first the official status of the victims is taken

3    into account under the six-level enhancement.  The commentary

4    indicates that in some cases an upward departure, upward

5    variance would be appropriate under the guideline depending

6    on the status of the victims and the cases that they indicate

7    in which that would be appropriate is if it was the Vice

8    President or the President.

9          So while I am not in any way making a comment about

10   the difference in status but I think they -- I think it's

11   more in terms of the quantity so that we have one Vice

12   President, one is President of the United States and if those

13   two individuals are targeted, the potential for disruption of

14   the entire country is much greater.  As the Court itself

15   noted in its own sentencing memoranda, that these kinds of

16   cases -- I'm not in any way condoning them -- do exist all

17   across the country, their major targets are judges.  And as

18   you pointed out in the State of Washington, there's not a

19   single county where judges have not been targeted by this

20   kind of conduct.

21         So in light of that because this is the normative

22   behavior and upward variances are directed at the unusual

23   kind of case, the unusual situation, I don't think that this

24   case qualifies for an upward variance of three additional

25   points.

1      If the Court wanted to take into consideration the

2  fact that there was multiple official victims, then an upward

3  variance of less than three points might be appropriate.  I

4  think the three points is far greater than necessary to meet

5  the goals of sentencing.  And the other point in this is that

6  while Ms. Phillips' obstreperous conduct was involved in her

7  brother's case, the actual filing of the liens was not

8  disruptive to either these individuals or to the courts other

9  than after a long period of time during which a District

10  Court Judge from this district handled this case, a judge,

11  your predecessor and now this Court, was called in to

12  administer this case so I think that the actual impact on the

13  judiciary and on these victims was minimal.  The actual

14  impact on the system from these liens was minimal.

15  Therefore, I do not believe that the upward variance is

16  appropriate in this case.

17      THE COURT:  Okay.  I didn't suggest a specific

18  number of points to vary upward.  I just suggested the status

19  of the victims as a potentially aggravating factor.

20      In this case, there are three victims who I think

21  were targeted solely because of their status or their role

22  because it's my understanding they had absolutely nothing to

23  do with this case.  The first is Chief Judge Holderman.  I

24  think he was targeted because he's the Chief Judge of this

25  district.  I saw nothing where he was involved in either

1   Ms. Phillips' case or the case of her brother.

2          The next is the United States Attorney

3   Mr. Fitzgerald.  He is the presidentially appointed

4   individual who governs that particular office but I saw

5   nothing where he was involved in particular in Ms. Phillips'

6   brother's case or hers.  And the last is the Clerk of the

7   Court, Mr. Dobbins, who I think was targeted because he's the

8   Clerk of the Court.  And I think it is an aggravating factor

9   that an individual would target these folks because of their

10  role.  They are most likely to be targeted because of their

11  role.  The higher a person's status, the more visible they

12  are and therefore the more likely they're going to be

13  targeted so I think there's a concomitant need to deter

14  retaliations against them.

15         Also, because they tend to have more discretionary

16  authority because of their role, they may be more likely

17  targets by individuals who think they can subject

18  their intimidation to them and I believe retaliation against

19  them is more likely to disrupt the government functions in

20  which they operate.  So I think the status of the victims in

21  this case, particularly Chief Judge Holderman, Clerk Dobbins

22  and U.S. Attorney Fitzgerald is something that I can consider

23  in aggravation.

24         Next is acquitted conduct.  As you know,

25  Ms. Phillips was indicted with 12 counts and the jury came

1   back on June 18th finding a guilty of ten but not guilty of

2   two.  The two that the jury found not guilty regarding

3   was Task Force Officers Thompson and Sanchez.  I think it's

4   clear from the jury's question that was sent during

5   deliberations and then the jury came back real quick after

6   that that I can conclude by a preponderance of the evidence

7   and based upon the evidence that I saw that she would have

8   been guilty of these two counts.  The question asked by the

9   jury was do the federal task force officers that were

10  deputies, were no longer deputies when the liens were filed,

11  are they considered federal officers after their term is over

12  and I think by that question, the jury felt that there had to

13  be some timing issue with respect to the filing of the liens.

14  The statute does not require that and I found by

15  preponderance of the evidence that she, in fact, violated the

16  statute as to Sanchez and Thompson.

17          Based upon that rendition, the government's

18  position?

19          MR. STUMP:  Your Honor, I think the case law is

20  clear on this as the Court finds by a preponderance of the

21  evidence that the crime was committed, even acquitted conduct

22  can be considered at sentencing.  There's Seventh Circuit

23  cases directly on point, I believe, *United States versus*

24  *Johnson.*  That may be one of them.  I don't have the cite in

25  front of me.  So we agree with the Court's conclusion that

1   the acquitted conduct can be considered at this hearing.

2          THE COURT: Okay. And again, this is a potentially

3   aggravating factor that I identified. Ms. Solomon?

4          MS. SOLOMON: I don't like to agree but the law is

5   pretty clear that the Court can consider acquitted conduct in

6   sentencing if you find by a preponderance of the evidence

7   that the conduct occurred. However, in this case under the

8   grouping rules, it would not have an impact on sentencing

9   whether it was ten counts or 12 because under the --

10         THE COURT: Because the grouping rules are

11   inadequate?

12         MS. SOLOMON: So I don't -- it's not taken into

13   consideration but I don't think it's new grounds for

14   aggravation in this case and I wouldn't -- I don't think it

15   supports an upward variance.

16         THE COURT: Okay. I'm going to consider it in

17   aggravation.

18         Then lastly, identified collateral damage and that

19   is that individuals who have these liens impressed upon them

20   by a filing in the Recorder of Deeds Office, while they might

21   not even know the lien is filed and impressed and perfected,

22   eventually that's going to come back and haunt them if they

23   want to sell their property, if they want to take out credit

24   so I placed you on notice that this is a potential area of

25   aggravation.

1          Mr. Stump?

2          MR. STUMP:  Well, your Honor, we certainly think

3   this is an important part of the case and that's the reason

4   why I filed Document Number 205 which is the motion asking

5   for an order that replaced in the record.  I don't really

6   know honestly what effect that will have going forward.  I

7   know that the testimony from the representative from the Cook

8   County Recorder of Deeds was that these documents remain in

9   their public recording forever.  They cannot be unrecorded.

10  I did confirm that with her before this proceeding and also

11  discussed with her what we might do about minimizing their

12  impact and the motion was something that she suggested to me

13  if there was an order in the record that that might have some

14  impact going forward.  But I think the best hope we could

15  have would be that a creditor or person engaged in any sort

16  of business transaction with one of the victims might see the

17  order in conjunction with the lien and just speed up the

18  process by which they say okay, the lien isn't going to have

19  an effect on our transaction but the lien will always be

20  there and I think that's something that the Court can

21  consider as an aggravating factor.  I know other states have

22  passed laws about these liens and ways in which they can be

23  expunged.  To my knowledge, Illinois has not yet done that.

24          THE COURT:  Ms. Solomon?

25          MS. SOLOMON:  I particularly object on this ground

1    and the reason I object is we have as evidence before the
2    Court that this kind of an encumbrance, false lien, is not --
3    does not prevent the transfer of property because the whole
4    reason this came to light was that Chief Clerk Dobbins was
5    attempting and did sell a parking place and it was discovered
6    that it had this bogus lien on it and on its face it's so
7    patently absurd that it's easily removed.  That being said,
8    that's the only property of any victim that was -- even has
9    this encumbrance on it.  There was testimony at trial that at
10   least one of the judges owned no property at the time.  So
11   clearly in her case, there is no impact on any -- there's no
12   collateral damage.
13           With respect to the other victims, I think to a
14   person, they indicated they were unaware of these liens, that
15   they only became aware of them through Mr. -- former Chief
16   Clerk Dobbins and that no one had attempted or even knew
17   whether any of these liens were lodged against any of their
18   property.  And as is apparent from the PIN numbers that were
19   attached to the liens, while they were in the -- maritime
20   liens were named under each of the victims, the property PIN
21   numbers that were attached to them were not any of the
22   victims' property so there's no collateral damage to any of
23   these victims.  There's none -- no one has come forward to
24   indicate that they were in any way damaged by this, by an
25   attempted transfer or because this lien was against any

1    property.

2         We did receive -- I did receive a copy of the letter

3    that was submitted by Magistrate Judge Brown this morning and

4    she indicated that this was a very disturbing event to her

5    because she learned of this filing.  However, I recall

6    when -- on the stand, as I recall, that she didn't know and

7    it seems from her letter submitted to the Court today that

8    she still is not aware of any kind of lien that has been

9    lodged against her in any way and it has not had any monetary

10   impact or interference on her life.

11        Now with the government's motion for expungement of

12   these liens, I believe that that will certainly facilitate

13   any potential problem in the future but it is apparent from

14   the transfer of the parking place that these are not

15   impediments at all.  And yes, Chief Clerk Dobbins did have an

16   attorney because he had an attorney who was dealing with the

17   transfer of the property.  He didn't hire an attorney to

18   specifically get rid of this lien because they were never

19   aware of it.  And as I recall, it was seen as preposterous by

20   the title company and they were completely aware that this

21   was bogus and that it was not anything that could impede the

22   transfer of the property.

23        So I think that the potential for collateral damage

24   is particularly inappropriate for grounds for an upward

25   departure because these liens are preposterous on their face.

1   They're maritime liens.  No title company will in any way

2   find this to be an impediment or it cannot be used against

3   the homeowner when it would appear to me that the name that

4   is listed on the lien does not even correspond with the

5   property.  And as we recall from Chief Judge Holderman's

6   testimony, two of these buildings are public buildings, one

7   of them is the MCC, another is a high-rise office tower in

8   the Loop so there cannot -- there's not even the potential

9   for collateral damage to any of these victims and so I would

10  argue that it is not appropriate grounds for an upward

11  variance in this case as an aggravating factor.

12          THE COURT:  You've tailored your argument to real

13  estate issues.  What about Judge Brown's concern that it

14  could affect her ability to obtain credit?

15          MS. SOLOMON:  There is no indication that any of

16  these liens have appeared on a credit report, none, no

17  evidence before the Court.  So if the Court wants to talk

18  about hearsay and the reliability of that hearsay, there is

19  absolutely no evidence to support that concern whatsoever.

20  And as a matter of fact, during testimony in this case,

21  Magistrate Brown indicated that she had never done a credit

22  check and that she had never checked her property title.  So

23  I would argue that there is no basis or -- that's not

24  supported in the evidence before the Court and would be

25  unreliable hearsay and should not be taken into account as an

1  aggravating factor in imposing sentence for Ms. Phillips.

2       THE COURT:  Okay.  The potential aggravating factor

3  identified as collateral damage at Page 24 of my sentencing

4  memorandum I think is somewhat guess, speculation, and

5  conjecture and therefore I'm not going to consider that as

6  part of the sentencing in this case.

7       Does the government have any testimony or just

8  argument?

9       MR. STUMP:  No, your Honor.

10       THE COURT:  Okay.  Ms. Solomon, do you have any

11  testimony to offer?

12       MS. SOLOMON:  No, your Honor.  I would just add that

13  Ms. Phillips' relatives are in the courtroom.  I believe -- I

14  see her son Josh and her Aunt Shirley and I believe the other

15  three individuals in between the two of them are also

16  relatives.  That is her aunt and I believe that may be her

17  father.

18       MS. KIRIKLAKIS:  It's her father, your Honor.

19       MS. SOLOMON:  Yes.  Mr. Phillips.

20       THE COURT:  Okay.  I did receive a letter from an

21  aunt today and it was just forwarded at the last moment to me

22  so I don't have a hard copy but I do have it on my --

23       MS. SOLOMON:  I have a hard copy for you.

24       THE COURT:  Okay.  Is it the same aunt who is

25  here is all I want --

1          MS. SOLOMON:  That is the same aunt.

2          THE COURT:  Okay.  All right.  Very good.  And I've

3     reviewed that.  Thank you.

4          All right.  At this time then, the Court recognizes

5     Mr. Stump for your argument with respect to an appropriate

6     sentence in this case in terms of both incarceration and

7     then -- and/or probation and your argument with respect to

8     the length of supervised release, potential fine and then

9     we'll go over the actual terms and conditions of supervised

10    release.

11         MR. STUMP:  Yes, your Honor.

12         Well, I believe the Court has now calculated a

13    guideline range of 63 to 78 months.  We're going to ask for

14    the top end of that which is 78 months and I'm going to walk

15    through the factors that the Court is bound to consider under

16    Section 3553(a) starting with the nature and circumstances of

17    the offense.

18         It's important to remember that this was a

19    calculated premeditated retaliation against government

20    servants, public servants who were just doing their jobs in

21    what, by all accounts, was a just prosecution of the

22    defendant's brother.  The testimony at the trial was that --

23    from the officers who actually conducted the undercover

24    investigation that the defendant's brother Devon Phillips

25    did, in fact, do a transaction for three kilograms of

1  cocaine.  So this is not a case in which we have a person who

2  really has a legitimate argument that she or her family

3  members were wronged by the judicial system and, as misguided

4  and ill advised as it may seem, takes whatever recourse they

5  feel is necessary to do something about it.  This was simply

6  a case of vengeance and it was trading an injustice for a

7  justice.

8          As the Court has already noted, the victims in this

9  case were chosen simply because of their association with the

10  defendant's brother's case.  The number of the task force

11  officers were just supervisors.  Justin Williams was the case

12  agent who merely adopted the case for purposes of

13  prosecution.  Magistrate Judge Brown testified that she

14  merely took the return of the superseding indictment and that

15  was the extent of her role in the case.  And, of course,

16  Michael Dobbins being the Clerk of Court did nothing else

17  except to have his name stamped on documents.

18          So this is not a situation where the defendant has a

19  particular beef against a particular person for some

20  particular perceived injustice.  This is merely lashing out

21  at the entire system.

22          What I want to point out for the Court because I

23  think it gets lost in this is that this was not a one-off

24  type deal.  This wasn't a situation where Ms. Phillips went

25  down to the Cook County Recorder of Deeds and just fired off

1   a bunch of false liens on a given afternoon.  There were 12
2   liens filed on four separate occasions at two different
3   locations in the Chicago Metropolitan area over a period of
4   more than a month so the crimes themselves are very distinct.
5   And it was interesting for me when I was preparing this case
6   for indictment to look to see how the liens were filed.  The
7   fact that the two magistrate judges, for instance, were filed
8   all at the same time.  Four federal task force officers,
9   those liens were recorded all at the same time.  The DEA
10  agent, he was filed separately on a separate occasion.  It
11  showed what was going through Ms. Phillips' mind which was
12  categories of people and not all at one time but over a
13  period of time, over a period of more than a month to say now
14  I'm going to record liens against this group of people for
15  doing nothing more than their jobs.
16          It's also important to note the one billion dollars
17  that's listed in the liens, yes, it's absurd.  Yes, it's
18  ridiculous.  It gave me fodder at trial to be able to say to
19  the jury this is obviously false on its face, no one owes
20  anybody in this country a billion dollars unless you're a
21  country but it was clearly designed to do the maximum amount
22  of damage possible.  How else do you pick a billion dollars
23  except to try to make this lien as much a thorn in the side
24  of the people that you're targeting as possible.
25          It's also important to note with regard to the

1    nature and circumstances of the offense that this was

2    premeditated.  This wasn't a knee-jerk reaction.  So the

3    mailing that was sent to then Chief Judge Holderman included

4    in it as part of this common law indictment a threat to file

5    liens and I'm just going to quote -- I think this is Page 19

6    of what we admitted at trial as the mailing -- and it says,

7    she wrote all parties who proceed to act or assist in said

8    action against -- and it was her brother Devon Phillips --

9    without thorough verifiable point-by-point rebuttal of each

10   and every point set forth in this affidavit shall be

11   immediately charged with criminal fraud, theft, conspiracy of

12   extortion, kidnapping, and commercial liens shall be placed

13   against all their real and personal properties and that was

14   mailed on March 7th.  The first liens were recorded the

15   following week, a week later so this was calculated and

16   thought out.

17          We showed at trial the evidence that she had done

18   research on maritime liens, had read articles on them online.

19   That mailing that she sent to Judge Holderman was an attempt

20   to intimidate him and an attempt to get him to back off.  And

21   it's interesting that we had a similar mailing in this case

22   from the defendant shortly before trial two days after the

23   final pretrial conference which, as the Court has noted, was

24   an attempt to intimidate the Court and my office and the FBI.

25          There's also testimony at the trial that I wanted

1  to remind the Court -- and this is reflected in Paragraph 24

2  of the PSR -- that when she was arrested, the defendant made

3  verbal threats to the arresting officers and those threats

4  were in the nature of tell me your name, I'm going to file

5  liens against you, something to that effect.  What that shows

6  is that these liens, the purpose that she had, her intent in

7  filing these liens was merely to harm and to retaliate

8  against the people who were doing their jobs.

9          Now the defendant in her sentencing memo, her

10  counsel, argues that this was a crime for which the defendant

11  obtained no benefit and I think that that same statement

12  might be said about, you know, anybody who throws a brick at

13  a police officer, you know, in a protest or any act of

14  terrorism, you know, what benefit was it for a person to blow

15  themselves up in a mall; and I'm not saying this is

16  terrorism.  Of course the FBI considers it paper terrorism

17  but my point is we don't have to have a financial benefit for

18  it to be a serious crime.  We don't have to have it be any

19  identifiable benefit at all except for what she got out of

20  this which was a chance to strike a blow at the system.  You

21  know, this is a chance for her to throw a punch and that's

22  what she did.

23          The defendant argues that nobody suffered a loss and

24  that this didn't hurt anybody.  Well, that certainly wasn't

25  the defendant's intent.  Clearly from these liens, it was her

1  intent to cause harm.  And the fact that she was maybe unable

2  to do as much damage as she hoped shouldn't be something

3  that's credited to her.  Certainly in some sense, her plan

4  worked because she has managed to disrupt a lot of people's

5  lives over this act that she committed.  I know the victims

6  in this case have been dragged through the litigation the way

7  any victim is, willingly or unwillingly.  They get called to

8  court.  They have to testify.  They have to meet with my

9  office and the FBI and prepare testimony and receive victim

10  notification and that whole thing.  But also, you know, there

11  is a loss of security.  I think Judge Brown captured it

12  somewhat in her victim impact statement.  And, in fact, your

13  Honor, I'd like to just briefly read into the record a

14  portion of that.

15       In her second paragraph, she writes Ms. Phillips'

16  obvious purpose filing a lien, however, was to cause problems

17  for me and other federal officers including other judges and

18  prosecutors because of our roles in her brother's criminal

19  case.  Ms. Phillips making the amount astronomically high

20  suggests that she intended to cause as much of a problem as

21  possible.  That fact shocked me that someone would go to that

22  effort and expense to retaliate and that I was one of the

23  targets of that retaliation.  It brought harm to me

24  personally the sad reality that federal judges and

25  prosecutors face risks because we carry out our duties.

1        And I think that this goes to -- and what she says

2   in her concluding sentence is part of what the Court has to

3   consider, of course, is the need to afford adequate

4   deterrence to future criminal conduct.  Not just for this

5   particular defendant but also for any like-minded individuals

6   who would seek to disrupt judicial proceedings to seek to

7   intimidate and threaten those who carry out justice in this

8   country by filing false liens or by committing any sort of

9   act of retaliation and so I think it's something that's

10  important for the Court to consider.  It was a serious crime.

11       I want to talk about the history and

12  characteristics of the defendant.  I read Ms. Solomon's

13  sentencing memo and what I thought to myself as I read it was

14  Cherron Marie Phillips sounds like a nice woman.  Sounds like

15  a good mother.  She sounds like a good family member and I

16  can believe that a hundred percent but what I thought to

17  myself was that's not the person that I know that I've been

18  prosecuting for two and a half years.  That's not the person

19  who the FBI investigated in 2011.  That's not the person who

20  was disruptive in this very courthouse and wreaking havoc up

21  and down from 2006 to 2011 and frankly until today.  That

22  person identifies herself as River Tali El Bey and she is

23  very different from whoever Cherron Marie Phillips used to

24  be.  This is something that I didn't just come up with.  Her

25  Aunt Shirley Hiner who wrote in the letter to the Court

1    notices this as well.

2            She talks about the fact that there was a gradual

3    change in Ms. Phillips.  She writes that the person that she

4    once knew, and I'll quote, is far removed from the one who

5    appeared in court.  She wrote that the loss of her freedom,

6    the separation from her child, the ability to raise her child

7    were never a threat to her.  That's what her aunt wrote in

8    the letter.  And this was something that Ms. Solomon's

9    sentencing memorandum recognized as well on -- I think it's

10   Page 11.  She wrote, her willingness to follow this ideology

11   on a path that takes her away from her children and

12   grandchild is the aspect of this case that is the most

13   incomprehensible.  This is particularly true where, as here,

14   she was previously a good and attentive mother.  Her young

15   child is sad and misses his mother yet she continues in her

16   adherence to the Moorish ideology.

17           I say this because I think it's important for the

18   Court to consider weighing against the mitigation of the fact

19   that she does have a young son who is going to her miss her

20   and this is undoubtedly going to cause difficulties for her

21   family and for that boy, that this is a situation that she

22   has put herself in.  This is a path that she herself has gone

23   down that she chose and she continues to choose this path and

24   this ideology and this willfulness over the concerns of her

25   own family.

1          The woman who she is today is the same woman who

2     served my office and your office with a lawsuit.  It's the

3     same woman who refused to rise when the jury entered.  It's

4     the same woman who refused to participate in the Presentence

5     Investigation, to have any meaningful contact with her

6     attorney and the one who claimed in her lawsuit that it was

7     my office and the Court and the FBI who were causing her, and

8     I'll quote, emotional trauma and spiritual distress.  She

9     blames this justice system, this judicial system that we're

10    in right now for the pain that's going to be caused to her

11    family; and it's set out in her lawsuit.

12         I didn't think that the lawsuit merited an

13    obstruction enhancement but I did note what was in there for

14    a list of requested relief.  What she's asking the District

15    Court and the District of Columbia for, among other things,

16    were for freezing of assets for all the parties that she had

17    filed against and named; and let me get that real quick,

18    Judge.  In addition to the freezing of assets, she wanted all

19    our employers to be notified.  She wanted each defendant to

20    be ordered to provide specific authorities supporting each

21    and every challenged action and omission and she wanted

22    damages to be paid, $1,750 per day that she was detained in

23    federal custody.  What that sounds a lot like to me is the

24    same mailing she sent to Judge Holderman and the same liens

25    that she filed against the people that prosecuted her

1    brother.

2           So what we're left with is a woman who, despite

3    whatever great qualities she has and had at some point in her

4    life, the woman that she is today is someone who not only

5    continues to be obstreperous but hasn't apparently learned

6    from her mistakes in the past despite the forgive me letter,

7    despite filing something in the CCRD that attempted to revoke

8    the liens.  As the Court says, that rings hollow when she

9    still now in this hour is claiming that she is the one who

10   the victim.

11          Your Honor, the Court has to consider a number of

12   different factors, the need for the sentence to promote

13   respect for the law and to provide just punishment.  I want

14   to talk briefly about that.  There are judges and

15   prosecutors, agents, court personnel, none of those folks

16   should ever have to look over their shoulders for fear that

17   something like this might happen to them just because they're

18   doing their job and the United States Sentencing Guidelines

19   interestingly lumped this crime with other threats.  You

20   know, so 2A6.1 covers not just filing of false liens.  It

21   covers any sort of threatening or harassing communication and

22   I think it's important for the Court to treat this crime that

23   way just the way that the guidelines do.

24          We have to promote respect for the law.  She has

25   challenged this Court's jurisdiction at every turn.  She

1   filed an interrogatory appeal mid trial.  She refused to

2   stand when the jury entered.  She accused everyone involved

3   in prosecuting her with violating their oaths of office.  She

4   wrote in her mailing to Judge Holderman I am not the creation

5   or chattel property of any person, any government agency

6   whatsoever.  I am not under any obligation whatsoever to any

7   government agency, state or federal, or any of their

8   self-passed laws, statutes, regulations, or policies.

9           When you have someone who -- her aunt thinks she was

10  brainwashed and her lawyer thinks that she was brainwashed.

11  But if you have someone who can be brainwashed or manipulated

12  to not only believe this kind of ideology but to act on it

13  and to act on it all the way to the point of incarceration,

14  that person presents a serious danger to the public because

15  whatever her ideology might say about filing liens or other

16  paper acts of retaliation today, it may say something

17  completely different tomorrow; and we know that sovereign

18  citizens have been violent.  There's no indication that

19  Ms. Phillips is a violent person or that she has taken any

20  violent actions but what assurance do we have that a person

21  who is willing to take these kinds of steps all the way to

22  the point of going to jail is going to be able to mind her Ps

23  and Qs when she gets out.

24          I think this Court needs to send a strong message to

25  the community that this comes out of that these cases are

1  taken seriously.  I think a sentence at the top end of the

2  guidelines will do that.  And, Judge, it also asks for a

3  significant period of time for supervised release.  I tend to

4  defer to the Court on that.  Your Honor sees a lot more cases

5  than I do and especially a lot more supervised release

6  revocations than I do.  But I do think that when she gets

7  out, we're going to need to have a system at least for

8  several years to make sure that she is abiding by the

9  conditions of her release and not posing a threat to anyone

10 else in the community.

11         THE COURT:  Any position on fine?

12         MR. STUMP:  Your Honor, my understanding is -- and

13 this is entirely based on the lack of information of the PSR

14 and the little bit that was included in the defendant's

15 sentencing memo that she does not have the ability to pay a

16 fine.  And I suppose in that case, your Honor, that either a

17 minimal fine or no fine at all is appropriate.  We're not

18 trying to get money out of Ms. Phillips.

19         I will note, however, that all this stuff that she

20 did required a heck of a lot of money.  You got to pay every

21 time you file something at the CCRD and it's not cheap but I

22 think it's something like $40 a page or at least for the

23 first page and of course all the mailings that she did,

24 registered mail and the like.  I don't know where her source

25 of income comes from today but I do note that apparently she

1  has a nice place where she lives and she has been able to

2  afford to file a heck of a lot of stuff and mail a heck of a

3  lot of stuff in this case.

4          THE COURT:  Thank you.  Ms. Solomon?

5          MS. SOLOMON:  I'll start at the end since we're

6  talking about ability to pay a fine.  We would ask that the

7  fine be waived.  Clearly, the Court is contemplating a

8  lengthy term of imprisonment.  And according to the

9  Presentence Report, she currently has outstanding debts.  She

10  has no current ability to pay even if she was given a

11  sentence of probation.  Obviously, she worked as a real

12  estate agent and an insurance broker and both of those means

13  of employment will be cut off from her because of her felony

14  conviction.  Her ability to -- if the Court were to release

15  her or to sentence her to probation, there would be

16  significant restrictions on her.  Clearly house arrest or

17  home confinement and her ability to pay a fine, even a

18  minimal fine, even the thousand-dollar assessment, special

19  assessment in this case is significant.  And frankly, I don't

20  even know whether if this Court were to sentence her to a

21  significant period of incarceration or any period of

22  incarceration how she could keep her house and who would be

23  paying for it to be maintained during the course of her

24  probation or during her sentence.

25          THE COURT:  With respect to a fine under 5E1.2(a), I

1   must impose a fine in all cases except where the defendant

2   establishes that he's unable to pay and is not likely to

3   become able to pay a fine.  So it's the defendant's burden to

4   show they don't have the financial means to pay a fine.  In

5   this case, I know of debts that Probation was able to find

6   but I know nothing about income or assets.  How do you meet

7   your burden in this case then?

8          MS. SOLOMON:  I think there's no evidence to show

9   that she is able to pay.  I think that the fact that there

10  are these debts which are significant is -- and we know,

11  there's the house which was purchased.  In the report, it

12  said it was purchased for $278,000.  However, the debts

13  exceed the purchase value.

14         THE COURT:  I'm willing to concede that based upon

15  Probation's handywork, she has a negative cash flow.  But

16  what about assets, we know nothing about assets.  She didn't

17  cooperate in the PSR which again is her right under the Fifth

18  Amendment.  I don't take issue with that.  But when she

19  doesn't cooperate and tell me about assets, how does she then

20  meet her burden that establishes she's unable to pay?

21         MS. SOLOMON:  Realistically, your Honor, in light of

22  a significant period of incarceration, is that ever really an

23  issue for an individual who has significant debts, faces

24  significant periods of incarceration?  I would hate for yet

25  another incredible financial burden to be imposed which is

1  never met and everyone knows --

2         THE COURT:  That sounds like the liens that were

3  impressed on the victims in this case.

4         MS. SOLOMON:  Well, however, $12,115 to $112,500

5  would be recognized as a realistic possibility of a debt.

6  The hundred billion dollar liens are certainly beyond that.

7         When we get to that question, you know, I wonder if

8  someone was truly trying to harm me and they tried to break

9  into my bank account, would they do it by seeking a hundred

10 billion dollars out of my bank account when of course they

11 would get nothing or would they do it more stealthily by

12 taking out small amounts of money at a time which is what the

13 fraudsters do when they get access to an account, they take a

14 small amount out, you know, a hundred dollars, a thousand

15 dollars to see whether or not it's noticed; and if it's not

16 noticed, then they go in for the larger amount.  You

17 certainly don't start with the one quantity that can't

18 possibly be met by any individual and then say I'm intending

19 to do maximum amount of damage because my reaction to that is

20 I'm intending to make a big, loud statement here that I think

21 is as ridiculous as I think the prosecution against my

22 brother is.

23         Now whether that's the right response in either

24 side, whether she thought the prosecution against her brother

25 was ridiculous or she thought the filing of a ridiculous lien

1   was appropriate, I think that's beyond the point.  But the

2   point is, I don't think when you look at a hundred billion

3   dollars you can equate I'm intending to do maximum damage

4   because obviously she knows that could never be met.  On the

5   other hand, a fine I think we also know can never be met by

6   Ms. Phillips.

7           THE COURT:  Do we know that, though?  She didn't

8   sign any information or releases so that Probation could run

9   a credit report.

10          MS. SOLOMON:  I think in the Court's experience,

11  which is extensive, that the Court could take judicial notice

12  without specific information from the defendant about her

13  assets.  There is no indication from the Probation Report

14  that she has any hidden assets, that she has any other

15  assets.

16          THE COURT:  What do you find if she doesn't tell

17  about them?

18          MS. SOLOMON:  Well, you can --

19          THE COURT:  As a practical matter, I can see the

20  chances of her being able to find within the guideline range

21  from a practical matter are probably nil but she might have a

22  pot of gold under some rainbow we don't know about.  I'd

23  like --

24          MS. SOLOMON:  From what source?

25          THE COURT:  I don't know because she didn't

1    cooperate.  The burden is on you to show her inability to

2    pay.  You can't show she's got three hundred and some

3    thousand dollars worth of debt and then come in and argue she

4    can't pay a fine because of the debt without telling me about

5    assets.

6         MS. SOLOMON:  Her assets are her car and her

7    house.

8         THE COURT:  You tell me that.

9         MS. SOLOMON:  It's in a Presentence Report.

10        THE COURT:  What about cash, what about IRAs, what

11   about savings?  We don't know.  So if I have to speculate,

12   should I speculate in favor of the defendant who doesn't

13   cooperate in the PSR and give us the information or do I

14   follow the guidelines which say it's her burden?

15        MS. SOLOMON:  It is apparent that she was appointed

16   counsel in this case because she had no ability to pay.

17        THE COURT:  Well, I got to tell you, that's the

18   standard but I've had cases where I've revoked individual's

19   pauper status when we found out there were assets.  Rare,

20   rare.

21        MS. SOLOMON:  There's no evidence in this case she

22   has hidden, undisclosed assets.  Certainly if the government

23   believed that she had these assets -- they've done full

24   investigations of her.  She has been under investigation by

25   the FBI for an incredibly long period of time.  There is no

1   indication from the record that there's any assets out there,

2   that she's hidden any assets, that she's going to go out and

3   live the Life of Riley.  I think that she comes from middle

4   class background.  She's lived a middle class life.  There's

5   no indication that she's in any way en massed, you know, huge

6   amounts of money.  There's nothing to indicate from her

7   demeanor in court that she was -- flashily had money that she

8   could spend and I think the Court could waive the imposition

9   of a fine in this case because there is -- she currently

10  doesn't have the ability to pay a fine and it's unlikely in

11  the future when and if she's released from prison that she

12  will have that ability.  It would harm her child, it would

13  harm her family, and I think it would be inappropriate in

14  this case.

15          THE COURT:  Well, I think certainly her future

16  ability to pay is in question.  My understanding is that her

17  insurance license has lapsed because of time and she's

18  unlikely to get it renewed based upon this felony conviction

19  so I'm willing to accept that.

20          Okay.  The rest of your argument, please?

21          MS. SOLOMON:  When I was listening to the

22  government, I thought it was really interesting that some of

23  the language he used in terms of agents or officials

24  shouldn't have to, you know, be looking over their shoulders

25  or thinking about who is behind them or who is potentially

1   out there to harm them and that this interferes with their

2   ability to do their job and that's absolutely true.  There's

3   no question about that, that that is true.

4          The Court system, the investigators are only one

5   part of the justice system so we also have to look at it from

6   the potential other view and the same -- I just was struck by

7   the fact that the same could be said for young men walking

8   down the street shouldn't have to look over their shoulders

9   to see if there's a police officer who is going to shoot them

10  if they move the wrong way.  So there's two very different

11  ways that we can look at the criminal justice -- at the

12  justice system and what justice means in America and who --

13  what it means to whom.  And I know that this is not a case

14  where that kind of activity was involved; but in light of

15  current events and in light of current inequality in America

16  which has existed in America since the beginning of time, I

17  just can't say that everyone looks at the justice system as

18  being just.  And I'm not saying any more than I would justify

19  a police officer shooting an unarmed African American man

20  walking down the street, I would not say that that person is

21  justified any more than I would say that someone like

22  Ms. Phillips is justified in filing these ridiculous liens.

23         At the same time, these two things are going on at

24  the same time and we have to ask why.  And if we have a

25  movement of people wrongheaded, and I believe there's an

1  individual in this courtroom who is part of that movement who

2  has been an advisor to Ms. Phillips, he is going to hear this

3  Court's sentence, he is going to hear what the Court has to

4  say, what the prosecutor has to say and he's going to know

5  exactly what happened in this courtroom and the question is,

6  is that going to change what's going to happen with this

7  particular movement or is it going to change what's happening

8  from the perspective of other people who are also engaged in

9  conduct that some people see as unjust and many of us can

10 agree is unjust.  And so when we talk about deterrence, we

11 have to look at the whole system of justice and whether or

12 not it's fair or the perception is fair as part of the mix

13 when we decide what is going to deter.

14          Now from my perspective, if you look at this

15 ideology and its success, has there ever been a case where

16 this ideology has run and an individual has walked out of the

17 courtroom free?  Absolutely not.  Every single case, every

18 defendant who has raised this kind of defense or espouse this

19 ideology ends up in prison.  In Ms. Phillips' own case, her

20 brother went to prison, her mother went to prison, her father

21 went to prison and now she's marching down the same line and

22 it had no deterrent value whatsoever.  They all had prison

23 terms.  They all had lengthy prison terms.  It wasn't

24 specifically deterrent and it wasn't generally deterrent and

25 the question is why.

1        It's not that Ms. Phillips has something wrong with

2   her, or perhaps she does.  We had a psychological examination

3   of her and she, because of her psychological background and

4   her profile, may be particularly vulnerable to this kind of

5   ideology, to this kind of tunnel vision because of her

6   schizo-type of personality.  But nonetheless, it's attractive

7   to a lot of people.  She got this ideology from other

8   individuals who also went to prison espousing it.  The fact

9   that people go to prison on the basis of this ideology has no

10  deterrent effect whatsoever.  As a matter of fact, it is

11  inflamed through the halls of the prisons.  That's how it's

12  transferred.  The prisons are rampant with this ideology.

13  That's why people come into court, in Federal Court with

14  handwritten statements espousing the same language.  They

15  don't have access to computers.  They're not out on the

16  street.  They're getting it within the prisons and there's

17  resentment against being confined, resentments against what's

18  perceived as the inequality of the criminal justice system

19  that fuels this.

20        So the question is, can we really solve this problem

21  through incarceration?  Can we solve it through specific

22  incarceration of Ms. Phillips through the general deterrence

23  of effect of having her incarcerated for a long period of

24  time?  And I think to a certain extent Mr. Stump is correct,

25  that there are two different people that we're talking about.

1    There is the Cherron Phillips, the wonderful mother,

2    wonderful daughter, dedicated family member, all of those

3    things, educated woman, highly motivated, driven, successful

4    person.  And then we have the person who espouses the

5    ideology of the Moorish Science Temple.

6           And I really -- I have not been able to understand

7    it.  Ms. Phillips, you know, cannot explain it.  She doesn't

8    want to explain it.  She barely talks to me.  She does not

9    want a lawyer.  She wants to stand before this Court and

10   espouse this failed ideology and there's -- I really have

11   no -- I've been trying to understand it.  And so I talked to

12   her father, I had a conversation with him and for him it's a

13   religion and I was shocked by that because religion is so

14   much deeper than some kind of political -- political

15   affiliation can be very strong too but religion goes really

16   deep and it's a religion that goes deep to roots of

17   empowerment.  And the question is how can people espouse what

18   appears to be so ridiculous and how powerless do they feel in

19   the face of the overwhelming power of the federal government,

20   the overwhelming power of federal judges and chief judges and

21   this whole machine or -- as I was told when I first

22   started -- the only train that works, it always goes forward,

23   that they would have to go to this ideology that is not

24   sensical at best and at its worse is violence.  And there's

25   this sense that it's attractive because of whatever strength

1    it gives people to get through.  And for Ms. Phillips, I
2    don't know why, she fell for it.  I really don't.  And none
3    of her family members know.

4         Her son noticed the marked change in her.  He was in
5    college when it happened; and I have to say, it's a sad day
6    for Ms. Phillips.  It was a sad day when she came upon this
7    and it was a very, very sad day for her entire family when
8    Devon was arrested and prosecuted.  And I have nothing to say
9    about whether or not that was legitimate.  I know nothing
10   about that case but we always talk about impacts on families
11   when we talk about sentencings.

12        We have an individual before the Court and we say
13   this will impact -- have this or that impact on the family.
14   Well, in this case, we have the real example of what that
15   impact was and it was a complete falling apart of a family
16   because of this criminal prosecution.  There's nothing about
17   this family up until the time that Devon was arrested that
18   says four members of the family were going to end up in
19   federal prison; nothing.  They're hard working.  They're
20   dedicated.  They're loving, supportive.

21        The first thing that Wayne Phillips said when I told
22   him I was Cherron's lawyer, he said, you know, I love my
23   daughter and my daughter loves -- is a very loving, kind
24   person.  This is someone who has just come out of federal
25   prison.  This is someone -- I've met Devon.  Devon -- of

1  course, you know, in a criminal case everyone is built up to

2  be a monster because that's how we convict them.  Devon is a

3  mild mannered, kind person.  I've met Josh Anderson, her son.

4  He's a very kind person.  I've met her young son.  He's a

5  very lovely young little child.  And then you have these four

6  family members who espouse this ridiculous philosophy who are

7  all going to prison.

8         The bottom line is what is the appropriate sentence

9  in this case.  I don't think it's an easy case.  I don't

10  think that Ms. Phillips is an easy person to categorize.  We

11  can put her into the category of the paper terrorist if that

12  makes it easier to sentence her but I don't think that gives

13  us her whole picture.  I don't think it stops this ideology.

14  And to be honest, I have no idea whether or not it will stop

15  her from believing in this ideology.  What if she sits in

16  prison and the only thing she thinks about for the next

17  whatever number of years is this ideology?  Is that ridding

18  her of it or is that more deeply rooting it into her very

19  being?

20         And the question is, what is the most effective

21  sentence for Ms. Phillips to personally deter her, to

22  generally deter, to protect the public, to help her because I

23  think as Ms. Hiner said, her aunt, she needs help.  Whether

24  or not she can get that help, I don't know, but I do believe

25  she needs help.  I believe that a long prison term with no

1   ability to rehabilitate within the prison system will be

2   extremely detrimental to her and will not in any way benefit

3   society.

4          So I would say that if a prison term -- if this

5   Court believes a prison term is appropriate, that it should

6   be a short prison term.  I think that there are conditions of

7   probation that could be put together to monitor her.  I think

8   therapy would be particularly important for her.  I think

9   that house arrest, home confinement.  And there's always the

10  threat that if she can't abide by the rules of Probation or

11  supervised release -- as with supervised release that this

12  Court always has the power to put her in prison.  Any

13  violation could put her there and that's the test of whether

14  or not there is a deterrent value in a federal sentence is

15  whether that threat -- because if that threat doesn't work,

16  how do we know it will work after she's released after a

17  lengthy prison term if there's no fear of going to prison,

18  then prison is not a deterrent.

19         And so I would request that this Court really look

20  at Ms. Phillips, River Tali Bey, as the whole person and

21  looking at the whole person and her family and her support

22  and give her the opportunity to get away from this ideology

23  and I don't think a lengthy prison term will accomplish that

24  end so thank you.

25         THE COURT:  Thank you.

1          Ms. Phillips, it's your turn to talk.  This is
2    called your right of allocution.  You're free to tell me
3    anything you want at this juncture.  Would you like to make a
4    statement?

5          THE DEFENDANT:  Yes.  I would.

6          THE COURT:  Okay.  Go ahead.

7          THE DEFENDANT:  For the record -- excuse me.  For
8    the record, I do not consent to the adjudication process
9    today.  Each court officer here has oathed themselves to the
10   Constitution of the United States at 5 U.S.C. 3331 and 28
11   U.S.C. 453.  I feel that the issues of law has not been
12   addressed in this court and that the jurisdictional -- person
13   of jurisdiction or the legal relationship between the
14   plaintiff and the accused was not established.  Without the
15   source of the legal relationship or the source of the law,
16   the obligation and the duties to the plaintiffs were not due.

17          The court officers here has acted -- excuse me.
18   The court officers here have acted in violations of oaths for
19   crimes of violence and capital punishment and drug offenses
20   with a maximum imprisonment of ten years or more.  Congress
21   directs the Court to detain the defendant for pending appeal.
22   On June 18th, the court officer imposed a legislative act
23   prescribing punishment without trial.  I was sentenced to
24   imprisonment on a charge not found by the indictment.  The
25   Court became the accuser and the trier imposing a sentence

1  without a jury creating an unlawful bill of attainder making

2  the Court a star chamber.

3       The category of the charged offense in the

4  indictment did not authorize a detention hearing by the court

5  officer as it was not a crime of violence, a capital offense,

6  or drug offense.  The statement of reasons given by the Court

7  did not evidence the charged conduct as the reason for

8  imprisonment.

9       This Court charged new behavior not contained in the

10 indictment which would have had to be answered and made

11 findings for a sentence.  That illegal process denied the

12 accused due process protections by the Fifth and Sixth

13 Amendment because the Court became the charging party denying

14 the jury provisions of the Sixth Amendment and imposing a

15 penalty.  The imprisonment sentence with no charge is

16 separate and outside of the claims of the indictment, void

17 from issuance and absent the statute authorizing such as a

18 penalty.

19      Unconstitutional application of the United States

20 Codes denies the accused protections of law required to be

21 provided by the United States in its own statements.  This

22 Court -- I'm sorry.  Unauthorized punishment is not

23 recognized by Congress or the Constitution and this case

24 herein charged by the indictment.  For the Court to impose

25 two penalties and the impairment of liberty essentially for

1    the same offense would be considered double jeopardy.

2    Wherefore, I do not consent to the proceedings.

3          There was no relationship between the plaintiff and

4    the defendant -- I'm sorry, the plaintiff and the accused on

5    the record and there could be no additional sentence as

6    unauthorized punishment is not recognized by Congress or the

7    Constitution.

8          THE COURT:  Anything else?

9          THE DEFENDANT:  No.  That's it.

10         THE COURT:  Okay.  Counsel, let's look at Document

11   201, the notice regarding the imposition of the potential

12   terms and conditions of supervised release and we'll start

13   there.

14         Are there any objections to the mandatory conditions

15   that I have suggested?  I do question whether or not the drug

16   testing condition could be suspended in this case or not.

17         MS. SOLOMON:  I believe it could, your Honor.

18   There's no evidence there was such a drug use in the past.

19         THE COURT:  Mr. Stump?

20         MR. STUMP:  I agree, your Honor.

21         THE COURT:  Okay.  So I'm going to strike number

22   three as a potential term and condition.  Do you have any

23   objections to any of the terms and conditions on Page 1,

24   government?

25         MR. STUMP:  No, your Honor.

1          THE COURT:  Defense?

2          MS. SOLOMON:  No, your Honor.

3          THE COURT:  Okay.  Let's go to Page 2.  Any

4   objection by the government to any of those terms or

5   conditions?

6          MR. STUMP:  No, your Honor.

7          THE COURT:  That's six through 21.  I did not check

8   seven and eight.  Ms. Solomon?

9          MS. SOLOMON:  No, Judge.

10         THE COURT:  Okay.  There are none.

11         Page 3, I did not check mental health treatment or

12  cognitive behavior evaluation and treatment.  But from your

13  argument, Ms. Solomon, I'm questioning whether or not you

14  would like me to consider that.

15         MS. SOLOMON:  I would, your Honor.

16         THE COURT:  Government?

17         MR. STUMP:  That's fine, your Honor.

18         THE COURT:  Okay.  I think Paragraph 25 would be

19  appropriate.  Cognitive behavioral evaluation and treatment

20  so I'll include that.

21         On Page 4, Paragraph 35, requires the defendant

22  cooperate with Probation -- or with the Financial Litigation

23  Unit of the U.S. Attorney's Office.  This condition is

24  checked because there's a mandatory special assessment and

25  this will assist the government in collecting that.

1      Any objection to that, Mr. Stump?

2      MR. STUMP:  No, your Honor.

3      THE COURT:  Ms. Solomon?

4      MS. SOLOMON:  No, your Honor.

5      THE COURT:  All right.  Page 5, I have Paragraph 37,

6  which is that she apply any moneys from income tax refunds,

7  lottery winnings, et cetera, to outstanding financial

8  obligations.  Any objection by the government?

9      MR. STUMP:  No, sir.

10      THE COURT:  Defense counsel?

11      MS. SOLOMON:  No, Judge.

12      THE COURT:  Okay.  On Page 6, I had checked but for

13  some reason it did not show up on the docket Paragraph 44

14  which is a general search or cyber search monitoring and the

15  reason I think that's appropriate in this case is two-fold.

16  First of all, there was a weapon found during the search of

17  the house and she did not have the appropriate documentation.

18  That is, her FOID card I think had been expired.

19      Secondly, I believe that the liens in this case were

20  in all likelihood created by use of a word processor and a

21  computer and therefore I think this is an appropriate

22  condition.

23      Any objection on behalf of the government?

24      MR. STUMP:  No, your Honor.

25      THE COURT:  Ms. Solomon?

1     MS. SOLOMON:  Your Honor, I know on behalf of

2  Ms. Phillips she would object to the cyber search.

3     THE COURT:  Okay.  I'm going to include it over

4  objection.  I think that her crime is committed with

5  computers and therefore I think a cyber search condition

6  allowing the probation office at a reasonable time and in a

7  reasonable manner to conduct such a search as indicated in

8  Paragraph 44.

9     In addition, there was a weapon found that she did

10  not have the correct documentation to possess when the search

11  warrant was issued so I think this is an appropriate search

12  condition.

13     Next over on Page 8, I alerted you all to Paragraphs

14  52 through 54 but again for some reason the checkmarks didn't

15  show up.  The first is that she cooperate in the preparation,

16  execution and filing of all documents necessary to remove any

17  liens or encumbrances she has filed or assisted in filing

18  against any victim in the case including Andre Thompson and

19  Noel Sanchez.

20     Any objection by the government?

21     MR. STUMP:  No, your Honor.

22     THE COURT:  By defense?

23     MS. SOLOMON:  No, Judge.

24     THE COURT:  Okay.  52 will be imposed then.

25     53, I included a restitution issue as follows.

1    Defendant shall pay restitution to any victim including Andre

2    Thompson and Noel Sanchez for expenses incurred in clearing

3    liens or encumbrances she has filed or assisted in filing

4    against them.

5           Government's position on that?

6           MR. STUMP:  No objection, your Honor.

7           THE COURT:  Ms. Solomon?

8           MS. SOLOMON:  No objection.

9           THE COURT:  Okay.  And 54, that she shall not file

10   any claims, liens, encumbrances, choses in action or lawsuit

11   without first obtaining leave of Court to do so.

12          Any objection by the government?

13          MR. STUMP:  None, your Honor.

14          THE COURT:  By the defense?

15          MS. SOLOMON:  No, Judge.

16          THE COURT:  Does the government request any

17   explanation for the reasons for any of these potential terms

18   and conditions?

19          MR. STUMP:  No, sir.

20          THE COURT:  Or the defense?

21          MS. SOLOMON:  No, Judge.

22          THE COURT:  Okay.  I'm going to impose a term of

23   three years of supervised release in this case on each of

24   Counts 1 through 5, 7 and 8 and 10 through 12 to run

25   concurrently and not consecutively.  I think the longest term

1   of supervised release is appropriate in this case because of

2   reasons I will articulate later.  Mainly, the defendant's

3   likelihood of recidivism.  Also, that will give us enough

4   time to monitor her and make sure that she meets her

5   financial obligations.

6        In terms of a fine, while I don't think she's met

7   her burden to overcome the presumption that she should pay a

8   fine, I recognize that she has family obligations including a

9   five year old.  I recognize that she will likely not be able

10  to renew her license to sell insurance and I recognize all

11  the other collateral consequences all of which are negative

12  associated with a felony conviction so I'm going to impose a

13  fine of $1,000 departing downward from $12,500.  That fine,

14  along with a $1,000 special assessment which is $100 per

15  count, is due and payable immediately.  If she can't pay

16  immediately, whatever balance remains will become a condition

17  of supervised release.  She will pay beginning 30 days after

18  supervision begins at the rate of $100 per month or ten

19  percent of her net monthly income, whichever is greater,

20  until the fine and administrative fee are paid in full.

21        I'm now going to discuss the 3553 factors in this

22  case.  I'm quoting by reference my filing again in my

23  sentencing memorandum Document 202 with respect to the

24  guideline calculations and I do, as I indicated earlier,

25  think that there are aggravating factors here such as the

1    status of the victims in this case, the acquitted conduct and

2    the obstruction of justice.  The most serious of those, I

3    think, in terms of the sentence in this case for aggravating

4    factors consideration is acquitted conduct.  Second would be

5    the obstruction of justice which would be the filing of

6    the -- actually the serving of the lawsuits against myself

7    and Assistant U.S. Attorney Stump.  And then lastly, the

8    status or the role of the victims in this case which is not

9    adequately considered by the guidelines.

10            As is my habit at the conclusion, I'm going to ask

11   either side if you want me to expand on one or more of the

12   factors under 3553.  Just ask and I'll be happy to do that.

13   Otherwise, I'm going to presume that my explanation is

14   factually and legally correct and sufficient for meaningful

15   appellate review.

16            In this case with respect to the nature and

17   circumstances of the offense, this was a planned, deliberate,

18   and orchestrated series of actions on behalf of the

19   defendant.  It was not a spur-of-the-moment single incident

20   but, rather, a series of events against 12 individuals with

21   significant document preparation and it was designed in my

22   view to influence, harass, annoy or intimidate the victims.

23   It was broad-based.  It included individuals from Third

24   Branch -- that is, the Judiciary who had varying levels of

25   responsibility -- the Chief Judge, the District Judge,

1    Magistrate Judge and the Clerk of the Court.  It included the

2    Executive Branch at varying levels including the United

3    States Attorney, the prosecuting attorney, a DEA agent and

4    four task force agents employed by non-federal law

5    enforcement agencies put on loan are part of a collaborative

6    federal, state, county task force.

7            There's a May 2014 American Bar Association article

8    by Lorelei Laird which cites the *Phillips* case and describes

9    her case as paper terrorism.  The FBI considers sovereign

10   citizen extremists as compromising a terrorist movement.  The

11   actions of Ms. Phillips certainly don't rise to the level of

12   what the FBI considers as an extremist, including Terry

13   Nichols who helped planned the Oklahoma City bombing, but

14   clearly her actions were designed to disrupt the actions of

15   the officials in this case.  She plastered federal officers

16   with bogus liens that were clearly formulated to influence,

17   harass, annoy, or intimidate them and in doing so to a

18   limited extent disrupted their usual and customary duties as

19   they confronted and dealt with these liens.  Her actions are

20   aptly described as death by paper -- a thousand paper cuts.

21   The sole purpose of doing this was to create havoc.  There is

22   no legitimate purpose that can be proffered for her actions.

23           In terms of the history and characteristics of the

24   defendant, Probation has done an admirable job cobbling

25   together information about her.  I accept the information

1    filed by defense counsel, the sentencing memorandum regarding

2    the defendant and her background.  Clearly she, according to

3    the reports and my conversations with her -- I did have a

4    chance to speak to her off the record at the final pretrial,

5    she's very articulate.  The psychological reports describe

6    her as being above normal intelligence.  I, however, sentence

7    the entire Cherron Marie Phillips; not just the one who comes

8    to the Court as a good daughter or good mother, one who

9    taught math and one who had very positive aspects, one who

10   was intelligent, one who had insurance licenses.  I also

11   sentence the individual who committed multiple federal

12   crimes.

13          In mitigation, she did write apology letters to five

14   of the 12 victims but then she continued on her rant with the

15   lawsuit against me and Assistant U.S. Attorney Stump and to

16   this date persists in the baseless notion that the Court

17   lacks jurisdiction over her and that this is some type of a

18   star chamber because I detained her at the conclusion of her

19   trial.  Interestingly, she did not ask me to reconsider that

20   or ask for a detention hearing.

21          The sentence must reflect the seriousness of the

22   offense.  Society cannot tolerate attempted or actual

23   harassment, intimidation, or attempts to improperly influence

24   its public officials.  The liens impressed will likely remain

25   impressed on the titles of victims forever and will cause

1   problems -- possibly cause problems buying or selling real

2   estate or personalty and may well affect their credit.  I

3   don't know.  We'll discuss what to do about those liens when

4   we discuss the government's motion in this case.

5          The sentence must promote respect for the law.  I

6   have no confidence that any sentence I impose today is going

7   to cause any follower of the Moorish Science Temple or the

8   Sovereign Citizen movement to respect the law.  Instead, this

9   sentence will reaffirm respect for the law by law-abiding

10  citizens.

11         The sentence must afford adequate deference to

12  criminal conduct and protect the public from further crimes

13  of the defendant.  In my view, the sentence in this case is

14  driven by deterrence -- that is, individual deterrence -- by

15  punishment and by preventing the defendant from committing

16  other crimes.  There are two types of deterrence.  I agree

17  with the defense counsel.  Any sentence I impose today is not

18  going to deter those who are bent on this frolic and detour

19  of claiming that the laws simply don't apply to them.  Their

20  argument is disingenuous.  They want a smorgasbord of laws

21  where they can pick and choose which ones apply to them and

22  reject others.  So when their house is on fire, they'll call

23  the fire department.  When they want to get somewhere,

24  they'll use the public roads.  But yet, when they have

25  obligations under the law, they attempt to shun that and that

1    kind of inconsistency simply doesn't pass muster.

2            There is, however, individual deterrence and that is

3    deterring Cherron Marie Phillips in the future and I think

4    it's important that that needs to be done because clearly as

5    recent as her allocution here today, she simply doesn't get

6    it.  Consequently, a sentence of imprisonment will deter her

7    by basically incapacitating her from committing further

8    crimes.

9            She continues to file frivolous and misguided

10   documents including multiple interlocutory appeals and

11   lawsuits.  Additionally, the sentence must provide adequate

12   punishment for the offense.  Indeed, the history of the

13   legislation in this case is that the purpose of the statute

14   was to provide punishment.

15           In terms of providing the defendant with needed

16   educational training, vocational training or medical care,

17   from what I know about her from the filings of defense

18   counsel and the Presentence Report, she has no health issues,

19   she doesn't require any vocational training or medical care

20   or correctional treatment.

21           In terms of the kinds of sentences available, the

22   potential sentence is anywhere from probation to 100 years of

23   incarceration.  That would be ten years per count running

24   consecutive.  I can include varying combinations including

25   home detention, home incarceration, probation, a term of

1    incarceration followed by a term of supervised release.

2         There are aggravating factors in this case which I

3    think are important.  As I indicated, the acquitted conduct

4    in this case I think has been proven by a preponderance of

5    the evidence that the two not-guilty verdicts were proven by

6    a preponderance of the evidence and were really the product

7    of juror confusion perhaps based upon an incomplete set of

8    instructions with respect to timing.  Although, I think the

9    instructions as a whole were certainly clear enough.

10        Second, the obstruction of justice.  That is, the

11   serving of lawsuits upon me and the Assistant U.S. Attorney

12   in a close temporal relationship with the final pretrial.

13   That is, two days later.  And lastly, and very minimally, the

14   role of the victims in this case.  And there, I'm talking

15   about Chief Judge Holderman, the Clerk of the Court and

16   United States Attorney Fitzgerald.

17        I must also try to avoid unwarranted sentencing

18   disparities among defendants found guilty of similar conduct

19   with similar backgrounds.  One of the reasons I wrote the

20   sentencing memorandum in this case is because I was

21   unfamiliar with this particular crime.  It's the first one

22   I've handled under this particular portion of the statute and

23   as I did research I felt important to reduce that to writing

24   and place the parties on notice of that which I had looked at

25   outside of the record.

1        I have had other cases involving individuals who are

2   claimed sovereign citizens.  *United States versus Hassebrock*,

3   *United States versus Marcotte*, and *United States versus*

4   *James*.  Both *Hassebrock* and *James* are published opinions.  In

5   both of those cases, I did impose guideline sentences.  In

6   *Hassebrock*, Mr. Hassebrock chose fit to not pay his taxes.

7   Mr. James felt that because he was a Moor, the laws of the

8   country didn't apply to him and therefore the marijuana

9   distribution laws did not apply to him.  Mr. Marcotte has not

10  been sentenced.  He was tried in March -- or May, found

11  guilty, didn't show up for sentencing and absconded.  He

12  recently turned himself in and he is going to be sentenced

13  after the new charges against him are disposed of.

14        And in addition, there is one case that's reported

15  under this particular statute under which Ms. Phillips was

16  convicted and that's the *Petersen* case that I cited in my

17  filings.

18        After considering all the factors in 18 U.S.C. 3553,

19  I believe an appropriate sentence in this case that is no

20  greater than necessary to meet the goals and purposes of

21  sentencing in Federal Court bearing in mind that the United

22  States Sentencing Guidelines are advisory is a sentence of 84

23  months.  That is a significant sentence, I recognize that,

24  but I think a sentence any less than that will not send a

25  message to this defendant, will not provide adequate

1    punishment, will not deter her and will not meet the goals

2    and purposes of sentencing in court.

3          Ms. Phillips, you have a right to appeal this

4    sentence and conviction in this case if you want to do so.

5    Any appeal has to be filed within 14 days of me entering

6    judgment in your case or your rights of appeal are gone

7    forever.  If you can't afford an attorney to handle the

8    appeal, I'll appoint one to represent you.  Ms. Solomon will

9    continue unless and until relieved by the Court of Appeals.

10   The filing and docketing fee for an appeal is $505.  If you

11   can't afford that, I'll waive that fee.  I'll also have the

12   court reporter prepare all of the transcript of proceedings

13   in your case so the Court of Appeals has a complete record of

14   everything that has occurred here at this level.

15         Do understand your rights of appeal?

16         THE DEFENDANT:  No.  You said that I have a right to

17   appeal and --

18         THE COURT:  Within 14 days of me entering judgment

19   in your case, okay, so you've got that deadline.  Secondly,

20   if you can't afford the filing and docketing fee, I'll waive

21   that so you can appeal for free.  And lastly, I'll have the

22   court reporter prepare the transcript at no charge if you

23   can't afford that fee and Ms. Solomon will continue to

24   represent you at no charge unless and until the Court of

25   Appeals relieves her so those are your four rights of appeal.

1       THE DEFENDANT:  She will continue to do -- what's
2  that?  Represent until -- what's that?
3       THE COURT:  She'll represent you on appeal unless
4  the Court of Appeals relieves her and appoints somebody
5  else.
6       THE DEFENDANT:  Okay.
7       THE COURT:  Do you understand all that?
8       THE DEFENDANT:  Yes.
9       THE COURT:  Okay.  I think the next order of
10 business then is a motion by the United States under the All
11 Writs Act.  It's at Document 205.  United States requests the
12 Court to enter an order expunging fraudulent liens.  More
13 specifically, they want a declaration that the liens are null
14 and void and shall not be afforded any legal effect.  And
15 lastly, they request an order stating that the liens are
16 released, withdrawn, and expunged from the record.
17      Mr. Stump?
18      MR. STUMP:  Yes, your Honor.  As I said, I talked to
19 Wendy Holderman at the Cook County Recorder of Deeds.  My
20 understanding is that this would potentially have some
21 benefit to the victims if an order such as this were filed.
22 I did my research.  I could not find a case directly on point
23 or even somewhat analogous but I do see that under the All
24 Writs Act, the Seventh Circuit and the Supreme Court have
25 recognized that the Court has the power to issue commands as

1    may be necessary or appropriate to effectuate and prevent the

2    frustration of orders it has previously issued in its

3    exercise of jurisdiction otherwise obtained.

4          This Court clearly has jurisdiction over this

5    proceeding.  This order that we're asking for would be under

6    that exercise of jurisdiction and not some separate exercise

7    under the All Writs Act but we do believe that the Court has

8    the power and the means under the All Writs Act to issue such

9    an order and we ask that it be issued.  And also, that the

10   Court require that the order be recorded at the Cook County

11   Recorder of Deeds' Office as well as a certified copy of the

12   final judgment in this case.

13         THE COURT:  So you're kind of asking for a writ of

14   mandamus against the Recorder of Deeds Office to require them

15   to do something?

16         MR. STUMP:  Well, what I asked, Judge, is really not

17   for them to be required to do something as much as it is for

18   my office to be required to record both an order that we

19   proposed and the final judgment at this CCRD.  The CCRD will

20   not -- they don't have any sort of mechanism by which they

21   will refuse such a filing as long as it meets their basic

22   criteria which of course will do but I don't think -- in

23   other words, I don't think the Court is going to be ordering

24   them to do anything as much as it is ordering my office to

25   take action.

1        THE COURT:  Well, your request asks me to order them

2  to expunge the liens.  I don't think I have jurisdiction to

3  do that.

4        MR. STUMP:  Well, your Honor, I ask merely that it

5  be a declaration that you, your Honor, finding that the liens

6  are expunged.  I don't know if that --

7        THE COURT:  I think I can do that; no problem.

8        MR. STUMP:  I don't know if that language will have

9  any effect.

10        THE COURT:  I don't think there's any question but I

11  can enter an order that the liens are false, null, and void

12  and without legal effect.

13        Why don't you send me a proposed order with a copy

14  to defense counsel and I'll consider it?  I'm happy to do

15  that and I think that's a good first step.  I don't think I

16  have the jurisdiction to require them to expunge.  I think

17  what you have to do is take the order that I enter here, file

18  it in state court and then the state court authorities file

19  it with the Recorder of Deeds.  I don't think I can do it

20  directly but I'm happy to look at anything that you propose.

21        MR. STUMP:  Yes, your Honor.  And, you know, I did

22  submit a proposed order already to your Proposed Order box.

23        THE COURT:  Oh, okay.  It didn't get to me I can

24  tell you that.

25        MR. STUMP:  Okay.  I have a hard copy here.

1          THE COURT:  Okay.  Sure.  So you sent it to my

2    prop --

3          MR. STUMP:  I did.

4          THE COURT:  Yeah.  We didn't get it.

5          MR. STUMP:  It was on Sunday or Monday.

6          THE COURT:  Okay.  I got filings up until 7:00

7    o'clock this morning so for some reason that didn't get to

8    me.

9          Have you seen this order, Ms. Solomon?

10          MS. SOLOMON:  Yes.  I have, Judge.

11          THE COURT:  Do you have any objection to it?

12          MS. SOLOMON:  I do not.

13          THE COURT:  It does ask -- it does have me order

14    expungement.  I'm willing to do this with the understanding

15    that there's a question about my authority to do it.  But

16    when I look at the policy behind the Recorder of Deeds

17    refusing to expunge anything -- as I recall the testimony,

18    once it's there, it's there forever -- I think then it ought

19    to be their burden to say why this shall ought not be

20    expunged whereas clearly the victims in this case were

21    innocent and it ought not be their burden to have to take

22    that issue up.  So I'm willing to sign it in its current form

23    and we'll see what the Courts of Appeal and/or the State of

24    Illinois does with it.

25          MR. STUMP:  Thank you, your Honor.

1        THE COURT:  I have one last thing; and then if
2   there's anything else, I'm happy to address it.
3        The sentence that I imposed in this case, I
4   recognize, is very lengthy.  I can tell you that absent the
5   United States Sentencing Guidelines, this would have been the
6   sentence and I don't say that with any regularity.  I know
7   some judges do it as a matter of habit.  I have probably made
8   that statement less than five times in my tenure on the
9   bench.  And, in fact, last week in a case entitled *U.S.*
10  *versus Tisa Vaughn*, I specifically said that had I not ruled
11  a certain way on an obstruction of justice, that the sentence
12  would have been two months less.  So I clearly don't as a
13  matter of practice say that this is a sentence irrespective
14  of my ruling on the guidelines or the very fact that the
15  guidelines exist.  But in this case, this would be the
16  sentence had there been no guidelines because I think
17  anything less than this does not meet the goals and purposes
18  of 18 U.S.C. 3553.
19        Is there anything else on behalf of the
20  government?
21        MR. STUMP:  No, your Honor.
22        THE COURT:  Anything else on behalf of the
23  defendant?
24        MS. SOLOMON:  Just a couple things, your Honor.
25        THE COURT:  Sure.

1       MS. SOLOMON:  Just for the record so I make sure

2  that it's clear that I object to the sentence based on the

3  aggravating factors so that is clear for the appellate record

4  in this case.  It's not clear to me whether or not we need to

5  make that objection after the sentence is imposed; but since

6  it's not clear, I want to lodge that objection.

7       THE COURT:  Sure.  And I can tell you in parsing the

8  sentence that the top of the guideline range was the 78

9  months and I added the six months because of the aggravating

10  factors.

11       MS. SOLOMON:  That's correct.  And then I also want

12  to clarify for the record that I will file the notice of

13  appeal for Ms. Phillips within the 14-day period and I'm also

14  seeking -- will be seeking leave to withdraw as counsel in

15  this matter in light of the history of the case and my

16  relationship to Ms. Phillips so I want to make that clear to

17  Ms. Phillips that that will be the case.

18       THE COURT:  Okay.

19       MS. SOLOMON:  Thank you.

20       THE DEFENDANT:  Your Honor?

21       THE COURT:  Yes, ma'am?

22       THE DEFENDANT:  Yes.  I understand that the

23  guidelines are only advisory --

24       THE COURT:  They are.

25       THE DEFENDANT:  -- and not to be taken completely

1   as -- they're only advisory based on the *Booker* case?

2          THE COURT:  Right.  My obligation is to accurately

3   calculate them and the starting point for Federal Court

4   sentencing is the guidelines but actually sentence under 18

5   U.S.C. 3553 which is what I did.

6          THE DEFENDANT:  Which is just the guidelines and

7   that the statutory -- that the -- I'm sorry, the statute

8   would take precedence over the guidelines?

9          THE COURT:  Yes.  Yes.  You were actually sentenced

10  under the statute with the guidelines as a starting point.

11         THE DEFENDANT:  Okay.  I guess I'm still confused

12  and so -- I'm still confused because I thought that -- well,

13  okay.  Okay.  Well, I have to talk about it.  I can't say

14  that I agree because --

15         THE COURT:  I understand.

16         THE DEFENDANT:  -- yeah, there's -- to my

17  understanding again, the guidelines were only advisory and

18  not statutory --

19         THE COURT:  Correct.

20         THE DEFENDANT:  -- but where the statute would take

21  precedence.

22         THE COURT:  Correct.  18 U.S.C. 3553 is the statute

23  under which you were sentenced but my obligation is to

24  accurately calculate the guidelines prior to considering the

25  statute.

1    THE DEFENDANT:  Say it again.  Your obligation is to
2    accurately?
3    THE COURT:  Accurately calculate the guideline range
4    prior to sentencing you under the statute.
5    THE DEFENDANT:  Okay.  I'd love to talk to Ms. --
6    THE COURT:  Ms. Solomon?
7    THE DEFENDANT:  -- Ms. Solomon for a second if I
8    could.
9    THE COURT:  Sure.
10    (Ms. Solomon and her client consulting.)
11    THE COURT:  Just so the record is clear also, that
12    sentence of 84 months is to run concurrent on each Counts 1
13    through 5, 7 through 8 and 10 through 12.  Okay.
14    Ms. Solomon, is there anything you wanted to say
15    after conferring with your client?
16    MS. SOLOMON:  I'm sorry.
17    THE COURT:  That's all right.
18    (Ms. Solomon and her client consulting.)
19    MS. SOLOMON:  Nothing further, Judge.
20    THE COURT:  Okay.  Nothing further from Ms. Phillips
21    either.  Okay.  Also, the supervised release runs concurrent
22    on each of those same counts.
23    Just one last thing, Ms. Solomon, I don't speak for
24    the Northern District of Illinois.  As you know, I don't sit
25    here.  But from my standpoint, you found yourself in the

1    unenviable position of representing by court appointment an

2    uncooperative and contestant client that was pursuing a

3    doomed defense against a resourceful opponent, the United

4    States, frankly for less money per hour than my auto mechanic

5    makes.  You did it admirably.  Thank you for your services.

6             Court is in recess.

7             MS. SOLOMON:  Thank you, Judge.

8             COURT SECURITY OFFICER:  All rise.

9        (Which concluded the proceedings in the above-entitled

10   matter.)

11                    C E R T I F I C A T E

12            I hereby certify that the foregoing is a transcript

13   of proceedings before the Honorable Michael J. Reagan on

14   October 14, 2014.

15

16   */s/Laura LaCien*
                                    December 1, 2014
17   _____              Date
     Laura LaCien
18   Official Court Reporter

19

20

21

22

23

24

25